© 1993 JULIUS BLUMBERG, INC.,
PUBLISHER, NYC 10013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company, | Index No.    05604128 Date purchased |

*Plaintiff(s)*

*against*

DEXIA, S.A., and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING CORP.,
S.A.),

*Defendant(s)*

Plaintiff(s) designate(s)
New York
County as the place of trial.

The basis of the venue is
Defendants' and Plaintiffs'
location

**Summons
with Notice**

Plaintiff(s) reside(s) at
767 Fifth Avenue
New York, NY 10153
County of
New York

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within    20    days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, November 21, 2005

Defendant's address: 445 Park Avenue,
New York, NY 10022

**F I L E D**

NOV 2 1 2005

NEW YORK
COUNTY CLERK'S OFFICE

Attorney(s) for Plaintiff

Office and Post Office Address
Steven B. Singer, Esq.
Avi Josefson, Esq.
Victoria O. Wilheim, Esq.
BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
1285 Avenue of the Americas, Floor 38
New York, NY 10019

**Notice:** The nature of this action is

COMMERCIAL - Other

The relief sought is  Monetary damages, interest, costs, fees and equitable relief.

Upon your failure to appear, judgment will be taken against you by default for the sum of $ 500,000,000.00 with interest from  May 20, 2000      xxx19xx    and the costs of this action.

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK, COUNTY OF _____ SS:  The undersigned, being duly sworn, deposes and says: deponent is not a party herein, is over 18 years of age and resides at _____

That on _____ at _____ M., at _____

deponent served the within summons, _____ on _____ defendant.

| | | |
|---|---|---|
| **INDIVIDUAL**<br>1. ☐ | by delivering a true copy *of each* to said defendant personally; deponent knew the person so served to be the person described as said defendant therein. | |
| **CORPORATION**<br>2. ☐ | a _____ corporation, by delivering thereat a true copy *of each* to _____ personally, deponent knew said corporation so served to be the corporation described in said summons as said defendant and knew said individual to be _____ thereof. | |
| **SUITABLE AGE PERSON**<br>3. ☐ | by delivering thereat a true copy *of each* to _____ a person of suitable age and discretion. Said premises is defendant's—actual place of business—dwelling place—usual place of abode—within the state. | |
| **AFFIXING TO DOOR, ETC.**<br>4. ☐ | by affixing a true copy *of each* to the door of said premises, which is defendant's—actual place of business—dwelling place—usual place of abode—within the state. Deponent was unable, with due diligence to find defendant or a person of suitable age and discretion thereat, having called there | |

**MAILING TO RESIDENCE USE WITH 3 OR 4**
5A. ☐
Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known residence, at _____ and deposited said envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4**
5B. ☐
Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class postpaid envelope properly addressed to defendant at defendant's actual place of business, at _____ in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the defendant.

**DESCRIPTION USE WITH 1, 2, OR 3**
☐

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☐ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features: _____

*Sworn to before me on* _____

Print name beneath signature. ................................................

LICENSE NO. ................................................

*Plaintiff(s)*

*against*

*Defendant(s)*

**Summons with Notice**
ACTION NOT BASED UPON A
CONSUMER CREDIT TRANSACTION

*Attorney(s) for Plaintiff(s)*

*Office, Post Office Address and Tel. No.*

*Index No.*

# SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

STONINGTON PARTNERS, INC., a Delaware
Corporation, STONINGTON CAPITAL
APPRECIATION 1994 FUND L.P., a Delaware
Partnership and STONINGTON HOLDINGS,
L.L.C., a Delaware limited liability company,

      Plaintiffs,

      v.

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING CORP.,
S.A.),

      Defendants.

Index No.

05601128

## COMPLAINT



FILED

NOV 21 2005

NEW YORK
COUNTY CLERKS

Plaintiffs Stonington Partners, Inc., Stonington Capital Appreciation 1994 Fund, L.P., and Stonington Holdings L.L.C. (collectively, "Stonington") hereby allege as follows:

## I.   PRELIMINARY STATEMENT

1.     This action arises out of the massive fraud that was perpetrated at Lernout & Hauspie Speech Products, N.V. ("L&H" or the "Company") and is related to another action brought by Stonington that is currently pending in Unites States District Court for the District of Massachusetts, entitled *Stonington Partners, Inc. et al. v. Dexia, S.A. et al.*, Civ. No. 04-10411 (PBS) (the "Federal Action"). The instant action is brought against DEXIA, S.A. ("Dexia S.A.") and DEXIA BANK BELGIUM ("Dexia Bank") (collectively, "Dexia") in response to Dexia Bank's announcement on November 11, 2005 that it is voluntarily liquidating its New York Branch, located at 445 Park Avenue, New York, NY.

2.     Specifically, in the Federal Action, which was filed on March 1, 2004, Stonington has asserted claims against Dexia arising under Section 10(b) of the Securities and Exchange Act of 1934, as well as common law claims of aiding and abetting fraud and conspiracy to commit fraud.  On February 9, 2005, the District Court (Saris, J.) denied Dexia's motion to dismiss the Exchange Act claims, and discovery in the Federal Action has been proceeding since that time. Dexia did not move to dismiss the common law claims Stonington asserted and, indeed, the District Court has explicitly recognized that "the allegations against Dexia describe a clear case of substantial participation in a manipulative scheme."

3.     After the District Court denied Dexia's motion to dismiss, Dexia asked the District Court to certify its decision for appeal to the United States Court of Appeals for the First Circuit, arguing that the Complaint only stated a claim for aiding and abetting fraud, which is not actionable under the Exchange Act pursuant to the Supreme Court's decision in <u>Central Bank of</u>

<u>Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994). The District Court certified its decision in July 2005 and, in October 2005, the First Circuit accepted that appeal. The First Circuit has not yet issued a briefing schedule or argument date for that appeal; accordingly, Stonington does not expect the First Circuit to render its decision until sometime in the Spring or Summer of 2006. In the event the First Circuit reverses the District Court's decision denying the motion to dismiss the Exchange Act claims, Dexia has stated that it will move to dismiss the common law claims Stonington has asserted for lack of personal jurisdiction, on the grounds that Dexia does not maintain a presence or conduct business in the Commonwealth of Massachusetts. If that motion were to be granted at a time when Dexia Bank has already liquidated and exited New York, Stonington would face the possibility of being left without a forum in which to assert its common law claims, which it has been prosecuting for nearly two years. Accordingly, Stonington is filing the instant action as a protective measure, in the event the First Circuit reverses the District Court's decision denying Defendants' motion to dismiss, and the District Court subsequently concludes that it lacks personal jurisdiction over Defendants..

4.    The instant action against Dexia is based on evidence demonstrating that Artesia Banking Corporation, S.A. ("Artesia"), which Dexia acquired in 2001, was a key participant in the fraud at L&H. In fact, on June 24, 2003, Dexia revealed that it had been indicted by the authorities in Belgium for actions taken by Artesia between 1998 and 2000 in connection with L&H.

5.    Until the fall of 2000, L&H successfully convinced the investment community that it was the market leader in the field of speech recognition software and related products. In 1998 and 1999, L&H reported "record" revenues and earnings, which were largely attributable to

lucrative, multi-million dollar contracts that L&H had entered into with so-called "strategic partners" and with customers in Korea and Singapore. L&H has now admitted that these "record" financial results were false. L&H's "strategic partners" were nothing more than shell corporations funded by entities related to L&H, and the Company's huge revenues from Asia were pure fiction. Many of L&H's customers did not even exist. As a result of this fraud, in May 2001, L&H announced that it would be restating $373 million, or nearly 70%, of its publicly reported revenues from January 1998 through June 2000.

6.     Perhaps the largest victim of this fraud was Stonington, which is a private equity firm located at 767 Fifth Avenue in New York City. On or about May 5, 2000, Stonington sold its 96% ownership interest in Dictaphone Corporation ("Dictaphone") to L&H in exchange for approximately $490 million in L&H stock (the "Dictaphone Transaction"). Within approximately six months of that transaction, L&H had announced a massive restatement of its previously filed financial statements, and filed for bankruptcy as a direct result of the fraud. And the nearly half billion dollars worth of L&H stock that Stonington had received for Dictaphone was worthless.

7.     As has now been revealed, L&H could not have perpetrated this massive accounting fraud without the knowing assistance of Artesia. Artesia provided L&H and its principals with critical off-balance sheet financing, which L&H then utilized to set up so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs"). The LDCs and CLDCs then paid these funds back to L&H in the form of licensing fees. To outside investors, the LDCs and CLDCs appeared to be legitimate customers of L&H that had licensed millions of dollars worth of L&H software. In reality, however, the LDCs and

CLDCs were nothing more than corporate shells utilized by L&H to artificially inflate its revenues.

8.    Artesia understood that the LDCs and CLDCs were nothing more than corporate fictions, with no real assets or operations. Indeed, Artesia's own internal "risk evaluation" documents, which are quoted in a May 28, 2001 report prepared by a panel of experts for prosecutors in Belgium (the "Report"), summed up the strategic partners as follows: "In actuality *these companies represent nothing (no activities, no assets)*." (Emphasis supplied).

9.    Artesia also understood that it was L&H who was ultimately responsible for ensuring that the loans would ultimately be repaid. Indeed, after the fraud was revealed, L&H admitted that it had initially financed the operations of the LDCs and CLDCs. Accordingly, Artesia requested that L&H's senior officers, Paul Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert") provide personal guarantees. This presented an enormous problem for L&H, however. Under U.S. Generally Accepted Accounting Principles ("GAAP"), if L&H officers personally guaranteed these loans, the strategic parties would be considered "related parties" to L&H, and that fact would have to be disclosed on L&H's financial statements, thus revealing the sham nature of these agreements.

10.    To solve this problem, Artesia devised a scheme that would still protect its interests and, at the same time, conceal the fact that Hauspie, Lernout and Willaert were personally guaranteeing the loans to the strategic partners. Artesia entered into agreements with these L&H officers called "credit default swaps." In effect, these agreements were nothing more than guarantees that were contained in side letters and, therefore, not included in the loan documents. By not disclosing the existence of these side letters to the SEC or the investing public, the parties were able to hide the fact that L&H officers were guaranteeing the loans, and

4



L&H was able to fraudulently record the entire amount of the licensing fees as revenue without making any "related party" disclosure. In total, Artesia made loans worth almost $60 million to L&H-related parties between 1997 and 1999. All of these amounts were then paid back to L&H and improperly included as revenue.

11.     Artesia's own internal documents confirm that Artesia knowingly entered into these credit default swaps for the sole purpose of defrauding the SEC and the investing public. For example, an email from P. Rabaey at Artesia to G. Dauwe and other Artesia employees, dated September 21, 1999, which is also quoted in the Report, states, "[t]he private guarantees, however, were not signed by Jo [Lernout], Pol [Hauspie] and Nico [Willaert] in order to avoid possible problems with the SEC. We therefore do not have the guarantees, and a solution is sought via credit default swaps."

12.     In return for its knowing participation in this fraud, Artesia was able to continue to receive lucrative banking fees, while providing L&H's major shareholders, including Lernout, Hauspie, and others, with substantial wealth through their fraudulently inflated L&H stock. In addition, Artesia charged excessive interest rates in connection with these loans and received equity interests based on an understanding that L&H ultimately would arrange for buy-outs of the strategic partners at a premium. In effect, Artesia was guaranteed high returns and a future pay-off in return for financing the fraudulent transactions at the outset.

13.     Ultimately, a substantial portion of Artesia's loans were repaid with funds obtained by L&H from unsuspecting investors. Artesia and L&H thereby consummated a classic Ponzi scheme in which Artesia provided the initial funding of the LDCs to create the illusion that the LDCs had actual investors and capital, in order to lure new investors to fund the LDCs, at which point Artesia was paid back.

14.    The fraud at L&H began to unravel in August 2000 when reporters at *The Wall Street Journal* investigating L&H's skyrocketing sales in both Korea and Singapore discovered that many of L&H's reported revenues from Asia were fictitious.   Thereafter, L&H's Audit Committee commenced an investigation and, over the course of several weeks, it was revealed that the LDCs and CLDCs financed by Artesia were shams, and that the licensing fees L&H received from these entities should never have been booked as revenue.

15.    On November 8, 2000, the Company announced that, as a result of accounting "errors and irregularities," it would be required to restate its financial results for fiscal years 1998 and 1999 and first two quarters of 2000.   "Irregularities" is a term of art in the accounting profession that signifies intentional accounting improprieties.

16.    Since that time, L&H filed for bankruptcy and liquidated, and Lernout, Hauspie, and Willaert have all been arrested in Belgium.

17.    On June 24, 2003, Dexia announced that the Belgian prosecutor investigating the L&H fraud had indicted Dexia for actions taken by Artesia in connection with L&H in 1998 through 2000.   Until then, Artesia's role in the fraud had not been disclosed.   The next day, on June 25, 2003, an article in *De Financieel Economische Tiqd* (a/k/a/ the "*Belgian Financial Times*") entitled "Artesia Knew [L&H] Was Playing With Fire" reported that, according to the Belgian investigators, Artesia was "an exceptionally important banker to [L&H] involved in just about everything surrounding [L&H]."   Belgian prosecutors had secretly seized records from Artesia in February 2001 which "contained a treasure of information" regarding the L&H fraud.   According to the article, these records (which are not available to Stonington or the public) show that Artesia made multiple loans in 1998 and 1999 totaling tens of millions of dollars, which were then used to artificially inflate L&H's revenues.   The article also reported that, according to



the Belgian Justice Department, Artesia "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC."

## II.    JURISDICTION AND VENUE

18.    Venue in this action properly lies in New York County based on Stonington's principal place of business and defendant Dexia Bank Belgium's primary place of business within the state, pursuant to CPLR § 503.

19.    This Court has jurisdiction over defendants pursuant to CPLR § 301 and CPLR § 302(a)(1) and (3) because (1) Dexia transacts business within the State or contracts both within and without the State to supply goods or services within the State; and (2) Dexia committed a tortious act without the State that caused harm within the State.

## III.    PARTIES AND PERTINENT NON-PARTIES

### Plaintiffs

20.    Plaintiff Stonington Partners, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Stonington Partners, Inc. is the management company of plaintiff Stonington Capital Appreciation 1994 Fund, L.P.

21.    Plaintiff Stonington Capital Appreciation 1994 Fund, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.  Prior to May 5, 2000, Stonington Capital Appreciation 1994 Fund, L.P. owned approximately 96% of the issued and outstanding capital stock of Dictaphone Corporation.  Pursuant to the Merger Agreement between L&H and Dictaphone, Stonington Capital Appreciation 1994 Fund, L.P. (the "Capital Appreciation Fund") was the beneficial holder of 9,064,329 shares of L&H common stock.

22.    Plaintiff Stonington Holdings, L.L.C. is a Delaware limited liability company with its principal place of business in New York, New York.  Pursuant to the Merger Agreement

7

between L&H and Dictaphone, Stonington Holdings, L.L.C. was the record holder of 8,478,929 shares of L&H common stock (with another 585,400 shares held in escrow for the benefit of Stonington so that the Capital Appreciation Fund is the beneficial owner of a total of 9,064,329 shares).

**Defendants**

23.    Dexia S.A. is a financial institution based in Belgium and, as a result of its acquisition of Artesia in 2001, is one of the three largest banks in that country.  It has over €350 billion in assets.

24.    Dexia S.A. regularly transacts business in the United States.  It has numerous financial services subsidiaries in the United States including Dexia Credit Local New York Agency, Financial Security Assurance, Dexia Bank Belgium, Artesia Mortgage Capital Corp., Astris Finance, and Dexia Securities U.S.A.

25.    Dexia Bank Belgium is a wholly-owned subsidiary of Dexia S.A. and regularly transacts business in the United States.  Dexia Bank's New York Branch is located at 445 Park Avenue, New York, New York.

26.    Artesia Banking Corporation was, until its acquisition by Dexia, a wholly-owned subsidiary of Acrofin CVBA, a Belgian financial services group.  On March 31, 2001 Dexia S.A. announced that it was acquiring Artesia Banking Corporation from Acrofin, and that Artesia would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium.

27.    Artesia continuously and systematically transacted business in the United States prior to its acquisition by Dexia through its subsidiaries.  Artesia's wholly-owned subsidiary Artesia Mortgage Capital Corp. ("Artesia Mortgage"), conducted business in the United States through its headquarters in Delaware and offices at 1180 NW Maple St. Suite 202, Issaqua,

Washington 98027.   Artesia Mortgage continues to conduct business under the same name although it is now owned by Dexia instead of Artesia, and since 1996, has closed loans with a principal balance of approximately $2 billion.   Artesia also conducted business in the United States prior to its acquisition by Dexia through its wholly-owned subsidiary Artesia North America (headquartered in Delaware), and its fifty-percent owned joined venture, Artesia Securities, headquartered in New York.   Finally, Artesia was a member of the bank lending syndicate that provided $450 million in financing to L&H for the acquisition of Dictaphone.   The borrowers of the funds were Dictaphone (of Stratfield, Connecticut), L&H, and the FLV Fund, a Belgian venture capital fund organized by Lernout and Hauspie, among others, to make various investments in the speech recognition industry.

## Pertinent Non-Parties

### L&H

28.    L&H was formed in 1987 by Lernout and Hauspie.   Its three core technologies were automatic speech recognition, text-to-speech conversions, and digital speech compression. L&H was jointly headquartered in Ieper, Belgium, and in Burlington, Massachusetts and, until November 9, 2000, it was listed on the NASDAQ exchange under the symbol LHSP.   On November 29, 2000, L&H filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware and, shortly thereafter, commenced bankruptcy proceedings in Belgium.   L&H has since been liquidated.

## L&H's Senior Officers

29.    Jo Lernout was a co-founder of L&H and served as its Managing Director of the Board since its organization in 1987, as President from January 1994 until October 1996, as Co-Chairman since October 1996, as a member of the Office of the Chief Executive since February



1996, and Co-Chairman in the Office of the Chief Executive since October 1996. Lernout resigned his management position with the Company on November 9, 2000 and director position on January 16, 2001.

30.    Pol Hauspie was a co-founder of L&H and served as a Managing Director since its organization in 1987, Chairman from January 1994 until October 1996 and as a Co-Chairman of the Board since October 1996, as a member of the Office of the Chief Executive since February 1996, and as Co-Chairman in the Office of the Chief Executive since October 1996. Defendant Hauspie resigned his management positions on November 9, 2000 and director position on November 22, 2000.

31.    Gaston Bastiaens was the President of L&H from October 1996 and Chief Executive Officer from May 1997 until his resignation on August 25, 2000. Bastiaens resigned his director position on November 22, 2000. Bastiaens is a defendants in *Stonington, et al. v. Bastiaens*, Civ. No. 1:03-10642 (PBD), which is pending in the United States District Court for the District of Massachusetts and has been consolidated with *Stonington Partners, Inc. et al. v. Dammekens et al.*, Civ. No. 02-10303 (PBD), also pending in the United States District Court for the District of Massachusetts (the "Dammekens Action").

32.    Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller and served as Senior Vice President of Finance from 1993 to 1996, and as Acting Chief Financial Officer of L&H from 1996 to July 1999. Dammekens was appointed Chief Financial Officer on July 7, 1999. Dammekens resigned his position with the Company as Chief Financial Officer on November 9, 2000. Dammekens is a defendant in the Dammekens Action.

33.     Nico Willaert was, at all relevant times, Managing Director and Vice Chairman of L&H until his resignation on November 9, 2000.   Willaert was a director of L&H until his resignation from that position on November 22, 2000.

34.     Lernout, Hauspie, and Willaert are not named defendants in this action or in the Federal Action because they are named as defendants in another action filed by Stonington in the Court of Chancery of the State of Delaware (the "State Court Action"), which sought rescission of the Dictaphone Transaction and monetary damages.   Default judgments have been entered in that action against Lernout, Hauspie and Willaert.   Lernout, Hauspie, and Willaert would be named as defendants here were it not for the pendency of the State Court Action.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     BACKGROUND OF THE DICTAPHONE TRANSACTION

35.     In 1995, L&H completed its initial public offering and commenced trading on NASDAQ.   From 1987 through 1995, the Company was never profitable and only produced a few million dollars in annual revenues.

36.     Beginning in the third quarter of 1996, L&H started rapidly expanding its business, primarily through a dizzying array of acquisitions.   As a result, L&H's sales quadrupled from 1995 to 1996, kicking off a period of unprecedented growth for L&H which made the Company an international success story and the pride of Belgium.

37.     From 1997 to June 2000, L&H reported incredible revenue growth – which, as it turns out, was largely the consequence of undisclosed related-party transactions and fraudulent accounting.   In 1997, the Company's total revenues increased 320% to $99.4 million from $31 million in 1996.   In 1998, L&H's revenues purportedly rose 213% to $211.6 million, and by 1999, the Company reported total annual revenues of $344 million.

11

38.     In July 1999, Stonington was approached by L&H and SG Cowen Securities Corporation, a securities and investment banking firm, regarding a proposed acquisition of Dictaphone. Although this initial overture was not fruitful, L&H tried again in early 2000. At the time, Dictaphone was one of L&H's competitors in the "speech and language applications" sector. Unbeknownst to Stonington, which owned 96% of Dictaphone's outstanding stock, Dictaphone was about to become merely the latest in a series of acquisitions completed by L&H through the use of its artificially inflated stock.

39.     At the time of the Dictaphone Transaction, Dictaphone, which was headquartered in Stratford, Connecticut, was a leader in selected vertical markets in the development, manufacture, marketing, service and support of integrated voice and data management systems and software, including dictation, voice processing, voice response, unified messaging, records management, call center monitoring systems and communications recording.

40.     Dictaphone was known worldwide for its medical record workflow systems and its transcription business. Indeed, Dictaphone's market penetration in this sector is noteworthy: according to industry analysts, as many as 400,000 physicians in the United States use Dictaphone to dictate 100,000 hours of dictation each day for clinical record processing.

41.     At the time of the Dictaphone Transaction, Dictaphone's healthcare market assets included its 5,000 medical industry customers worldwide, its 100 sales representatives, its strong national network of technical service representatives, its experienced executive management team, and its broad range of solutions for medical industry dictation and data management.

42.     The acquisition of Dictaphone, recognized by L&H management as "a leader in the medical dictation and patient record management market," was therefore an integral step in L&H's plans to form a powerful Healthcare Enterprise business group with immediate access to

Dictaphone's large customer base and the opportunity to integrate leading technologies to create new healthcare enterprise market solutions. The acquisition of Dictaphone would also provide L&H with a wide range of assets with which to further its healthcare business strategies.

43.    In acquiring Dictaphone, L&H hoped to capitalize on Dictaphone's healthcare market revenues of $130 million in 1999, and its noteworthy market penetration in this area.

44.    L&H also recognized that access to Dictaphone's products and other resources, such as Dictaphone's document creation solutions, including its digital portable hand held voice recorders, transcription job administration and document distribution offerings, would further enable L&H to realize its plans for development of its enterprise healthcare solution.

45.    For its part, Stonington was intrigued by L&H's overtures because of L&H's apparent financial success in a market compatible with Dictaphone's. Moreover, L&H's revenues and stock price were rising and continued to rise throughout the course of the discussions between Stonington and L&H.

46.    In agreeing to negotiate with, and ultimately enter into an agreement with L&H, Stonington hoped to realize the potential synergies that a combination of the two companies and their technology and geographic market coverage seemed to promise.

47.    Specifically, based on what L&H represented as its extraordinarily positive results in the Asian and European markets, and Dictaphone's well-established United States presence, Stonington entered into the transaction with an expectation that an integration of the two companies would make the combined entity a worldwide leader in the speech recognition business.

48.    In deciding to enter into the Dictaphone Transaction, Stonington relied on L&H's publicly reported financial results for 1998 and 1999. Indeed, on February 9, 2000, L&H issued



a press release reporting its results for the fourth quarter and full year 1999. L&H reported "record" revenues of $344 million in 1999, an increase of nearly 63% over 1998 reported revenues.

49.    The proposed transaction was a stock-for-stock swap pursuant to which Stonington would receive not cash but shares of L&H common stock. In addition, as part of the transaction, Stonington was precluded for two years from selling approximately 4 million of the 9 million shares of L&H common stock it received. For that two-year period, Stonington was required to assign certain voting rights to all the L&H shares it held to a voting trust controlled by Jo Lernout and Pol Hauspie.

50.    With these facts in mind, Stonington retained legal and financial advisors to conduct due diligence of L&H in the months leading up to the Closing Date of May 5, 2000 (the "Closing Date"). Stonington was assisted in its accounting due diligence by the accounting firm of Deloitte & Touche LLP ("D&T"). As part of the due diligence, Stonington and D&T held a series of face-to-face and telephonic meetings with L&H, its outside auditors (KPMG U.S.), and its investment bankers (SG Cowen Securities Corp.), visited certain L&H facilities, and reviewed L&H's financial statements and documents provided by L&H and KPMG.

51.    From an accounting standpoint, Stonington identified L&H's revenue recognition practices as a key area and focused on it throughout the due diligence process. Stonington asked many questions relating to, (a) revenue recognition and the Company's licensing arrangements, (b) the nature of L&H's significant contracts, including royalty agreements, licensing agreements, and contracts with strategic partners; (c) L&H's billing practices, including the nature of unbilled receivables; (d) the nature of all of L&H's related-party arrangements; and (e) the accounting for contract revenues on various consulting and services contracts. Stonington

also specifically asked if the Company's revenue recognition practices were consistent at all L&H locations and made a request for L&H's revenue recognition policies for all significant revenue streams within each business segment.

52.    In spite of Stonington's reasonable due diligence conducted in early 2000, Stonington did not learn of Artesia's role in the fraud.  The underlying information relating to defendant's misconduct and the particulars thereof were not available to Stonington and the public, and remained exclusively within the possession and control of L&H and Artesia. Stonington first learned of Artesia's role in the fraud when a story in the Belgian press, dated June 25, 2003, reported that Dexia had been placed under criminal investigation and indicted by the Belgian prosecutor.

53.    Following this due diligence process, L&H, Stonington and Dictaphone entered into a series of agreements beginning on or about March 7, 2000 pursuant to which L&H would acquire Dictaphone from Stonington in a stock-for-stock deal.  L&H agreed to acquire all of the outstanding stock of Dictaphone, in exchange for 9,064,329 shares of L&H common stock and the assumption of approximately $400 million of Dictaphone debt and other obligations.

54.    This series of agreements included several documents detailing the terms of the transaction:  (1) the Agreement and Plan of Merger among L&H, Dark Acquisition Corp. and Dictaphone Corporation, dated March 7, 2000; (2) a Stockholder Letter of Transmittal, Indemnity and General Release Pursuant to Agreement and Plan of Merger; (3) an Indemnity and Escrow Agreement by and among L&H, Stonington and other Dictaphone Stockholders and State Street Bank and Trust Company as escrow agent, dated as of May 5, 2000; (4) an Agreement of Limited Liability Company between Stonington Capital Appreciation 1994 Fund, L.P. and L&H Holding N.V., dated as of May 5, 2000; (5) a Stockholders Agreement among

15

Stonington Holdings, L.L.C., LEHA, L&H Holding N.V., L&H Holding III, Oldco N.V., L&H

Investment Company N.V. and L&H, dated as of May 5, 2000; (6) a Voting Agreement and

Waiver by and among L&H, Dark Acquisition Corp. and Stonington Capital Appreciation 1994

Fund, L.P., dated March 7, 2000; and (7) a Registration Rights Agreement among L&H and the

Dictaphone Stockholders, dated May 5, 2000. These documents are collectively referred to

herein as the "Merger Agreements."

55.     The Merger Agreements contained various representations and warranties

pursuant to which L&H warranted the truth and accuracy of its financial statements and SEC

filings. In Section 4.4 of the Agreement and Plan of Merger, L&H (referred to as "Buyer")

represented that:

> (a) Buyer has filed and made available to [Dictaphone] all forms,
> reports and documents required to be filed with the SEC since January
> 1, 1997. Buyer's Registration Statement on Form F-3 (File No. 333-
> 11324), filed with the SEC on January 7, 2000 . . . (i) was prepared in
> compliance in all material respects with the applicable requirements of
> the Securities Act and the Exchange Act, as the case may be, and the
> rules and regulations of the SEC thereunder applicable to such Buyer
> Registration Statement, and (ii) does not contain any untrue statement
> of a material fact or omit to state a material fact necessary in order to
> make the statements therein, in the light of the circumstances under
> which they were made, not misleading.

> (b) Each of the consolidated financial statements, as amended
> (including, in each case, any related notes or schedules), contained in
> the Buyer Registration Statement were prepared in accordance with
> US GAAP applied on a consistent basis throughout the periods
> involved (except as may be indicated in the notes to such financial
> statements or, in the case of unaudited statements as permitted by the
> SEC on Form 6-K under the Exchange Act) and fairly presented in all
> material respects the consolidated financial position of Buyer and its
> Subsidiaries as of the dates of the consolidated results of its operations
> for the periods indicated, consistent in all material respects with the
> books and records of Company and its Subsidiaries . . .

its representations in the Merger Agreements that there had been no material adverse changes in its business since the date of its most recently published quarterly financial statements, which were for the quarter ended September 30, 1999. In Section 4.6 of the Agreement and Plan of Merger, L&H represented that:

> Except as expressly contemplated by this Agreement, as disclosed in the Buyer SEC Reports or Company press releases filed or issued prior to the date hereof, or in connection with the matters disclosed at Section 4.5 of the Buyer Disclosure Schedule that Buyer has discussed with Company prior to the date hereof, since September 30, 1999, there has not been (i) any change in the financial condition, results of operations, business, or properties of Buyer and its Subsidiaries, taken as a whole, that has had, or is reasonably likely to have, a Buyer Material Adverse Effect; (ii) any damage, destruction or loss to property (whether or not covered by insurance) with respect to Buyer or any of its Subsidiaries having a Buyer Material Adverse Effect; (iii) any revaluation by Buyer of its assets having a Buyer Material Adverse Effect, exclusive of any revaluations (including write-downs or write-offs) of good will; or (iv) any other action or event that would have required the consent of Company pursuant to Section 5.3 of this Agreement had such action or event occurred after the date of this Agreement

"Buyer Material Adverse Effect" is defined in Section 4.1 of the Agreement and Plan of Merger as "a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement."

57.    Stonington was entitled to terminate the Merger Agreements prior to closing if it learned that L&H's unaudited financial statements for 1999 were materially misstated. The Merger Agreements made the lack of a material adverse change in L&H's financial condition a precondition to the obligation of Stonington to complete the merger. Section 7.3(a) of the Agreement and Plan of Merger provides in relevant part:

> (i) The representations and warranties of Buyer and Sub set forth in this Agreement that are not qualified as to Buyer Material Adverse Effect shall be true and correct, except where failure to be true and correct would not have a Buyer Material Adverse Effect, as of the Closing Date, as though made at and as of the Closing Date, except

in. those representations and warranties that address matters only as particular date shall so remain true and correct as of such date.

(ii) The representations and warranties of Buyer and Sub set forth in this Agreement that are qualified as to Buyer Material Adverse Effect shall be true and correct in all respects as of the Closing Date, as though made at and as of the Closing Date, except that those representations and warranties that address matters only as of a particular date shall remain so true and correct in all respects as of such date . . .

58.     On April 27, 2000, KPMG issued a clean and unqualified audit report on L&H's financial statements for 1999. Ten days later, on May 5, 2000, the Dictaphone Transaction was consummated. Stonington received 9,064,329 shares of L&H common stock in exchange for its interest in Dictaphone, which, based upon the trading price of L&H stock on the Closing Date ($53.97 per share), were valued at approximately $490 million. Only six months later, after the fraud was disclosed, Stonington's shares of L&H stock would be worthless.

**B.     THE FRAUD AT L&H**

59.     As has now become apparent, and as more fully detailed in the Amended Complaint filed in connection with the Dammekens Action, L&H's business was a complete sham.

60.     As a result of the Dictaphone Transaction, L&H became subject to additional SEC reporting requirements, including providing a geographic breakdown of revenues in its SEC filings. This information, which was disclosed for the first time in L&H's quarterly report filed on SEC Form 10-Q on June 30, 2000, revealed that a significant portion of the Company's total revenues in 1999 were from two countries in Asia: Singapore and Korea. In 1999, L&H's revenue totaled $344.2 million. Of that amount, Korea accounted for $62.9 million and Singapore accounted for $80.3 million in revenue. By comparison, in 1998, those two countries accounted for less than $300,000 in combined sales.

18

... filed reporters from *the Wall Street*
... commenced an investigation into L&H's customers in Singapore and Korea. It began
reporting the results of this investigation in an article published on August 8, 2000. The article
disclosed that many of the companies which L&H had identified as Korean customers had
denied that they did business with L&H:

> *. . . [S]ome companies that L&H has identified as Korean*
> *customers say they do no business at all with L&H.  Others say*
> *their purchases have been smaller than L&H says.*  L&H officials
> now acknowledge they made some mistaken initial representations
> about customers.  But the company disputes other accounts given
> by some of the Korean companies, and it insists its Korean revenue
> figures are accurate.

> . . .  In all, 18 of about 30 companies claimed by L&H as
> customers were contacted by this newspaper.

> Three of the companies say they aren't, in fact, L&H customers.
> L&H says one of those was a former Bumil customer, and was
> mistakenly put on its list.  Three more companies say their
> purchases from L&H over the past three quarters were smaller than
> figures provided by Mr. Bastiaens or Sam Cho, vice president of
> L&H Korea.  One additional company says it is in a joint business
> with L&H that produces considerably less revenue than L&H
> claims.  Officials from an eighth company initially said it had
> formed a joint venture with L&H and that the joint venture, not the
> company itself, had purchased products from L&H.  Later, the
> company retracted this initial version.

> All told, of the 13 companies that responded to inquiries about
> their purchases from L&H in the period since it acquired Bumil,
> the revenue tallies roughly $32 million.  From all of its customers
> in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8
> million of Korea sales, and it has said that it expects second-
> quarter revenue from that country to exceed the first quarter's
> $58.9 million. . . .

> [Emphasis added.]

62.    Although L&H attempted to deny these allegations and claimed that all Korean

revenues were accurate, on August 15, 2000, *The Wall Street Journal* reported that L&H had

commissioned a mid-year interim audit of the company by KPMG. The goal of the audit was to allay concerns about the financial results of [L&H's] South Korean division."

63. On August 25, 2000, L&H announced that Bastiaens had resigned from his position as president and CEO of L&H. Bastiaens was replaced by John Duerden, the former CEO of Dictaphone. Bastiaens remained a director of L&H.

64. On September 22, 2000, *The Wall Street Journal* reported that the SEC had commenced an investigation into L&H's accounting practices in January 2000. In fact, on or about January 24, 2000, the SEC had issued a request for documents to L&H, which focused on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners." Subsequently, the SEC raised the status of the investigation to "formal." No one, however, ever disclosed the existence of the SEC investigation to Stonington prior to the Closing Date.

65. On September 22 and 26, 2000, *The Wall Street Journal* also raised significant additional questions about L&H's revenue, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999. The articles also raised concerns that the FLV Fund had financial connections to eight start-ups with close links to L&H, and that those start-ups accounted for a large portion of L&H's 1998 and 1999 revenues. One of the transactions questioned involved the eight Singapore start-ups which were initially funded by the FLV Fund without any disclosures relating to their nature as related-party transactions.

66. On September 26, 2000, *The Wall Street Journal* reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H. On the same date, Bloomberg News reported that the EASDAQ would also investigate the FLV Fund.

20

6.     In October 13, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the Company's 1999 revenues and 10% of its 1998 revenues. While L&H admitted that it had helped start the 30 companies and initially financed their operations, the Company maintained that the firms were owned by independent investors interested in developing new applications for L&H speech software. L&H released new details about the operations of 17 of the 30 companies, which revealed that these companies had no real corporate existence whatsoever, and certainly no economic substance apart from L&H. Of these 17 companies, none had any direct employees. Seven companies were relying on L&H employees to do work for them and had agreed to repay L&H for its services. The other 10 had not started developing software, though they had paid hefty licensing fees to L&H. According to *The Wall Street Journal*, the 30 companies were all registered at just a few common addresses in Belgium and Singapore, and many had common officers and nominee shareholders.

68.    On November 9, 2000, L&H issued a press release announcing that as a result of accounting "errors and irregularities," the Company would need to restate its previously issued financial statements for 1998, 1999 and the first two quarters of 2000:

> [a]s a result of certain errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000. Although the audit committee is working diligently to determine the impact of these discrepancies on L&H's financial statements for these periods, L&H does not expect the audit and necessary restatements to be completed by November 14, 2000. Accordingly, the Company does not believe that its Form 10-Q for the third quarter ended September 30, 2000 will be filed in a timely manner.

company also warned that its third quarter 2000 revenues would "be at least $40 million below its previously published range of $165 to $185 million." The Company also announced that (1) Lernout and Hauspie had both resigned their posts as executive co-chairmen, but intended to remain on L&H's Board of Directors; (2) John Duerden, the newly appointed CEO, had been appointed the sole Managing Director; (3) Roel Pieper had been appointed Chairman of the Board; (4) a new CFO would be appointed by Duerden; and (5) Willaert would step down as managing director.

69.    L&H's announcement of "accounting irregularities" was, in accounting terms, tantamount to an admission of fraud. Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements, meaning that there was fraud in their preparation.

70.    In response to these revelations, on November 9, 2000, both NASDAQ and EASDAQ suspended trading in L&H stock. Prior to the suspension, the price of L&H on the NASDAQ market fell as low as $6.2188. After trading finally resumed on December 8, 2000, the stock fell to $1.40 per share and, by December 12, 2000, the stock was trading at less than $1.00 per share.

71.    On November 17, 2000, following months of allegations, investigations and admissions of irregularities, *The Wall Street Journal* reported that KPMG had finally withdrawn its audit report on L&H's 1998 and 1999 financial statements, stating that its prior audit opinions "should no longer be relied upon."

72.    On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report, which had previously been presented to the L&H Board of Directors on

November 20, 2000. The Audit Committee Report concluded, in part, that: (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) the Company should reverse all of its Korean revenues recorded during 1999 and 2000, amounting to approximately $182 million; and (c) software license revenues from twenty-four of the thirty "strategic partners" were doing nothing more than funding L&H's research and development through related-party transactions.

73.     On November 21, 2000, *The Wall Street Journal* reported that the EASDAQ had suspended trading in the FLV Fund. The article described the FLV Fund as an investment vehicle over which Jo Lernout and Pol Hauspie "exercise considerable influence over its affairs," with "a history of investing in L&H customers, typically small companies that pay license fees to L&H."

74.     These disclosures shocked the market and decimated the price of L&H shares, which fell from more than $53 per share on May 5, 2000 (the date of the Dictaphone Transaction) to $6.22 per share on November 8, 2000, in direct response to these disclosures. Trading in L&H shares ceased on November 8, and the shares were essentially worthless after that date.

75.     On November 29, 2000, L&H filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware. According to a November 30, 2000 *Wall Street Journal* article, the decision to file for bankruptcy protection came after L&H executives discovered that $100 million in cash was missing from the Company's South Korean unit.

76.     On December 14, 2000, *The Wall Street Journal* reported on the thirty "strategic partners" that comprised a significant portion of L&H's revenues, revealing that Mercator was

the ultimate owner of 16 of the 30 start-ups and that the FLV Fund had funded, at least in part, approximately 8 of the remaining 14.

77.    On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

78.    On March 2, 2001, L&H announced that co-founder Lernout had been forced to step down as chief technology officer. Lernout had been the last remaining senior executive from the time the accounting scandal erupted.

79.    In late April of 2001, South Korean authorities began investigating allegations against the Korean Banks, as well as certain former L&H Korea employees.

80.    On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation. On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant. Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation, and accounting law violations.

C.    **ARTESIA SUBSTANTIALLY ASSISTED L&H IN THE FRAUD**

81.    As detailed below, Artesia knowingly participated in the fraud at L&H by providing loans that it knew L&H was fraudulently booking as revenue. Artesia knew that it was making the loans to shell corporations created and controlled by L&H, which, in turn, were paying these funds to the LDCs and CLDCs, which had no legitimate business operations. Artesia also knew that these funds were then being paid back to L&H in the form of licensing fees that L&H improperly booked as revenue. Furthermore, Artesia devised a scheme to minimize its own risks relating to these loans through the use of credit default swaps. This

24

scheme allowed L&H's senior officers to guaranty Artesia's loans while, at the same time, fraudulently concealing that fact from the SEC and investors.

82.    Recognition of revenue by L&H from these Artesia loans was improper under U.S. GAAP for at least two reasons.  First, although the loans were funneled through various shell entities, in substance, the loans were made to L&H.  It is axiomatic under U.S. GAAP that L&H cannot recognize loans as revenue that it ultimately must repay.  Second, revenue recognition was improper because the transactions with the LDCs and CLDCs lacked any economic substance.  The LDCs and the CLDCs had no operations, employees, assets, products, or customers.  There simply were no end-users purchasing any products from the CLDCs, LDCs or L&H.  Accordingly, the revenue recognized by L&H from these Artesia loans was a flagrant violation of U.S. GAAP, and Artesia was fully aware of this fact.  Furthermore, even if there was some economic substance to these transactions, L&H's financial statements would still have been materially false and misleading, for, at best, the transactions between L&H and the strategic parties were "related party" transactions, the nature of which had to be fully disclosed to investors under the most basic provisions of GAAP.

### Background: L&H Begins to Use Strategic Partners to Artificially Inflate Revenues

83.    In 1996, L&H formed Dictation Consortium N.V. ("Dictation") to develop software for L&H.  In December of that year, L&H then entered into a very profitable licensing agreement with Dictation pursuant to which Dictation provided L&H with $26.6 million in revenue, or 25% of L&H's 1996 sales and 19% of L&H's 1997 sales.

84.    Between December 1996 and early 1998, Dictation "developed" the software, purportedly bearing the research and development costs.  However, Dictation was not actually performing any of the work to develop the software.  Rather, as defendant Lernout later

acknowledged, *L&H* employees wrote Dictation's business plan and did the software development work under contract.

85.     Once the development was completed, L&H had the option to purchase Dictation. In May of 1998, at the end of the contract, L&H purchased Dictation for $40 million. Thus, in effect, L&H purchased the software that it had developed at a significant premium. L&H then booked the goodwill associated with the purchase as an asset and amortized the cost over a period of years, rather than recording the research and development expenses as current expenses.

86.     Bolstered by the success of the Dictation arrangement, on March 13, 1997, L&H established Brussels Translation Group N.V. ("BTG") as a limited liability company in Belgium, "primarily engaged to acquire, develop, commercialize and license machine translation software." Defendant Artesia was a key player in the creation of BTG, providing the initial financing to allow BTG to operate. Artesia lent a total of $22.9 million to BTG with the intent that L&H would find external investors to repay the loan. However, L&H never disclosed the owners of BTG, and according to a December 7, 2000 article, *The Wall Street Journal* was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but no further."

87.     In March of 1997, BTG entered into a software development and commercialization agreement with L&H, pursuant to which L&H agreed to provide engineering services to BTG for the development of machine translation services for L&H's iTranslator services, which had been licensed by L&H to BTG. The agreement called for BTG to pay L&H $3.5 million in licensing fees, plus royalties. The licensing fees were increased to $5 million in

26

May 1997. L&H also entered into an agreement to provide BTG with engineering services, under which BTG paid L&H approximately $30 million.

88.    From 1997 though 1999, L&H incurred $9 million in expenses to develop the BTG software. At the end of the contract, in June 1999, L&H purchased BTG for $59 million. This sum was comprised of an aggregate purchase price of approximately $42.3 million and the assumption of approximately $17 million of debt. The purchase price exceeded the fair value of the net assets acquired, and the difference was allocated to goodwill or other intangible assets on L&H's financial statements. Thus, in effect, L&H was able to develop its product, without deducting the research and development expenses, and then was able to capitalize the purchase price it paid for BTG, once again turning what would normally be an expense into an asset.

**Artesia Raises Money for a United States Company (Vasco)**
**to Support L&H's Fraudulent Transactions**

89.    On March 25, 1998, an Illinois company known as Vasco Data Security International ("Vasco"), a customer of L&H's Burlington, Massachusetts' office, purportedly licensed $800,000 of L&H software. The technology covered by L&H's license, however, was useless to Vasco, which only agreed to pay the licensing fee in order to obtain a $3 million loan from L&H it desperately needed. The loan was originally due on January 4, 1999. But by January 1999, Vasco still could not pay the loan. Hauspie took advantage of the situation and extorted Vasco to enter into a second licensing agreement with L&H worth $900,000, and to backdate the agreement to December 31, 1998. According to Vasco's former Chief Technology Officer, Hauspie threatened to call the loan due on January 4, 1999 if Vasco refused to backdate the contract. In desperation, Vasco acceded, entered into the second licensing agreement, and L&H fraudulently recorded the $900,000 in 1998.

90.    Because Vasco still did not have the financial resources to repay the loan in early 1999, at the behest of Lernout and Hauspie, Artesia organized and managed an $11.5 million private placement of Vasco common stock. On April 15, 1999, Artesia completed the private placement and wired the $11.5 million to Vasco's account in the United States. Vasco used these funds, in part, to repay L&H. The investors in the private placement included LHIC (a company formed by Lernout and Hauspie to invest in companies that specialized in speech and language based products), which invested $5 million. LHIC obtained a 7% ownership stake in Vasco and a seat on the company's board of directors. That seat was filled by defendant Hauspie. Another top investor in Vasco was Mercator, which purchased approximately $1 million of Vasco stock through the private placement managed by Artesia.

**Artesia Orchestrates the Financing of L&H's LDCs and Other Strategic Partners Through Credit Default Swaps and Other Vehicles in Order to Defraud the SEC and the Investing Public**

91.    Following the transactions with Dictation, BTG and Vasco, L&H's senior officers and Artesia expanded their fraudulent scheme into what ultimately would be described by *The Wall Street Journal* as "Dictation Consortium-type structure – but on steroids." Instead of creating <u>one</u> shell company (i.e., Dictation Consortium or BTG) to funnel false revenues to L&H, L&H created a series of holding companies financed by Artesia. These holding companies, in turn, financed multiple LDCs, which then paid "licensing fees" back to L&H.

92.    One such holding company was Radial Belgium N.V. ("Radial"). On September 29, 1998, Artesia loaned approximately $6 million to Radial, which wired this money, in $2 million installments, to three LDCs: (a) the Slavic Development Company N.V., (b) the Farsi Development Company N.V., and (c) the Bahassa Development Company N.V. These LDCs were supposed to develop speech recognition products in Slavic, Farsi and Bahassa (Indonesia),

respectively. The Slavic, Farsi and Bahassa LDCs, however, used the $2 million to pay L&H

licensing fees. L&H then booked the entire $6 million as revenue in the third quarter of 1998.

None of these LDCs had bona fide offices or any operations that would have enabled them to

develop speech recognition products.

93.    Internal Artesia documents quoted in the Report demonstrate that Artesia

knowingly entered into this transaction in furtherance of the fraud. They show that Artesia knew

that its loan was to be used by Radial to finance the three LDCs (all of which had the same

business address), that the LDCs and Radial had been created by L&H, and that the monies

would be used by the LDCs to pay licensing fees in identical amounts to L&H. They also show

that Artesia knew that the loans would be guaranteed by Lernout, Willaert and Hauspie, and that

their actions would enable L&H to fraudulently conceal that fact from the SEC and the investing

public.

94.    In an e-mail dated September 21, 1999 by P. Rabaey at Artesia to G. Dauwe and

other Artesia employees, Rabaey stated,

> Our loan . . . was used for the establishment of 3 Language Development
> Companies: Slavic, Farsi and Bahassa. Starting capital per company: $2 million.
> The 3 companies bought first of all software licenses from [L&H]. The objective
> is to repay our loan to Radial Belgium by attracting investors and to further
> increase the capital per Language Development Company.

95.    Another document quoted in the Report states,

> [On September 29, 1998 Artesia Bank advances loan to Radial] by way of a
> bridge financing for the establishment of the following language development
> companies THE SLAVIC DEVELOPMENT COMPANY N.V., THE FARSI
> DEVELOPMENT COMPANY N.V., and THE BAHASSA DEVELOPMENT
> COMPANY N.V., *all based at 2370 Arendonk, Schoolstraat 1A*, in anticipation
> of the establishment of the Language Development Fund and the sign-up of
> investors. (Emphasis supplied).

29

96.    P. Rabaey's September 21, 1999 e-mail also stated that, "[t]he private guarantees, however, were not signed by Jo [Lernout], Pol [Hauspie] and Nico [Willaert] *so as to avoid possible problems with the SEC*.  We have therefore no security and look for a solution via credit default swaps." (Emphasis supplied).

97.    Artesia knew that the credit default swaps were highly unusual instruments to be used by individuals and that their sole purpose was to deceive the SEC and investors.  For example, an internal Artesia memorandum entitled "Direction Internal Audit" from J.P. Cloes and F. Dankelman to K. Claessens and others, dated January 31, 2000, notes that the credit default swaps executed by Lernout, Hauspie and Willaert had "special characteristics (they are the only contracts of this type concluded with natural persons)."  Artesia clearly understood, however, that "the credit default swaps were concluded *in order to get around the guarantees* that the other parties (=J. Lernout + P. Hauspie + N. Willaert . . . ) did not wish to provide," as documented in a February 14, 2000 internal Artesia memorandum pursuant to discussions with Geert Dauwe of Artesia.  (Emphasis supplied).

98.    Because Artesia knew that the credit default swaps were nothing more than guarantees, it went to great lengths to conceal their existence.  An internal Artesia document quoted in the Report notes that Lernout, Hauspie and Willaert refused to execute a loan that made reference to the credit default swaps: "not signed by the borrowers (refused because of possible fiscal and auditing problems when filing the financial statements)."  Accordingly, a June 15, 1999 internal Artesia e-mail from P. Rabaey to B. Mommens concerning LIC and Radial and quoted in the Report states that Artesia did not identify the Lernout, Hauspie and Willaert because "the client does not agree with mentioning the identity of the private individuals because

30

by doing so a link is established between the debtor and the private individuals. It is not desirable to the client that there be such a direct link for the outside world to see."

99.    Artesia also knew that the LDCs would not generate any real revenue to repay the loans, and that L&H intended to attract new investors who would act as a new source of funds: "The objective is to repay our loan to Radial Belgium by attracting investors and to further increase the capital per Language Development Company." (P. Rabaey's September 21, 1999 e-mail).

100.    The June 25, 2003 article in the *Belgian Financial Times* confirms that Artesia knowingly issued the Radial loan in furtherance of L&H's fraudulent scheme:

> On September 29, 1998, Artesia issued a loan to a Belgian company known as Radial in the amount of approximately $6 million. Artesia's own documents reveal that Radial was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDC's. These same bank documents also show that Artesia was aware that Lernout, Hauspie and Willaert did not want to sign the required personal guarantees to obtain this and other LDC and CLDC loans "in order to avoid possible problems with the SEC." As a result, Artesia devised a scheme to have Lernout, Hauspie and Willaert guarantee the Radial loan using "credit default swaps." Unlike personal guarantees, however, these swaps do not have to be revealed in the loan letters of credit. However, the sale of credit default swaps to individual investors is highly unusual, demonstrating the degree to which Artesia was willing to go to participate in L&H's massive accounting fraud.

101.    After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia replicated this scheme in the fourth quarter. The name of the holding company this time was Language Investment Co. ("LIC"). Artesia made a loan on December 22, 1998 to LIC for approximately $6 million. LIC then sent the funds in four installments of $1.5 million to four separate LDCs: the (1) Greek, (2) Hungarian, (3) Polish, and (4) Czech development companies. These LDCs then immediately paid these funds to L&H as licensing fees so that L&H could book this "revenue" prior to year-end.

102.   These loans were also secured by credit default swaps.  According to an internal, undated memorandum of Artesia written in connection with the loan to LIC and quoted in the Report: "If Mr. J. Lernout, P. Hauspie, and N. Willaert do not accept signing a guarantee (for tax reasons), they seem willing to act as the counter-party in a credit default swap."

103.   Indeed, the June 25, 2003 article in the *Belgian Financial* Times also confirmed that Artesia also issued this loan to LIC in furtherance of the fraud:

> Artesia engaged in a similar fraudulent transaction on December 22, 1998, issuing a loan to the Language Investment Company for the purpose of creating 4 LDC's so that L&H could recognize revenues from these LDCs in the fourth quarter of 1998.  Again, Artesia used credit default swaps to conceal the fact that the principals of L&H had secretly guaranteed the loans used to set up the 4 LDC's in question.

104.   L&H continued to perpetuate the scheme in 1999.  On March 31, 1999, L&H set up the Language Development Fund ("LDF") and transferred $12 million that same day to the bank accounts of seven LDCs at Artesia.  The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each.  This time, the $12 million came from Mercator & Noordstar in the form of a $2 million capital contribution and a $10 million loan to LDF.  All of these funds made their way into L&H's financial statements as revenue.

105.   Internal Artesia documents quoted in the Report leave no question that Artesia knew that these LDCs were also shell entities created by L&H.  A fax dated March 1999 from Ph. Depecker at L&H to Artesia stated:

> The following companies are to be established, for which I need an account number: Thai Language Development Company N.V., Hindi Language Development Company N.V., and Tamil Language Development Company N.V.

The representative-director of these companies is in each case Mr. Tony Snauwaert, and the company seat will be 9900 Eekloo, Stationstraat 83. Could you get me three account numbers as soon as possible?

106.    In the second quarter of 1999, L&H requested that LDF receive a $20 million loan from Artesia. Artesia's internal documents relating to LDF reveal that the bank was fully aware of the fraud being perpetuated at L&H. Specifically, according to an internal e-mail from B. Ferrand, dated June 21, 1999:

> LDF as overarching holding company is now already 100% shareholder in 3 Language Development Companies ("LDC"): Tamil DC, Hindi DC and Thai DC. [Six million dollars] of capital stock and the Mercator-Noordstar loan was channeled to these various LDCs which used it to buy licenses from [L&H] in the first quarter of 1999.

> \* \* \*

> In view of the fact that [L&H] books the sale of licenses as revenue, it is essential under GAAP rules that LDF be totally independent from [L&H]. Therefore, [L&H] cannot under any circumstances be a party involved in an agreement whose subject is the repayment of the requested financing. A credit default swap with Messrs. Lernout, Hauspie, and Willaert is however possible.

> \* \* \*

> [L&H] does not itself execute the R&D for these languages but has it done in various special purpose companies (see the work methods at Dictation Consortium, BTG, LIC). These companies buy a license for the use of software development kits and tool kits from [L&H] which permit the implementation of the speech and language technology in the various languages. The system offers [L&H] two advantages: 1) the R&D takes place outside their own profit and loss structure; 2) the royalties received can be booked immediately as revenue.

107.    Although Artesia ultimately denied the loan to LDF, on June 25, 1999, it granted a $20 million line of credit to Lernout, Hauspie and Willaert, personally. This time, however, Artesia demanded that the three individuals pledge 650,000 registered shares of L&H as collateral for the loan. The vast majority of this $20 million was used to fund six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money

33

was ultimately booked as revenue on L&H's financial statements.    L&H did not reveal the source of the funds received by these LDCs in L&H's SEC Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10-K for the year ended December 31, 1999.

108.    By mid to late 1999, Artesia became increasingly concerned that its loans would not be repaid.  The loans to Radial and LIC were due June 30, 1999, and the $20 million personal loan to Lernout, Hauspie and Willaert was due in October 1999.  To avoid a technical default, Artesia extended the loans to December 15, 1999.  Artesia subsequently had multiple discussions with Hauspie, Lernout and Willaert to closely track their progress in attracting potential new investors in the LDCs, whose funds would be used by L&H to repay Artesia.  L&H and Artesia were effectively seeking to "rob Peter to pay Paul," and creating a quintessential Ponzi scheme in which funds from new investors were used to pay old investors.  In an internal memorandum dated September 7, 1999, B. Ferrand at Artesia reported a conversation that he had with Willaert and others the day before:

> Status of the negotiations with external investors for the various Language Development Companies:
>
> • Negotiations with the Arabian investment fund are supposed to be finalized around September 30, 1999 = repayment RADIAL loan ([$6 million] originally planned due date June 30, 1999) should take place around September 30, 1999 (at least in part).
>
> • Negotiations with the Russian investment fund will be continued in Moscow September 20 and 21.  According to Nico Willaert this means then that
>
> - either an amount of +/- [$25 million] will be available at LIC for repayment of the loans ([$6 million] originally planned due date June 30, 1999) and at Lernout/Hauspie/Willaert ([$20 million], due date October 1999
>
> -or Artesia is to receive a bank guarantee (from the bankers of the Russian investment fund) as a surety for the current loan to LIC and Radial

34

My impression is that these negotiations are still far from being finalized and that it is also very unlikely that a bank guarantee can be obtained.

- Nico Willaert stresses that all loans made by Artesia within the framework of the establishment of the Language Development Companies will be repaid in full for sure around December 31, 1999 (Radial [$6 million], LIC [$6 million] and Lernout/Hauspie/Willaert [$20 million]).

109.   Similarly, on December 27, 1999, P. Cordonnier at Artesia reported in an e-mail to B. Ferrand and other Artesia employees that he had received a telephone call from Willaert, who stated that "on Wednesday December 29, 1999, (sufficient) US$ will be available in an account of a Singapore bank to pay back the loans to LIC and Radial." Willaert also gave Mr. Cordonnier the details of the contact person in Singapore.

110.   On or about January 5, 2000, a Lebanese-Armenian businessman, Harout Katchadourian, wired $36 million at the request of Lernout, Hauspie and Willaert to the Singapore bank account of Velstra, a Singaporean company owned by Mercator. This money was then used to pay off the $20 million line of credit, and the two $6 million loans to Radial and LIC, thereby consummating the classic Ponzi scheme.

**The Belgium Prosecutor Confirms that Artesia Conspired with and Substantially Assisted L&H in Connection with this Fraud**

111.   Based on internal documents obtained from Artesia, a panel of experts retained by the Belgian prosecutors concluded that Artesia intentionally participated in the L&H fraud. The conclusions are damning:

> Evaluation of the Financing
>
> Three of the four members of L&H's executive committee [Lernout, Hauspie and Willaert] are negotiating credit default swaps with Artesia Bank for the loans to Radial, LIC and LDF (loan to LDF not approved). These loans are guaranteed by members of L&H's executive committee via credit default swaps for paying license fees to L&H (booked as revenue). The loan denied to LDF was approved for an identical amount

35

to the three members of L&H's executive committee and also used for paying license fees to L&H (booked as revenue).

These loans were concluded at great urgency and just before the quarterly closing of accounts at L&H. Decisions had to be made always "on the double," which only can be explained by the approaching quarterly or yearly closings.

The choice of credit default swaps as financial guarantee is inspired by the intention of not having to report this sort of financial guarantee on the letter of credit of the borrower and so as to avoid possible problems with the US SEC. *The efforts of the members of L&H's executive committee to prevent that the credit default swaps appear on the letter of credit show that there was an awareness that this could lead to problems with revenue recognition and related parties.*

\* \* \*

It is irrelevant that Artesia Bank does <u>not</u> utilize the provided guarantees in which members of L&H's executive committee are involved . . . . Of crucial importance is the following finding: the provided guarantees (credit default swaps, the pledge of 650,000 L&H shares) in which 3 of the 4 members of L&H's executive committee are involved are a basic condition for granting of the loans to Radial, LIC and to Lernout/Hauspie/N. Willaert (3 members of the L&H executive committee), whereby these financial resources flow to the LDCs and subsequently to L&H for payment of license fees that are booked as revenue just before a quarter or a fiscal year closing. *Because of the financing of license payment (credit default swap, loan to 3 members of the executive committee, pledging L&H shares) we consider the revenue based on the license agreements with the LDCs fictitious.* (Emphasis supplied).

## Artesia Lied to Investigators to Conceal Its Role in the Fraud

112.    Artesia took affirmative steps to cover up its role in the fraud at L&H after the investigation of the fraud began in November 2000. For example, Loeff Claeys Verbeke, one of the law firms charged with that investigation and co-author of the Audit Committee Report, asked Artesia about L&H's possible role in securing financing for LIC. On November 24, 2000, Artesia sent a letter to Loeff Claeys Verbeke in response to that inquiry. According to the Report, Artesia's letter stated: "On December 22, 1998, ARTESIA BANK N.V. granted a credit line to N.V. LANGUAGE INVESTMENT COMPANY in the amount of BEF 220,000,000;

36

L&H provided no bank guarantees for this loan. Artesia made no mention of the credit default swaps executed by the principals of L&H – Lernout, Hauspie and Willaert on the LIC transaction so as not to disclose its complicity in the fraud. As a result, the Audit Committee Report makes no mention of Artesia's role in the fraud. Likewise, none of the Wall Street Journal articles that disclosed the fraud at L&H mentioned any role by Artesia.

## V. THE MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. Publicly Issued False and Misleading Statements

113.    On April 28, 1998, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Record Q1 Revenues of $35 Million; Strong Earnings of $0.13 Per Share Before One Time Charge for First Quarter." This press release stated, in relevant part:

> For the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997.
>
> * * *
>
> Net income before one time charges and unusual items for the first quarter of 1998 reached $7 million, or $0.13 per share on 52.5 million average diluted shares outstanding which is a 62.5% increase when compared to $2.7 million in net income, or $0.08 per share on 34.4 million average outstanding shares for the first quarter of 1997.

114.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on May 1, 1998.

115.    These statements regarding L&H's financial results for the first quarter of 1998 were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $2 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

On 104/128 1998, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Record Q2 Revenues of $45 Million; Record Net Profits of $9.5 Million or $0.17 EPS Before Exceptional Items." This press release stated, in relevant part:

> For the second quarter of 1998, L&H's total revenues were $45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997.
>
> * * *
>
> Net income before one time charges and unusual items for the second quarter of 1998 reached $9.5 million. This represents $0.17 per share on 55.1 million average diluted shares outstanding which is a 138% increase when compared to $4.0 million in net income, or $0.11 per share on 36.1 million average outstanding shares for the second quarter of 1997.

117.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on August 7, 1998.

118.    These statements regarding L&H's financial results for the second quarter of 1998 were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $800,000 and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

119.    On October 27, 1998, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Record Q3 Revenues of $54.9 Million; Record Net Profits of $12.1 or $0.22 EPS Before Exceptional Items." This press release stated, in relevant part:

> For the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997.
>
> * * *
>
> Net income before one-time charges and unusual items for the third quarter of 1998 reached $12.1 million. This represents $0.22 per share on 55.9 million average diluted shares outstanding which is a 133% increase when compared to $5.2 million in net income,

ov $0.01 per share on 40.5 million average outstanding shares for the third quarter of 1997.

120.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on October 29, 1998.

121.    These statements regarding L&H's financial results for the third quarter of 1998 were materially false and misleading, as admitted by L&H's restatement of its financials for this period.  Revenues and accounts receivable were artificially inflated by at least $10.6 million, including approximately $6 million of licensing fees paid by the LDCs and CLDCs from funds borrowed from Artesia, as set forth above.  Earnings were also materially overstated.

122.    On April 7, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues and Record Earnings Before One-Time Charges for Fourth Quarter 1998 and Fiscal Year 1998."  This press release stated, in relevant part:

> Lernout & Hauspie (Nasdaq: LHSP) (Easdaq: LHSP) (L&H), a worldwide market leader in speech and linguistic technologies, products and services, today announced results for the fourth quarter of $76.7 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997.  For the fiscal year 1998, the company reported total revenues of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for 1997.

> *  *  *

> The Company reported approximately $12.9 million in net income, before one-time charges and exceptional items, for the fourth quarter of 1998 or EPS (Earnings Per Share) of $0.22 cents per share on 58.3 million average diluted shares outstanding.  The Company's fourth quarter net income includes an increase in goodwill amortization expense of approximately $1.5 million or $0.03 per share, relating to the company's previously announced revaluation of in-process research and development acquired in prior quarters, to reflect new United States Securities and Exchange Commission (the "SEC") guidelines.  If not for this change, the Company's net income before one-time charges would have been $0.25 per share.

39

* * *

> Net income for the full year of 1998, excluding one-time charges, totaled $37.8 million or $0.69 per share on 55.2 million average diluted shares compared to $20 million or $0.53 per share on 38.9 million average diluted shares during 1997.

123.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on April 19, 1999.

124.    On June 30, 1999, L&H filed with the SEC its Form 20-F Annual Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1998 (the "1998 20-F"). The 1998 20-F included the same financial information contained in L&H's April 7, 1999 press release.

125.    These statements regarding L&H's financial results for the fourth quarter of 1998 and for the 1998 fiscal year were materially false and misleading, as admitted by L&H's restatement of its financials for this period. Fourth quarter revenues and accounts receivable were artificially inflated by at least $14.5 million, including approximately $6 million of licensing fees paid by the LDCs and CLDCs from funds borrowed from Artesia, as set forth above. Year-end revenues were also artificially inflated by at least $27.9 million, and earnings were materially overstated.

126.    On May 18, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues and Strong Earnings For First Quarter; Company Achieves Revenues of $70.7 Million and EPS of $0.12 Before Exceptional Items." This press release stated, in relevant part:

> For the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the

40

role speech and language technologies play in a broad range of
markets and applications.

* * *

Net income before exceptional items for the first quarter of 1999
reached $7 million, or $0.12 per share on 58.1 million average
diluted shares outstanding which is a 13% increase when compared
to $6.2 million in net income, or $0.12 per share on 52.5 million
average outstanding shares for the first quarter of 1998.

127.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of

Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of

1934, filed with the SEC on June 1, 1999.

128.    These statements regarding L&H's financial results for the first quarter of 1999

were materially false and misleading because revenues and accounts receivable were artificially

inflated by at least $24.7 million and earnings were materially overstated, as admitted by L&H's

restatement of its financials for this period.

129.    On July 28, 1999, L&H issued a press release via Business Wire entitled "Lernout

& Hauspie Reports Strong Revenues, Earnings and Cash Flow For Second Quarter; Company

Achieves Revenues of $76 million and EPS of $0.17; Reduced DSO's."  This press release

stated, in relevant part:

For the second quarter of 1999, L&H's total revenues were $76.0
million, an increase of 69% over reported revenues of $45.0
million for the second quarter of 1998.  L&H's total revenues for
the six months ending June 30, 1999 were $146.7 million, an
increase of 83% over reported revenues of $80.1 million for the
same period in 1998.  The company attributes the increased
revenues to L&H's continued success in expanding the role speech
and language technologies play in a broad range of markets and
applications.

* * *

Net income for Q2 1999 reached $10.1 million, or $0.17 per share
on 59.4 million shares which is a 21% increase when compared to
$8.3 million, or $0.15 per share on 55.1 million shares for the
second quarter of 1998.  Net income for the first six months ended

41

June 30, 1999 reached $17.1 million, or $0.29 per share on 58.8 million average diluted shares outstanding, which is a 17% increase when compared to $14.6 million in net income, or $0.28 per share on 52.5 million average outstanding shares for the six months ended June 30, 1998.

130.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on August 6, 1999.

131.    These statements regarding L&H's financial results for the second quarter of 1999 were materially false and misleading, as admitted by L&H's restatement of its financials for this period.  Revenues and accounts receivable were artificially inflated by at least $43.7 million, including approximately $20 million of licensing fees paid by the LDCs and CLDCs from funds borrowed from Artesia, as set forth above.  Earnings were also materially overstated.

132.    On October 27, 1999, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Record Revenues of $87.5 Million and Strong Earnings of $0.16 for Third Quarter; Record Earnings Before Goodwill Amortization of $18.5 Million or $0.31 per Share."  This press release stated, in relevant part:

> For the third quarter of 1999, L&H's total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998.
>
> * * *
>
> Net income for Q3 1999, before goodwill amortization, reached $18.5 million, or $0.31 per share on 60.5 million shares. This is a 25% increase compared to $14.7 million before goodwill amortization and one-time charges, or $0.26 per share on 55.8 million fully diluted shares, for the third quarter of 1998. Net income for the nine months ended September 30, 1999 reached $50 million before goodwill amortization and one-time charges, or $0.85 per share on 59.1 million fully diluted shares which is a 43% increase when compared to $34.7 million in net income, or $0.64

42

per share on 54.1 million fully diluted shares for the nine months
ended September 30, 1998. Net income for the third quarter of
1999 was $9.8 million or .16 per share on a fully-diluted basis
versus a net loss of $35.6 million or $.70 per share net loss for the
third quarter of 1998.

133.   This press release was included as Exhibit 2 to L&H's Form 6-K Report of

Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of

1934, filed with the SEC on November 4, 1999.

134.   These statements regarding L&H's financial results for the third quarter of 1999

were materially false and misleading because revenues and accounts receivable were artificially

inflated by at least $40.7 million and earnings were materially overstated, as admitted by L&H's

restatement of its financials for this period.

135.   On February 9, 2000, L&H issued a press release via Business Wire entitled

"Lernout & Hauspie Reports Record Revenues of $110 Million and Earnings Per Share of $0.22

for Fourth Quarter (Before Exceptional Items); Strong Fiscal Year 1999; Announces 2-For-1

Stock Split; Record Earnings of $22.6 Million or $0.37 Earnings Per Share Before Goodwill

Amortization and Exceptional Items; Cash Flow of $68 Million from 1999 Operations and

DSO's Reduced to 86 Days." This press release stated, in relevant part:

> For the fourth quarter of 1999, L&H's total revenues were $110
> million, or a 43.5% increase in the reported revenue of $76.7
> million for the fourth quarter 1998. For fiscal 1999, the company
> reported total revenues of $344 million or an increase of 62.7%
> over the reported revenues of $211.6 million for 1998.
>
> The company reported approximately $13.4 million in net income
> for the fourth quarter of 1999, before exceptional items, or EPS
> (Earnings Per Share) of $0.22 cents per share on 60.7 million
> average diluted shares outstanding. Net income for fiscal 1999,
> excluding exceptional items, totaled $40.2 million or $0.67 per
> share on 59.6 million average diluted shares compared to $38.2
> million or $0.69 per share on 55.2 million average diluted shares
> during 1998. The exceptional items for the fourth quarter of 1999

resulted in a $2.7 million net loss (unrealized currency exchange loss). For fiscal 1999 the exceptional items resulted in a $2.5 million net benefit (mainly unrealized currency exchange gain).

136.    These statements regarding L&H's financial results for the fourth quarter of 1999 and for the 1999 fiscal year were materially false and misleading because fourth quarter revenues and accounts receivable were artificially inflated by at least $65.6 million, year-end revenues were artificially inflated by at least $174.7 million, and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

## VI.    THE FRAUD-ON-THE-MARKET PRESUMPTION

137.    Stonington relied on the existence of an efficient market for L&H stock, and will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine. At all relevant times, L&H stock traded on the NASDAQ, an open and efficient market. Several entities and individuals, including but not limited to L&H, made material public misrepresentations or failed to disclose material facts regarding L&H's financial results during 1999 and 2000. These misrepresentations and omission would tend to induce a reasonable investor to misjudge the value of L&H's stock.

138.    In addition, L&H stock was followed by analysts including, inter alia, Auerbach Grayson, Branch Cabell & Co., Ladenburg, Thalman & Co., S.G. Cowen Sec. Corp. and Deutsche Bank. The price of L&H stock reflected the effect of news from these and other analysts, among other sources, disseminated in the market.

139.    Based on the foregoing, Stonington is entitled to the presumption of reliance upon the integrity of the market, and the market price of L&H stock.

44

CLAIMS FOR RELIEF

## COUNT ONE

### Conspiracy to Commit Fraud

140.   Stonington repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and asserts this count against Dexia.

141.   Dexia S.A., and/or Dexia Bank Belgium, by acquiring Artesia is liable to Stonington for Artesia's wrongful conduct.

142.   As set forth above, at all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Stonington.   These parties made all of the materially false and misleading statements identified above, knowing that Stonington and the investing public would rely on those statements in connection with their purchases of L&H stock.  In addition, L&H falsely represented to Stonington, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP.   Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

143.   Artesia conspired with L&H, Lernout, Hauspie and Willaert to defraud the SEC and the investing public, including Stonington.  Among other things, as detailed herein, Artesia knowingly and willfully devised a scheme to conceal the fact that L&H officers were guarantors of millions of dollars in loans that were made to L&H-controlled entities, including the LDCs, and then paid back to L&H as licensing fees.  In so doing, Artesia, knowingly enabled L&H to recognize the entire amount of the loans as revenue, in blatant violation of GAAP.

144.   In furtherance of the conspiracy, Artesia committed the following overt acts:

    a.   On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie

45

and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

b.   On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

c.   On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

145.   Artesia committed this misconduct intentionally, with full knowledge of the fraud being perpetrated at L&H.  Specifically,

a.   Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H, as set forth above.

b.   Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H, as set forth above.

c.   Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H, as set forth above.

d.   Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees, as set forth above.

e.   Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties, as set forth above.

f.   Artesia knew that if Lernout, Hauspie and Willaert were included in the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties, as set forth above.

146.   As a consequence of the foregoing, Stonington suffered damages in an amount to be proven at trial.

## COUNT TWO

### Aiding and Abetting Fraud

147.    Stonington repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and asserts this count against Dexia.

148.    Dexia S.A., and/or Dexia Bank Belgium, by acquiring Artesia is liable to Stonington for Artesia's wrongful conduct.

149.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Stonington, as set forth above.  These parties made all of the materially false and misleading statements identified above, knowing that Stonington and the investing public would rely on those statements in connection with their purchases of L&H stock.  In addition, L&H falsely represented to Stonington, among other things, that its 1998 and 1999 financial statements were prepared in conformity with U.S. GAAP.   Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

150.    Artesia substantially assisted L&H in perpetrating the fraudulent scheme. Specifically,

a.    On or about September 29, 1998, Artesia made a $6 million loan to Radial, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

b.    On or about December 22, 1998, Artesia made a $6 million loan to LIC, an L&H-related entity, which was guaranteed by Lernout, Hauspie and Willaert through credit default swaps, and then was paid back to L&H through the LDCs as licensing fees, which were improperly included as revenue on L&H's financial statements.

c.    On or about June 25, 1999, Artesia awarded Lernout, Hauspie and Willaert a $20 million line of credit, which they then used to make

47

payments to L&H through the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.

151.    At all times relevant to this complaint, Artesia knew of the fraud perpetrated by L&H. Specifically,

a.    Artesia knew that its $6 million loan to Radial was used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H, as set forth above.

b.    Artesia knew that its $6 million loan to LIC was used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no operations or purpose other than to create fictitious revenue for L&H, as set forth above.

c.    Artesia knew that the LDCs were not independent of L&H but were rather controlled by L&H, as set forth above.

d.    Artesia knew that the LDCs were shell corporations, with no assets, operations, or employees, as set forth above.

e.    Artesia knew that the credit default swaps were used by L&H to conceal from the SEC and the investing public that the LDCs were related parties, as set forth in ¶¶ 84-115 above.

f.    Artesia knew that if Lernout, Hauspie and Willaert were included on the loan documents as guarantors of the loans, L&H would have to disclose that the LDCs were related parties, as set forth above.

152.    As a consequence of the foregoing, Stonington suffered damages in an amount to be proven at trial.

## COUNT THREE

### Fraudulent Conveyance

153.    Stonington repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.  This claim is brought pursuant to Debtor and Creditor Law § 276 against Dexia S.A. and Dexia Bank.

48

154.    By virtue of the claims set forth herein, as well as the claims Stonington previously asserted against Dexia in the Federal Action, Stonington is a creditor or future creditor of Dexia.

155.    Dexia is liquidating the New York operations of Dexia Bank and is transferring, or has transferred, its assets either to a Dexia-related entity outside the United States or to Dexia Credit Local, a wholly-owned subsidiary of Dexia S.A. with offices in New York.    The liquidation of Dexia Bank's New York Branch, and the transfer of its assets, is intended to hinder, delay or defraud Stonington as a creditor of Dexia by making it more difficult, if not impossible, for Stonington (1) to enforce any judgment against Dexia obtained through the Federal Action and (2) to assert claims against Dexia in State Court in the event that the District Court's decision sustaining Stonington's federal claims under the Exchange Act, brought in the Federal Action, is overturned by the Court of Appeals for the First Circuit.

156.    On November 11, 2005, Dexia published notice of the liquidation of the New York Branch of Dexia Bank, and expects to complete that liquidation prior to December 31, 2005. In connection with the liquidation of its New York operations, Dexia drastically reduced the assets of Dexia Bank's New York Branch, transferring over $10 billion either out of United States or to a corporate sibling. Specifically, Dexia Bank reduced its assets from $11.35 billion in March 2004 to just $504 million in June 2005.

157.    During the same time period, the assets of Dexia Credit Local increased from less than $7 billion to over $20 billion. Dexia Credit Local is a wholly-owned subsidiary of Dexia S.A. with offices in New York at 445 Park Avenue – the same address as Dexia Bank's New York Branch.   While its assets were increasing by billions of dollars, Dexia Credit Local's volume of loan origination decreased markedly, with total loan volume dropping over 20%,

public sector production dropping 21% and structured financing production dropping 63% from 2003 to 2004.  At a time when Dexia Credit Local's assets should have been stagnant or decreasing, they nearly tripled.

158.   Through the decrease in assets at Dexia Bank New York, and the increase at Dexia Credit Local, Dexia S.A. has maintained a relatively consistent level of assets in the United States.

159.   Dexia Bank began transferring its assets in March 2004 – the very month that Stonington filed the Federal Action (and that other parties filed related actions against Dexia arising out of Artesia's involvement in the L&H fraud).  These actions sought damages of billions of dollars from Dexia.

160.   The liquidation of Dexia Bank's New York Branch, and the transfer of its assets, whether to Dexia Credit Local or to another Dexia entity outside the United States, therefore constitutes a fraudulent conveyance pursuant to Section 276 of the Debtor and Creditor Law.

### PRAYER FOR RELIEF

WHEREFORE, Stonington prays for judgment as follows:

A.   Awarding Stonington all compensatory damages suffered as a result of the wrongful conduct of the defendants in an amount to be determined at trial, including lost profits and consequential and incidental damages;

B.   Awarding Stonington punitive damages in an amount to be determined at trial;

C.   Awarding Stonington pre-judgment and post-judgment interest;

D.   Awarding Stonington their costs and expenses incurred in this action, including fees for plaintiffs' attorneys and experts;

E.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued on hereunder, including any relief available under Sections 278 and 279 of the Debtor and Creditor Law, including setting aside any fraudulent conveyance or attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of Dexia's business activities or their other assets, or the proceeds or assets of Dexia's subsidiaries, so as to assure that plaintiffs have an effective remedy; and

F.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Stonington hereby demands a trial by jury.

Dated: November 21, 2005

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

_____
Max W. Berger
Steven B. Singer
Victoria Wilheim
Avi Josefson
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

*Attorneys for Plaintiffs Stonington Partners, Inc.,*
*Stonington Capital Appreciation 1994 Fund L.P. and*
*Stonington Holdings, L.L.C.*