UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., S.A.),<br><br>                    Defendants. | Civil Action No. 03-Civ-10411 (PBS) |

## DECLARATION OF THOMAS TEIGE CARROLL IN SUPPORT OF DEXIA BANK BELGIUM'S MOTION FOR A SUBPOENA PURSUANT TO 28 U.S.C. § 1783

I, Thomas Teige Carroll, Esq., declare, under penalty of perjury, that:

1.      I am an associate at Clifford Chance US LLP, counsel for Defendant Dexia Bank Belgium, and I submit this declaration in support of Dexia Bank Belgium's Motion for a Subpoena Pursuant to 28 U.S.C. §1783.

2.      Attached hereto as Exhibit A is a true and accurate copy of the letter received by Clifford Chance US LLP, via electronic mail, from Bernstein Litowitz Berger & Grossman LLP on March 3, 2006.

3.      Attached hereto as Exhibit B is a true and accurate copy of the letter from Clifford Chance US LLP delivered to Thomas E. Engel, attorney for John Duerden, on March 13, 2006.

NYA 779056.1

4.    Attached hereto as Exhibit C is true and accurate copy of the initial disclosures from the present action received and filed with the Court by Stonington Partners, Inc.

5.    Attached hereto as Exhibit D is a true and accurate copy of a BusinessWeek Online article from September 11, 2000.

6.    Attached hereto as Exhibit E is a true and accurate copy of John H. Duerden's voting registration in the State of Connecticut obtained from Westlaw.

7.    Attached hereto as Exhibit F is a true and accurate copy of the subpoena counsel for Dexia Bank Belgium intend to serve, with the Court's permission, on John Duerden.

8.    Attached hereto as Exhibit G is a true and accurate copy of portions of Albert Fitzgibbons' Deposition in In re Lernout and Hauspie Sec. Litig., No. 00-CV-11589 (PBS), (D. Mass. July 13, 2004).

9.    Attached hereto as Exhibit H is a true and accurate copy of a portion of Janet Baker's testimony before the court in In re: Lernout and Hauspie Speech Products, N.V., No. 00-4389, (Bankr. D. Del. March 14, 2001).


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April, 2006, at New York, New York.

_____
Thomas Teige Carroll

# EXHIBIT A

# BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

### ATTORNEYS AT LAW

#### NEW YORK • CALIFORNIA • NEW JERSEY • LOUISIANA

Avi Josefson
avi@blbglaw.com
212-554-1493

March 3, 2006

**Via Electronic Mail and First Class Mail**

Thomas Teige Carroll, Esq. (thomas.carroll@cliffordchance.com)
Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019-6131

> Re:  ***Quaak v. Dexia, S.A.*, No. 03-CV-11566-PBS**
> ***Stonington Partners, Inc. v. Dexia, S.A.*, No. 04-CV-10411-PBS**
> ***Filler v. Dexia, S.A.*, No. 04-CV-10477-PBS**
> ***Baker v. Dexia, S.A.*, No. 04-CV-10501-PBS**

Dear Mr. Carroll:

I write in response to your February 27, 2006 letter to Steven Singer regarding John Duerden, Albert J. Fitzgibbons, Richard McGuire, Alexis Michas, Rob Schwager, Scott Shaw and Joe Skrzypczak. Stonington provided Dexia with employment and contact information for these individuals in its Rule 26 Initial Disclosure Statement on April 15, 2005.

Our firm represents Messrs. Fitzgibbons, McGuire, Michas and Shaw in this litigation. Mr. Fitzgibbons and Mr. Michas are current employees of Stonington Partners, Inc., and compulsory process is not required to obtain their appearance at depositions. Mr. Shaw and Mr. McGuire are former employees of Stonington Partners, Inc., and we will accept compulsory service of process on their behalf. Mr. McGuire no longer resides in the New York area, and may not appear for a deposition in New York.

We are not authorized to accept service of process for Messrs. Duerden, Schwager and Skrzypczak. It is our understanding that Mr. Duerden is represented by Thomas E. Engel of Engel & McCarney in this and/or related litigation.

Sincerely,

Avi Josefson

cc:  Patrick T. Egan (pegan@bermanesq.com)
Karen C. Dyer (kdyer@bsfllp.com)
Susan M. Davies (sdavies@josephnyc.com)
Patrick L. Rocco (procco@lawssb.com)

# EXHIBIT B

**C L I F F O R D**
**C H A N C E**

CLIFFORD CHANCE US LLP

31 WEST 52ND STREET
NEW YORK NY 10019 6131

TEL +1 212 878 8000
FAX +1 212 878 8375
www.cliffordchance.com

Thomas Teige Carroll
Associate

DIRECT TEL +1 212 878 8231
thomas.carroll@cliffordchance.com
admitted in New York

March 13, 2006

BY HAND

Thomas E. Engel, Esq.
Engel McCarney & Kenney, LLP
720 Fifth Avenue
New York, New York 10019

Re:     Quaak v. Dexia, S.A., No. 03-CV-11566 (PBS)
        Filler v. Dexia, S.A., No. 04-CV-10477 (PBS)
        Baker v. Dexia, S.A., No. 04-CV-10501 (PBS)
        Stonington Partners, Inc. v. Dexia, S.A., No. 04-CV-10411 (PBS)

Dear Mr. Engel:

It was nice to meet you today over the phone. As I said during our conversation, we represent Dexia Bank Belgium in the above-referenced actions pending in the District of Massachusetts before Judge Patti Saris. It is our intention to depose your client, Mr. John Duerden, in connection with these actions.

In order to provide you with some background on the matters in question as we discussed, I enclose copies of the complaints in the above actions, as well as a list of counsel in the actions. As to discovery in these actions, it commenced May 2005 and is scheduled to conclude on June 16, 2006; document discovery has largely concluded and the parties have begun taking depositions.

Please let me know if I can provide any additional help to you in your consideration of this matter. I look forward to hearing from you.

Sincerely yours,

Thomas Teige Carroll

Enclosures

## LIST OF COUNSEL

BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
Glen DeValerio
Jeffrey C. Block
Patrick T. Egan
One Liberty Square
Boston, MA 02109
(617) 542-8300
Fax (617) 542-1194

SHALOV, STONE & BONNER LLP
Lee S. Shalov
James Bonner
Patrick L. Rocco
485 Seventh Avenue, Suite 100
New York, NY 10018
(212) 239-4340
Fax (212) 239-4310

CAULEY BOWMAN CARNEY &
WILLIAMS, PLLC
Steven E. Cauley
Curtis L. Bowman
11311 Arcade Drive, Suite 200
Little Rock, AK 72212
(501) 312-8500
Fax (501) 312-8505
*Counsel for Class Plaintiffs*

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
Max W. Berger
Steven B. Singer
Javier Bleichmar
Avi Josefson
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400
Fax (212) 554-1444
*Counsel for Plaintiffs Stonington Partners, Inc.,
Stonington Capital Appreciation 1994 Fund L.P.
and Stonington Holdings, L.L.C.*

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph
Susan M. Davies
805 Third Avenue, 31st Floor
New York, NY 10022
(212) 407-1200
Fax (212) 407-1299
*Counsel for Plaintiffs Gary B. Filler and
Lawrence Perlman, Trustees for the TRA Rights
Trust*

BOIES, SCHILLER & FLEXNER LLP
Karen C. Dyer
George R. Coe
255 South Orange Avenue, Suite 905
Orlando, FL 32801
(407) 425-7118
Fax (407) 425-7047
*Counsel for Plaintiffs Janet Baker, James Baker,
JKBaker LLC, and JMBaker LLC*

MINTZ LEVIN COHN FERRIS
GLOVSKY & POPEO
Peter M. Saparoff
Breton Leone-Quick
One Financial Center
Boston, MA 02111
(617) 542-6000
Fax (617) 542-2241

CLIFFORD CHANCE US LLP
James B. Weidner
Joel Cohen
Jeff Butler
Thomas Teige Carroll
31 West 52nd Street
New York, NY 10019-6131
(212) 878-8000
Fax (212) 878-8375
*Counsel for Dexia Bank Belgium*

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware Limited Liability Company, <br><br>       Plaintiffs, <br><br>       v. <br><br> DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), <br><br>       Defendants. | Civil Action No.: 04-10411 (PBS) |

## THE STONINGTON PLAINTIFFS' INITIAL DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Plaintiffs Stonington Partners, Inc.,

Stonington Capital Appreciation 1994 Fund L.P. and Stonington Holdings, L.L.C. (collectively,

"Stonington Plaintiffs," or "Plaintiffs") hereby submit the following initial disclosure statement.

The Stonington Plaintiffs disclose this information based on the information reasonably available

as of the date of these disclosures and do not represent that these disclosures identify every

document, tangible thing, or witness possibly relevant to this lawsuit, nor do the Stonington

Plaintiffs waive their right to object to the production of any document or tangible thing

disclosed herein on the basis of any privilege, obligation to maintain confidentiality, the work

product doctrine, relevancy, undue burden or any other valid objection.  Rather, the Stonington

Plaintiffs' disclosures represent a good faith effort to identify information they reasonably believe

1

is relevant to the factual disputes alleged with particularity in their Complaint, as required by Rule 26(a)(1). The Stonington Plaintiffs' disclosures are made without waiving the right to amend these disclosures. Subject to the foregoing qualifications, the Stonington Plaintiffs state as follows:

I.    INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

Pursuant to Rule 26(a)(1)(A), attached hereto as Exhibit A is a chart that identifies individuals that may have discoverable information relating to the claims and defenses in this action, excluding any impeachment witnesses. The Stonington Plaintiffs also hereby incorporate by reference all persons listed in (i) the accompanying Stonington Partners' Initial Disclosure Statement Pursuant to Federal Rule 26(a)(1), served on February 27, 2003 in connection with *Stonington Partners, Inc. et al. v. Carl Dammekens, et al.* 02-10303 (PBS), with the exception of Judith A. Witterschein, Esq.; and (ii) the initial disclosures served by Class Plaintiffs, the Filler Plaintiffs and the Baker Plaintiffs in the related actions against Defendants. The Stonington Plaintiffs reserve the right to amend, alter and supplement the attached list.

II.    DOCUMENTS

Pursuant to Rule 26(a)(1)(B), attached hereto as Exhibit B is a description by category of documents, data compilations and tangible things in the possession, custody or control of the Stonington Plaintiffs which may be used to support their claims, other than solely for impeachment. The Stonington Plaintiffs reserve the right to amend, alter and supplement the attached list.

Subject to any Protective Orders governing the production of documents in this or any related litigation copies of documents identified in Exhibit B are available for production as soon

2

as the Confidentiality Agreement entered into in *Stonington Partners, Inc. et al. v. Carl Dammekens, et al.* 02-10303 (PBS), is entered in this action.

In addition to the documents described in Exhibit B, the Stonington Plaintiffs are in possession of documents on a single DVD obtained from the Belgian authorities in connection with their investigation of Lernout & Hauspie Speech Products N.V. The Belgian authorities placed strict conditions on the Stonington Plaintiffs' access to this information, which prevent the Stonington Plaintiffs from duplicating or distributing these documents. Accordingly, the Stonington Plaintiffs cannot presently make these documents available to Defendants. It is the Stonington Plaintiffs' understanding, however, that Belgian law affords Dexia the same access and opportunity to obtain a copy of an identical DVD from the Belgian authorities directly. Thus, Dexia may presently obtain the DVD and the documents contained thereon from the Belgian authorities, if Dexia has not done so already.

## III.    DAMAGES

The Stonington Plaintiffs interpret Rule 26(a)(1)(C) of the Federal Rules of Civil Procedure as requiring a computation of compensatory damages, not including punitive or other exemplary damages, or offsets. The Stonington Plaintiffs compute their compensatory damages to be $489,183,797, which represents the value of Dictaphone at the time the Stonington Plaintiffs surrendered their 96% interest therein in exchange for shares of Lernout & Hauspie Speech Products N.V. ("L&H"). The basis for Plaintiffs' computation of compensatory damages is as follows: in a March 7, 2000 press release, L&H announced its agreement to acquire Dictaphone in exchange for 4.75 million shares (pre-split)[1] of L&H common stock. On May 5,

---

[1]    On February 9, 2000, L&H announced a 2-for-1 stock split for record holders of L&H stock as of April 28,

3

2000 - the closing date of the merger - the Stonington Plaintiffs surrendered their 96% interest in Dictaphone and, in exchange for that interest, received 9,064,329 shares of L&H common stock. On May 5, 2000, L&H stock was trading at $53.969 a share. Accordingly, on the date that the Stonington Plaintiffs surrendered their shares of Dictaphone stock in exchange for 9,064,329 shares of L&H stock, the Stonington Plaintiffs received L&H common stock valued at $489,183,707. The Stonington Plaintiffs never sold any of those shares. Following the announcement that L&H would restate its previously issued financial statements for 1998, 1999 and the first two quarters of 2000, and the announcement of L&H's bankruptcy, the Stonington Plaintiffs' shares of L&H were worthless. The Stonington Plaintiffs reserve their right to submit expert materials relating to damages.

## IV.    INSURANCE

The Stonington Plaintiffs incorporate by reference their response pursuant to Rule 26(a)(1)(D) set forth in the accompanying Stonington Partners' Initial Disclosure Statement Pursuant to Federal Rule 26(a)(1), served on February 27, 2003 in *Stonington Partners, Inc. et al. v. Carl Dammekens, et al.* 02-10303 (PBS).

Dated: April 15, 2005                      Respectfully submitted,


BERNSTEIN LITOWITZ BERGER
& GROSSMAN LLP


    /s/ Steven B. Singer
Steven B. Singer
J. Erik Sandstedt
Javier Bleichmar
Avi Josefson

---

2000. The split was executed on May 15, 2000.

1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400 (phone)
(212) 554-1444 (fax)

- and -

**LOONEY & GROSSMAN, LLP**

Richard J. Grahn (BBO #206620)
Charles P. Kindregan (BBO # 554947)
101 Arch Street
Boston, Massachusetts 02110
(617) 951-2800 (phone)
(617) 951-2819 (fax)

Attorneys for the Stonington Plaintiffs.

5

# EXHIBIT A

### of the Stonington Plaintiffs' Initial Disclosures

## EXHIBIT A

## INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

| Name | Contact Information (if known) | Subject(s) Of Information |
|------|-------------------------------|---------------------------|
| Bastiaens, Gaston | c/o Craig and Maccauley<br>Federal Reserve Plaza<br>600 Atlantic Avenue<br>Boston, MA 02210<br>(617) 367-9500 | Defendant's involvement in and knowledge of the LDC fraud. |
| Bryan Cave LLP | 700 Thirteenth Street, N.W<br>Washington, D.C. 20005<br>(202) 508-6000 | Defendant's involvement in and knowledge of the LDC fraud. |
| Claessens, K. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Cloes, J.P. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Coolen, M. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Cools, Dirk | | Defendant's involvement in and knowledge of the LDC fraud. |
| Cordonnier, Piet | | Defendant's involvement in and knowledge of the LDC fraud. |
| Dankelman, F. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Dauwe, Geert | | Defendant's involvement in and knowledge of the LDC fraud. |
| De Clerk, Filip | | Defendant's involvement in and knowledge of the LDC fraud. |
| De Gendt, F. | | Defendant's involvement in and knowledge of the LDC fraud. |
| De Schaepdrijver, Th. | | Defendant's involvement in and knowledge of the LDC fraud. |

| | | |
|---|---|---|
| Devogele, J.L. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Dubois, J.B. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Fajct, Patrick | | Defendant's involvement in and knowledge of the LDC fraud. |
| Ferrand, Bart | | Defendant's involvement in and knowledge of the LDC fraud. |
| Flanders Language Valley Foundation | | Defendant's involvement in and knowledge of the LDC fraud. |
| Giovognolim, Chr. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Goffaux, G. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Hauspie, Pol | c/o Morrison Mahoney LLP 250 Summer Street Boston, Massachusetts 02210 (617) 439-7500 | Defendant's involvement in and knowledge of the LDC fraud. |
| Lamiroy, B. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Legien, M. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Lernout, Jozef | c/o GOODWIN PROCTOR LLP Exchange Place Boston, MA 02109 (617) 570-1000 | Defendant's involvement in and knowledge of the LDC fraud. |
| Mercator & Noordstar NV | | Defendant's involvement in and knowledge of the LDC fraud. |
| Millants. Gerry | | Defendant's involvement in and knowledge of the LDC fraud. |
| Mommens, Bernard | | Defendant's involvement in and knowledge of the LDC fraud. |

| | | |
|---|---|---|
| Rabaey, Peter | | Defendant's involvement in and knowledge of the LDC fraud. |
| Seghers, C. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Tritz, S. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Van Coillie, Etien | | Defendant's involvement in and knowledge of the LDC fraud. |
| Van Riet, K. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Van Riet, K. | | Defendant's involvement in and knowledge of the LDC fraud. |
| Willaert, Nico | c/o Morrison Mahoney LLP 250 Summer Street Boston, Massachusetts 02210 (617) 439-7500 | Defendant's involvement in and knowledge of the LDC fraud. |

# EXHIBIT B

of the Stonington Plaintiffs' Initial Disclosures

# EXHIBIT B

## DOCUMENTS[2]

### PLAINTIFFS' DOCUMENTS

1. Documents produced from the files of the Stonington Plaintiffs, Bates stamped: STN 1- 16783.

### Shearman & Sterling Documents

2. Documents produced from the files of Shearman & Sterling in connection with their representation of the Stonington Plaintiffs in the sale of Dictaphone to Lernout & Hauspie, Bates stamped: SS 1- 6510.

### Deloitte & Touche Documents

3. Documents produced from the files of Deloitte & Touche in connection with their retention by Stonington Plaintiffs in the sale of Dictaphone to Lernout & Hauspie, Bates stamped: DT 1- 7475.

### Lernout & Hauspie Speech Products N.V. Documents

4. Documents produced to the Securities and Exchange Commission ("SEC") in connection with its investigation of L&H. This is comprised of approximately 38 boxes of documents and several CD-ROMs that were provided to plaintiffs' counsel by Milbank Tweed Hadley & McCloy, LLP.

5. Documents reviewed and obtained pursuant to a June 13, 2003 Order from the U.S. Bankruptcy Court For The District of Delaware modifying the automatic stay under section 362 of the Bankruptcy Code. Plaintiffs were permitted access and made selective copies of certain L&H documents stored at two locations in Belgium and in a warehouse facility in Danvers, Massachusetts. Plaintiffs possess approximately 57 boxes of documents from the Belgian warehouses and 15 boxes of documents from the Danvers facility.

---

2    All documents listed herein are in the possession, custody or control of Counsel for the Stonington Plaintiffs or counsel for Plaintiffs in other related cases brought by or on behalf of the Class Plaintiffs, the Filler Plaintiffs or the Baker Plaintiffs.

**DOCUMENT PRODUCED BY DEFENDANTS**
**IN** *STONINGTON PARTNERS, INC. ET AL. V. CARL DAMMEKENS, ET AL. 02-10303 (PBS)*

6. Documents produced by Dirk Cauwelier, Bates stamped: DC 00001-003367.

7. Documents produced by Ellen Spooren, Bates stamped: ES 0001-0029.

8. Documents produced by Erwin Vandendriessche, Bates stamped EV 000001-000936.

9. Documents produced by FLV Fund during jurisdictional discovery, comprising approximately 6 boxes, with documents affixed with various Bates prefixes.

10. Documents produced by FLV Fund during merits discovery, comprising 28 boxes, with documents affixed with various Bates prefixes.

11. Documents produced by Francis Vanderhoydonck, Bates stamped FV 000001-002089.

12. Documents produced by KPMG LLP, Bates stamped: KPMUS 00001-124507.

13. Documents produced by KPMG Belgium, Bates stamped KPMG-B-00001-047295.

14. Documents produced by L&H's former Audit Committee, Bates stamped AC 000001-002787.

15. Documents produced by Marc DePauw, Bate stamped MD 000001-3483.

16. Documents produced by Mercator during jurisdictional discovery, Bates stamped M&N 1-3058.

17. Documents produced by SG Cowen, Bates stamped SGC 1-116286.

**DOCUMENTS PRODUCED BY THIRD PARTIES**
**IN** *STONINGTON PARTNERS, INC. ET AL. V. CARL DAMMEKENS, ET AL. 02-10303 (PBS)*

18. Documents produced by A4 Health Systems (formerly Nine Rivers Technology), Bates stamped NRT 00001-68.

19. Documents produced by Arthur Andersen, Bates stamped AA000001-001019; AA-2 000001-006752.

20. Documents produced by Breveon, Inc. (formerly KorTeam International, Inc.), Bates stamped KTI 001-246.

21. Documents produced by Brown Rudnick Berlack Israels LLP ("Brown Rudnick"), comprising approximately 58 boxes, with documents affixed with various Bates prefixes.

22. Documents produced by Bryan Cave LLP, Bates stamped BRY 0000001-247; BCLLP 1-1520.

23. Documents produced by Citrix Systems, Inc. (formerly Sequoia Software Corporation), Bates stamped CTXS 0001-0068.

24. Documents produced by CMHC Systems, Bates stamped VIT 001-0180.

25. Documents produced by D&H Distribution Company, Bates stamped DH0001-135.

26. Documents produced by Jeanne Steele, Bates stamped JS 000001-190.

27. Documents produced by Merge Technologies, Inc. (formerly Interpra Medical Imaging Network, Ltd.), Bates stamped IMIN 001-0503.

28. Documents produced by PricewaterhouseCoopers, Bates stamped PWC000001-010196.

29. Documents produced by Vasco Data Security International, Bates stamped V000001-001285.

30. Documents produced by Nomura International Trust Co., Bates stamped NITC 0001-0075.

31. Documents produced by Prudential Securities, Bates stamped WACH- 1-2759.

32. Documents produced by RBC Dain Rauscher Investment, produced via email.

33. Documents produced by Stifel Nicolaus, Bates stamped STEIF_NIC 0001-0012.

34. Documents produced by StockCross Financial Services, Inc., Bates stamped STK CROSS 0001-0006.

35. Documents produced by Piper Jaffrey, Bates stamped PIP_JAF 0001-0143.

36. Documents produced by U.S. Clearing Corporation, Bates stamped USCLEAR 00001-00935.

37. Documents produced by UBS/Paine Webber, Bates stamped UBS 001-2100

38. Documents produced by Wayne Hummer Investments LLC, produced on disc.

39. Documents produced by Wedbush Morgan Securities, Bates stamped WEDBUSH 0001-0099.

40. Documents produced by Bear Stearns Securities Corp., produced on disk.

41. Documents produced by Bidwell & Company, Bates stamped BID 1-174.

42. Documents produced by Brown Brothers Harriman & Co., produced on disk.

43. Documents produced by Charles Schwab, Bates stamped SCHWAB 1-6204.

44. Documents produced by CIBC World Markets Corp., produced on disk.

45. Documents produced by Crowell Weedon & Co., Bates stamped CROW 001-28.

46. Documents produced by D.A. Davidson, Companies, Bates stamped DA DAVID 00001-00007

47. Documents produced by Oppenheimer & Co., Inc., Bates stamped OPP 1-33.

48. Documents produced by H&R Block Financial Advisors.

49. Documents produced by Harris Investors Services LLC, Bates stamped HAR 0001-0488.

50. Documents produced by Mesirow Financial, Bates stamped MEISROW 0001-1277.

51. Documents produced by Morgan Keegan & Company, Inc., Bates stamped MOR_KEE 0001-0032.

52. Documents produced by Auerback Grayson, Bates stamped AG 0001-0074.

53. Documents produced by Friedman Kaplan, Bates stamped FKSA 1-67.

54. Documents produced by John Shagoury, Bates stamped SHAG00001 - 00463.

## ADDITIONAL DOCUMENTS

55. Transcript of deposition of Michael Faherty, taken by the Securities and Exchange Commission and documents Bates stamped GSB 0001-0541.

56. May 28, 2001 Report prepared by a panel of experts for prosecutors in Belgium and

referred to in ¶ 6 of the complaint.

57. All pleadings, discovery papers and deposition transcripts related to *Stonington Partners, Inc. et al. v. Carl Dammekens, et al.*, 02-10303 (PBS) and related actions.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STONINGTON PARTNERS, INC., et al., | : : | No. 02-CV-10303-PBS |
| Plaintiffs, | : | |
| v. | : : | |
| CARL DAMMEKENS, et al., | : | |
| Defendants. | : : | |

## STONINGTON PARTNERS' INITIAL DISCLOSURE STATEMENT
## PURSUANT TO FEDERAL RULE 26(a)(1)

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiffs Stonington

Partners, Inc., Stonington Capital Appreciation 1994 Fund, L.P., and Stonington Holdings,

L.L.C. (collectively, "Stonington Partners" or "Plaintiffs") make the following initial disclosure

statement:

## INITIAL DISCLOSURE QUALIFICATIONS

1.     This Initial Disclosure Statement is made based upon information presently

known to Plaintiffs and is made without prejudice to producing during core discovery or at trial

such data, information or document as are: (i) subsequently discovered; (ii) subsequently

determined to be relevant for any purpose; or (iii) subsequently determined to have been omitted

from these disclosures.

2.     Plaintiffs hereby reserve the right at any time to revise and/or supplement this

Initial Disclosure Statement and the information and documents provided pursuant to Plaintiffs'

initial disclosure obligations.

3.     Plaintiffs hereby expressly reserve all objections to the use for any purpose of this

Initial Disclosure Statement or any of the information and documents referenced herein in this

case or any other proceeding. By referring to or producing documents in the initial disclosure process. Plaintiffs make no representations or concessions regarding the relevancy or appropriateness of any particular documents or types of documents.

4.      By referring to or producing documents in the initial disclosure process. Plaintiffs do not waive the right to object to Defendants' discovery requests on any basis. including without limitation, relevancy, confidentiality, overbreadth and burden. and the attorney-client privilege, the attorney work product doctrine or any other lawful protection from disclosure.

## INITIAL DISCLOSURES

**Rule 26(a)(1)(A):** The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.

Subject to and without waiving the Initial Disclosure Qualifications. the individuals identified below are likely to have discoverable information that Plaintiffs may use to support their claims. Individuals are identified in connection with the entity with which they were affiliated at the times relevant to this action. Except where otherwise noted. Plaintiffs have no telephone or address information for these individuals apart from that of the entity listed. In addition to the individuals listed below. other individuals who may have discoverable information relating to the Claims set forth in Plaintiffs' Amended Complaint (the "Complaint") are identified in the Findings and Recommendations to the Audit Committee of Lernout & Hauspie Speech Products. N.V. ("L&H") by Bryan Cave LLP and Loeff Clayes Verbeke. and that document is hereby incorporated by reference. Further. to the extent they relate to the Claims set forth in the Complaint. Plaintiffs hereby incorporate by reference the witnesses listed in the initial disclosures of the Class Plaintiffs. the Filler Plaintiffs and the Baker Plaintiffs.

2

1.    **Stonington Partners, Inc.**, located at 767 Fifth Avenue. New York. New York 10153. (212) 339-8500.  The individuals identified below are likely to have discoverable information relating to Plaintiffs' sale of Dictaphone Corporation ("Dictaphone") to L&H in exchange for shares of L&H stock.  Any communication with these individuals should be through the undersigned counsel for Plaintiffs.

     a.    Albert J. Fitzgibbons, III

     b.    Michael Lin

     c.    Mick McGuire

     d.    Alexis P. Michas

     e.    Scott Shaw
        Lincoln Technical Institute, Inc.. 200 Executive Drive. West Orange. New Jersey 07052

     f.    Judith A. Witterschein. Esq.
        Merrill Lynch & Co., Inc.. 4 World Financial Center. 250 Vesey Street. New York, New York 10080. (212) 670-0420

2.    **Dictaphone Corporation**, located at 3191 Broadbridge Avenue. Stratford. Connecticut 06497, (203) 381-7000.  The individuals identified below are likely to have discoverable information relating to Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock and the accounting improprieties at L&H.

     a.    John H. Duerden
        Invensys PLC. Carlisle Place. London SW1P 1BX.  United Kingdom. 44 20 7834 3848

     b.    Daniel P. Hart. Esq.

     c.    Rob Schwager

     d.    Joe Skrzypczak
        Imagistics International Inc.. 100 Oakview Drive. Trumbull. Connecticut 06611. (203) 365-2343

3. **Deloitte & Touche LLP.** c/o Eric Fisher. Esq.. located at Two World Financial Center. New York. New York. 10281-1414. (212) 436-2000. The individuals identified below are likely to have discoverable information relating to Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock.

    a.    John Malvisi

    b.    Gil Martin

    c.    Mindy Meyers

    d.    Megan Zietsman

4. **SG Cowen.** located at Two International Place. Boston. Massachusetts 02110. (617) 946-3700. The individuals identified below are likely to have discoverable information relating to Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock.

    a.    Ben Howe

    b.    Peter Lombard

    c.    George Assam

5. **Shearman & Sterling.** located at 599 Lexington Avenue. New York. New York 10022-6069. (212) 848-4000. The individual identified below is likely to have discoverable information relating to Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock.

    a.    Clare O'Brien. Esq.

6. **Chase H&Q.** now doing business as J.P. Morgan Chase & Co. The individual identified below is likely to have discoverable information relating to Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock.

    a.    Eric L. Johnson

7. **Chase Securities, Inc..** now doing business as J.P. Morgan Chase & Co. The individual identified below is likely to have discoverable information relating to Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock.

    a.    James A. Feeley

8. **KPMG US.** The individuals identified below are likely to have discoverable information relating to one or more of the following: (1) Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock: (2) the allegedly fraudulent and deceptive schemes

4

described in the Complaint; (3) Defendants' knowledge thereof; (4) the investigation by the Securities and Exchange Commission ("SEC") into L&H.

    a.    Craig Buckler Allen

    b.    James K. Boyer, Jr.

    c.    Glen L. Davison

    d.    Fran Dissaro

    e.    Timothy F. Egan

    f.    Thomas Michael Faas

    g.    Robert P. McLamb
        700 Louisiana Street, Houston, Texas 77002, (713) 319-2000

    h.    Paul Sisson

    i.    Edward A. Sullivan

    j.    Kaveh Varjavand

    k.    Digby Wirtz

    l.    Carolyn Worth

    m.    Tom De Wilde

9.    **KPMG Belgium**, located at Bollebergen 2B, Bus 13, B-9052 Gent, Belgium, (32 (9) 241 8800). The individuals identified below are likely to have discoverable information relating to one or more of the following: (1) Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock; (2) the allegedly fraudulent and deceptive schemes described in the Complaint; (3) Defendants' knowledge thereof; (4) the investigation by the SEC into L&H.

    a.    William Van Aerde

    b.    Stephan Huysman

    c.    Veronique De Roose

    d.    Rob Snijders

    e.    Patrick De Poorter

       f.     Jo Demario

10.    **KPMG Korea**, located at Star Tower, 10th Floor, 737 YeokSam Dong, KangNam-gu, Seoul, Republic of Korea 135-984, (82 (2) 2112 0001). The individuals identified below are likely to have discoverable information relating to one or more of the following: (1) the allegedly fraudulent and deceptive schemes described in the Complaint; (2) Defendants' knowledge thereof; (3) the investigation by the SEC into L&H.

       a.     Oh Bum Kwon

       b.     Philip Lee

11.    **Brown, Rudnick, Freed & Gesmer**, located at One Financial Center, Boston, Massachusetts 02111, (617) 856-8200. The individual identified below is likely to have discoverable information relating to the investigation by the SEC into L&H.

       a.     Philip Flink, Esq.

12.    **Lernout & Hasupie Speech Products**. The individuals identified below are likely to have discoverable information relating to one or more of the following: (1) Plaintiffs' sale of Dictaphone to L&H in exchange for shares of L&H stock; (2) the allegedly fraudulent and deceptive schemes described in the Complaint; (3) Defendants' knowledge thereof; (4) the investigation by the SEC into L&H.

       a.     Jo Lernout

       b.     Pol Hauspie

       c.     Gaston Bastiaens

       d.     Nico Willaert

       e.     Carl Dammekens

       f.     Erwin Vandendriessche

       g.     Dirk Cauweiler

       h.     Marc G.H. DePauw

       i.     Filip Beernaert

       j.     Frederick Deschodt

       k.     Jacques Vanloo

    l.     Philip Depacker

    m.     Allan P. Forsey

13.    **L&H Korea**. The individuals identified below are likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

    a.     Ju-Chul Seo

    b.     Hye Jin Kang

14.    **L&H Asia Pacific**. The individuals identified below are likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

    a.     Louis Woo

    b.     Cheryl Foo

    c.     Sam Cho

15.    **L&H Investment Company**. The individuals identified below are likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

    a.     Chantal Mestdagh

    b.     Francis Vanderhoydonck

16.    **Loeff Claeys Verbeke**. c/o Allen & Overy. located at Avenue de Tervuren 268A. B-1150. Brussels. Belgium. (32 2 780 2222). The individuals identified below are likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

    a.     Kathleen Lemmens. Esq.

    b.     Louis Verbeke. Esq.

17.    **FLV Fund**. The individuals identified below are likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

    a.     Paul Behets

    b.     William Hardeman

7

c.    Philip Vermeulen

18.  **HI Worldwide**, located at Donga Media Center, 139, Sejong-Ro, Chongro—Ku, Seoul, Korea, (822.2020.2101). The individuals identified below are likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

a.    Chun Hyung Lee

b.    Richard Lee

19.  **Language Development Companies**. The individual identified below is likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

a.    Tony Snauwaert

20.  **Digital Sei-Young Ltd.**, located at Soom-om Building, 6th Floor 1027-4, Bang-Bae 3 Dong, Seo-Cho Gu, Seoul, Korea. The individual identified below is likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

a.    An Hee Chois

21.  **Document Management Partners (DMP)**. The individual identified below is likely to have discoverable information relating to the allegedly fraudulent and deceptive schemes described in the Complaint and Defendants' knowledge thereof.

a.    Luc Broos

**Rule 26(a)(1)(B)**: A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of Plaintiffs that may be used to support Plaintiffs' claims or defenses.

Subject to and without waiving the Initial Disclosure Qualifications, Plaintiffs represent that they have in their possession, custody or control documents and other tangible things that may support their claims. The following categories of documents and things are in the possession, custody or control of Plaintiffs: (1) documents from Plaintiffs' files relating to Plaintiffs' sale of Dictaphone Corporation to L&H; (2) documents from the files of Deloitte & Touche LLP relating to Plaintiffs' sale of Dictaphone Corporation to L&H; and (3) documents

8

and things obtained from certain non-parties to this and other related litigations. With respect to the documents and things in category (3) above. it is Plaintiffs understanding that certain of these documents and things are already available to the parties to this litigation.

Subject to any Protective Orders governing the production of documents in this or any related litigation. copies of the documents and things described above are available. upon reasonable notice. for the review of all parties at the offices of Plaintiffs' counsel. Bernstein Litowitz Berger & Grossmann LLP. 1285 Avenue of the Americas. New York. New York 10029, (212) 554-1400. Attn: Avi Josefson. Esq.. (E-mail: avi@blbglaw.com). A set of copies will be furnished upon written request at the expense of the requesting party.

**Rule 26(a)(1)(C)**: A computation of any category of damages claimed by the disclosing party. making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Plaintiffs interpret Rule 26(a)(1)(C) of the Federal Rules of Civil Procedure as requiring a computation solely of compensatory damages. and not of punitive or other exemplary damages. Plaintiffs compute their compensatory damages to be $489.183.707. which represents the value of Dictaphone at the time Plaintiffs' surrendered their 96% interest therein in exchange for shares of L&H. The basis for Plaintiffs' computation of compensatory damages is as follows: In a March 7. 2000. press release. L&H announced its agreement to acquire Dictaphone in exchange for 4.75 million shares (pre-split)[1] of L&H common stock. On May 5. 2000 – the closing date of the merger – Stonington surrendered its 96% ownership interest in Dictaphone and. in exchange for that interest. received 9.064.329 shares of L&H common stock. On May 5. 2000. L&H's stock was trading at $53.969 a share. Accordingly. on the date that Stonington surrendered its

---

[1] On February 9. 2000. L&H announced a 2-for-1 stock split for record holders of L&H stock as of April 28. 2000. The split was executed on May 15. 2000.

shares of Dictaphone stock in exchange for 9,064,329 shares of L&H stock. Stonington received L&H common stock valued at $489,183,707. Plaintiffs never sold any of those shares. Following the announcement that L&H's would restate its previously issued financial statements for 1998, 1999 and the first two quarters of 2000, and the announcement of L&H's bankruptcy, Plaintiffs' shares of L&H were worthless.

Subject to and without waiving the Initial Disclosure Qualifications, and with reservation of Plaintiffs' right to submit expert materials relating to damages in accordance with the schedule set forth by the Court at the February 13, 2003 Scheduling Conference, Plaintiffs represent that all non-privileged documents and evidentiary material in Plaintiffs' possession, custody or control on which such computation is based (other than such material as is publicly available) is included in those documents and materials being made available pursuant to 26(a)(1)(B), as described above.

**Rule 26(a)(1)(D)**:  For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment.

Plaintiffs are aware of an L&H Directors and Officers Liability Insurance Policy (Policy No. 99 X 000 602 346) issued by AXA Global Risks for the period February 25, 1999 to February 25, 2001, and an Excess Directors & Officers Liability Insurance Policy (Policy No. 3DP-00-1096) issued by Kemper Insurance Company for the period April 12, 2000 to April 12, 2002 under which AXA Global Risks and/or Kemper Insurance Company may be liable to satisfy part or all of a judgment which may be entered in favor of Plaintiffs or to indemnify or reimburse for payments made to satisfy such a judgment.  Copies of those policies are available from the individual L&H Defendants.

Dated: February 27, 2003

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

By: _____

Max W. Berger
Steven B. Singer
Gerald H. Silk
Avi Josefson
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

- and -

LOONEY & GROSSMAN, LLP

Richard J. Grahn (BBO # 206620)
Charles P. Kindregan (BBO # 554947)
101 Arch Street
Boston, Massachusetts  02110
Tel:     (617) 951-2800
Fax:     (617) 951-2819

Attorneys for Plaintiffs

65960.4                              11

## CERTIFICATE OF SERVICE

I, Avi Josefson, hereby certify that, on February 27, 2003, I caused true and correct copies of STONINGTON PARTNERS' INITIAL DISCLOSURE STATEMENT PURSUANT TO FEDERAL RULE 26(a)(1) to be served by first-class United States mail, postage prepaid, on all counsel listed on the attached service list.

Avi Josefson

SERVICE LIST

**COUNSEL FOR DEFENDANT FLANDERS
LANGUAGE VALLEY FUND**
Robert J. Kaler
GADSBY & HANNAH, LLP
225 Franklin Street
Boston, MA 02110

**COUNSEL FOR DIRK CAUWELIER, ERWIN VANDENDRIESSCHE, MARC DePAUW**
John B. Missing
DEBEVOISE & PLIMPTON
553 13th Street N.W., Suite 1100E
Washington, D.C. 20004

**COUNSEL FOR LOUIS H. VERBEKE**
Roger E. Zuckerman
ZUCKERMAN SPAEDER LLP
1201 Connecticut Avenue, N.W., Suite 1200
Washington, D.C. 20036

**COUNSEL FOR MERCATOR & NOORDSTAR, N.V.**
Jennifer Semko
BAKER & MCKENZIE
815 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20006

**COUNSEL FOR DEFENDANT KLYNVELD PEAT
MARWICK GOERDELER BEDRIIFSREVISOREN**
George A. Salter
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022

**COUNSEL FOR KPMG LLP**
Michael P. Carroll
DAVIS, POLK & WARDELL
450 Lexington Avenue
New York, NY 10017

**COUNSEL FOR CLASS PLAINTIFFS**
Glen De Valerio
BERMAN, DEVALERIO PLEASE
TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA 02109

**COUNSEL FOR FILLER PLAINTIFFS**
Gregory P. Joseph
GREGORY P. JOSEPH
  LAW OFFICES LLP
805 Third Avenue, 31st Floor
New York, NY 10022

**COUNSEL FOR BAMBERG PLAINTIFFS**
Jack R. Pirozzolo
WILLCOX, PIROZZOLO
  & McCARTHY PC
50 Federal Street
Boston, MA 02110

**COUNSEL FOR BAKER PLAINTIFFS**
Karen C. Dyer
BOIES, SCHILLER & FLEXNER LLP
255 South Orange Avenue
Suite 905
Orlando, FL 32801-3456

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served to counsel in the attached service list by first-class United States mail, postage prepaid on April 15, 2005.

*STONINGTON PARTNERS, INC. v. DEXIA BANK BELGIUM*

## SERVICE LIST

1.    **Counsel for Stonington Partners, et al.**

Steven B. Singer, Esq.
Erik Sandsted, Esq.
Javier Bleichmar, Esq.
Avi Josefson, Esq.
**BERNSTEIN LITOWITZ, BERGER & GROSSMAN LLP**
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

2.    **Co-Lead Counsel for the Lead Plaintiffs**

Glen DeValerio
Jeffrey C. Block, Esq.
Patrick T. Egan, Esq.
**BERMAN, DEVALERIO PEASE**
       **TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA 02109
(617) 542-8300

J. Allen Carney, Esq.
Cauley Bowman Carney & Williams, PLLC
11001 Executive Center Drive, Suite 200
PO Box 25438
Little Rock, AR 72221-5438
(501) 312-8505

James P. Bonner, Esq.
Patrick L. Rocco, Esq.
**SHALOV STONE & BONNER**
485 7th Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

3.    **Counsel for Filler, et al.**

Gregory P. Joseph, Esq.
Susan M. Davies, Esq.
**GREGORY P. JOSEPH LAW OFFICES, LLC**
805 Third Avenue
31st Floor
New York, NY 10022
(212) 407-1210

4.    **Counsel for Baker, et als**

Karen C. Dyer, Esq.
George C. Coe, Esq.
**BOIES, SCHILLER & FLEXNER LLP**
255 S. Orange Avenue
Suite 905
Orlando, FL 32801-3456
(407) 425-7118

Alan K. Cotler, Esq.
Joan Yue, Esq.
**REED SMITH LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 10103-4301
(215) 851-8100

Terence K. Anker, Esq.
**LAW OFFICES OF PATRIDGE, AKNER
& HORSTMANN LLP**
200 Berkely St., 16th Floor
Boston, MA 02116
(617) 859-9999

5.    **Counsel for Defendant Dexia Bank Belgium**

James B. Weidner, Esq.
Jeff E. Butler, Esq.
**Clifford Chance US LLP**
31 West 52nd Street
New York, NY 10019
Tel: 212-878-8205

Fax: 212-878-8375
Jeff.Butler@CliffordChance.com

Peter M. Saparoff, Esq.
**MINTZ LEVIN COHN FERRIS**
  **GLOVSKY AND POPEO, PC**
One Financial Center
Boston, MA 02111

# EXHIBIT D

Case 1:04-cv-10411-PBS     Document 77     Filed 04/11/2006     Page 43 of 71

BUSINESSWEEK ONLINE : SEPTEMBER 11, 2000 ISSUE
[an error occurred while processing this  [an error occurred while processing this
directive]                                                      directive]

INTERNATIONAL -- EUROPEAN BUSINESS

# How Hype Hurt Lernout & Hauspie (int'l edition)
**Finally, skeptical investors sold shares**

RELATED ITEMS
How Hype Hurt Lernout &
Hauspie (int'l edition)

TABLE: Lernout &
Hauspie's Ups and Downs

INTERACT
E-Mail to Business Week
Online

Gaston Bastiaens was flush with anticipation. It was mid-July, and the chief executive of Lernout & Hauspie Speech Products was lunching in style near the company's headquarters in Ieper, Belgium. Between sips of red wine he described how L&H, with its lock on some of the best speech-recognition software, was powerfully positioned as the Web migrated into phones and cars, where people will talk to machines and machines will talk back. With his purchase of two U.S. rivals, the 53-year-old Belgian suddenly had a software company with $1 billion in annual sales, one poised to follow SAP and Nokia Corp. into Europe's tech elite. "This market is going to explode," he said (see BW Online, Video Views, "Talking Tech").

For Bastiaens, that may well have been the last sunny moment of the summer. Within days, newspaper reports alleged that the company inflated its fast-growing South Korean revenues. Bastiaens denied the reports and ordered KPMG to conduct a special audit. Still, L&H investors, battered over the years by revelations of tangled finances, dumped the company's stock. From a high of 72 1/2 in March, it plummeted to 34 on Aug. 24. The next day, Bastiaens stepped down. John H. Duerden, the former CEO of Dictaphone, one of Bastiaens' U.S. acquisitions, replaced him. But worried investors drove L&H shares down further even as Duerden pledged to provide "greater clarity and precision."

Where have we heard those words before? "Clarity and precision" are becoming Europe's New Economy refrain, one that resounds from the remains of the software burnout Baan Co. to the Amsterdam bourse, site of the disastrous initial public offering of Internet service provider World Online. L&H too has struggled to grow from a small-country company into a global heavyweight. It not only has issued sheaves of windy press releases but has also engaged unsettled investors on numerous fronts, from insider stock trades far above market price to the surprising burst of Asian sales. Such behavior spooks investors, draining funds from Europe's high-tech hopefuls.

**SHAKEUP.** L&H's latest stumble could hardly have come at a worse time. Bastiaens had assembled a speech technology powerhouse, one

rivaled only by IBM. And L&H's base in Europe has positioned it for a
bonanza in the mobile Internet, where the Old World leads America.
Now, though, the company must weather a management shakeup. And
even if L&H proves that its lofty Korean sales are genuine, the company
must come to terms with its history. For years, L&H has alternated
zanily between soaring vision and unsettling surprises. That's why it has
long been a favorite of short-sellers.

Hype has been part of the company since its birth in 1987. Even as
founders Jo Lernout and Pol Hauspie were passing the hat among
neighboring farmers in the Flemish lowlands, they were planning to
create a portfolio of companies. And for this they needed a high-flying
stock.

But L&H was plagued by a disconnect between its vision and
technology. Speech programs in their infancy were too primitive and
computers too weak for L&H's technology to take off. While L&H
wowed investors with techno-mirages of humans chatting with
computers, it made money with low-tech offerings. Its speech programs
went into talking toys and tinny translation machines that provided good
earnings. The company listed on Nasdaq in 1995.

Initially, Bastiaens, an engineer who led the failed Newton project at
Apple Computer Inc., flourished at L&H despite frequent run-ins with
analysts. Bastiaens bought technological leaders, including Kurzweil
Technologies Inc., a speech-recognition company in Wellesley Hills,
Mass., and Mendez Translation Group of Brussels. In 1997, a year after
he came on board, Bastiaens landed the big one: William H. Gates III.
Microsoft invested $45 million in L&H, ending up with an 8% stake.
Intel Corp. jumped in in 1999 with $30 million. The early Microsoft
investment gave L&H much needed credibility and revenues--Microsoft
uses L&H software. "Speech recognition is one of the key technologies
of the future," Gates said at a press conference in Brussels--just before
anarchists lobbed a cream pie at him.

L&H's vision grew ever more grandiose. The company wouldn't just be
a commercial success; it would also create a technological cluster. The
Flanders Language Valley Fund, a venture-capital fund, went public in
1997 with offices right next to L&H's headquarters. But it turned out the
fund was supporting some of L&H's own customers. Chastened,
Lernout and Hauspie severed their ties. "It was a mistake because people
thought we were buying our revenues," Lernout admits.

Bastiaens' conflicts with financial analysts escalated this year. In
February, Lehman Brothers Inc.'s Brian Skiba issued a bombshell

report. It claimed that L&H's growth in the U.S. and Europe was much lower than investors had assumed, and that the company was not coming clean. Bastiaens denied it, but in a conference call, he refused to give a geographic breakdown of sales.

Still, investors applauded the acquisitions of Stratford (Conn.)-based Dictaphone and Dragon of Newton, Mass. Soon after the $650 million Dictaphone deal, Royal Philips Electronics paid $1.2 billion for medical-transcription company Medqvist. "Philips is validating our strategy," said Bastiaens.

**PUZZLING.** But the Dictaphone purchase meant more than half of L&H's business was in the U.S., which obliged the company to file detailed accounts with the Securities & Exchange Commission. Analysts learned that sales in Korea had soared from a mere $97,000 in 1998 to $58.9 million in this year's first quarter, some 52% of the total. Suspecting an attempt to pump up results, investors began dumping the stock. At the end of July, Bastiaens bought 620,000 shares from founder Lernout at a 12.5% premium, while letting Lernout keep his voting rights. The move only puzzled analysts, who suspected a ploy to prop up the stock ahead of bad news. "Why buy just two weeks before reporting second-quarter results, and why at a premium?" asks Patrick Michielsen of Fortis Bank in Brussels. Says Bastiaens: "I wanted to show confidence in the company." L&H reported a first-half net loss of $15.6 million on sales of $365.6 million. But if one-time charges for the Dictaphone acquisition are excluded, it earned 23 cents a share.

Then, on Aug. 8, the *Wall Street Journal* claimed discrepancies in the all-important Korean sales. Bastiaens and other top officials saw a conspiracy to bring them down. "This was no accident," one says in private. In particular, they questioned the role of New York-based Rocker Partners. Rocker General Partner Marc Cohodes admits shorting the stock but not feeding dirt to reporters. "Instead of saying, 'It's the shorts,' this company should answer the questions about its related-party dealings and how Korea accounts for two to three times more than its U.S. business," says Cohodes.

After the Korea scandal broke, Bastiaens rushed to restore confidence. He contacted several of the Korean customers interviewed for the *Journal* story, and they publicly said they were misquoted. A trip to Korea was arranged for two financial analysts, both of whom were impressed with the company's business there. "I met customers and saw L&H products really being used," says Kurt Janssens of KBC Securities in Brussels. BUSINESS WEEK also contacted LG Electronics and Hung Chang, both quoted in the *Journal* article, who confirmed that

they are L&H customers but refused to reveal the extent of their contracts. Most important, Bastiaens asked for the KPMG special audit. "He wouldn't be so stupid as to ask for an audit if he had something to hide," says Pierre-Paul Verelst, an analyst at Brussels brokers Vermeulen Raemdonck. Yet if the Korean allegations prove true, investor reaction will be devastating.

By this time, founders Lernout and Hauspie thought Bastiaens had become a liability. His replacement is Duerden, a British-born U.S. citizen who had worked at Xerox Corp. and Reebok International Ltd. before running Dictaphone. Bastiaens remains on the board and is a 2% shareholder. Meanwhile, Duerden is flying to Seattle to personally reinforce ties with Microsoft, a key shareholder and customer. For important meetings, face-to-face is still better than the phone--especially when the company's credibility is on the line.

*By William Echikson in Ieper, Belgium, with Ihlwan Moon in Seoul*

BACK TO TOP

Copyright 2000-2006, by The McGraw-Hill Companies Inc. All rights reserved.
Terms of Use   Privacy Notice

The McGraw-Hill Companies

# EXHIBIT E

Westlaw.

```
State:                    CONNECTICUT
File Acquired:            02/01/2006
```

### NAME AND PERSONAL INFORMATION

```
Name:                     JOHN H DUERDEN
Address:                  195 WAMPHASSUC ROAD
                          STONINGTON, CT 06378-2816
Mailing Address:          195 WAMPHASSUC RD
                          STONINGTON, CT 06378
```

### REGISTRATION INFORMATION

```
Motor Voter Identification    001722646
Number:
```

### DEMOGRAPHIC INFORMATION

```
Date of Birth:            10/XX/1940
Gender:                   MALE
Political Party:          NON DECLARED
```
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## Issued by the
# UNITED STATES DISTRICT COURT

**DISTRICT OF** _____ **MASSACHUSETTS** _____

STONINGTON PARTNERS, INC., STONINGTON
CAPITAL APPRECIATION 1994 FUND L.P.,
STONINGTON HOLDINGS, L.L.C., et al.
### V.
DEXIA, S.A. and DEXIA BANK BELGIUM (formerly
known as ARTESIA BANKING CORP., S.A.)

**SUBPOENA IN A CIVIL CASE**
Pursuant to 28 U.S.C. Section 1783
CASE NUMBER: [1]  04-10411 (PBS)
　　　　　　　　　 03-11566 (PBS)
　　　　　　　　　 04-10477 (PBS)
　　　　　　　　　 04-10501 (PBS)

Pending in the United
States District Court for the
District of Massachusetts

TO:　　MR. JOHN H. DUERDEN
　　　　Invesys PLC
　　　　Carlisle Place, London, SW1P 1BX, United Kingdom

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify
in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
the above case.

| PLACE OF DEPOSITION<br>Clifford Chance<br>10 Upper Bank Street, London, United Kingdom | DATE AND TIME<br>May 5, 2006, 9:30 a.m. |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place,
date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE<br>Clifford Chance<br>10 Upper Bank Street, London, United Kingdom | DATE AND TIME<br>May 5, 2006, 9:30 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

　　Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more
officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person
designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>　　　　　　　　Attorney for Defendant Dexia Bank Belgium | DATE<br>April ___, 2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Breton Leone-Quick
Mintz Levin Cohen Ferris Glovsky & Popoe, One Financial Center, Boston, MA 02111, (617) 348-6000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
　　　　　　　　　　　DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

---

### Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)　A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)　(A)　A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)　Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)　(A)　On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)　fails to allow reasonable time for compliance,
(ii)　requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)　requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)　subjects a person to undue burden.

(B)　If a subpoena

(i)　requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)　requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii)　requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)　DUTIES IN RESPONDING TO SUBPOENA.

(1)　A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)　When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## DEFINITIONS

1.    "Artesia" means Artesia Banking Corporation, S.A, and its predecessors Paribas Bank België (a.k.a. Paribas Banque Belgique) and Bacob Bank.

2.    "Dexia" means Dexia S.A. or Dexia Bank Belgium (a.k.a. Dexia Bank België or Dexia Banque Belgique).

3.    "Dictaphone" means Dictaphone Corporation.

4.    "L&H" means Lernout & Hauspie Speech Products, N.V., including any of its predecessors, successors, parents, subsidiaries, divisions or affiliates and their officers, directors, agents, attorneys, accountants, employees, partners, or other persons occupying similar positions or performing similar functions.

5.    "L&H actions" refers to the above-captioned actions or any other action filed, in any court, in connection with L&H's bankruptcy or alleged fraud.

6.    The term "Plaintiffs" refers to any of the plaintiffs in this action or the related actions against Dexia Bank Belgium pending in the District of Massachusetts, namely Hans A. Quaak; Attilio Po; Karl Leibinger; Stonington Partners, Inc.; Stonington Capital Appreciation 1994 Fund, L.P.; Stonington Holdings, L.L.C.; Gary B. Filler and Lawrence Perlman, as trustees of the TRA Rights Trust; Janet Baker; James Baker; JKBaker LLC; and JMBaker LLC.

7.    The term "Plaintiffs' Counsel" refers to the following law firms: Berman DeValerio Pease Tabacco Burt & Pucillo; Shalov Stone & Bonner LLP; Cauley Bowman Carney & Williams; Shearman & Sterling LLP; Young Conaway Stargatt & Taylor; Looney & Grossman LLP; Bernstein Litowitz Berger & Grossman LLP; Partridge Anker & Hortsman LLP; Boies Schiller & Flexner, Reed Smith LLP; Fried, Frank, Harris, Shriver & Jacobson LLP; Gregory P. Joseph Law Offices LLC; Reece & Associates, P.C.; Kotin Crabtree & Strong, LLP;

1

Marx Van Ranst Vermeersch & Partners; Dal & Veldekens; Van Doosselaere Advocaten; CMS DeBacker; and Keuleneer Storme Vanneste Van Varenbergh Verhelst, Advocatenassociatie.

8.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in the Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations.   A draft or non-identical copy is a separate document within the meaning of this term.

9.      The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

10.      The term "concerning" means relating to, in relation to, referring to, describing, evidencing or constituting.

11.      "And" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

12.      The word "all" shall be deemed to include and encompass the words "each" and "any."

13.      The use of the singular form of any word includes within its meaning the plural form, and vice versa.

14.      The use of any tense of any verb includes within its meaning all other tenses of the verb.

## INSTRUCTIONS

1.      Each document request shall be responded to separately and fully, unless it is in good faith objected to, in which event the reasons for the objection shall be stated with specificity.  If an objection pertains to only a portion of the a request, or to a word, phrase, or

2

clause contained therein, you shall state the objection to that portion only and respond to the remainder of the request.

2.      If any document responsive to these document requests is withheld under a claim of privilege, including the work-product doctrine, you shall identify with respect to each document:  (a) the date of the document, (b) the title of the document; (c) the type of the document; (d) a description of the subject matter of the document, (e) the name of each author, addressee, and copyee, and (f) the specific privilege or protection claimed.

3.      If, in responding to these document requests, you claim any ambiguity in a document request, or in a definition or instruction applicable thereto, such claim shall not be utilized as a basis for refusing to respond, but you shall set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to the document request.

4.      Each request shall be construed according to its terms and not with reference to any other request.

5.      All responsive documents, wherever located, that are in your possession, custody or control shall be produced in response to these document requests.

6.      An original or one copy of each responsive document shall be produced. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation, highlighting, underlining or other marks, or any omission, or a draft or successive iteration thereof and all modifications thereto shall constitute a separate document and must be produced, whether or not the original of such document is within your possession, custody or control.

NYA 778421.1

7.    All documents that are physically attached to each other when located for production shall be left so attached.  Documents that are segregated or separated from other documents whether by use of binders, files, sub-files, or by dividers, tabs, or any other method, shall be left so segregated or separated. All labels or markings on any such binders, files, sub-files, dividers, tabs, or folders shall be produced.

8.    A request for documents shall be deemed to include a request for all transmittal sheets, cover letters, exhibits, enclosures, and attachments to the documents in addition to the document itself, without abbreviation or expurgation.

9.    The relevant time period for this request is from January 1, 1994 to the present.

## DOCUMENT REQUESTS

1.    All documents concerning any transaction or course of dealing between Artesia or Dexia and L&H.

2.    All documents concerning L&H in relation to the acquisition of Dictaphone by L&H or the potential acquisition of Dictaphone by any other company.

3.    All documents concerning the historical financial condition and operating results of Dictaphone including, but not limited to, valuations or other financial assessments, financial statements, balance sheets, statements of income and/or operations and cash flow statements.

4.    All documents concerning Jo Lernout, Pol Hauspie, Gaston Bastiaens, Carl Dammekens, or Nico Willaert in relation to the acquisition of Dictaphone by L&H or the potential acquisition of Dictaphone by any other company.

5.    All documents concerning any Language Development Company or Cross-Language Development Company.

6.    All documents concerning Language Investment Co. and Radial Belgium N.V.

7.    All documents concerning Vasco Data Security International.

4

8.      All documents concerning the acquisition of Dictaphone by L&H or the potential acquisition of Dictaphone by any other company, including documents related to any and all due diligence or other investigations undertaken in connection therewith.

9.      All documents concerning communications with any investment bank, accounting firm or other outside advisor concerning the acquisition of Dictaphone by L&H or any other company, including communications concerning any and all due diligence or other investigations undertaken in connection therewith.

10.     All documents concerning or incorporating any communications with Plaintiffs or Plaintiffs' Counsel referring to Artesia or Dexia or the acquisition of Dictaphone by L&H or by any other company.

11.     ·All documents concerning Plaintiffs' decision to consent to the acquisition of Dictaphone by L&H.

12.     All documents concerning any investigation of Artesia or Dexia conducted in connection with the sale or potential sale of Dictaphone or in connection with the L&H actions.

13.     All documents concerning any investigation conducted into L&H's accounting of the Language Development Companies and the Cross-Language Development Companies.

14.     All documents concerning any investigation conducted into the funding of the Language Development Companies and the Cross-Language Development Companies.

15.     All communications with Plaintiffs or Plaintiffs' Counsel referring to Artesia or Dexia or the acquisition of Dictaphone by L&H.

16.     All documents concerning your position at Stonington during the relevant time period.

# EXHIBIT G

1

1

2    UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
3    Civil Action No. 00-CV-11589(PBS)
                     No. 02-CV-10302(PBS)
4                    No. 02-CV-10303(PBS)
                     No. 02-CV-10304(PBS)
5                    No. 02-CV-10305(PBS)
     ------------------------------------x
6

     IN RE LERNOUT AND HAUSPIE
7

     SECURITIES LITIGATION
8

             and
9

     CONSOLIDATED and RELATED CASES
10

     ------------------------------------x
11               July 13, 2004
                 8:35 a.m.
12

13

14        Deposition of ALBERT J. FITZGIBBONS,
15   III, taken by Defendants, pursuant to
16   Notice, held at the offices of Davis Polk
17   & Wardwell, Esqs., 450 Lexington Avenue,
18   New York, New York, before Todd DeSimone,
19   a Registered Professional Reporter and
20   Notary Public of the State of New York.
21

22

23

24

25

53

                    FITZGIBBONS

1

2  recognition.

3      Q.      How did you learn about this?

4      A.      I have no specific recollection

5  of how I learned about it.  That was told

6  presumably by Dictaphone management.

7      Q.      When did this happen?

8      A.      I believe it was in the summer.

9      Q.      The summer of '99?

10     A.      That's correct.

11     Q.      Was any price discussed?

12     A.      No, not to my recollection.

13     Q.      What happened after you learned

14  about the inquiry from Lernout & Hauspie?

15     A.      We took a trip to Ieper, which

16  is in Belgium, which is where they are

17  headquartered, in order to visit their

18  headquarters and discuss the business

19  purpose of combining speech recognition

20  and our transcription systems.

21     Q.      And who is the "we"?

22     A.      I believe it was John Duerden,

23  Rob Schwager, it may have been Joe

24  Skrzypczak, Scott Shaw, and myself.

25     Q.      You were at Stonington and a

54

1                        FITZGIBBONS

2    board member of Dictaphone, correct?

3        A.       That's correct.

4        Q.       Same for Mr. Shaw, correct?

5        A.       That's correct.

6        Q.       The third gentleman you named,

7    I've got his initials, but I forget the

8    name.

9        A.       Skrzypczak.

10       Q.       Who was Mr. Skrzypczak?

11       A.       He was the chief financial

12   officer.

13       Q.       Did he have any position at

14   Stonington?

15       A.       No.

16       Q.       And the second name after

17   Mr. Duerden?

18       A.       Rob Schwager.

19       Q.       What was his position?

20       A.       He was heading up the medical

21   transcription business.

22       Q.       And then Mr. Duerden was the

23   CEO of Dictaphone?

24       A.       That's correct.

25       Q.       Why did you and Mr. Shaw go on

75

1              FITZGIBBONS

2   Well, let me ask it differently.

3              What is the next communication

4   after your trip back from Ieper having to

5   do with Lernout & Hauspie that you

6   remember?

7       A.      I recall that after the new

8   year either John Duerden or Rob Schwager

9   indicated there to have been another

10  contact from Lernout & Hauspie to see if

11  there was some transaction that could make

12  sense.

13      Q.      That is after the new year of

14  2000?

15      A.      That's correct.

16      Q.      Would this be January?

17      A.      I believe it is January of

18  2000.

19      Q.      And one of those two gentlemen

20  lets you know that, they contact you and

21  say "We've had another communication from

22  Lernout & Hauspie"?

23      A.      That's correct.

24      Q.      What did he tell you about the

25  communication?  This is either Mr. Duerden

76

1                      FITZGIBBONS

2  or Mr. Schwager who tells you about their

3  communication.

4       A.       I believe I was told that the

5  Lernout & Hauspie people wanted to meet to

6  see if there was some framework as to how,

7  if there was a transaction, it could be

8  put together.

9       Q.       Did you understand from that

10  what type of transaction they had in mind?

11       A.       I don't think at that point in

12  time.  I think we agreed to meet.

13       Q.       With Lernout & Hauspie?

14       A.       That's correct.

15       Q.       And when was that -- was there

16  a meeting, and when was it?

17       A.       It was a meeting in January of

18  2000.

19       Q.       Was that overseas or in the

20  U.S.?

21       A.       It was in Boston.

22       Q.       At?

23       A.       I believe the offices of Brown

24  Rudnick.

25       Q.       And who was at that meeting?

<u>EXHIBIT H</u>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 00-4398
                                    .
                                    .
LERNOUT AND HAUSPIE                 .
SPEECH PRODUCTS, N.V.               . Wilmington, DE
                                    .
              Debtor,               .
                                    . March 14, 2001
                                    . 9:30 a.m.
. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Milbank, Tweed
                         By:  THOMAS ARENA, ESQ.
                              LUCENT DESPINS, ESQ.
                         1 Chase Manhattan Plaza
                         New York, New York

                         Morris, Nichols, Arsht & Tunnell
                         By:  GEORGE WERKHEISER, ESQ.
                         1201 North Market Street
                         Wilmington, Delaware 19899

For the Creditors Committee: Akin, Gump, Strauss, Hauer, Feld
                         By:  DANIEL GOLDEN, ESQ.
                              KIM KOOPESMITH, ESQ.
                         590 Madison Avenue
                         New York, New York 10022


Audio Operator:          Norma Sader

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

DIANA DOMAN TRANSCRIBING
P. O. Box 129
Gibbsboro, New Jersey 08026

(856) 435-7172  Fax No.(856) 435-7124

Janet Baker
Ex 43
8/9/04   CMR

BAKE033136

1   mismanagement, not --

2   A    I don't think it's a single person.

3   Q    Well, give me some names.

4   A    I believe the CEO has to bear responsibility, of course.

5   Q    Who was the CEO?

6   A    The CEO in the beginning of January was John Duerden.

7   Q    So, Mr. Duerden beared some responsibility?

8   A    Yes.

9   Q    Of the gross mismanagement?

10  A    Yes

11  Q    What did Mr. Duerden do that rises to the level of gross

12  mismanagement?

13  A    Well, I don't know that I would say that it was John

14  Duerden's dealings.  I think that there were decisions that

15  were made that were very deleterious to the company, and as

16  CEO, it begins at the top.  It doesn't mean that he made those

17  individual decisions.  The decisions to cancel off the

18  international development is something which impacts not just

19  the retail products, but a vast array of intricate abilities

20  for the entire company, and negatively impacts that.  I don't

21  know that he ever seriously looked at the details of that, but

22  that strikes me as gross mismanagement.

23  Q    Okay --

24  A    All of this if far after -- in the most gross parts after

25  the time -- after the October time frame.  The November time

BAKE033263

Baker - Cross/Arena                                    232

1   frame, for that matter.

2   Q    We'll get to the international development staff in a

3   second.

4   A    What else did Mr. Duerden do that rises to the level of

5   gross mismanagement?

6   A    I don't know what else Mr. Duerden did per se.  There is

7   significant -- what mr. Duerden did is he was trying to get

8   transparency of the financials of a company that had engaged in

9   big questionable practices.  And he was able to release

10  information about that and it's believed that as a result of

11  that in large part, he was replaced.

12  Q    Who else is responsible for the gross mismanagement?

13  A    I believe the present management is.

14  Q    You refer to Mr. Bodson?

15  A    Yes.

16  Q    Have you ever met Mr. Bodson?

17  A    No, I haven't.  But again, as CEO, you take responsibility

18  for your company and what it does.

19  Q    All right.  Just as you took responsibility for --

20  A    Yes, of course.

21  Q    -- for the company?  So, you testified, if I'm not

22  mistaken that you gave notice of your resignation in early

23  November of 2000 --

24  A    Yes.

25  Q    -- that you stayed on until early December in a

BAKE033264

1   consultant-like capacity, is that correct?

2   A   Basically, I gave a two-week notice at the beginning of

3   November which -- which -- and that was for November 17th, and

4   I stayed on for three weeks thereafter helping to transfer

5   files and organize things, hand them off, and the like.

6   Q   And Mr. Bodson was appointed as CEO in January of 2001

7   after you left the company, correct?

8   A   Yes, sir.

9   Q   So, you never overlapped with Mr. Bodson at any point in

10  time?

11  A   That's correct.

12  Q   Could you tell the Court what Mr. Bodson did that rises to

13  the level of gross mismanagement that should warrant the

14  appointment of a Chapter 11 trustee over L&H Holdings?

15  A   I don't think it's so much a matter of what Mr. Bodson did

16  that rises to that level as what the company as a whole has

17  done in that time frame, and some of which during some of that

18  period, John Jordan was CEO and some of that time Philipe

19  Bodson is in charge. And so I don't think it's attributable

20  necessarily to either individual in total.

21  Q   When you say that time frame, what period of time are you

22  referring to?

23  A   Basically, I was almost especially concerned as I

24  discovered events that happened after I had left the company,

25  after I had left the -- in December -- whatever it was -- but

BAKE033265

Baker - Cross/Arena                                      234

1   there were decisions that have come into the moves that had to

2   do with giving up a retail -- all of our retail products and

3   turning them over to the publishers, that was, I believe, under

4   John Jordan's direction.  I believe that we should have done

5   different -- tried sales and marketing in different areas

6   because when you go to a publisher, it kills your credibility

7   and your branding and everything else going forward, usually in

8   exchange for not very much money.  I believe that giving up the

9   international development team was very injurious because it

10  impacts your ability to deal with future markets

11  internationally, and much of the future prospects of -- in the

12  market study show that those marketplaces are not simply

13  healthcare, but rather, you know, dealing with hand held

14  devices, most of which, by the way, today are sold with cell

15  phones internationally and are not used in English nor

16  Japanese.

17  Q    Ms. Baker, can you help me make a list of all the things

18  that happened after you left the company in December of 2000

19  that you think rise to the level of gross mismanagement.  You

20  mention getting rid of the international development team,

21  that's one.

22  A    Um-hum.

23  Q    You mentioned selling retail products through a third

24  party republisher.  That's another, correct?

25  A    Worldwide, yes.

BAKE033266

Baker - Cross/Arena                                                      235

1    Q    Worldwide, okay. What else? I have those two.   What
2    else?
3    A    Basically, I think especially making clear that there is
4    reneging on the promises to employees, and although eventually
5    there may be something that is given to them.  That's been a
6    continuing process, both in term of the -- their benefits as
7    well as you know, the shares that were never distributed and so
8    forth.  That has been an ongoing continuing process, and I
9    think that what really -- I have no argument with Mr. Bodson
10   whatsoever.  I have never met the man and you know, and so
11   forth, but the fact that John Duerden who is trying to be
12   transparent and visible with respect to the very serious
13   financial issues was replaced in large part apparently due to
14   the fact that he had released the audit report which showed
15   tremendous financial mismanagement, was really something that
16   tipped the scales for me and for a number of the longest term
17   employees at Dragon.
18   Q    So, in addition to getting rid of the international
19   development team, sending retail products to third party
20   republishers, then there was the continued reneging on certain
21   promises regarding employee benefits and the distribution of
22   stock options to employees, correct?
23   A    Yes, there were some other things.  I mean, concerned that
24   there were products that apparently had been canceled, such as
25   the Version V of the Enterprise Edition, which was -- there had

BAKE033267

1  been significant delays and the -- in printing out the

2  professional version of Number 5, which there were large

3  backlogs of, and so we lost those revenues to the -- and

4  resellers.  I had personal contact with resellers who contacted

5  me after I had left and I forwarded e-mails and phone calls of

6  those to John Shagory, I believe, in all cases, because there

7  was a tremendous amount of upset.  I understand that that's, in

8  fact, well-documented, although I have not seen it on the

9  Dragon bar form.  I also was aware of the letter that was e-

10 mailed that had been introduced earlier today from Joachin

11 Twelmeyer because he had been employed at Dragon systems.  He

12 was very, very upset about the destruction of the business that

13 he built up in Germany, and --

14 Q    Do you know that from the e-mail?

15 A    He called me on the telephone and he subsequently sent me

16 an e-mail, which I answered it and everything that was

17 furnished to you in this process.

18 Q    And it's your testimony that all those things together

19 lies to the level of gross mismanagement by L&H N.V., correct?

20 A    Yes, I do.

21 Q    Okay.  I want to go back to something you said earlier.

22 You said that Mr. Duerden in your view, was trying to be

23 transparent with respect to the operation of the company.

24 A    With respect to the finances.  Ys.

25 Q    With respect to the finances of the company.

**BAKE033268**

1  A    Yes.

2  Q    Can you explain to the Court how Mr. Bodson has been any

3  less transparent than Mr. Duerden?

4  A    Basically, he has not had any investor relations calls or

5  maybe there's been one, I don't know, since he's taken over,

6  but there was a strong perception that the reason that he was

7  put in place was that John Duerden was too open.

8  Q    And that's a perception that you had?

9  A    That's a perception I gave by talking to Dan Hart.  That's

10 also broadly held by the employee population.

11 Q    Okay.

12 A    And by much of the public, I think.

13 Q    Okay.  Are you aware that Mr. Bodson was instrumental in

14 the termination of Mr. Lernout?

15 A    I know -- I have every reason to believe he's trying to do

16 a number of correct things, and that's why, in fact, he's going

17 to replace all the boards.  I believe he's trying to do that.

18 But that doesn't change my other statements.

19 Q    Okay.  Let's go back to some of the things that you listed

20 as constituting mismanagement by L&H N.V..  Getting rid of the

21 international development team.

22 A    Yes, sir.

23 Q    Am I correct that L&H Holdings sells some of its products

24 overseas to foreign markets?

25 A    Yes, sir.

BAKE033269