# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HANS A. QUAAK, ATTILIO PO and KARL LEIBINGER, on behalf of themselves and those similarly situated, | |
| Plaintiffs, | Civil Action No.: 03-11566 (PBS) |
| v. | |
| DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), | |
| Defendants. | |
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company, | |
| Plaintiffs, | Civil Action No.: 04-10411 (PBS) |
| v. | |
| DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), | |
| Defendants. | |
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust, | |
| Plaintiffs, | Civil Action No.: 04-10477 (PBS) |
| v. | |
| DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), | |
| Defendants. | |

JANET BAKER and JAMES BAKER,
JKBAKER LLC and JMBAKER LLC,

        Plaintiffs,

        v.

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),

        Defendants.

Civil Action No.:  04-10501 (PBS)

## DECLARATION OF JEFF E. BUTLER

I, Jeff E. Butler, declare and state as follows:

1.      I am an attorney associated with Clifford Chance US LLP and admitted *pro hac vice* to practice before this Court.  I submit this declaration in support of Dexia Bank Belgium's Opposition to Plaintiffs' Motion for Protective Order Preventing Depositions of Counsel.

2.      Attached hereto as Exhibit A is a true and correct copy of Class Plaintiffs' Opposition to Defendant Dexia S.A.'s and Dexia Bank Belgium's Motions to Dismiss the Second Amended Complaint dated May 3, 2004.

3.      Attached hereto as Exhibit B is a true and correct copy of Class Plaintiffs' Responses to Dexia Bank Belgium's First Interrogatories dated June 1, 2005.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      May 30, 2006

_____

Jeff E. Butler

Exhibit A



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **HANS A. QUAAK, ATTILIO PO** and **KARL LEIBINGER**, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),**<br><br>Defendants. | : | **Civil Action No. 03-11566 PBS** |

## CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DEXIA S.A.'S AND DEXIA BANK BELGIUM'S MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**
Jeffrey C. Block
Michael T. Matraia
Patrick T. Egan
Nicole R. Starr
One Liberty Square
Boston, MA 02109
(617) 542-8300

**SHALOV STONE & BONNER, LLP**

Lee M. Shalov
James Bonner
Ralph M. Stone
Patrick L. Rocco
485 7th Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

**CAULEY GELLER BOWMAN & RUDMAN, LLP**
Steven E. Cauley
Curtis Bowman
Allen Carney
11001 Executive Center Drive, Suite 200
PO Box 25438
Little Rock, AR 72221-5438
(501) 312-8505

**CO-LEAD COUNSEL FOR LEAD PLAINTIFFS**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... i

PRELIMINARY STATEMENT ................................................... 1

FACTS ................................................................................. 3

ARGUMENT ......................................................................... 7

I.    THE CLAIMS ARE NOT BARRED BY
      THE STATUTE OF LIMITATIONS ............................................. 7

      A.    The Statute of Limitations Began To Run On the
            Date Of The Filing Of L&H's Last False
            Financial Statement, June 30, 2000........................... 10

      B.    Since The Action Was Commenced In August 2003,
            The SOX Statute Of Limitations Period Governs..... 12

      C.    Class Plaintiffs Were Not On Inquiry
            Notice of Claims Against Dexia In 2001 .................. 17

II.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT
      DEFENDANTS VIOLATED § 10(B) BY ENGAGING
      IN A FRAUDULENT SCHEME........................................ 17

      A.    Plaintiffs Have Adequately Alleged
            That Dexia Substantially Engaged In Manipulative
            And Deceptive Conduct ............................................ 17

      B.    The Court Should Not Reconsider
            The Lernout V Decision............................................ 19

III.  THIS COURT HAS PERSONAL JURISDICTION
      OVER S.A. ................................................................ 21

      A.    The Court Must Evaluate Artesia's Nationwide
            Contracts To Determine Whether To Exercise
            Personal Jurisdiction Over S.A. .............................. 21

      B.    Requirements Of Specific Personal Jurisdiction....... 23

            1.    This Court Has Specific Personal
                  Jurisdiction Over Artesia.............................. 23

C.     Plaintiffs Are Entitled To Conduct
       Limited Jurisdictional Discovery ............................     25

CONCLUSION ............................................................................     25

# TABLE OF AUTHORITIES

## CASES

*Bamberg v. SG Cowen*,
   236 F. Supp. 2d 79 (D. Mass. 2003) .................................................... *passim*

*Calder v. Jones*,
   465 U.S. 783 (1984) ........................................................................ 24

*Catrone v. Ogden Suffolk Downs, Inc.*,
   647 F. Supp. 850 (D. Mass. 1986) ................................................... 21

*Central Trust Co. v. Official Creditor's Comm. Of Geiger Enterprise*,
   454 U.S. 354 (1982) ........................................................................ 11

*Continental Bank, Nat'l Assoc. v. Ludlow*,
   777 F. Supp. 92 (D. Mass. 1991) ..................................................... 7

*Cooper v. Pickett*,
   137 F.3d 616. 624 (9th Cir.1997)....................................................... 21

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole*, P.A.,
   290 F.3d 42 (1st Cir.),
   *cert. denied*, 537 U.S. 1029 (2002) .................................................. 23

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003).............................................. 9

*Glaser v. Enzo Biochem, Inc.*,
   303 F. Supp. 2d 724 (E.D. Va. 2003)................................................. 9

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ................................................... 16

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .............................................. 21

*In re Enterprise Mortgage Acceptance Co., LLC Sec. Litig.*,
   295 F. Supp. 2d 307 (S.D.N.Y. 2003)................................................ 9

*In re Heritage Bond Litig.*,
   289 F. Supp. 2d 1132 (C.D. Cal. 2003).............................................. 9

*In re Homestore.com, Inc. Sec. Litig.*,
   252 F. Supp. 2d 1018 (C.D. Cal. 2003).............................................. 19, 20

*In re Integrated Res. Real Estate Sec. Litig.*,
 815 F. Supp 620 (S.D.N.Y. 1993) ........................................... 16

*In re Lernout & Hauspie Sec. Litig.*,
 236 F. Supp. 2d 161 (D. Mass. 2003) ................................. *passim*

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
 501 U.S. 350 (1991) ............................................................. 7

*Landgraf v. USI Film Prods.*,
 511 U.S. 244 (1994) ............................................................. 10

*Law v. Medco Research*,
 113 F.3d 781 (7th Cir. 1997)............................................... 14

*Levin v. Harned*,
 292 F. Supp. 2d 220 (D. Mass. 2003) ................................. 23, 24

*Levitt v. Bear Stearns & Co.*,
 340 F. 3d 94 (2d Cir. 2003)................................................. 11, 12, 13

*Marks v. CDW Computer Ctrs., Inc.*,
 122 F.3d 363 (7th Cir. 1997)............................................... 16

*Massachusetts Sch. of Law v. American Bar Ass'n*,
 142 F.3d 26 (1st Cir. 1998) ................................................. 23

*McClary v. Erie Engine & Mfg. Co.*,
 856 F. Supp. 52 (D.N.H. 1994) ........................................... 22

*Motorsport Eng'g, Inc. v. Maserati, S.p.A.*,
 183 F. Supp. 2d 209 (D. Mass. 2001),
 *aff'd by* 316 F.3d 26 (1st Cir. 2002) .................................. 22

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
 338 F.3d 773 (7th Cir. 2003)............................................... 21

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000)................................................. 13

*Select Creations v. Paliafito Am.*,
 852 F. Supp. 740 (E.D. Wis. 1994)..................................... 21-22

*Steir v. Girl Scouts of the USA*,
 218 F. Supp. 2d 58 (D.N.H. 2002) ...................................... 23

*Sterlin v. Biomune Sys., Inc,*
    154 F.3d 1191 (10th Cir. 1998)................................................ 12

*United States v. Erb,*
    543 F.2d 438 (2d Cir. 1976)................................................ 8

*United States v. Hunter,*
    700 F. Supp. 26 (M.D. Fla. 1988) ................................................ 10

*United States v. Rastelli,*
    870 F.2d 822 (2d Cir. 1989)................................................ 8

*Williams v. Bowman Livestock Equip. Co.,*
    927 F.2d 1128 (10th Cir. 1991)................................................ 22

*Young v. Lepone,*
    305 F.3d 1 (1st Cir. 2002) ................................................ 7, 12, 14, 16

## STATUTES AND RULES

Fed. R. Civ. P. 12(b)(2) ................................................ 22

Fed. R. Civ. P. 12(b)(6) ................................................ 16

15 U.S.C. §78j................................................ 7

28 U.S.C. § 1658(b) ................................................ 7

S.E.C. Rule 10b-5................................................ 16

## UNREPORTED DECISIONS

*ATO RAM II, Ltd. v. SMC Multimedia Corp.,*
    03 Civ. 5569 (HB), 2004 U.S. Dist. LEXIS 5810,
    (S.D.N.Y. Apr. 6, 2004) ................................................ 8

*Bouley v. American Cyanamic Co.,*
    No. 85-4368-Z, 1986 WL 13400,
    (D. Mass. Nov. 19, 1986) ................................................ 22

*In re Enron Securities Derivative & ERISA Litig.,*
    No. MDL-1446, Civ. A. H-01-3624, 2004 WL 405886,
    (S.D. Tex. Feb. 25, 2004)................................................ 9, 11

*In re Global Crossing, Ltd. Sec. Litig.,*
    02-Civ. 910 (GEL),
    2003 U.S. Dist. Lexis 22930 (S.D.N.Y. Dec. 18, 2003) ..................... 16

*In re Rural Cellular Corp. Sec. Litig.,*
    No. Civ. 02-4893,
    2004 WL 67651 (D. Minn. Jan. 9, 2004) ............................... 19, 20

*Roberts v. Dean Witter Reynolds, Inc.,*
    No. 8:02-cv-2115-T-26EAJ, 2003 U.S. Dist. LEXIS 5676,
    (M.D. Fla. Mar. 14, 2003) ..................................................... 9

**OTHER**

148 Cong. Rec. S7418-7420 (July 26, 2002) .............................. 10

Sarbanes-Oxley Act, 28 U.S.C. § 1658(b) .................................... 7

Class Plaintiffs submit this memorandum in opposition to the motion to dismiss filed by Dexia S.A. ("S.A.") and Dexia Bank Belgium ("Dexia Bank"). For the reasons set forth herein, the motion should be denied.

## PRELIMINARY STATEMENT

Class Plaintiffs bring this action against S.A. and Dexia Bank, which acquired Artesia Banking Corp. ("Artesia") pursuant to a merger dated April 1, 2002.[1] Artesia was the former chief commercial banker for Lernout & Hauspie Speech Products N.V. ("L&H").

Part of the massive accounting scam at L&H involved the improper recognition of revenues from the language development companies ("LDCs"). This Court has previously denied motions to dismiss the allegations that L&H misrepresented the revenues it received from the LDCs and denied motions to dismiss by defendants FLV Fund, Mercator & Noordstar and Henri Verbeke for their roles in creating and funding the LDCs as being direct participants in the LDC scam. *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161 (D. Mass. 2003) (*Lernout V*).

Artesia played a more direct role in the LDC scam than any of these 3 other defendants. Based on documents seized by the Belgian prosecutor, which were reviewed by plaintiffs' counsel, Artesia provided the funding to allow the LDC scam to get off the ground. It devised the means by which L&H's top officers, defendants Jo Lernout, Pol Hauspie and Nico Willaert, could provide the necessary funding for the LDCs but nevertheless avoid disclosure of the related party nature of the transactions and recognize revenue in direct contravention of GAAP.

As alleged, Lernout, Hauspie and Willaert approached Artesia about lending millions of dollars to the start-up LDCs for the purpose of having the LDCs "buy" product from L&H. Artesia understood that the LDCs were nothing more than paper companies with no employees, assets or

---

[1] S.A. acquired Acrofin CVBA, a Belgian financial services group, of which Artesia was a wholly-owned subsidiary. It appears that Artesia was merged into and became Dexia Bank. At this time, however, it is not clear whether Artesia's liabilities were also merged into Dexia Bank or were acquired by SA.

1

business purpose other than a funding mechanism by which L&H could recognize revenue. As such, Artesia would not lend money to the LDCs absent personal guarantees by Lernout, Hauspie and Willaert because, as paper companies, the LDCs were not credit-worthy. Artesia was informed, however, that neither Lernout, Hauspie nor Willaert could sign a personal guarantee because if they did, disclosure would be required and L&H could not immediately recognize the LDC revenues as they would be considered related party transactions.

So, Artesia devised the concept of using so-called "credit default swaps" to allow Lernout, Hauspie and Willaert to stand behind the loans without having to make any disclosure of their guarantees. As Artesia knew, however, credit default swaps had never before been used for a natural person and this was a highly unorthodox arrangement.

Artesia loaned the LDCs more than $32 million which L&H immediately recognized as revenue as a direct result of the LDC scam. Ultimately, L&H reversed $79 million of LDC revenue, more than 40% of which came directly from the manipulative and deceptive conduct of Artesia.

Each of the arguments raised by S.A. and Dexia Bank[2] in support of dismissal lack merit. Defendants incorrectly assert that a few scant newspaper articles from 2001 in a Belgium financial newspaper, which merely reflect that Artesia - L&H's long time commercial banker - loaned money to the LDCs, started the statute of limitations clock running on plaintiffs' claims so the claims are now time-barred. As this Court found in *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 85 (D. Mass. 2003) (*Lernout IV*), "following receipt of sufficient storm warnings, a plaintiff's cause of action is deemed to accrue on the date when, exercising reasonable diligence, *she would have unearthed the fraud.*" (emphasis added). Here, Artesia's role in the fraud could not have been "unearthed" until June 2003 when it was revealed that Artesia/Dexia Bank was being indicted for its role in the fraud. Prior to that point, the only available information was that Artesia lent money to some of the LDCs.

---

[2] Notably, Dexia Bank does not challenge the scienter allegations nor the particularity with which the fraud is pled.

Lending money, without more, does not equate to fraud and certainly does not establish that plaintiffs were able to "unearth" the fraud.

Defendants' other statute of limitations argument, that the last act they undertook in the fraud was lending money in June, 1999, so Sarbanes-Oxley ("SOX") cannot revive these claims which expired in June, 2002, prior to the enactment of SOX, is also incorrect. Courts hold quite clearly that the last act for purposes of measuring the statute of repose in a 10b-5 action is the date on which the last false statement was disseminated to the market. Here, that statement was issued on June 30, 2000. Since class plaintiffs' claims were not time barred at the time SOX was enacted (July, 2003) the SOX 2year/5year statute of limitations applies to these claims and class plaintiffs' claims are timely.

Dexia Bank's contention that *Central Bank* requires its dismissal is also erroneous. As this Court has already determined with regard to FLV Fund and Mercator, *Central Bank* does not bar claims where a party directly engages in manipulative or deceptive conduct, which is precisely what Artesia did here. There is no justification for this Court to reverse its prior ruling as Defendants ask the Court. Finally, the Court has jurisdiction over S.A. as the successor entity to Artesia and Artesia had sufficient U.S. contacts to permit this Court to assert jurisdiction over it.

## FACTS

This is a class action on behalf of investors who purchased L&H common stock between August 19, 1998 and November 8, 2000. This action is related to *In re Lernout & Hauspie Sec. Litig.*, 00-CV-00589 (PBS). It charges a newly discovered defendant, Artesia Bank, with securities fraud for its role in devising, implementing and funding the LDC scam. The Court's opinion in *Lernout V* succinctly describes the LDC scam and class plaintiffs will not burden the Court with a repetition of the facts underlying this aspect of the fraud. *See* 236 F. Supp. 2d at 166 n.2.

As alleged, after the Dictation and BTG transactions, Lernout, Hauspie and Willaert were attempting to devise another means by which L&H could record revenue from otherwise related parties, but without publicly disclosing the relatedness of these parties to L&H. Hence, they devised the LDC scam. ¶ 97.[3]  They decided to create a number of fictitious shell companies whose purpose was to funnel money to L&H that it could publicly report as revenue, without disclosure that these were all related party revenues.

In 1998, Radial Belgium N.V. was established and Artesia loaned $6 million to Radial on September 29, 1998. ¶ 98.  Radial, in turn, wired $2 million each to three LDCs (Slavic Development, Farsi Development and Bahassa Development) and they each immediately "paid" L&H the entire $2 million as licensing fees. ¶¶ 98-99.  L&H booked the entire $6 million as revenue in its 1998 third quarter. ¶ 98.

However, before Artesia would loan the LDCs the funds, Artesia demanded that these loans be backed by Lernout, Hauspie and Willaert. ¶ 99.  A September 21, 1999 internal e-mail at Artesia provided, in summarizing the loan to Radial, "'

REDACTED

'." ¶ 100.  The same e-mail continued that "

REDACTED

." ¶ 103 (emphasis added).

Internal Artesia documents confirm that Artesia knew the credit default swaps were highly unorthodox and were employed simply to avoid L&H having to disclose that its senior officers were funding the LDCs.  An Artesia memorandum entitled " REDACTED " dated January 31,

---

[3] References to "¶___" are to the Second Amended Class Action Complaint against Dexia Bank and S.A.

2000 reveals that the credit default swaps executed by Lernout, Hauspie and Willaert had "

REDACTED                                    "" ¶119.

Another Artesia document, dated February 14, 2000, states that "t

REDACTED            " *Id.* Indeed, another Artesia document notes that

reference to the credit default swaps was deleted from one of the letters of credit issued in

connection with the LDC loans and the letter "'

REDACTED          " ¶ 120 (emphasis added).

The September 21, 1999 e-mail further amplified Artesia's role in and knowledge of the

fraud. "'

REDACTED

.'" ¶ 105.  In addition, Artesia knew the LDCs were paper shells: "'

REDACTED

." *Id.*

On December 22, 1998, Artesia loaned Language Investment Co. ("LIC") – an entity

equivalent to Radial – $6 million for the establishment and funding of 4 more LDCs (Greek,

Hungarian, Polish and Czech).  ¶ 107.  Again, Artesia knew the purpose of the loan, that the entities

were shams and that the loans were backed by credit default swaps entered into by Lernout, Hauspie

and Willaert so as to avoid SEC disclosure problems.  The revenue was all recorded in L&H's 1998

fourth quarter. ¶¶ 108 and 109.

In June 1999 Artesia was considering lending an additional $20 million for LDC funding.

An internal Artesia e-mail, dated June 21, 1999, again confirms that Artesia knew the full scope

and purpose of the LDC fraud:

REDACTED

¶113.

On June 25, 1999, Artesia granted Lernout, Hauspie and Willaert a personal $20 million line of credit which Artesia knew was being used to fund 6 new LDCs.[4]  ¶114.  This $20 million was recorded by L&H as revenue in its 1999 second quarter financial results.  *Id.*

Accordingly, Artesia had direct knowledge of the LDC fraud and was a direct participant.  It engaged in manipulative and deceptive conduct by financing the LDCs and by devising the concept of using credit default swaps so Lernout, Hauspie and Willaert could avoid disclosure that they were the financiers behind the LDCs.  Artesia also knew the true purpose behind this scheme: to artificially inflate L&H's publicly reported revenues in violation of GAAP.

---

[4] By this point in time, Artesia was concerned that the loans were not being repaid so they changed the structure to lend directly to the 3 individuals but knew that the money was to be used to fund LDCs and Artesia was to be repaid after the LDCs attracted new investors.  ¶¶ 114-116.

6

## ARGUMENT

I.  **THE CLAIMS ARE NOT BARRED BY
    THE STATUTE OF LIMITATIONS**

### A. The Statute of Limitations Began To Run On the Date Of The Filing Of L&H's Last False Financial Statement, June 30, 2000

Defendants' argument that the statute of limitations began to run when Artesia made its June 25, 1999 loan is incorrect because the fraudulent scheme in which Defendants knowingly participated was not completed until long after that date. Indeed, pursuant to Defendants' fraudulent scheme, L&H released false financial statements as late as June 30, 2000 as they overstated L&H's revenue by concealing the fact that L&H and the LDCs funded by Defendants were "related parties".

The statute of limitations both before and after the passage of SOX begins to run only after the *violation* of Rule 10b-5 occurs. *See Young v. Lepone,* 305 F.3d 1, 8 (1st Cir. 2002) (prior to SOX, claims "must be commenced. . . within three years *after such violation"* (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364 (1991)) (emphasis added); Sarbanes-Oxley Act, 28 U.S.C. § 1658(b) (A cause of action "may be brought not later than the earlier of - (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years *after such violation.")*(emphasis added). Here, defendants participated in a scheme to fraudulently inflate L&H's financial statements by knowingly funding sham entities for the express purpose of allowing L&H to deceive its investors through material misrepresentations and omissions in L&H's public financial statements. Thus, the *violation* did not occur until L&H disclosed to the investing public its false financial statements (which included the fraudulent transactions Artesia funded) and publicly issued those false filings. [5]  *See Continental Bank, Nat'l Assoc. v. Ludlow,* 777 F. Supp. 92, 102 (D. Mass. 1991) (Young, C.J.) (Section 10(b) "repose period begins when the last alleged

---

[5] When Artesia made its fraudulent loans the 10b-5 violations had not yet occurred because its actions were not yet "in connection with the purchase or sale of any security" as required by § 10(b). 15 U.S.C. §78j.

7

misrepresentation was made by any of the Participants [defendants]"). *See e.g., ATO RAM II, Ltd. v. SMC Multimedia Corp.*, 03 Civ. 5569 (HB), 2004 U.S. Dist. LEXIS 5810, at *18 (S.D.N.Y. Apr. 6, 2004) ("Plaintiff's claims were not yet barred when [SOX] was enacted and, accordingly, the amended statute of limitations applied.").[6]

In analogous circumstances, courts have held that, when defendants engaged in conduct intended to advance unlawful schemes completed long after the defendants' final conduct, the statute of limitations on claims against those defendants begin to run only after the completion of the unlawful scheme. For example, in *United States v. Erb*, 543 F.2d 438, 446 (2d Cir. 1976), the Second Circuit held that the statute of limitations on claims that a defendant aided and abetted securities fraud violations related to misrepresentations made in false registration statements began to run only upon the publication of the false SEC filings. In reaching that conclusion, the court rejected the argument that the securities fraud claims were untimely because the defendant's "acts of aiding and abetting occurred a few months before" the publication of the registration statements because "[t]he crime that [the defendant] aided and abetted was not complete or committed until the false statement was filed." *Id.* Similarly, in *United States v. Rastelli*, 870 F.2d 822, 839 (2d Cir. 1989), the court held that the statute of limitations on claims brought against a defendant who aided and abetted a variety of RICO predicate acts "began to run against him only when each crime or racketeering act he aided and abetted was complete." Thus, the statute of limitations did not begin to run against Artesia until, at the earliest, June 30, 2000.

---

[6] Defendants argue that SOX cannot revive claims that expired prior to the statute's July 30, 2002 enactment (Mem. at 4), implicitly conceding, as it must, that claims that were still viable under the old statute of limitations at the time SOX was enacted get the benefit of SOX's longer statute of limitations, which is precisely the case here.

The running of the statute of limitations against all defendants, however, did not commence until August 8, 2000, the day on which the *Wall Street Journal* ran its front-page story questioning L&H's financial results.  At best, August 9, 2000 is the date on which the statute of limitations on class plaintiffs' claims began to run against Defendants and under *Lampf,* (securities fraud claims must be brought 1 year from date of discovery and within 3 years after the violation occurs), class plaintiffs' claims against any and all defendants would expire by August 9, 2003.  SOX, however, was signed into law by President Bush on July 30, 2002 so any claims against Artesia were not stale at that date and are now governed by the new SOX statute of limitations.

Defendants' arguments that SOX does not act to revive stale claims is a red herring. Defendants' chief case is *In re Enterprise Mortgage Acceptance Co., LLC Sec. Litig.,* 295 F. Supp. 2d 307 (S.D.N.Y. 2003).  There, plaintiffs brought new lawsuits against defendants and asserted claims that they admitted had expired prior to the enactment of SOX.  The court determined that SOX did not expressly revive stale claims so it dismissed the claims as being untimely.  *Enterprise Mortgage* is contrary to the court's holding in *Roberts v. Dean Witter Reynolds, Inc.,* No. 8:02-cv-2115-T-26EAJ, 2003 U.S. Dist. LEXIS 5676, at *9 (M.D. Fla. Mar. 14, 2003), finding that SOX did retroactively revive otherwise stale claims.  The *Roberts* court found that "[a]s a whole, the history [of SOX] reveals that Congress intended to lengthen the statute of limitations to enable people who lost their life-savings to companies like Enron to recover some of their investments. To do so, the amendment must be given retroactive application." *See also Friedman v. Rayovac Corp.,* 295 F. Supp. 2d 957, 974-76 (W.D. Wis. 2003) (applying SOX retroactively).[7]

---

[7] Notably, all of the defendants' cases involved actions that were commenced *before* the enactment of SOX and are therefore distinguishable. See *In re Enron Securities Derivative & ERISA Litig.,* No. MDL-1446, Civ. A. H-01-3624, 2004 WL 405886, at *4 (S.D. Tex. Feb. 25, 2004) (original complaint filed October 20, 2001), *Glaser v. Enzo Biochem, Inc.,* 303 F. Supp. 2d 724, 732 (E.D. Va. 2004) (plaintiffs action began on March 6, 2002), *In re Heritage Bond Litig.,* 289 F. Supp. 2d 1132, 1147 (C.D. Cal. 2003)(plaintiffs' "Third Amended Complaint . . . filed on July 24, 2002"). Here, the action against Dexia Bank and S.A. was commenced after SOX and the claims against them were still timely when SOX was enacted.

While there can be no dispute that Congress can apply a new statute of limitations to revive otherwise stale claims, *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *see also United States v. Hunter*, 700 F. Supp. 26, 27 (M.D. Fla. 1988)("It is within the power of a legislature . . . to extend a previously applicable limitation period that had already commenced running and to enact a new limitation rule so as to revive claims already barred under a prior rule."), the Court need not engage in that inquiry here. At the time SOX was enacted, July 30, 2002, class plaintiffs' claims against Artesia had not yet run so SOX is not acting to revive stale claims but, by its terms, is being applied to "all proceedings . . .that are commenced on or after the date of enactment of [the] Act." [8] Since the claims against Defendants were still viable claims as of July 30, 2002, SOX's 2year/5year statute of limitations applies and class plaintiffs' claims are timely.

### B.  Since The Action Was Commenced In August 2003, The SOX Statute Of Limitations Period Governs

Defendants assert that the August 19, 2003 complaint – the very first complaint by class plaintiffs asserting any claims for the wrongdoing by Artesia - "should not be considered a new proceeding" because it was "technically an amendment of the previous consolidated complaint," so that the pre-SOX statute of limitations should apply. Defendants are wrong.

Under the Federal Rules of Civil Procedure, class plaintiffs' option to add new defendants to this action is to either seek an amendment under Rule 15[9] or file a new action. Class plaintiffs chose the latter. There is no rule or case law providing that the only means to sue additional defendants involving similar wrongdoing is to amend an existing complaint and,

---

[8] The legislative history of section 804(b) provides that "This [2-year/5-year] provision is *intended to lengthen any statute of limitations* under federal securities law, and to shorten none. The section [804], by its plain terms, applies to any and all cases filed after the effective date of the Act, *regardless of when the underlying conduct occurred* . . . It applies to all private securities fraud actions for which private causes of action are permitted and applies to any case filed after the date of enactment, *no matter when the conduct occurred*." 148 Cong. Rec. S7418-7420 (July 26, 2002)(emphasis added).

[9] Clearly, class plaintiffs would have been denied the right to amend under Rule 15(c) because they failed to name Defendants in the earlier action because of lack of evidence and not a mistake as to their identity. *Lernout IV*, 236 F. Supp. 2d at 86.

tellingly, defendants cite no such rule. While Defendants may not like the procedural mechanism chosen by plaintiffs, it is entirely appropriate.

Defendants curiously rely on *In re Enron Sec. Deriv. & ERISA Litig.*, 2004 WL 405886 (S.D. Tex 2004).[10] In *Enron*, Lead Plaintiffs sought to amend their existing complaint by adding a new plaintiff and naming new defendants concerning certain stock offerings that were made to foreign investors. The existing complaint was filed pre-SOX and the amendment was filed post-SOX. The court found that while SOX did not apply to the amended claims because plaintiffs had amended an existing action, *Id.* at 13, the court nonetheless found that the new claims were not time barred. The court found that the collapse of Enron in December 2000 was insufficient to put these plaintiffs on inquiry notice with regard to claims against these particular defendants. Instead, relying on *Levitt v. Bear Stearns & Co.,* 340 F. 3d 94, 103 (2d Cir. 2003) the court found that "this is not a typical storm warnings case, as it was not brought against [the Company] or its officers and directors but instead against . . . the clearing agent. . . . Instead, this is a case involving the liability of a secondary wrongdoer-the clearing agent." *Enron*, 2004 WL 405886, at *20. Thus, the court found that plaintiffs were not on inquiry notice of claims against these particular defendants until their role in the fraud was more crystallized and that statute of limitations did not begin to run until that time. *Id.* [11]

---

[10] Defendants rely on a footnote in *Enron* in which the court disagreed with the court's decision in *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 974-76 (W.D. Wis. 2003) wherein the court applied SOX's new statute of limitations to an amended pleading noting that it seemed artificial to require plaintiffs to file a new pleading to take advantage of the new, more favorable, statute of limitations.

[11] Defendants also misplace their reliance on *Central Trust Co. v. Official Creditor's Comm. Of Geiger Enterprise*, 454 U.S. 354 (1982). There a debtor moved to dismiss its 1979 bankruptcy petition to file a new petition in 1980 to take advantage of the Bankruptcy Reform Act. The Act, however, was enacted after the filing of the original petition and, by its terms, prior-filed petitions were not governed by the Act. Accordingly, the Court understandably rejected the debtors' attempt to take advantage of the new law.

### C. Class Plaintiffs Were Not On Inquiry
### Notice of Claims Against Dexia In 2001

Defendants have also failed to demonstrate that class plaintiffs were on inquiry notice of their

claims against Artesia in 2001. Pursuant to the two-step inquiry regarding inquiry notice outlined in

*Lernout IV,* which follows the First Circuit's decision in *Young*, the Court must determine: (1)

whether sufficient storm warnings existed to put investors on inquiry notice; and (2) whether, "once

sufficient storm warnings were apparent, the investor probed the matter in a reasonably diligent

matter." *Young,* 305 F.3d at 8. "[P]laintiff's cause of action is deemed to accrue on the date when,

exercising reasonable diligence, *she would have unearthed the fraud.*" *Id.* at 10 (emphasis added).

The First Circuit noted in *Young* that depending on the circumstances, it may take a reasonably

diligent plaintiff "as much as a few years to get to the bottom of the matter." *Id.* at 9.[12]

Defendants heavily rely on this Court's decision in *Lernout IV*, which dismissed Cowen from

the Bamberg action on statute of limitations grounds. Defendants, however, ignore that the Court

denied Cowen's motion to dismiss it from the Baker's action. The Court's distinction between the

actions of counsel in both cases is critical to the analysis here:

> The [Bamberg] plaintiffs assert that they did not know that SG Cowen had made
> misrepresentations with scienter even when the storm warnings were seen, and thus did not
> know at the time that they had a viable claim against SG Cowen, as opposed to the other
> defendants they did name. However, once the defendant has shown the presence of storm
> warnings, the plaintiff must "counter with a showing that she fulfilled her corresponding duty
> of making a reasonably diligent inquiry into the possibility of fraudulent activity." (citation
> omitted).

---

[12] Courts have counseled that "the applicable statute of limitations should not precipitate groundless or premature suits
by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to
support their claims." *Sterlin v. Biomune Sys., Inc*, 154 F.3d 1191, 1202 (10th Cir. 1998) *cited with approval* in *Young,*
305 F.3d at 9; *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 104 (2d Cir. 2003) ("It makes little sense from a policy
perspective to require specific factual allegations - on pain of dismissal in cases of this sort - and then to punish the
pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time
barred.").

No such showing has been made here. The plaintiffs do not, and cannot, argue that they were unaware that storm warnings in the fall of 2000 potentially implicated SG Cowen, *for the Bambergs' own complaint is predicated on financial misrepresentations that SG Cowen made directly to them during the Dragon deal in February and March 2000.* The Bakers filed their virtually identical case against SG Cowen on June 6, 2001. To be sure, a plaintiff should not be encouraged to clone another's complaint if unsure about its factual basis. Rule 11 requires more. However, *the Bambergs have pointed to no reasonable investigation, or additional evidence gathered, that has finally clinched their belief that they have a viable claim against SG Cowen.* Rather, the amended complaint seems to be based on the same allegations that were available a year before they filed their amended complaint.

*Lernout IV*, 236 F. Supp. 2d at 85-86. (emphasis added).

In stark contrast to the facts at issue in *Lernout IV*, Defendants did not call attention to their fraudulent conduct by making misrepresentations directly to Plaintiffs. In fact, Defendants actively concealed their role in the fraud. ¶¶ 127 and 128. Moreover, the Complaint is replete with critical fact concerning Defendants' misconduct that only learned after June 2003. Block Decl. ¶¶ 2-5. Defendants point to no publicly-available means by which Plaintiffs could have learned prior to June 2003 that Artesia knew the LDCs were sham entities, that L&H was recording revenue from them in violation of GAAP and that Lernout, Hauspie and Willaert provided the financial backing for the LDC revenues. Thus, because those facts were necessary for Plaintiffs to establish the requisite scienter element of their claims against Defendants, *Lernout IV* provides no support for dismissing Plaintiffs' claims.[13]

Defendants' argument also ignores the fact that Plaintiffs have alleged that they undertook substantial efforts to investigate their claims, but uncovered no evidence demonstrating that Defendants were active participants in the L&H fraud until June of 2003. Indeed, the First Amended Complaint is 213 pages, and is based on an extensive review and investigation of this fraud

---

[13] *See e.g., Levitt v. Bear, Stearns & Co.,* 340 F.3d 94, 104 (2d Cir. 2003) (even where other plaintiffs had commenced legal actions against a defendant related to the misconduct at issue in the instant action, the claims asserted against that defendant were not time barred if the additional facts alleged against it were necessary to establish the plaintiffs' claims); *Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir. 2000) (claims against auditor brought in amended complaint were not time barred because two facts the plaintiffs could not have learned until after the initial complaint was filed were necessary for the plaintiffs to establish viable claims against the auditor.)

13

including a thorough search of newspaper articles, L&H public filings, interviews with former L&H

employees and a review of over 30 boxes of documents that L&H produced to the SEC pursuant to

the SEC's investigation of L&H.  Each of the Transactional Plaintiffs filed similar lengthy

complaints.  Defendants can search in vain, but there is no suggestion in the First Amended

Complaint that Artesia played any role in the L&H fraud.[14]  Indeed, the articles Defendants

principly rely on are all dated months <u>before</u> the First Amended Complaint was filed buttressing that

Artesia's fraudulent conduct was well concealed until June, 2003.

Plus, class plaintiffs relied on the L&H Audit Committee's Report which set forth its

findings, based on its internal investigation, into the fraud.  Tellingly, Artesia is not mentioned as a

participant in the fraud in the Audit Committee Report.[15]  While the collapse of L&H certainly put

plaintiffs on notice of claims against L&H, its officers and directors, auditors and other identified

participants in the LDC scam, there was nothing in the public record to establish that viable claims

existed against Artesia.

Nonetheless, Artesia points to 5 articles in *L'Echo*, a Belgian newspaper, dated between

March and June, 2001 from which Defendants argue provide "indications of Artesia's *potential* role

in the alleged fraud."  (Mem. at 9)  As set forth in class plaintiffs' motion to strike, however,

Defendants may not rely on these articles to dismiss this action at this stage.

In any event, perusal of the articles fail to establish Defendants' burden that class plaintiffs

were on notice of storm warnings concerning Artesia's role in the fraud by June 2001.

---

[14] Defendant bears the burden of proving the existence of "storm warnings." *Young*, 305 F.3d at 8-9. *Law v. Medco Research*, 113 F.3d 781, 786 (7th Cir. 1997) (defendants "have the burden of proving an affirmative defense, such as that the statute of limitations has run").

[15] It is now apparent that this was at least in part due to Artesia's efforts to mislead those investigators and conceal the off-the-books guarantees provided by L&H's principal officers on the loans that Artesia extended to L&H. ¶ 128.

Tellingly, each of these articles appeared in Flemish and French and were translated into English solely for purposes of this motion. Plus, Defendants provide no indication of the circulation of *L'Echo* or whether any of these articles were ever picked up by a news reporting service outside of Belgium and were available to the U.S. media outlets.

The most specific of these articles is an April 24, 2001 reporting that Artesia lent money "to the first LDCs [that] emerged in Belgium in the second half of 1998." (Exhibit E to the Leon-Quick Affidavit.) It notes that the first LDCs were capitalized with $21 million and "*[a]ccording to our information*, half of this amount was financed by credit points extended by the Artesia bank to each of the seven LDCs that emerged in 1998." (emphasis added). The article provides no details or information about the source of its "information" or any information that Artesia had any knowledge that the LDCs were sham entities, that L&H was improperly recording revenue from these phony paper shells or that Lernout, Hauspie and Willaert provided unorthodox credit default swaps to hide their roles as financiers. An article which appears to come from *The Financial Times* dated April 24, 2001,[16] reiterates what is in the *L'Echo* article prefacing the information with the qualification "*[a]ccording to sources close to the matter*, half of this sum [$21 million] was financed by credit-bridges by Artesia . . ." (Exhibit F to the Leon-Quick affidavit.) (emphasis added).

Defendants then quote an attorney for Deminor[17] suggesting that Artesia's role in the fraud was well known. What this lawyer says, however, in commenting on Artesia/Dexia's indictment, is that "this means that we were right to have the *impression* that a *series of banks* participated in the fraudulent operations." Leone-Quick Decl. ¶ 11.

---

[16] Unlike the other articles they rely on, Defendants provide no information as to what medium this article appeared in.

[17] Deminor is a law firm in Europe which has filed thousands of individual lawsuits regarding the L&H fraud in Europe.

Defendants argument lacks merit.  They point to a single newspaper article in Belgium in April 2001, which reported, based on undisclosed or unverifiable information, that Artesia lent money to some of the LDCs, and a lawyer from Deminor whose "impression" was confirmed that "banks" – not Artesia but "banks" – were involved in the LDC fraud.  From these two scant facts, Defendants make the wholly unsupported leap that plaintiffs were on specific notice of Artesia's role in the fraud in April 2001.

Defendants have failed to carry their burden that class plaintiffs were on notice of storm warnings of Artesia's role in the fraud, let alone sufficient facts which would permit plaintiffs to have "unearthed the fraud."[18]  Indeed, in seeking dismissal Defendants themselves argue that "commonplace business transactions" cannot support a fraud claim.  (Mem. at 15.)  At best, these articles support that Artesia was engaged in commonplace business transactions lending money, which is what banks do.  Not until Artesia was indicted, however, did the evidence surface that this was more than commonplace business – it was fraud.

Even if this Court were to find that the single April 24, 2001 article created sufficient storm warnings, the second prong of the *Young* analysis – that the statute does not run "until 'the time when the plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains'" – is still not met.

---

[18] Typically, it is for the fact finder to determine both whether the circumstances sufficiently warned plaintiff to place her on inquiry notice and whether plaintiff exercised reasonable diligence in the face of such warnings. *Young*, 305 F.3d at 8-9; *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997) ("Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under S.E.C. Rule 10b-5 is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)"); *In re Global Crossing, Ltd. Sec. Litig.*, 02-Civ. 910 (GEL), 2003 U.S. Dist. Lexis 22930 (S.D.N.Y. Dec. 18, 2003)("question of whether a plaintiff exercised due diligence is 'usually a question of fact for the jury to decide.'" (quoting *In re Integrated Res. Real Estate Sec. Litig.*, 815 F. Supp 620, 638 (S.D.N.Y. 1993)); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 602 (D.N.J. 2001) ("[I]t is inappropriate to dismiss claims as time-barred where, as here, the analysis is so fact-intensive.").

The Court dismissed the Bambergs because they "pointed to no reasonable investigation, or additional evidence gathered, that . . . clinched their belief that they had a viable claim against SG Cowen." *Lernout IV*, 236 F. Supp. 2d at 85-86. Here, class plaintiffs undertook an extraordinarily thorough investigation of the fraud in 2001 and named as many defendants as possible, consistent with their obligations under Rule 11, to hold as many parties accountable for this massive fraud. The new evidence, unearthed in June 2003, was the indictment of Dexia Bank for Artesia's role in this fraud. This is the first time <u>any</u> available facts would establish that Artesia played a role in this fraud. The Belgian prosecutor, unlike class plaintiffs, has the ability to seize documents and Artesia's internal documents establish its direct participation in and knowledge of this fraud. Those documents are not publicly available and not until the prosecutor granted plaintiffs request to become co-prosecutors (in 2003) and review those documents, did class plaintiffs "unearth" the facts to charge Artesia with fraud, consisted with Rule 11. Within 2 months of the indictment being made public, class plaintiffs investigated the claims, reviewed the documents the prosecutors seized, and commenced suit. Class plaintiffs were extremely diligent in conducting their investigation after the first indications were publicly available concerning Artesia's role in this fraud and the claims are not the barred. Block Dec. ¶ 4.

## II. PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT DEFENDANTS VIOLATED § 10(B) BY ENGAGING IN A FRAUDULENT SCHEME

### A. Plaintiffs Have Adequately Alleged That Dexia Substantially <u>Engaged In Manipulative And Deceptive Conduct</u>

In *Lernout V*, this Court held that § 10(b) and Rule 10b-5:

> impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive devise (like the creation or financing of a shame entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.

17

236 F. Supp. 2d at 173. Here, there can be no dispute that Artesia substantially participated in a manipulative and deceptive scheme by financing the sham LDCs.[19]

Indeed, as alleged, Artesia was the key to the scheme by devising a highly unorthodox method for Lernout, Hauspie and Willaert to obtain financing for the LDCs so they would not have to disclose their roles and to avoid revenue recognition issues with the SEC.

In *Lernout V*, this Court denied FLV Fund's motion to dismiss under the "scheme theory of liability" finding that "[p]laintiffs' allegations suffice to show that FLV substantially participated in the strategic-partner scheme, by owing and funding multiple strategic partners." 236 F. Supp. 2d at 175. The Court found sufficient to counter FLV's contention that it was simply a "venture capital fund investing in legitimate start-up companies" the allegations that which "create[d] a strong inference of FLV's scienter with respect to the sham entities." In particular, "plaintiffs have alleged that the strategic partners themselves were mere shells, with no technical, financial or personnel resources to meet their purported mission." *Id.* The Court also rejected FLV's argument that "its strategic-partner transactions were not shams, but rather involved customers that at a later point in time became unable to satisfy their obligations." *Id.* As the Court ruled, "[i]f it turns out that FLV only invested in viable entities, but L&H fraudulently misrepresented the relatedness of those entities, FLV's allegation that at worst it wan an aider and abettor would have more force. However, it is inappropriate to resolve that dispute at this preliminary stage." *Id.* The Court denied Mercator's motion to dismiss its role in the strategic partner scheme on almost identical grounds that it denied FLV Fund's motion. *Id.* at 175-76.

The Court's denial of Verbeke's motion is also relevant here.[20] The Court denied Verbeke's motion finding the allegations that Verbeke provided "the legal work involved in creating these start-

---

[19] S.A. argues that it cannot be held liable, as it is not charged it with improper conduct. As we discuss *infra*, S.A. is charged with Artesia's knowledge and conduct via successor liability.

18

ups [the 30 strategic partners] was performed in whole or in part by Verbeke, in his capacity as a partner of Loeff Clays." *Id.* at 169. The Court found this allegation, which was missing from the Class Complaint, sufficient to demonstrate his active participation in and knowledge of the scheme.

Here, there can be no dispute that Artesia knew of the fraud and directly participated in it. It devised the credit default swaps so it could lend money to the LDCs without Lernout, Hauspie and Willaert's financial backing having to be disclosed so that L&H could record revenues, and inflate its financial results, in violation of GAAP. It knew the LDCs were shell companies with no assets or activities and were nothing more than funding mechanisms through which L&H could record bogus revenue. Just as this Court found that FLV Fund and Mercator engaged in manipulative or deceptive acts in furtherance of the LDC fraud, so too should it find that Artesia engaged in the same manipulative or deceptive acts and it should deny them motion to dismiss.

## B. The Court Should Not Reconsider The Lernout V Decision

Knowing that the allegations against it are even stronger and more detailed than the allegations against FLV Fund, Mercator or Verbeke, Dexia asks this Court to reconsider its decision in *Lernout V* and to reverse itself. The Court should decline the request.

Defendants' citation to two out of circuit district court decisions should not lead to a different result. *In re Rural Cellular Corp. Sec. Litig.*, No. Civ. 02-4893, 2004 WL 67651 (D. Minn. Jan. 9, 2004) and *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018 (C.D. Cal. 2003). Neither case warrants reconsideration or reversal.

*Rural Cellular* is legally distinguishable and, thus, of little relevance. There, plaintiffs brought a securities fraud claim against Arthur Andersen ("AA"), the former auditor of the

---

[20] Class plaintiffs' complaint did not contain the allegations that were in the Transactional Plaintiffs' complaints that Verbeke provided the legal services in connection with the establishment of the LDCs. While the Court granted the motion to dismiss the 10(b)-5 claims with regard to class plaintiffs, it denied the motion to dismiss with regard to the Transactional Plaintiffs' aiding and abetting claims against Verbeke. Mr. Verbeke was subsequently dismissed for lack of subject matter jurisdiction.

defendant company, alleging, *inter alia*, that AA substantially participated in the issuance of the

defendant/company's false and misleading financial results. 2004 WL 67651, at *6. Tellingly, the

plaintiff *did not* allege that AA engaged in any scheme to defraud under Rule 10b-5(a) and (c). As

such, the court only focused on whether or not AA could be held liable under Rule 10b-5(b) for the

Company's false and misleading statements under the so-called "substantial participation" test. *Id.*

Thus, the *Rural Cellular* court *never addressed* the very issue that Dexia wants this Court to

reconsider.

      Defendants' reliance on *Homestore* is equally unpersuasive. There, the court was reluctant to

impose Section 10(b) liability on "outsiders" – there, simple business partners – who were not

envisioned as potential primary violators by the Supreme Court in *Central Bank.* 252 F. Supp. 2d at

1038-39. But *Central Bank* expressly acknowledged that banks – like Dexia – *are* potential primary

violators under Section 10(b). *See Central Bank*, 511 U.S. at 191 ("Any person or entity, including a

lawyer, accountant, *or bank*, who employs a manipulative device or makes a material misstatement

(or omission) on which a purchaser or seller of securities relies may be liable as a primary violator

under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.")

(emphasis added). Moreover, the *Homestore* Court sought to distinguish between primary violators

that "employ" the fraudulent schemes – meaning the "primary architects" who "designed and carried

out" the scheme – and secondary violators who merely facilitate the scheme. *Homestore*, 252 F.

Supp. 2d at 1040. Here, Artesia was a fundamental architect of the strategic partner scheme,

creating the "credit swap" mechanism through which L&H concealed the fraudulent, related-party

nature of the LDC/CLDC transactions.

      Plus, the *Homestore* court found that the plaintiffs suffered damages from their reliance on

the false and misleading statements issued by the Homestore, not the scheme itself. In *Lernout V*,

however, this Court disagreed, finding that "plaintiffs have alleged facts sufficient to show that they

relied on the strategic partner scheme, under the fraud-on-the-market theory." *See* 236 F. Supp. 2d at 174 (holding that the alleged scheme "artificially inflated L&H's profits, which in turn artificially inflated the L&H common stock price during the class period").

The decision in *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002), is directly on point and supports the *Lernout V* opinion. There, the court sustained 10(b)-5 (a) and (c) claims against commercial banks who created special purpose entities ("SPEs") with the Enron which engaged in sham transactions with the SPEs in order to record phony profits and conceal Enron's debt on the SPE's balance sheets. *Enron*, 235 F. Supp. 2d at 591 (citing *Cooper v. Pickett*, 137 F.3d 616. 624 (9th Cir.1997)).

III.  **THIS COURT HAS PERSONAL JURISDICTION OVER S.A.[21]**

    A.  **The Court Must Evaluate Artesia's Nationwide Contracts To Determine Whether To Exercise Personal Jurisdiction Over S.A.**

The fundamental flaw in S.A.'s personal jurisdiction argument is that it focuses on its own contacts with the United States, rather than Artesia's contacts.[22] This case, however, stems from the fraudulent conduct of Artesia. S.A. is the legal successor to Artesia, and as such, stands in the shoes of Artesia for purposes of liability and can be expected to be haled into the same courts as Artesia. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 784 (7th Cir. 2003) ("In the corporate successor context, the successor corporation has chosen to stand in the shoes of its predecessor and has chosen to accept the business expectations of those who have dealt previously with the predecessor. Therefore, it can be expected to be haled into the same courts as its predecessor."); *Select Creations v. Paliafito Am.*, 852 F. Supp. 740, 765 (E.D. Wis.

---

[21]  Dexia Bank does not contest jurisdiction.

[22]  Plaintiffs have asserted claims under the federal securities laws, therefore, as S.A. acknowledges, the inquiry focuses on whether Artesia has sufficient contacts with *the United States as a whole*. *See Catrone v. Ogden Suffolk Downs, Inc.*, 647 F. Supp. 850, 853 (D. Mass. 1986) (citations omitted).

1994) (holding that where a court has personal jurisdiction over the predecessor corporation, "personal jurisdiction over the successor in interest necessarily exists.").

As the Court held in *McClary v. Erie Engine & Mfg. Co.*, 856 F. Supp. 52 (D.N.H. 1994):

> In order to make a prima facie showing that this court has personal jurisdiction over [a defendant] under the doctrine of successor liability, plaintiff must demonstrate (1) that the court has personal jurisdiction over [the predecessor] and (2) that [defendant] is liable as a successor to [the predecessor] under [state law]."

*Id.* at 57.[23] Under Massachusetts state law, successor liability attaches if, *inter alia*, there is an express or implied assumption of the predecessor's liabilities. *See Motorsport Eng'g, Inc. v. Maserati, S.p.A.*, 183 F. Supp. 2d 209, 217-18 (D. Mass. 2001), *aff'd by* 316 F.3d 26 (1st Cir. 2002).

Here, Plaintiffs allege that either S.A. or Dexia Bank assumed all liabilities of Artesia, via merger. ¶¶ 2, 20, 29, 32. S.A. does not directly challenge those allegations. Rather, S.A. submits the Affidavit of Paul Delva, the Deputy General Secretary for S.A., attesting that S.A. itself has no direct contacts with the United States. *See* Affidavit of Mr. Paul Delva In Support Of Defendant Dexia S.A.'s Motion To Dismiss The Second Amended Class Action Complaint Pursuant To Fed. R. Civ. P. 12(b)(2) ("Delva Affidavit"). This Affidavit is of little utility because it is entirely silent on whether S.A. acquired Artesia's liabilities. Instead, it merely mirrors the allegations in the Complaint, stating that between March and July 2001, S.A. acquired all of the shares of AcroFin, and that on April 1, 2002, S.A. completed a legal merger of Artesia into its subsidiary, Dexia Bank Belgium. Delva Affidavit at ¶¶ 15-16.

---

[23] *See also Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor."); *Bouley v. American Cyanamic Co.*, No. 85-4368-Z, 1986 WL 13400, at *2 (D. Mass. Nov. 19, 1986) (recognizing that court will assert personal jurisdiction over a successor corporation when liability is premised on a theory of merger).

22

Given the uncontested allegations that both S.A. and Dexia Bank are successors to Artesia, and construing all pleadings in the light most favorable to Plaintiffs,[24] Plaintiffs have alleged sufficient facts to demonstrate successor liability via merger. Accordingly, if the Court finds that it has personal jurisdiction over Artesia, then Dexia S.A.'s motion to dismiss for lack of personal jurisdiction should be denied.

**B.    Requirements Of Specific Personal Jurisdiction**

A court may assert personal jurisdiction over a defendant by the exercise of either general or specific jurisdiction. *See Massachusetts Sch. of Law* v. American Bar Ass'n, 142 F.3d 26, 34 (1ˢᵗ Cir. 1998); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole*, P.A., 290 F.3d 42, 51 (1st Cir.), *cert. denied*, 537 U.S. 1029 (2002). For specific jurisdiction, the cause of action must relate to, or arise from defendants' contacts with the forum. *Steir v. Girl Scouts of the USA*, 218 F. Supp. 2d 58, 63 (D.N.H. 2002); *see also Daynard*, 290 F.3d at 52. As this Court has held, specific jurisdiction may be exercised when: "(1) the claim 'directly relates to or arises from the defendant's contacts with the forum'; and (2) 'the contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws.'" *Levin v. Harned*, 292 F. Supp. 2d 220, 225 (D. Mass. 2003) (citation omitted).

**1.    This Court Has Specific Personal Jurisdiction Over Artesia**

Artesia's role in the LDC scheme provides a sufficient basis for specific personal jurisdiction. Both the Supreme Court and this Court have held that defendants, like Artesia, who directly participate in an intentional tort that occurs within this Court's jurisdiction, or is intentionally aimed at residents of this forum and causes injury here, are subject to this Court's

---

[24] On a motion to dismiss for lack of personal jurisdiction, the Court construes all pleadings and affidavits in the light most favorable to the plaintiff. *Massachusetts Sch. of Law v. American Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998).

jurisdiction *even if they have no direct contracts with this forum. See Calder v. Jones*, 465 U.S.
783, 789-90 (1984) (finding that where "intentional, and allegedly tortious, actions were
expressly aimed at" the forum, then the actor "must 'reasonably anticipate being haled into court
there'") (citations omitted); *Levin*, 292 F. Supp. 2d at 227 (emphasizing that "numerous courts
have upheld a court's exercise of personal jurisdiction over non-resident defendants with no
direct contact with the forum when the intentional tort was individually targeted at the resident of
the forum state, and the brunt of the harm was felt there."). Furthermore, in *Levin*, this Court
held that the purposeful availment prong of the specific jurisdiction inquiry may be satisfied
where, as here, the "defendants allegedly committed an intentional tort, the forum was the focal
point of the alleged harms suffered by plaintiffs, and the alleged tort was expressly aimed at the
forum." Id. at 229-30.

Here, plaintiffs' claims directly relate to Artesia's forum contracts. Artesia directly
participated in the fraudulent LDC scheme, which this Court has already ruled was an intentional
tort aimed at investors who purchased L&H shares on the NASDAQ exchange. *Lernout V*, 236
F. Supp. 2d at 166-67. Moreover, Artesia devised the credit default swaps to conceal *from the
SEC* the fact that L&H principles were guaranteeing loans to sham customers. ¶ 11. Based on
quotations in Artesia's own contemporaneous documents, there can be no doubt that the
fundamental purpose of the scheme – and Artesia's participation – was to defraud the United
States securities markets. ¶¶ 10, 11, 113, 119-2.[25] As such, plaintiffs satisfy the standard for

---

[25] The Complaint provides further details of Artesia's United States dealings directly related to L&H. For example,
Artesia was a member of the banking consortium that lent $230 million of part of L&H's acquisition of U.S.-based
Dictaphone. ¶ 34. One borrower of these funds – Dictaphone – was based in Stratfield, Connecticut. ¶ 34. In
addition, Artesia was intimately involved in transactions with L&H's customer Vasco Data Securities International
("Vasco"), an Illinois-based company. In 1997, Artesia lent money to Vasco. ¶ 34. Then, in early 1999, Artesia
was the lead underwriter in a $11.5 million private placements to Vasco that involved several L&H-related players
(including Lernout & Hauspie Investment Company, Mercator & Noordstar and Sofinim N.V., a company affiliated
with L&H Board Member and Audit Committee member Marc DePauw.). ¶¶ 34, 124. This private placement was
consummated only after Vasco agreed to backdate a contact with L&H. ¶¶ 123-24. In furtherance of a scheme to

personal jurisdiction outlined in *Levin* and have demonstrated that it is entirely fair and

reasonable for Artesia to be haled into a U.S. court based on its role in the LDC scheme.

### C. Plaintiffs Are Entitled To Conduct Limited Jurisdictional Discovery

Should the Court determine that Plaintiffs have not alleged sufficient facts to establish

personal jurisdiction via successor liability, Plaintiffs contend that they are entitled to conduct

jurisdictional discovery on this issue. This Court has already held that jurisdictional discovery

was warranted upon a showing of a colorable claim of personal jurisdiction. *See* July 24, 2003

Memorandum And Order On Plaintiffs' Request For Jurisdictional Discovery. As demonstrated

above, Plaintiffs easily satisfy this burden. The only open issue is whether or not S.A. assumed

any liabilities of Artesia. This is a simple question and the answer is uniquely in the hands of

defendants S.A. and Dexia Bank. As such, narrowly tailored discovery is warranted.

### CONCLUSION

For the reasons set forth herein, the motion should be denied in its entirety.

Dated: May 3, 2004                         Respectfully submitted,

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**

/s/ Jeffrey C. Block
Glen DeValerio, BBO # 122010
Jeffrey C. Block, Esquire, BBO # 600747
Michael T. Matraia, BBO # 633049
Patrick T. Egan, BBO # 637477
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

---

artificially inflate revenues from Vasco, Artesia wired approximately $11.5 million to Vasco's account in the United States. ¶¶ 124-126.

**CAULEY GELLER BOWMAN &
COATES, LLP**
Steven E. Cauley
Curtis L. Bowman
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
Tel: (501) 312-8500
Fax: (501) 312-8505

**SHALOV STONE & BONNER LLP**
Lee S. Shalov
James Bonner
Patrick L. Rocco
485 Seventh Avenue, Suite 1000
New York, New York 10018
Tel: (212) 239-4340
Fax: (212) 239-4310

**PLAINTIFFS' COUNSEL**

G:\Boston Case Folder\Securities\Lernout2\Draft Pleadings\Dexia_facts.doc

Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HANS A. QUAAK, ATTILIO PO **x** <br> and KARL LEIBINGER, on behalf of <br> themselves and those similarly situated, **:** <br> **:** <br>     **Plaintiffs,**     **:** <br> **:** <br>     **v.**     **:** <br> **:** <br> **DEXIA, S.A. and DEXIA BANK**     **:** <br> **BELGIUM (formerly known as**     **:** <br> **ARTESIA BANKING CORP., SA),**     **:** <br> **:** <br>     **Defendants.**     **:** <br> ————————————————— **x** | **Civil Action No.** <br> **03-11566 PBS** |

## CLASS PLAINTIFFS RESPONSES TO DEXIA
## BANK BELGIUM'S FIRST INTERROGATORIES

Lead Plaintiffs Hans A. Quaak, Attilio Po, and Karl Leibinger ("Plaintiffs") hereby

respond and object to Defendant Dexia Bank Belgium's First Interrogatories to Class Plaintiffs

(the "Interrogatories") as follows:

### GENERAL OBJECTIONS

1.    Plaintiffs object to the Interrogatories to the extent they, individually or

cumulatively, purport to impose duties and obligations beyond those required by the Federal

Rules of Civil Procedure or the Local Rules or Orders of this Court.

2.    Plaintiffs object to the Interrogatories to the extent that they are overbroad,

harassing, vague or ambiguous, and to the extent that the discovery sought is unreasonably

cumulative, duplicative, disproportionate or unduly burdensome.

3.    Plaintiffs object to the Interrogatories to the extent that any Interrogatory is

premature inasmuch as it purports to call for opinions, including expert opinions, or contentions

relating to fact or to the application of law to fact that Plaintiffs would not be required to disclose until all discovery has been completed or at such later time as the Court may direct.

4.    Plaintiffs object to the Interrogatories to the extent that the information sought is protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or doctrine, Rule 26(b)(3) of the Federal Rules of Civil Procedure relating to trial preparation materials, or is otherwise privileged or immune from discovery. This objection includes, but is not limited to, information requested by defendants that relates to mental impressions, conclusions, opinions, or legal theories of Plaintiffs' attorneys or representatives concerning the litigation or that seeks information regarding communications between Plaintiffs and any attorneys representing Plaintiffs or the class in this action, relating to this lawsuit, or during or in anticipation of litigation.

5.    Plaintiffs object to the Interrogatories to the extent they fail to define an applicable time period. Unless otherwise noted, Plaintiffs will respond to each Interrogatory as it relates to the period from 1997 to December 13, 2000 because Defendant has refused to produce documents to Plaintiffs prepared after that date. If defendant agrees to expand the time period for which it will produce documents, plaintiffs will reconsider its position accordingly.

6.    Plaintiffs object to the Interrogatories to the extent they seek documents that are not relevant to the claims or defenses of any party.

7.    Plaintiffs object to the definition of "L&H Litigation" as overbroad to the extent it encompasses actions that are not or were not brought by Plaintiffs. Plaintiffs will define "L&H Litigation" as limited to *In re Lernout & Hauspie Speech Products Securities Litigation*, 00-CV-11589 (PBS).

8.    In providing Answers to the Interrogatories, Plaintiffs do not in any way waive or

2

intend to waive, but rather intend to preserve and are preserving:

      (a)     All objections as to competency, relevancy, materiality and admissibility of the Interrogatories, the Answers and their subject matter;

      (b)     All rights to object on any ground to the use of any of the Answers, or their subject matter, in any subsequent proceedings, including the trial of this or any other action;

      (c)     All rights to object on any ground to any further interrogatories or other discovery requests involving or related to the subject matter of the Interrogatories;

      (d)     The right to supplement Answers to the Interrogatories prior to trial; and

      (e)     Any and all privileges or rights arising under applicable Federal Rules of Civil Procedure, Local Rules of this Court, other statutes, or the common law.

9.     In addition to the General Objections set forth above, Plaintiffs also state additional specific objections to the Interrogatories where appropriate. By setting forth such specific objections, Plaintiffs do not intend to limit or restrict the General Objections set forth above. To the extent that Plaintiffs respond to the specific Interrogatories, any stated objections are not waived by providing Answers. In addition, the inadvertent disclosure of privileged information shall not constitute a waiver of any applicable privilege.

10.    Subject to and without waiver of the foregoing General Objections, each of which is hereby incorporated into each of Plaintiffs Answers and specific objections to each Interrogatory, Plaintiffs respond as follows:

### SPECIFIC OBJECTIONS AND ANSWERS

**Interrogatory No. 1**
State each date on which you claim alleged conduct by Artesia caused the price of L&H common stock to decline and, for each such date, identify any Disclosure you claim led to that decline.

**Response to Interrogatory No. 1:**    Plaintiffs object to this Interrogatory as premature and harassing because it calls for expert testimony prior to the time when such testimony must be completed pursuant to the Court's May 18, 2005 Scheduling Order.  Plaintiffs have not received all relevant documents in the control of defendant and/or third parties, analyzed such documents, taken deposition testimony from the persons who created the documents and/or were familiar with them and the activities they describe, or engaged expert witnesses, to the extent required to formulate opinions based upon the factual record developed in this case.  Until this process has been concluded, Plaintiffs cannot provide an accurate and complete answer, and object to this Interrogatory as vague, overbroad, unduly burdensome, harassing and premature. Plaintiffs further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work-product doctrine.

**Interrogatory No. 2:**
For each relevant quarter, state separately the amount of publicly reported L&H revenue that you claim was attributable to each of (a) the Radial Loan; (b) the LIC Loan, (c) the Personal Loan, and (d) the Vasco Private Placement.

**Response to Interrogatory No. 2:**    Plaintiffs object to this Interrogatory as premature and harassing because it calls for expert testimony prior to the time when such testimony must be completed pursuant to the Court's May 18, 2005 Scheduling Order.  Plaintiffs have not received all relevant documents in the control of defendant and/or third parties, analyzed such documents, taken deposition testimony from the persons who created the documents and/or were familiar with them and the activities they describe, or engaged expert witnesses, to the extent required to formulate opinions based upon the factual record developed in this case.  Until this process has been concluded, Plaintiffs cannot provide an accurate and complete answer, and object to this Interrogatory as vague, overbroad, unduly burdensome, harassing and premature.

Plaintiffs further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work-product doctrine.

**Interrogatory No. 3:**
For each relevant quarter, state separately the amount of any reported L&H revenue identified in response to Interrogatory no. 2 that was restated by L&H.

**Response to Interrogatory No. 3:**    Plaintiffs object to this Interrogatory on the grounds that it is irrelevant to the claims or defenses of any party. Plaintiffs further objection to this Interrogatory as premature and harassing because it calls for expert testimony prior to the time when such testimony must be completed pursuant to the Court's May 18, 2005 Scheduling Order. Plaintiffs have not received all relevant documents in the control of defendant and/or third parties, analyzed such documents, taken deposition testimony from the persons who created the documents and/or were familiar with them and the activities they describe, or engaged expert witnesses, to the extent required to formulate opinions based upon the factual record developed in this case. Until this process has been concluded, Plaintiffs cannot provide an accurate and complete answer, and object to this Interrogatory as vague, overbroad, unduly burdensome, harassing and premature. Plaintiffs further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work-product doctrine.

**Interrogatory No. 4:**
Identify each person who you claim reviewed any credit agreement or other documentation for the Radial Loan or the LIC Loan for the purpose of determining how L&H should account for fees from any language development company.

**Response to Interrogatory No. 4:** Plaintiffs object to this Interrogatory to the extent that they have already agreed to produce the requested information as part of Plaintiffs' Rule 26 Initial Disclosure Statement. Plaintiffs further object to this Interrogatory as premature

harassing because plaintiffs have not received all relevant documents in the control of defendant and/or third parties, analyzed such documents, taken deposition testimony from the persons who created the documents and/or were familiar with them and the activities they describe, or engaged expert witnesses, to the extent required to formulate opinions based upon the factual record developed in this case. Until this process has been concluded, Plaintiffs cannot provide an accurate and complete answer, and object to this Interrogatory as vague, overbroad, unduly burdensome, harassing and premature. Plaintiffs further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work-product doctrine.

**Interrogatory No. 5**
Identify any print and electronic media and any computer databases you reviewed, by and through your attorneys, as described in paragraph 21 (c) of the Complaint.

     **Response to Interrogatory No. 5:**    Plaintiffs object to this Interrogatory because it is overly broad and unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and it seeks information that is protected by the attorney-client privilege and the attorney work product doctrine.   Plaintiffs further object to this Interrogatory on the grounds that it seeks information that is irrelevant to the claims or defenses of any party.

**Interrogatory No. 6:**
Identify any former employee of L&H and any former employee of customers of L&H that you interviewed, by and through your attorneys, as described in paragraph 21 of the Complaint.

     **Response To Interrogatory No. 6:**  Plaintiffs object to this Interrogatory to the extent that they have already identified all relevant witnesses as part of Plaintiffs' Rule 26 Initial Disclosure Statement. Plaintiffs object to this Interrogatory because it is overly broad and unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and it and it seeks information that is irrelevant to any claim or defense of any party, as well as

6

information that is protected by the attorney-client privilege and the attorney work product

doctrine.

**Interrogatory No. 7:**
Identify any efforts beyond those listed in paragraph 21 of the Complaint that were part of
"counsel's investigation" as set forth in that paragraph.

    **Response to Interrogatory No. 7:**    Plaintiffs object to this Interrogatory because it is

vague, ambiguous, overly broad and unduly burdensome, not reasonably calculated to lead to the

discovery of admissible evidence and it seeks information that is irrelevant to any claim or

defense of any party, as well as information that is protected by the attorney-client privilege and

the attorney work product doctrine.

**Interrogatory No. 8:**
State each date on which you or your attorneys reviewed any portion of the over 4.5 million
pages of L&H documents located in Belgium and Massachusetts described in the settlement
notice for the KPMG Settlement, and for each such date, state the full address of the location
where such documents were reviewed.

    **Response to Interrogatory No. 8:**    Plaintiffs object to this Interrogatory because it is

overly broad and unduly burdensome, not reasonably calculated to lead to the discovery of

admissible evidence and it seeks information that is irrelevant to any claim or defense of any

party, as well as information that is protected by the attorney-client privilege and the attorney

work product doctrine.   Subject to the foregoing objections, plaintiffs state that the first time

plaintiffs or their counsel reviewed any of the approximately 4.5 million documents located in

Belgium and in Massachusetts were as follows: June 23, 2003 (Belgium), and July 9, 2003

(Danvers, Massachusetts).

**Interrogatory No. 9:**
Identify each person who submitted a Proof of Claim in connection with the KPMG Settlement
and, for each such person, state the date(s) of purchase(s) and/or sale(s) of L&H securities by
that person; the amount of any Recognized Claim for that person; and the amount of any
payment made to that person in connection with the KPMG Settlement.

7

**Response to Interrogatory No. 9:**  Plaintiffs object to this Interrogatory because it is overly broad and unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and seeks information irrelevant to the claim or defense of any party. Plaintiffs further object to this Interrogatory as premature to the extent that the settlement administration process is ongoing.

**Interrogatory No. 10:**
Identify each person who submitted a Proof of Claim in connection with the Director/FLV Settlement and, for each such person, state the date(s) of purchase(s) and/or sale(s) of L&H securities by that person; the amount of any Recognized Claim for that person; and the amount of any payment made to that person in connection with the Director/FLV Settlement.

**Response to Interrogatory No. 10:**  Plaintiffs object to this Interrogatory because it is overly broad and unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and seeks information irrelevant to the claim or defense of any party. Plaintiffs further object to this Interrogatory as premature to the extent that the settlement administration process is ongoing.

Dated: June 1, 2005

**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**

Glen DeValerio, BBO # 122010
Jeffrey C. Block, BBO # 600747
Patrick T. Egan, BBO # 637477
One Liberty Square
Boston, Massachusetts 02109
(617) 542-8300
(617) 542-1194 (fax)

**SHALOV STONE & BONNER LLP**

James P. Bonner, Esq.
Patrick L. Rocco, Esq.
485 7th Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

8

**CAULEY BOWMAN CARNEY
& WILLIAMS, PLLC**
S. Gene Cauley, Esq.
J. Allen Carney, Esq.
11001 Executive Center Drive, Suite 200
PO Box 25438
Little Rock, AR 72221-5438
(501) 312-8505

**PLAINTIFFS' CO-LEAD COUNSEL**