# EXHIBIT A

01 CV 9510

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph (GJ-4208)
Pamela Jarvis (PJ-9058)
Honey L. Kober (HK-8380)
Sandra M. Lipsman (SL-4590)
Douglas J. Pepe (DP-1357)
805 Third Avenue, 31st Floor
New York, New York 10022
(212) 407-1200
Fax: (212) 407-1299

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

GARY B. FILLER and LAWRENCE PERLMAN, :
Trustees of the TRA RIGHTS TRUST,

                Plaintiffs,

       v.

HANVIT BANK, SHINHAN BANK, and
CHOHUNG BANK,

              Defendants.

-------------------------------------------------x

**Jury Trial Demanded**

CIVIL ACTION NO.



## COMPLAINT

Plaintiffs, by their attorneys, as and for their complaint, allege the following upon

knowledge as to themselves and their own actions; as to their predecessor in interest, Seagate

Technology, Inc. ("Seagate"); and as to the actions of Seagate and its representatives. As to all

other matters, plaintiffs' allegations are based on information and belief arising out of the

investigation of plaintiffs' counsel, which included, among other things, investigation into, and

1

reviews of public statements of and about, Lernout & Hauspie Speech Products NV ("L&H"); its

subsidiary, Lernout & Hauspie Korea ("L&H Korea"); and defendants Hanvit Bank ("Hanvit"),

Shinhan Bank ("Shinhan"), and Chohung Bank ("Chohung"). Based on this investigation,

plaintiffs believe that their information-and-belief allegations are likely to have evidentiary

support after a reasonable opportunity for further investigation and discovery

## NATURE OF THE ACTION

1.    This is an action to recover damages sustained by Seagate when it sold its nearly

$170 million interest in Dragon Systems, Inc. ("Dragon"), for artificially inflated, and ultimately

worthless, L&H stock. Seagate (prior to a merger and leveraged buyout on November 22, 2000)

was a world leader in storage technology for Internet, business and consumer applications; it

designed, manufactured and marketed products for storage, retrieval and management of data on

computer systems, including disc drives, disc drive components, tape drives, and software.

Seagate owned a large stock position in Dragon, which was and is a leading worldwide supplier

of speech and language technology, including award-winning speech recognition software,

Dragon NaturallySpeaking. L&H, which acquired Seagate's stock position in Dragon, is a

global speech recognition software company, now in bankruptcy, that offers products and

services including automatic speech recognition, text-to-speech, digital speech and music

compression and text-to-text translation, and was one of Dragon's chief competitors.

2.    Seagate purchased L&H common stock in a stock-for-stock merger of Dragon

into a subsidiary of L&H (the "Merger"), in which Seagate's shares of Dragon common stock

were exchanged for L&H common stock. The Merger was consummated only months before

public exposure of pervasive fraudulent transactions and accounting practices that enabled L&H

to falsely inflate its revenues worldwide by at least 50% since 1997. This included a massive

2

fraud at L&H Korea, perpetrated by former L&H Korea executives with the active and essential participation of defendants Hanvit, Shinhan and Chohung, which are major Korean banks. That fraud resulted in a vast inflation of the market value of L&H stock; when that fraud was publicly disclosed, most of the nearly $160 million in sales booked by L&H Korea between September 1999 and June 2000 was written off, and the price of L&H common stock collapsed. Among other things, the defendants deliberately concealed the fraudulent nature of numerous transactions entered into by L&H Korea (including numerous transactions to which the banks were themselves party), which collectively represented nearly half of L&H's worldwide revenue between September 1999 and June 2000. Defendants' scheme had the intended and actual consequences, among other things, that: (i) L&H's financial statements were fraudulently inflated with enormous amounts of non-existent revenue, income and assets, and (ii) as an immediate, intended and foreseeable result, the trading price of L&H's common stock was artificially and fraudulently inflated. Once the fraud was exposed, the stock price plummeted. That, however, was months after Seagate entered into, executed, and fully performed its agreement to exchange Dragon for L&H shares in the Merger, in reliance on the integrity of L&H's financial statements, as presented by L&H management and audited, represented and reported on by L&H's outside auditor, Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren ("KPMG Belgium"), and in reliance on the integrity of the market price of L&H stock, to plaintiffs' severe prejudice.

## JURISDICTION AND VENUE

3.    This action arises under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1962(c) and (d), and under doctrines of fraud, and aiding and abetting fraud, at common law.

4.      This Court has subject matter jurisdiction over this case pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; RICO, 18 U.S.C.§ 1964(c); 28 U.S.C. §§ 1331 and 1332; and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 18 U.S.C. § 1965(a), and 28 U.S.C. §§ 1391(b) and (d).

## PARTIES AND OTHER ACTORS

6.      Plaintiffs Gary B. Filler, a citizen of the State of Utah, and Lawrence Perlman, a citizen of the State of Minnesota (the "Trustees"), are the former Co-Chairmen of the Board of Seagate and currently the Trustees of the TRA Rights Trust, a trust organized under the laws of the State of Delaware (the "Trust"). The Trust is the sole successor in interest to Seagate for and on behalf of the former stockholders of Seagate in respect of any and all claims and causes of action possessed by Seagate arising out of, in connection with, or relating to, Seagate's acquisition or ownership of shares of, or holdings in, L&H. The Trustees have the authority to prosecute any claim, action, suit or proceeding against L&H and its affiliates, and any other person or entity, whether at law or in equity, arising out of, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H ("Claims"). Plaintiffs have previously commenced an action asserting Claims against certain members of L&H management and KPMG Belgium for their roles in this fraud. Seagate and Dragon are Delaware corporations. Seagate's principal executive offices were at all material times located in Scotts Valley, California. The former shareholders of Seagate are the beneficiaries of the Trust, and they are legally entitled, through the Trust, to the sole and exclusive benefit of any and all proceeds from

4

all Claims. The overwhelming majority of former Seagate shareholders who are beneficiaries of the Trust are American citizens resident in the United States, as are the Trustees.

7.    Defendant Hanvit Bank ("Hanvit"), is Korea's largest commercial bank and a Korean corporation with its principal place of business in Seoul. It was reported by *The Banker*, an English financial magazine, in July 1999, to rank 113th among the world's top 200 banks in terms of equity capital, with equity of $3.22 billion. Hanvit has an office at 245 Park Avenue in New York City, which is supervised by the New York State Banking Department as a "supervised institution/foreign agency." In February, 2000, Hanvit issued $850 million of subordinated bonds in the United States. In April, 2001, L&H filed a criminal complaint against Hanvit with the Seoul Prosecutor's Office in connection with fraud at L&H Korea.

8.    Defendant Shinhan Bank ("Shinhan") is one of Korea's largest banks, a Korean corporation with its principal place of business in Seoul, and was ranked 171st among the world's largest banks, with equity of $1.98 billion, by *The Banker* in July 1999. Shinhan does business in New York through a branch located at 800 Third Avenue in New York City, which is supervised by the New York State Banking Department as a "supervised institution/foreign branch." In April, 2001, L&H filed a criminal complaint against Shinhan with the Seoul Prosecutor's Office in connection with fraud at L&H Korea.

9.    Defendant Chohung Bank ("Chohung") is one of Korea's largest banks, and a Korean corporation with its principal place of business in Seoul. Chohung does business through branches and subsidiaries throughout the world, including a New York branch at 320 Park Avenue in New York City, which is supervised by the New York State Department of Banking as a "supervised institution/foreign branch." In April, 2001, L&H filed a criminal complaint against Chohung with the Seoul Prosecutor's Office in connection with fraud at L&H Korea.

5

10.    Non-defendant L&H is a Belgian corporation, with its principal place of business in Ieper, Belgium, and a headquarters office in Burlington, Massachusetts. Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ." L&H stock also traded on the European analog to NASDAQ, known as EASDAQ, until it was "indefinitely suspended" on or about November 9, 2000. On November 29, 2000 L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium.

11.    Non-defendant L&H Holdings USA, Inc. ("L&H USA"), is a Delaware corporation, a wholly owned subsidiary of L&H, and the successor corporation to Dragon. On November 29, 2000, L&H USA also filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware.

12.    Non-defendant L&H Korea is a Korean corporation and a wholly-owned subsidiary of L&H. At all material times, L&H Korea was under the management of John Seo, a/k/a Joo Chul Seo, who became the President and General Manager of L&H Korea in September, 1999, when L&H Korea acquired Bumil Information and Communications Co., Ltd. ("Bumil"), a company which Seo had been founded. On November 22, 2000, L&H announced "the immediate suspension of Joo Chul (John) Seo as President and General Manager of L&H Korea and his removal as a director of L&H Korea, stating that Seo had been immediately relieved of all responsibilities." In April 2001, L&H filed a criminal complaint against Seo with the Seoul Prosecutor's Office in connection with fraud at L&H Korea.

## SUBSTANTIVE ALLEGATIONS

### Purchase of L&H Shares

13.     On March 27, 2000, L&H, L&H USA, Dragon, and certain of the principal stockholders of Dragon, including Seagate, entered into an agreement (the "Merger Agreement") pursuant to which L&H would acquire Dragon in the stock-for-stock Merger.

14.     On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated, and Seagate acquired 3,871,489 shares of L&H common stock. On that date, L&H was valued at $43.125 per share. Thus, Seagate purchased L&H shares for an interest in Dragon valued at approximately $166,957,963.

15.     As a consequence of the fraud conducted by Defendants, described below and revealed after the closing of the Merger, Seagate's holdings of L&H shares were and are virtually worthless.

### The Fraudulent Scheme

### September 1999-June 2000:
### L&H Inflates Stock Price with Essential Assistance of the Korean Bank Defendants

16.     At the time Seagate agreed to sell its interest in Dragon to L&H in return for L&H common stock, the price of L&H stock was at an all-time high, buoyed by reports of, and financial statements showing, exponential increases in L&H revenues, including, primarily, record growth in the newly-penetrated Korean market. These reports were false, but the truth was intentionally concealed from Seagate. The Korean Bank Defendants knowingly played a critical role in this fraudulent concealment.

17.     On February 9, 2000, L&H announced that: "For the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7

million for the fourth quarter 1998. For the fiscal 1999 [sic], the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." In that February 9, 2000 press release, L&H showcased fourth quarter 1999 growth in the Pacific Rim area:

> The demand for speech-enabled applications continued to grow in the Pacific Rim and L&H technologies were increasingly popular in the region. South Korea and other PacRim based developers who plan to build application employing L&H's RealSpeak, ASR, TTS and dialogue systems solutions include: Hyundai Securities and Daewoo Securities, EPC Asia, IBCC (International Business Computer Co., Ltd.), NeoTelecom, LG Electronics, Intelligent Communications, Softech Advantage, and SofTel Telecommunications Pte Limited.... L&H enhanced its ability to develop telephony solutions, increased its presence in Korea and continued to expand its telecommunications leadership by acquiring resources that included Bumil Information & Communications, Ltd. of Korea and others.

This press release, and all L&H press releases cited in this Complaint, bore a Burlington, Massachusetts, dateline and L&H's NASDAQ ticker symbol, and were widely disseminated in the international financial press. All were materially false when issued, as the Korean Bank Defendants knew at the time, to the extent they reported revenues, because the revenues reported were grossly inflated due to the frauds (described below) in which the Defendants knowingly and actively participated and in which they played an essential role. As bankers to L&H at all material times, Defendants were actually aware of, and actively participated in generating, the false financial numbers that L&H was, with Defendants' actual knowledge, reporting to the investing public, including Seagate. Defendants actively worked to conceal this fraud.

18.    Throughout the period immediately prior to and during which the Merger Agreement was negotiated, executed and consummated, L&H touted what it claimed to be its flourishing Korean unit. L&H's fraudulent statements included the following:

(a)    In a June 25, 1999 press release, L&H announced that it "is the sole provider of speech recognition technology for the ASR Stock quote Server, Korea's latest

telephone based automated stock quote and trading service through an application developed by L&H business partner Bumil Information and Communications Co., Ltd." The June 25, 1999 press release stated that Bumil "is a leading systems integrator developing customized applications for the telecommunications industry. The company has been an L&H licensee and joint development partner since March of 1997. Its customers include major Korean telecommunications providers, LG Securities and other major corporations in Korea."

     (b)    On August 13, 1999, L&H announced "that its technology is being used to speech-enable the automated attendant system used by Hanvit Bank, Korea's largest commercial banking institution. Deployment of the system — Korea's first commercially available auto attendant program — represents L&H's growing presence in the Korean telecommunications industry and enhances its leadership position in the market overall. The L&H based system is one of several telecommunications applications recently developed by L&H's business partner Bumil Information & Communications Co. Ltd. (BIC) and sold to leading Korean businesses."

     (c)    On September 13, 1999, L&H announced that it had expanded its Pacific Rim presence by acquiring Bumil:

> Bumil has been an L&H business partner and licensee since 1997 and, during that time, has deployed L&H's speech technology in several highly visible, strategic telecommunications applications for leading Korean companies. Most recently, Bumil used L&H's speech recognition to speech-enable an automated attendant system it developed for Hanvit Bank, Korea's largest commercial banking institution. Bumil also recently used L&H's speech recognition and text to speech technology to develop the ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service.

> The acquisition of Bumil builds on L&H's already significant presence and resources in Asia and helps position it for the leadership position there. L&H's existing Asia Pacific customer base includes Samsung, LG Semicon, NEC,

Hitachi, Sega, Inventec, Group Sense Limited, Pioneer, Alpine and Fuji-Xerox, among others. It has offices in Tokyo, Beijing, Hong Kong, Taipei and Singapore and Sydney Australia. L&H's speech offerings for the Asian Pacific market include the world's first PC-based Cantonese continuous speech recognition product as well as ASR, TTS, and machine translation support for Korean, Mandarin and Japanese.

"As we pursue our long-term objectives, we continue to receive validation that our growth strategy is sound — particularly for the worldwide telecommunications industry," said Jo Lernout, L&H co-founder and co-chairman. "Our recent successes with Bumil, as well as industry analysts' predictions regarding the rapidly increasing demand for speech enabled applications, underscores the outstanding growth opportunities that this acquisition helps bring to us."

    (d)    In a December 28, 1999 press release, L&H "announced several deals

with customers in the telecommunications, enterprise solutions and embedded

technologies markets. ... The agreements, signed with industry-leading companies in

Asia and several companies in Europe, follow recently announced deals in the U.S." In

the press release, L&H cited:

strong demand for its speech and language technologies and solutions in the Asia Pacific region, especially South Korea. Among the solutions provided are dialogue systems that provide customers with a fast and simple way to access information, as well as embedded speech engines and language technologies. The signed contracts include:

- Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, and Daewoo Securities, along with more than 10 other securities companies, have selected L&H to develop client server solutions for on-line trading and automated dialogue systems that allow securities customers to receive stock quotes and trade.

                    *     *     *

- LG Electronics has agreed to use L&H's TTS technologies.

- Intelligent Communications has agreed to use L&H's TTS technologies for use in e-mail reading and unified messaging applications.

- SofTech Advantage expanded their agreement with L&H to utilize L&H RealSpeak for their unified messaging platform for the Philippines.

(e)    A January 10, 2000 press release repeated that "the company also recently announced more than a dozen new contracts with telecommunications developers in Korea and elsewhere in the Pacific Rim and Europe, further readying L&H's Enterprise and Telephony Solutions business group for separate legal entity status. Contracts were signed … with Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, Delfi, GenSoft, EPC Asia and NeoTelecom, among others."

(f)    In a January 31, 2000 press release, L&H announced that "Hung Chang Co., Ltd. has signed a multi-year agreement under which it will license L&H's speech technologies in multiple languages to develop speaker verification and reservation applications. The agreement with Hung Chang, a Seoul-based telecommunications technology leader, adds to a long list of worldwide telecommunications industry contracts recently signed by L&H and furthers the company's strategy to create a separate entity for Enterprise and Telephony Solutions."

19.    High earnings reports continued on May 9, 2000, when L&H announced that "for the first quarter of 2000, L&H's total revenues were $110.7 million, an increase of 57% over reported revenues of $70.7 million for the first quarter of 1999."

20.    In a Form 10-K for the fiscal year ended December 31, 1999 and filed with the United States Securities and Exchange Commission ("SEC") on June 30, 2000, L&H revealed that the high earnings that resulted in its high stock price consisted, in significant part, of extraordinary revenues in Korea. Out of 1999 earnings of $344 million, Korean revenues were nearly $63 million, up from less than $250,000 in 1998. In that Form 10-K, L&H elaborated upon its extraordinary growth in Korea:

11

In September 1999, we acquired Bumil Information & Communication, Co., Ltd., a developer of interactive voice, call center and other telephony and telecommunications market applications, based in Seoul, South Korea. This acquisition provides us with increased resources to apply our core technologies to develop telephony applications and solutions. Following this acquisition, we accelerated the introduction of our speech and language technologies, produced solutions and service for enterprise and telephony into the Korean market. In the fourth quarter of 1999, by combining our technologies, products, solutions and services with Bumil's existing business, we were able to substantially increase our revenues in Korea. In addition to licensing our core speech technology, our offerings in Korea include the following products and services:

- Client services for call centers and automated attendants (currently in use by banks, securities companies and other corporate customers);

- Client service solutions for on-line securities trading (currently in use in over 15 securities companies in Korea);

- Applications for games, toys, and consumer appliances;

- Voice portals and speech services for stock quotes, news and sports;

- Integration of speech and language technology for document management; and

- Application of speech and language solutions for English as a second language.

Korean revenues for the first two quarters of 2000 were reported to be $127 million, nearly half of L&H's total revenues for those two quarters.

### August to December 2000: The Fraud Unravels

21.     Six months after the Merger was consummated, L&H was in bankruptcy, the target of investigations by the SEC and others, its stock delisted by the NASDAQ and suspended on the European EASDAQ exchange, after a stock price collapse that resulted in a loss of nearly $9 billion – more than 95% of L&H's stock market value.

22.     L&H's collapse followed closely upon revelations by *The Wall Street Journal* that a majority of L&H's claimed customers in Korea actually did little or no business with L&H, and that $100 million was simply "missing" from the bank accounts of L&H Korea. Other aspects of the fraud included L&H, worldwide, reporting extraordinary revenues from "strategic

partner" licensees who in fact were shell start-up companies created by L&H and its affiliates as a means of improperly funding research and development efforts off the books, and using a variety of other illegal accounting practices to inflate revenues. As described below, the Korean Bank Defendants played an active and critical role in consummating these frauds.

23.     On August 8, 2000, *The Wall Street Journal* reported that "some companies L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says." *The Wall Street Journal* contacted 18 of 30 companies claimed by L&H as customers in Korea:

> Three of the companies say they aren't, in fact, L&H customers.... Three more companies say their purchases from L&H over the past three quarters were smaller than the figures provided by [Gaston] Bastiaens [then President and CEO of L&H] or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

> All told, of the 13 companies that responded to inquiries about their purchases from L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million....

> Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government-regulated clearing house for stock trades. Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30. According to two Koscom officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stockquote service. Korea Telecom collects the per-call payment, keeps 10% and splits the rest between Koscom and L&H. One of the Koscom officials estimates L&H and Bumil's share of the revenue at roughly $1.5 million in 1999....

> In a December 28, 1999 press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

13

*     *     *

<u>L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics — a contact provided by L&H — says his company never bought products or licenses from L&H.</u> Instead, he says the two firms briefly worked on a joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

*     *     *

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H, says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became the largerst, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice-recognition technology, and says Hung Chang is only a passive shareholder.

*     *     *

<u>Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1 million.</u> At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by his institution tallied $150,000.

(Emphasis added.)

    24.     On August 13, 2000, in response to allegations in the press, L&H commissioned a special mid-year audit by KPMG Belgium to examine issues raised with respect to Korea.

    25.     On September 20, 2000, the L&H Board of Directors authorized its Audit Committee to "conduct such inquiries as it deemed appropriate into certain accounting and other practices of the Company that were the subject of a formal investigation being conducted by the [SEC]," according to a report provided to the Audit Committee two months later, on November

14

20, 2000 (the "Audit Committee Report"), by the advisors retained by the Audit Committee —

the U.S. law firm Bryan Cave LLP, the Belgian law firm Loeff Claeys Verbeke, and the

accounting firm of Arthur Andersen LLP (the "Audit Committee Advisors").

26.     On September 21, 2000, L&H confirmed that the SEC had commenced "an

investigation of its prior financial statements."

27.     On November 9, 2000, L&H "provided an update on the status of the mid-year

audit of the Company that it had commissioned last August and of the ongoing audit committee

inquiry" and announced that,"[a]s a result of errors and irregularities identified in the audit

committee inquiry, the company expects to restate its financial statements for the periods 1998,

1999 and for the first half of 2000."

28.     That day, the NASDAQ suspended trading in L&H shares.  Just before the

suspension, L&H shares were changing hands at $3.525, more than 95% below the record high

of $72.50 they reached in March, when the company claimed a market capitalization of more

than $10 billion.  The slide wiped out more than $9 billion of the company's stock market value.

29.     On November 17, 2000, *The Wall Street Journal* reported that L&H's

independent auditor, KPMG Belgium, had withdrawn its audit report of L&H's previously-

announced 1998 and 1999 financial statements:

> Lernout & Hauspie Speech Products NV's accounting firm withdrew its audit report for
> the company's 1998 and 1999 results, saying its prior clean opinions of the software
> maker's books "should no longer be relied upon."
>
> The move by KPMG International's Belgium member firm, disclosed in a regulatory
> filing by L&H, came after L&H announced last week that an internal probe had
> discovered "errors and irregularities" in its financial statements for those two years, and
> for the first six months of 2000.

30.     On November 17, 2000, as *The Wall Street Journal* reported (on December 7, 2000), John Duerden, who replaced Bastiaens as Chief Executive Officer of L&H in the wake of the scandal, concluded that $100 million on the books of L&H's Korean unit was missing:

> [John Duerden, t]he chief executive officer of Lernout & Hauspie Speech Products NV had come to South Korea to solve a mystery: why his Korean lieutenants refused to release $100 million in cash they had on their books. Amid a deepening accounting scandal, Lernout & Hauspie, a leading maker of speech recognition software, desperately needed the funds to stave off bankruptcy.
>
> Arriving at the Seoul office of L&H Korea on Nov. 17, he was kept waiting for an hour before being ushered into a room with a visibly nervous Joo Chul Seo, head of the subsidiary. Mr. Duerden began grilling him about the cash. "Suddenly," Mr. Duerden recalls, "the door was kicked open with a terrific crash and three guys ran into the room, shouting and gesticulating."
>
> The CEO watched in shock as the men dragged Mr. Seo out of the room and into an adjoining office, from where loud shouts and bangs were heard. "I thought the guy was getting beaten up," Mr. Duerden says. After urging employees to call the police, he left the building and hightailed it out of the country.
>
> The whereabouts of Mr. Seo, whom L&H has suspended, are still unknown. But Mr. Duerden soon learned the worst about the $100 million: it was gone. And with it went the company's last hope to remain solvent.
>
> [Duerden] believes that some of L&H's $100 million may never have been fully within its control. One theory at L&H is that banks that bought its receivables had been secretly assured they would be repaid if they couldn't collect from L&H's Korean customers — and they couldn't.
>
> If this is correct, L&H at a minimum improperly included the cash on its balance sheets. In any case, it now appears that much of the $100 million shouldn't have been counted as revenue, throwing into doubt a majority of the Korean unit's sales since late 1999.

(Emphasis added.)

31.     On November 20, 2000, the L&H Audit Committee Advisors presented the Audit Committee Report, which concluded that $277 million – or one third – of L&H's revenue over the past 2 ½ years may have been improperly recorded. And this was a conservative and incomplete figure. The Audit Committee Advisors reported that their efforts were impeded by a

lack of cooperation on the part of KPMG Belgium and members of L&H's management and board.

32.    As to Korea, the Audit Committee Advisors recommended that L&H consider reversing the company's entire Korean revenue during 1999 and 2000, amounting to approximately $182 million, and then record the revenue if and when cash is later received from Korea. The Audit Committee Advisors were "unable to reach any conclusions with respect to issues in Korea" because of their lack of access to information. However, the Audit Committee Advisors were able to review some Korean contracts, and suggested that the company revisit those specific contracts if and when "global issues" are resolved.

### April 2001: The Defendant Korean Banks' Role in the Fraud Is Revealed

33.    Following Mr. Duerden's visit to Korea and the release of the Audit Committee Report, L&H intensified its efforts to uncover the malfeasance in Korea, by, among other things, commissioning an investigation by the accounting firm PricewaterhouseCoopers. At a press conference reported by *The Wall Street Journal* on March 5, 2001, Philippe Bodson, who replaced Mr. Duerden as CEO in January, 2001, "stated that L&H would issue a formal statement … to account for what happened at its Korean unit, where $100 million in cash from booked revenues mysteriously evaporated late last year. That statement may include an outright admission of fraud, he said. L&H has avoided using the term 'fraud,' referring instead to 'errors' and 'irregularities' in its past accounting. 'Korea is a real catastrophe. The situation there is as bad as one could possibly imagine,' Mr. Bodson said, adding that L&H Korea never really had any sales to speak of."

34.    In April 2001, it was revealed that the massive, fraudulent inflation of Korean revenues had been accomplished through at least two schemes in which the defendant Korean

17

Banks were central: (1) the Defendants pretended to factor the accounts receivable from L&H Korea's (largely fictitious) customers <u>without</u> recourse, while secretly entering into side agreements <u>giving the banks recourse</u> to L&H Korea's bank accounts, and (2) the Korean Banks funneled L&H money back to L&H — so that L&H could report it as revenue — by extending "loans" to secret "transferees" of L&H's customers to whom the customers had secretly transferred their contracts with L&H. These undisclosed "transferees" then paid the money to the original L&H customer, who then paid it to L&H Korea. The "payment" was completely fictitious, however, because the "transferee" loans were secured by L&H Korea time deposits, and L&H Korea was thus simply paying itself, as the Korean Banks knew. These ruses had major implications for L&H's financial statements, as the Korean Bank Defendants knew that they would, resulting in a huge, fraudulent inflation of L&H revenues, income and assets and, correspondingly, the price of L&H stock. As the L&H fraud worldwide became undone, L&H Korea cancelled factored contracts to protect cronies who had assumed the roles of customers, and to protect the banks, to whom L&H Korea's time deposits then reverted as provided by the secret "with recourse" secret factoring agreements and the terms of loans to secret "transferees."

35.     At a press conference on April 6, L&H released an abridged version of a report that had been prepared by PricewaterhouseCoopers on its investigation of the situation in Korea (the "L&H Korea Preliminary Report" or "Abridged Report"). The Abridged Report revealed that more than half of the missing cash was in the hands of defendant Korean banks, who had schemed with L&H Korea management to give the appearance that small start-up customers, who had never intended to fulfill exorbitant contracts, were in fact making payments on those agreements. Much of the rest went to erstwhile "customers," cronies of John Seo, as "penalties" to compensate "for the inconvenience of dealing with the auditors." At the end of November, as

the fraud was unraveling, L&H had cancelled the contracts in order to prevent foreign creditors

of L&H from enforcing them, and also to protect the defendant Korean Banks. In that press

conference, Mr. Bodson named the Korean banks involved in the fraud, defendants Hanvit,

Shinhan, and Chohung, and, to a lesser extent, Hana Bank.

36.    The Abridged Report revealed that the $100 million had been recorded as income

from 47 bogus agreements that were later cancelled, in November, 2000, leaving L&H Korea

with available cash of $2.3 million, rather than the $97.5 million that had been supporting L&H's

stock price:

> LHNV's [Lernout & Hauspie] findings indicate that LHK [L&H Korea] recognized over
> $100 million in revenue from September 30, 1999 through June 30, 2000 related to 47
> license and maintenance agreements. In November 2000 these 47 license and
> maintenance agreements were cancelled. Prior to the cancellation, LHK's accounting
> records showed available cash of $97.5 million. In fact, LHK's actual available cash after
> cancellation was only approximately $2.3 million. LHK misrepresented its actual
> revenues and available cash position through various schemes that included side
> agreements with customers, the use of factoring agreements with various banks and
> transactions termed "transfers" that were designed to give the appearance that customers
> were making payments on outstanding agreements.

*    *    *

> LHK originally forecasted gross margins of $50 million for the year 2000. The original
> forecast was subsequently increased by LHK management to $200 million. The company
> now understands that LHK employees believe that the pressure to meet these unrealistic
> budget targets led to the recognition of questionable license revenues during 2000. This
> situation appears to have been compounded by pressure from LHNV to improve
> collections of accounts receivable ("A/R") once the sales were recorded.

> The company also understands that in response to sales pressure, an "arrangement" was
> created to give the appearance of valid license agreements being sold to existing
> businesses. These arrangements were called "strategic" sales by LHK. During sales
> meetings, the company understands that salesmen were told to agree to terms outside of
> LHNV's standard agreement, including side agreements not to enforce the collection of
> A/R. It appears that additional oral and written side agreements were entered into by
> which LHK agreed to significant changes to the standard LHNV license agreement
> including deferral of contract payments. LHK recognized the full value of the sale
> immediately. The size of these contracts was very large in comparison to the customers
> who were mostly small businesses, often start-ups. It appears that LHK had no real

<u>expectation of collecting these large royalties within a reasonable time</u>. These side agreements appear to have allowed LHK to meet their sales goal, but also created a problem of needing to show cash collections to avoid reversal of the sale.

Abridged Report at 2-3 (emphasis added).

37.    The false revenue reports also entitled John Seo, the head of L&H Korea, to a $25 million bonus in addition to the $25 million he had received for his interest in Bumil. That performance bonus was paid in January, 2000, according to L&H's 1999 Form 10-K.

38.    The Abridged Report reveals that Seo and other L&H Korea executives colluded with the Korean bank defendants in schemes designed to conceal the fact that L&H Korea customers, many of whom apparently were friends and relatives of defendant Seo, were unable to meet their commitments to provide revenue that had already been booked.

39.    One of the two fraudulent devices the Korean Bank Defendants created was a factoring scheme, in which the banks agreed to factor revenues from L&H Korea customers, but entered into secret arrangements giving the banks recourse to L&H Korea bank accounts in the event that the banks were unable to collect from L&H Korea customers. The secrecy of the side agreements with the defendant banks resulted in gross overstatement of L&H's revenue, income and assets:

LHK then entered into "factoring arrangements" with four banks, apparently as a solution to their collections and revenue recognition issues. <u>LHK created documents, which were accepted by the banks, to give the appearance that the factoring was "without recourse", which allowed LHK to recognize the full value of the licensing agreements.</u> In fact, there were factoring side agreements which stated, among other things that LHK was liable for payment and required the use of "restricted" time deposits. Upon factoring an agreement, LHK's records reflect the bank deposited the factoring proceeds in a "restricted time deposit" that LHK agreed not to withdraw. LHK recorded the time deposit in its accounting records and eliminated the A/R. <u>As a result, LHK's financial statements reflect an increase in sales, collection of A/R and a large amount of cash. In fact, there were little or no payments by LHK's customers and the cash from factoring was held by the banks.</u>

*        *        *

Beginning in September 1999, LHK entered into a series of factoring arrangements by which the A/R from licensing agreements were sold to various banks. The company now understands, the banks involved did not have factoring arrangements with other Korean companies prior to LHK. The company also understands LHK had discussions with bank representatives about creating documentation which gave the appearance that the factoring arrangements were "without recourse" when, in fact, the factoring was "with recourse". The bank documentation supporting the factoring arrangements also reflects that the agreements were "without recourse", meaning the credit risk had been shifted to the bank and LHK could reduce their A/R and record the receipt of cash. However, through the use of written side agreements between LHK and the banks, LHK agreed to make the factoring arrangements "with recourse," "not to object" if the time deposit is offset against factored receivables upon default and to fully collateralize the loans with the factoring proceeds.

As a result, approximately $53,627,737 reverted to the banks to pay off the balance of the factored receivables upon cancellation of the license agreements in November 2000. Notations included on LHK's bank books indicate that payments totaling approximately $31.5 million (included in the $53,627,737) were made to a LHK manager upon cancellation of eight license agreements. However, according to discussions with LHK management, the majority of these payments were then actually made to the banks to pay off loans taken out by the LHK manager. It appears that the banks involved requested the loans be restructured to a personal obligation of the LHK manager out of concern over negative press and alleged non-recourse provisions of factoring arrangement. The LHK manager was paid approximately $3.8 million as reimbursement for payments made to a different Korean bank on behalf of LHK.

Abridged Report at 3, 9-10 (emphasis added).

40.    In a second ruse, the banks made arrangements that permitted L&H to funnel

money through various third parties to disguise the fact that L&H Korea was not receiving

income but rather was paying itself:

In addition to the factoring arrangements, LHK created another arrangement, for a different group of contracts, referred to as "transfers." The arrangement was designed to address a need to demonstrate collections to LHK's outside auditors. It appears that LHK instructed the original customer to transfer its agreement to a third party arranged by LHK. That third party then apparently obtained a loan and used the proceeds to pay LHK through the original customer. LHK provided collateral for the loan. This arrangement gave the appearance that the original customers were making payments on the agreements. The transfers occurred primarily during September 2000. Upon cancellation, LHK paid penalties to the transferees and the customers as compensation for the "inconvenience" of dealing with the auditors.

21

*     *     *

> During the course of LHK's June 30, 2000 audit, the LHNV auditors questioned the collectibility of A/R and indicated to LHK management that collections between 10% and 20% of the A/R balance would be sufficient to avoid having to record a full reserve of the A/R balance. In response, LHK transferred certain license agreements from the original customer to unrelated third parties ("transferees") at 110% of the original contract amount. It appears that LHK then provided collateral to allow the transferee to obtain a bank loan and the transferee used the loan proceeds to make payments approximating 10% -20% of the original contract to LHK. LHK's accounting records do not reflect any of the transactions related to the transfer of contracts. Upon cancellation, LHK refunded the payments plus a "penalty amount" to the original licensees and transferees. The transferees then paid off the banks and LHK's collateral was released.

Abridged Report at 4, 12 (emphasis added).

41.     The cancellation of the contracts, which drained L&H Korea's bank accounts and precipitated the bankruptcy of L&H, was done to protect the banks and other third parties who participated in the scheme:

> LHK cancelled the license agreements in November 2000, apparently out of concern that foreign creditors would attempt to enforce the original contracts as well as out of concern for the potential impact on the banks. LHK reversed the sales and the time deposits reverted to the banks.

Abridged Report at 4.

42.     More details of the full PricewaterhouseCoopers report, which has not been released to the public, were disclosed by *The Wall Street Journal* on April 6, 2001:

> "L&H Korea agreed to freeze the money the banks gave it in a special bank account and to return the money the minute the banks asked for it back," said a person close to L&H who has seen the Pricewaterhouse report. By providing the unit with cash, the factoring agreements enabled L&H to fool its parent company's regular auditor, KPMG, into thinking customers had paid up, according to Pricewaterhouse's findings. When KPMG sought to verify that payments did in fact come from customers, L&H Korea employees would routinely pose as clients. "The level of scheming was just unbelievable," said the person close to L&H.
>
> The Pricewaterhouse report also concluded that many of L&H's Korean customers had undisclosed financial ties to Mr. Seo, other L&H Korea executives or to L&H itself. One tangled example, which comes from a separate Wall Street Journal investigation, centers on one of L&H's largest supposed Korean customers, Human Interface Worldwide Co.,

22

or HI World. The tiny start-up accounted for some $19 million of L&H's Korean revenue, and also helped L&H recognize an additional $10 million of revenue in Singapore through a complex series of transactions. But a June 22, 2000, e-mail obtained by The Wall Street Journal suggests that HI World was partly funded by L&H and its executives. In the e-mail, sent by HI World's then-CEO, Chun Hyung Lee, to Gaston Bastiaens, L&H's then-CEO, Mr. Lee said HI world received eight billion won (about $5.8 million at current exchange rates) in the form of a loan guaranteed by L&H Korea, and an additional four billion won in a loan from Mr. Seo, the head of L&H Korea.

In the angry e-mail, Mr. Lee accused L&H of repeated failure to deliver promised technology, and demanded that L&H buy his 80% stake in HI World. If not, he threatened to publicly reveal "all the material facts" about L&H's behavior, which he said included a "past practice of creating questionable transactions," along with attempts to get HI World to "turn a blind eye when your annual audit was being conducted by KPMG."

Within days of the e-mail, according to people familiar with the matter, L&H Korea agreed to buy Mr. Lee's 80% of HI World for $6.5 million. But these people say L&H Korea didn't pay the cash to Mr. Lee until Nov. 16 -- the day before then-CEO John Duerden (Mr. Bastiaens' successor) arrived in Korea to hunt for $100 million in cash that the Korean unit refused to release. When he arrived, the entire amount was gone.

(Emphasis added )

43.     On April 9, 2001, *The Wall Street Journal* reported that "KPMG filed a lawsuit against L&H's former management in a Belgian court. The complaint alleges that former senior L&H executives 'deliberately' provided 'false or incomplete information' to KPMG and conspired to obstruct the firm's audits, according to a news release." Later in April, 2001, L&H made publicly available KPMG Belgium's REPORT OF THE CIVIL CO-OPERATIVE COMPANY WITH LIMITED LIABILITY KPMG AUDITORS AS ORDERED BY THE COURT OF COMMERCE OF IEPER (B) BY JUDGMENT ON JANUARY 5, 2001 ("KPMG Report"). In that document, KPMG Belgium, which has access to the non-public PricewaterhouseCoopers report, provided further details of the fraud:

The fact that the top management of the Company has influenced some third parties regarding the declarations for KPMG, has also been confirmed by PricewaterhouseCoopers ("PwC"). In the spring of 2001, this audit firm has by order of the Company, investigated particular transactions of L&H Korea. In its report, PwC concludes, amongst other things, that with the active cooperation of customers and of

<u>Korean banks, fraudulent schemes have been created to achieve the sales objectives in an</u>
<u>artificial way and to hold the truth back from KPMG.</u>

These facts clearly show that it concerns deceptive schemes with active collaboration of third parties (customers and banks) with the intention to deceive KPMG. This has actually been repeatedly confirmed by PwC:

<u>Example regarding the factoring agreements:</u>

- First factoring transaction occurred on September 30, 1999 with Hanvit Bank.

- LHNV instructed LHK that factoring arrangements should be "without recourse."

- Henry Oh and John Seo had discussions with a representative of Shinhan Bank wherein <u>a scheme was designed in which documentation would be created to give</u> <u>the appearance that the factoring agreements were "without recourse" when in</u> <u>fact, the factoring was "with recourse."</u> The recourse terms were clearly documented in a written side agreement.

- Mr. Oh and Mr. Seo established similar relationships, including side agreements, with Hana Bank and Hanvit Bank.

<u>Example regarding the "transfers" of agreements to third parties</u> (the second system that was described above):

- " ... LHK designed a scheme wherein license agreements were transferred from the original customer to unrelated third parties. ..."

- LHK created the appearance through the use of third parties and bank loans that customers were making payments.

- Mr. Oh stated that the transfer of contracts from the original licensee to a new company was concealed from KPMG.

(Emphasis added.)

44.    On April 26, 2001, *The Wall Street Journal* reported that L&H had filed a

criminal complaint in Korea against all of the defendants in the present action, among others:

The new management of Lernout & Hauspie Speech Products NV filed a criminal complaint with the Seoul Prosecutor's Office against the former head of the company's Korean unit, several other former Korean executives and four Korean banks.

The complaint alleges that former L&H Korea President Ju Chul Seo, also known as John Seo, committed "criminal fraud and breach of trust in office, among other criminal activities" and requests an investigation into Mr. Seo's activities between September

24

1999 and November 2000, L&H said. Mr. Seo couldn't be reached for comment. Investigators have been unable to track him down since November, when L&H fired him.

      *     *     *

Besides Mr. Seo, the criminal complaint names former L&H Korea executives Sam Cho, Henry Oh and J.H. Kim. Messrs. Cho, Oh and Kim couldn't be reached for comment. The complaint also alleges that four Korean banks --- Chohung Bank, Hana Bank, Hanvit Bank, and Shinhan Bank --- abetted Mr. Seo's activities. ...

In its report, PricewaterhouseCoopers cited secret side agreements between L&H Korea and the banks and inconsistent statements from the bank's loan officers as evidence that the banks colluded with L&H Korea executives to fool L&H's auditors.

In a phone interview Wednesday, Mr. Bodson said: "The evidence is so damning that the Korean banks won't be able to continue to deny their involvement much longer: either each bank's CEO will admit that his bank is at fault or he will have to admit that he was fooled by his own employees."

(Emphasis added.)

45.    More, but not full, details of the Defendant Korean Banks' scheme are provided in a redacted copy of the full PricewaterhouseCoopers Report ("PwC Report"). That copy, the only one to which plaintiffs presently have access, has been redacted to hide the names of all individuals and entities discussed in it, except that plaintiffs have been provided the identity of the Defendant Korean Banks. That copy of the PwC Report describes dealings between the defendant banks and persons referred to as "[Individual 2]", "[Individual 4]" and "[Individual 5]". "[Individual 2]" is described in the PwC Report as a "former [LHK] account manager" and "[Individual 4]" as a "current [LHK] employee." "[Individual 5]" appears to be John Seo. The PwC Report states that:

- According to Generally Accepted Accounting Principles ("GAAP"), LHK should have recorded the "recourse" factoring of receivables as a secured borrowing.

- First factoring transaction occurred on September 30, 1999 with Hanvit Bank. The receivable from [Entity 55] of W8,434,300,000 was factored "with recourse".

- LHNV instructed LHK that factoring arrangements should be "without recourse".

25

- [Individual 4] and [Individual 5] had discussions with a representative of Shinhan Bank wherein a scheme was designed in which documentation would be created to give the appearance that the factoring agreements were "without recourse" when in fact, the factoring was "with recourse". The recourse terms were clearly documented in a written side agreement.

- It is unlikely that the banks would have factored the receivables without recourse given the credit risk of LHK's customers. When we questioned the bankers on this issue, one banker commented "under the circumstances" they entered into a factoring agreement. It is unclear what he meant by circumstances.

- [Individual 4] and [Individual 5] established similar relationships, including side agreements, with ... Hanvit Bank.

- [Individual 4] refused to identify the representatives of the banks with whom these arrangements were made.

- PwC obtained copies of the side agreements with ... Hanvit Bank and Shinhan Bank. LHK stated they did not have a side agreement with Chohung Bank, instead they used a secured loan agreement.

- When A/R were factored, the bank created a restricted time deposit in the name of LHK. Because the account was pledged as collateral, as noted in clause 2 to the side agreement, LHK was unable to access the cash. Restricted time deposits were created by all four banks.

- Bank confirmations were prepared by [Individual 2] and [Individual 4]. [Individual 2] and a [Entity 10] representative then went to the banks to obtain the loan officers' signatures.

- Bank confirmations did not identify LHK's time deposits as restricted. The banks signed these confirmations. The confirmations conflict with the side agreements and statements made by [Individual 4] and [Individual 2].

PwC Report at 21 (emphasis added).

46.    The PwC Report states that with respect to L&H Korea contracts cancelled in

November 2000, precipitating the L&H bankruptcy, accounts receivable amounting to

$57,555,971 were subject to secret agreements with the defendant Korean banks.

- Defendant Hanvit Bank entered into three factoring agreements, accompanied by secret side letters providing for recourse to L&H Korea time deposits, dated September 30, 1999, December 27, 1999 and June 30, 2000, and relating to $29,705,503 of accounts receivable.

- Defendant Shinhan Bank entered into factoring agreements, accompanied by secret side letters providing for recourse to L&H Korea time deposit, relating to $19,706,022 of accounts receivable.

- Defendant Chohung Bank did not enter into a factoring agreement with L&H Korea, although L&H Korea recorded $8,144,446 of accounts receivable as factored to Chohung Bank without recourse. Instead, Chohung Bank secretly gave L&H Korea a secured loan, placed the proceeds in L&H Korea passbooks, and designated those funds as collateral for the loan.

47.     The PwC Report contains an example of a "Bank Side Agreement" with Hanvit Bank, which provides as follows:

> 1.  I (we) promise to take recourse responsibility under this confirmation, although the bank waived recourse right even in cases that transferred accounts receivable is defaulted or possible to be defaulted when the bank purchased accounts receivable without recourse and I (we) obtained a account receivable loan.

> 2.  Upon account receivable loan is allowed, I shall deposit the loan proceeds, sign a separate pledge agreement and adhere this agreement.

> 3.  Pursuant to the above clause, I (we) will not raise any objection when the deposit is used to offset against account receivable loan when this loan is overdue.

PwC Report at 84.

48.     Moreover, the PwC Report reveals that once the fraud at L&H began to appear in the press, Hanvit Bank restructured $27.5 million of its factoring agreements as a loan to John Seo out of concern that the secret "recourse" side agreements would not withstand public scrutiny:

> Notations were included on LHK's bank books which indicate that payments totaling approximately $31.5 million were made to [individual 5] upon cancellation of eight license agreements. According to discussions with [individual 4], the majority of the payments were actually made to Hanvit Bank to pay off bank loans taken out by [individual 5] for the benefit of LHK. [Individual 4] stated that [individual 5] was paid approximately $3.8 million as reimbursement for payments he made to Hana Bank on behalf of LHK.

> The Hanvit Bank transactions involved six license agreements that were factored for $27.5 million. Based on discussions with [individual 4], Hanvit Bank converted their original factoring arrangement with LHK to a personal obligation of [individual 5] in September 2000. The substance of the transaction did not change; LHK continued to



maintain restricted time deposits that were collateral for the loan to [individual 5]. Hanvit Bank requested the restructuring because they became nervous as a result of the negative press coverage related to LHNV and were concerned about the non-recourse provisions of their factoring agreement.

PwC Report at 20.

49.    The PwC Report, in its detail of the transactions that drained the L&H Korea bank accounts in November 2000, notes that more than $23 million was withdrawn as "transfer to transferee" in connection with the loans to secret transferees that were collateralized by L&H Korea time deposits. PwC Report at 33. As illustrated by the detail of a transaction with "[entity 44]," these withdrawals reimbursed the "transferee" for its repayment of a loan from one of the Korean Banks. PwC Report at 32.

50.    While the PwC Report does not detail the precise statements made by the Korean Bank defendants in which they misrepresented the terms of the factoring agreements and loans to transferees and thereby furthered the fraud, L&H's auditors claim in the KPMG Report that the Korean Banks falsified confirmations to auditors who reported that L&H's materially false financial statements fairly presented L&H's financial position:

> KPMG has to deduce from all of this [the PwC Report regarding factoring and transfers] that former confirmations by the Company (at least from L&H Korea), and by customers and banks are deceptive (e.g. regarding the independence of certain customers with respect to L&H, L&H Korea and/or the management, regarding the products supplied and the timing thereof, regarding the giving of sureties for the customers) and that the payment statements and the reported turnover of L&H Korea has been falsified.

KPMG Report at 45.

51.    The existence and terms of the fraudulent agreements were never publicly disclosed. Instead they were hidden from L&H shareholders and, contrary to their terms, the loan proceeds to which they relate were recorded as L&H Korea revenue. That fictitious revenue

constituted nearly 70% of L&H Korea's reported revenues, and nearly half of all the revenue for L&H worldwide in the first half of 2000.

### Defendants' Fraudulent Scheme Directly and Foreseeably Harmed Seagate

52.     Defendants' fraudulent scheme had the intended and actual effect of fraudulently overstating L&H's revenue, income and assets and L&H's common stock price by, among other things, permitting L&H to fraudulently misrepresent its revenues, income and assets by means of interstate mail and wire, both directly and through L&H's agents, including KPMG Belgium. Seagate was a direct and foreseeable recipient of these fraudulent communications and relied on them in multiple ways. Among other things, Seagate relied on the integrity of L&H's fraudulently inflated financial statements; Seagate relied on the integrity of the fraudulently inflated market price of L&H common stock; and Seagate relied on the written and oral misrepresentations of L&H and its representatives, including KPMG Belgium. As bankers to L&H, the Korean Bank Defendants regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result. As bankers to L&H, the Korean Bank Defendants were actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, the Korean Bank Defendants knew or recklessly disregarded that Seagate was actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

### Reliance on L&H's Fraudulently Misstated Financial Statements

53.     Seagate relied on the accuracy of L&H's 1998 and 1999 financial statements. Among other things, Seagate was entitled to terminate the Merger Agreement prior to closing if

it became apparent that L&H's unaudited financial statements for 1999, released prior to execution of the Merger Agreement, were materially misstated. They were fraudulently misstated, due to the misconduct of the defendants and L&H, but this was hidden from Seagate, preventing Seagate from walking away from the Merger, which it would have done if defendants' fraudulent behavior had been made known:

  (a) The Merger Agreement included L&H's representations and warranties that: (i) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission; (ii) all financial statements, included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (iii) L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and fairly presented in all material respects the consolidated financial position of L&H as of the date thereof.

  (b) Section 9.1 of the Merger Agreement allowed Seagate to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or] warranty ... which causes the conditions set forth in section 7.3(a) ... to be incapable of being satisfied."

  (c) Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

54. In reliance on the integrity of L&H's financial statements, as audited and reported on by KPMG Belgium, Seagate proceeded to close the Merger on June 7, 2000. Because of

defendants' fraudulent behavior, L&H's revenues, income and assets were grossly overstated and L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were not prepared in accordance with U.S. GAAP.  Seagate, like other purchasers of L&H securities, was severely harmed due directly and immediately to the pervasive falsity of L&H's financial statements, in which defendants actively participated and were complicit.  Defendants knew that this reliance and harm would be, as it was, a necessary and proximate result of defendants' fraudulent behavior, and it operated to plaintiffs' severe prejudice.

### Reliance on the Integrity of the Fraudulently Inflated Market for L&H Securities

55.    Seagate relied on the integrity of the market for L&H common stock — a market that was artificially inflated by defendants' fraud.  Among the most important factors Seagate considered in setting the price for its Dragon holdings, which L&H paid for in L&H stock, was the market price of L&H common stock.

56.    At all relevant times, the market for L&H stock was efficient because L&H common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the EASDAQ, which were automated and highly efficient markets.  As a regulated issuer, L&H filed periodic public reports with the SEC.  L&H also regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar media.  The market for L&H stock promptly digested current information regarding L&H from the publicly available sources described above and reflected such information in the price of L&H stock.

57.     Consequently, at all relevant times -- including the time Seagate was negotiating

the price it would accept in L&H stock, the time Seagate executed the Merger Agreement, and

the time the Merger was consummated -- the price of L&H stock was fraudulently inflated by

defendants' misrepresentations and nondisclosures, to plaintiffs' severe prejudice.

### FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

58.     Plaintiffs repeat and reallege paragraphs 1 through 52 as though fully set forth

herein.

59.     Section 10(b) of the 15 U.S.C. §78j(b), provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors

60.     SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

>> a.  To employ any device, scheme, or artifice to defraud,

>> b.  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

>> c.  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security.

61.    The defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course and scheme of fraudulent conduct to fraudulently overstate the revenues, income and assets of L&H and thereby to artificially inflate the price of L&H common stock and to conceal L&H's true financial condition. Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse, non-public information; they engaged in acts, practices, and a course of conduct that included the manipulation of the price of L&H stock; and they made, and participated in the making of, untrue and misleading statements of material fact and omitted to state material facts necessary in order to make the statements not misleading.

62.    The defendants' fraudulent conduct was committed, directly or indirectly, "in connection with" Seagate's purchase of L&H shares, within the meaning of § 10(b) and SEC Rule 10b-5.

63.    All defendants participated, directly or indirectly, in the foregoing scheme and fraudulent inflation of L&H's financial statements and the price of L&H common stock, and in the fraudulent misrepresentations and omissions of L&H in its annual reports and other filings with the SEC detailed herein and in L&H press releases as set forth above, in paragraphs 17-20, *supra*. All defendants knew that the financial statements of L&H would necessarily be, and were, materially false and omissive by, among other things, overstating revenues, income and assets by highly material amounts, by virtue of defendants' participation in and knowledge of, among other schemes and devices:

(a)    The factoring scheme detailed in paragraphs 39, 42, 43, 45, 46, 47, 48, 50 and 51, *supra*.

(b)    The transfer scheme detailed in paragraphs 40, 43, 49, 50 and 51, *supra*.

(c)    Accounting practices which these frauds were intended to, and did, permit, which mischaracterized the foregoing transactions in order to falsely inflate L&H's revenues, income and assets.

(d)    The concealment of all of the foregoing.

### Scienter

64.    Defendants' knowledge of the fraud and intent to perpetrate it is evidenced by, among other things:

(a)    The fact that there was no legitimate business reason for the fraudulent conduct detailed in the PwC Report, including the secret factoring side agreements and transfer agreements.

(b)    Hanvit Bank's restructuring of $27.5 million in factoring agreements as a personal loan to John Seo secured by L&H Korea time deposits when the fraud at L&H began to appear in the press because it was afraid that the secret "recourse" terms of its factoring agreements would not withstand public scrutiny.

(c)    PricewaterhouseCoopers' conclusion that the factoring scheme, the transfer scheme, and the deception of auditors were deliberate.

(d)    KPMG's assertion that confirmations received from the defendant Korean Banks during audits of L&H financial statements were "deceptive" and "falsified."

(e)    As bankers to L&H, the Korean Bank Defendants regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result.

34

(f)    As bankers to L&H, the Korean Bank Defendants were actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, the Korean Bank Defendants knew or recklessly disregarded that Seagate was actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

(g)    Financial incentives to commit fraud, including the continuation of profitable banking relationships between the Korean Bank Defendants and L&H, and the $25 million performance bonus illegitimately claimed and received by the head of L&H Korea, Mr. Seo.

65.    As a direct and proximate result of the wrongful conduct of defendants, plaintiffs suffered substantial damage in connection with their exchange of their interest in Dragon for L&H stock.

66.    By reason of the foregoing, defendants are jointly and severally liable to plaintiffs for the aforesaid damages, in an amount to be proven at trial but no less than $166,957,963.


## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## FOR VIOLATION OF SECTION 1962(c) OF RICO

67.    Plaintiffs repeat and reallege paragraphs 1-66 as though fully set forth herein.

68.    At all times relevant hereto, each of the plaintiffs and each of the defendants was an individual or entity capable of holding a legal or beneficial interest in property and therefore constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

69.    At all times relevant hereto, each of the Defendant Korean Banks pursued its fraudulent schemes through, and was party to, an association-in-fact "enterprise" with L&H Korea within the meaning of RICO, 18 U.S.C. § 1961 *et seq.*:

(a)    **Hanvit/L&H Korea Enterprise.**  The banking relationship between L&H Korea and defendant Hanvit Bank, including the factoring, "transferee" and secret side agreements, lawful and unlawful, detailed herein formed an association-in-fact between Hanvit and L&H Korea;

(b)    **Shinhan/L&H Korea Enterprise.**  The banking relationship between L&H Korea and defendant Shinhan Bank, including the factoring, "transferee" and secret side agreements, lawful and unlawful, detailed herein formed an association-in-fact between Shinhan and L&H Korea; and

(c)    **Chohung/L&H Korea Enterprise.**  The banking relationship between L&H Korea and defendant Chohung Bank, including the "transferee," secured loan agreement and other secret agreements, lawful and unlawful, detailed herein formed an association-in-fact between Chohung and L&H Korea.

70.    The activities of each of these association-in-fact enterprises affected interstate and foreign commerce by, among other things, directly and immediately affecting the contents of L&H's financial statements, including the revenues, income and assets reflected thereon, and the price of L&H stock traded on the NASDAQ and EASDAQ.  Among other effects on interstate and foreign commerce, the fraudulent acts alleged herein artificially inflated the price of L&H stock, resulting in the subsequent loss of more than 95% — or in excess of $9 billion — of L&H's $10 billion market capitalization.

71.     As set forth above, each of the defendants committed multiple acts, between at least September 1999 and November 2000, chargeable as aiding and abetting L&H's securities fraud, each of which constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1) (hence, closed-ended continuity).  In light of the fact that each of the Korean Bank Defendants engaged in a similar pattern of racketeering activity, as did non-defendant Hana Bank, it is a reasonable inference that these fraudulent acts represent a regular course of business for the defendants and for major Korean banks (hence, open-ended continuity).  Those acts included entering into and concealing the factoring side agreements, and concealing the transfers, with the knowledge and intent that such concealment would cause L&H's revenues, income and assets to be materially overstated, and that such material misrepresentation of L&H's financial statements would be communicated to the SEC and to L&H shareholders and public investors in the United States, including Seagate.  Because aiding and abetting securities fraud is not actionable, and was not actionable at the time of the passage of the Private Securities Litigation Reform Act on December 22, 1995, these predicate acts do not fall within the proscription of "conduct that would have been actionable as fraud in the purchase or sale of securities" in RICO, 18 U.S.C. § 1964(c).

72.     As set forth above, each of the defendants committed multiple acts, between September 1999 and November 2000, chargeable as mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343, each of which constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1) (hence, closed-ended continuity).  In light of the fact that each of the Korean Bank Defendants engaged in a similar pattern of racketeering activity, as did non-defendant Hana Bank, it is a reasonable inference that these fraudulent acts represent a regular course of business for the defendants and for major Korean banks (hence, open-ended continuity).  Those

37

acts included entering into and concealing the factoring side agreements, and concealing the transfers, with the knowledge and intent that such concealment would cause L&H's revenues, income and assets to be materially overstated, and that such material misrepresentation of L&H's financial statements would be communicated to the SEC and to L&H shareholders and public investors in the United States, including Seagate, by means of mail and wire. The precise dates on which defendants communicated with L&H management and auditors as a means of disseminating the false information detailed herein are not stated in the PwC Report and are peculiarly within the knowledge of defendants. The dates on which such false information was communicated, by means of interstate mail and wire, to plaintiffs, include, among others: (a) December 28, 1999, the date of an L&H press release, disseminated worldwide, falsely detailing L&H business in Korea; (b) a January 31, 2000 press release, disseminated worldwide, falsely detailing L&H business in Korea; (c) a February 9, 2000 press release, disseminated worldwide, falsely detailing L&H fourth quarter 1999 financial results; (d) a March 22, 2000 conference call in which KPMG representatives communicated defendants' misrepresentations about L&H Korea to plaintiffs' representatives in connection with negotiation of the Merger; (e) a May 9, 2000 L&H press release, disseminated worldwide, falsely detailing L&H's first quarter 2000 results; (f) L&H's Form 10-Q for the first quarter of 2000, filed with the SEC on June 30, 2000; and (g) L&H's Form 10-K for 1999, filed with the SEC on June 30, 2000.

73.     Each of the defendants possessed the requisite criminal intent to commit the aforesaid acts of mail and wire fraud, and aiding and abetting securities fraud, as is evidenced by, among other things, the terms of the secret side agreements, which had no legitimate business purpose and had no effect other than to permit L&H to book millions of fictitious dollars in

revenues, income and assets that each of the defendants knew would be, and was, included in financial statements filed with the SEC and disseminated to the public worldwide.

74.    Defendants' predicate acts of racketeering activity constituted a pattern of racketeering activity, as defined in §1961(5) of RICO. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including plaintiffs. The duration of the pattern extended from at least September 1999 to at least November 2000. Moreover, the defendants were aiding, abetting and facilitating the thoroughly corrupt usual course of business of L&H in L&H Korea.

75.    In violation of 18 U.S.C. § 1962(c), each of the defendants conducted or participated, either directly or indirectly, in the conduct of its respective association-in-fact enterprise's affairs through the pattern of racketeering activity described above. Specifically, each of Defendants Hanvit, Shinhan, and Chohung participated in its respective association-in-fact enterprise's affairs by, *inter alia,* negotiating, entering into, and performing the factoring and secured loan agreements detailed herein, including the concealed provisions of those or accompanying agreements that caused the fictitious inflation of L&H Korea's revenue and consequent collapse of L&H worldwide.

76.    As a direct and proximate result of defendants' violations of 18 U.S.C. § 1962(c), plaintiffs have suffered substantial damage to business and property in connection with their exchange of their interest in Dragon for L&H stock.

77.    By reason of the foregoing, defendants are jointly and severally liable to plaintiffs for the aforesaid actual damages to business and property, in an amount to be proven at trial but

no less than $166,957,963, which are to be trebled pursuant to 18 U.S.C. § 1964(c). Plaintiffs

are also entitled to recover the costs of bringing this suit and attorneys' fees.

### THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 1962(d) OF RICO

78.    Plaintiffs repeat and reallege paragraphs 1 through 77 as though fully set forth

herein.

79.    During a period extending from at least September 1999 to at least November

2000, the defendants, in violation of 18 U.S.C. § 1962(d) conspired to violate § 1962(c) of

RICO.

80.    The object of the conspiracy was to artificially inflate the financial statements of

L&H, and thus the price of L&H common stock, by fraudulently misrepresenting the revenues of

L&H Korea. The overt acts taken in furtherance of the conspiracy included the factoring and

loan agreements detailed above.

81.    Each defendant agreed to the commission of predicate acts as set forth in

paragraphs 33-51, *supra*. Each Defendant knew that the acts in which it participated and of

which it was actually aware were part of a pattern of racketeering activity with management of

L&H Korea. Each Defendant actually knew that the financial statements of L&H were

fraudulently inflated and that the price of L&H stock was fraudulently inflated as a result. Each

Defendant actually knew of the Merger well in advance of its closing in June 2000.

82.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d),

plaintiffs have suffered substantial damage in connection with their exchange of their interest in

Dragon for L&H stock.

83.    By reason of the foregoing, defendants are jointly and severally liable to plaintiffs for the aforesaid actual damages to business and property, in an amount to be proven at trial but no less than $166,957,963, which are to be trebled pursuant to 18 U.S.C.§1964(c).  Plaintiffs are also entitled to recover the costs of bringing this suit and attorneys' fees.

## FOURTH CLAIM FOR RELIEF AGAINST
## ALL DEFENDANTS FOR COMMON LAW FRAUD

84.    Plaintiffs repeat and reallege paragraphs 1 through 83 as though fully set forth herein.

85.    As set forth above, all defendants intentionally misrepresented their transactions with L&H Korea by, *inter alia*, describing their factoring agreements as "non-recourse" when secret side agreements clearly made the factoring "with recourse."

86.    All defendants intended by their actions to permit L&H to fraudulently overstate its revenues, income and assets and thereby to inflate the price of the common stock of L&H, causing plaintiffs, among others, to purchase L&H common stock at prices inflated by their fraud.

87.    In reliance on the fraudulently inflated L&H financial statements and common stock price directly and immediately produced by defendants' misrepresentations and omissions, Seagate entered into, executed and fully performed the Merger Agreement, to its detriment.

88.    As a result of defendants' fraudulent conduct, plaintiffs have sustained damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## FOR AIDING AND ABETTING COMMON LAW FRAUD

89.    Plaintiffs repeat and reallege paragraphs 1 through 88 as though fully set forth herein.

90.    As set forth above, L&H intentionally misrepresented its revenues, income and

41

assets, by material amounts, in its financial statements, press releases and public statements, including, among other things, its filings with the SEC. Those misrepresentations were intended to and did have the effect of fraudulently inflating L&H's financial statements and common stock price, specifically including the price of the L&H common stock that L&H exchanged for Seagate's interest in Dragon.

91.    Each of defendants knew that L&H was a publicly held company that traded on the NASDAQ and EASDAQ and was required to publicly disclose its financial statements and file reports on its financial condition with, among others, the SEC. Defendants knew that the secret provisions of their relationships with L&H as set forth above, including the factoring arrangements with L&H Korea, had the effect of rendering fictitious L&H Korea's publicly reported revenues and constituted a fraud on the market for L&H shares. Defendants knew that the fraud they were perpetrating with L&H had the actual effect of fraudulently inflating L&H's financial statements and common stock trading price.

92.    Each of defendants knowingly or recklessly rendered substantial assistance to L&H Korea's fraudulent scheme by entering into, concealing, and enforcing secret agreements that transformed L&H Korea's time deposits, held by defendant banks and publicly represented as L&H Korea assets, into collateral for secret loans that eventually reverted to the defendant banks, precipitating L&H's collapse and the collapse of its common stock.

93.    Plaintiffs have been harmed by the defendant banks' aiding and abetting the fraud by L&H Korea, and have sustained damages in an amount to be proven at trial.

**WHEREFORE,** plaintiffs demand judgment as follows:

(a)  Awarding plaintiffs damages in an amount to be determined at trial against all defendants, jointly and severally, for Seagate's purchases of L&H shares, as well as reimbursement for any liabilities and expenses incurred as a result of the impact of the fraud on Seagate's sales of L&H shares or otherwise;

(b)  Pursuant to 18 U.S.C.§1964(c) and (d), awarding plaintiffs treble the amount of all damages to business and property, determined at trial, for Seagate's purchases of L&H shares and any impact of the fraud on Seagate's sales of L&H shares or otherwise;

(c)  Awarding plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Awarding such other, further or different relief as the Court may deem just and proper.

**Dated:**  October 29, 2001

**GREGORY P. JOSEPH LAW OFFICES LLC**

By: _____
        Gregory P. Joseph (GJ-4208)
Pamela Jarvis (PJ-9058)
Honey L. Kober (HK-8380)
Sandra M. Lipsman (SL-4590)
Douglas J. Pepe (DP-1357)
805 Third Avenue, 31st Floor
New York, New York  10022
(212) 407-1200
Fax: (212) 407-1299

**Attorneys for Plaintiffs**