# United States District Court
# District of Massachusetts

HANS A. QUAAK,
ATTILIO PO,
KARL LEIBINGER, on behalf of
    themselves and those similarly situated,
        Plaintiffs,

v.                              CIVIL ACTION NO. 2003-11566-PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
    (formerly known as
     ARTESIA BANKING CORP., SA),
        Defendants.

_____

STONINGTON PARTNERS, INC., a Delaware
    Corporation,
STONINGTON CAPITAL APPRECIATION 1994 FUND L.P.,
    a Delaware Partnership,
STONINGTON HOLDINGS, L.L.C.,
    a Delaware Limited Liability Company,
        Plaintiffs,

v.                              CIVIL ACTION NO. 2004-10411-PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
    (formerly known as
    ARTESIA BANKING CORP., SA),
        Defendants.

———————————————————————————

GARY B. FILLER,
LAWRENCE PERLMAN,
     Trustees of the TRA Rights Trust,
        Plaintiffs,
v.                              CIVIL ACTION NO. 2004-10477-PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
     (formerly known as
     ARTESIA BANKING CORP., SA),
        Defendants.

———————————————————————————————

JANET BAKER,
JAMES BAKER,
JKBAKER LLC,
JMBAKER LLC,
        Plaintiffs,

v.                              CIVIL ACTION NO. 2004-10501- PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
     (formerly known as
     ARTESIA BANKING CORP., SA),
        Defendants.

# MEMORANDUM AND ORDER ON PLAINTIFFS' JOINT MOTION TO COMPEL DEPOSITIONS OF DEXIA BANK BELGIUM THROUGH PIET CORDONNIER, BART FERRAND, AND PETER RABAEY (#99 in 03cv11566, #24 in 04cv10411, #38 in 04cv 10477, #28 in 04cv10501) AND PLAINTIFFS' MOTION TO COMPEL DEPOSITIONS OF DEFENDANT DEXIA BANK BELGIUM THROUGH JEAN-PAUL CLOES, CATHERINE ECOUTERE, IVAN DE COEN, JORIS VAN HELLEPUTTE, AND NADIA VAN HOVE (#227 in 03cv11566, #79 in 04cv10411, #97 in 04cv 10477, #81in 04cv10501)

COLLINGS. U.S.M.J.

## I.    Introduction

This case arises out of the well-known Lernout and Hauspie ("L&H") securities litigation.  In the case at bar, the plaintiffs are suing Dexia Bank S.A.,

3

Dexia Bank Belgium (formerly known as Artesia Banking Corp., SA) (hereinafter "Dexia") for its purported role in assisting L&H to perpetrate accounting fraud. Specifically, the plaintiffs allege that Dexia was involved in issuing loans totaling more than $20 million "which were used to artificially [sic] inflate L&H's revenues" and that Dexia "employed a ruse known as 'credit default swaps...'" ("CDSs"). (First Amended Class Action Complaint #7-1 ¶¶ 77, 78) The loans were given by Dexia to entities known as Radial Belgium N.V. ("Radial") and Language Investment Company ("LIC"). (Plaintiffs' Supporting Memorandum of Law #101 at 3)[1] In addition, Dexia provided funding to L&H's first strategic partner, a shell company known as Dictation Consortium N.V. ("DC"). (#101 at 3)

With the instant motions and supporting memoranda of law, the plaintiffs are seeking to compel the depositions of eight Dexia employees, Piet Cordonnier ("Cordonnier"), Bart Ferrand ("Ferrand"), Peter Rabaey ("Rabaey"), Jean-Paul Cloes ("Cloes"), Catherine Decoutere ("Decoutere"), Ivan De Coen ("De Coen"), Joris Van Helleputte ("Van Helleputte") and Nadia Van Hove ("Van

---

[1] Most of the pleadings relevant to the instant motions were, with approval of the Court, filed under seal and thus oftentimes the motion to seal was filed along with the relevant pleading but only the motion to seal was given a docket number. Page number citation is to the underlying pleading not to the motion to seal.

4

Hove")(collectively, the "Belgian witnesses"), all of whom are located in Belgium.[2] Dexia filed under seal a Memorandum of Law in Opposition to Plaintiffs' Joint Motion to Compel Depositions of Piet Cordonnier, Bart Ferrand and Peter Rabaey, along with the Declaration of Jeff E. Butler (#105). The plaintiffs then filed under seal a Reply Memorandum of Law in Further Support of Plaintiffs' Joint Motion to Compel Depositions of Piet Cordonnier, Bart Ferrand and Peter Rabaey (#124).

In response to the plaintiffs' subsequently filed motion to compel the depositions of Cloes, Decoutere, De Coen, Van Helleputte and Van Hove (which was filed along with the substantial Declaration of Susan M. Davies)(#227), Dexia filed a Memorandum of Law in Opposition to the Motion to Compel (#239). Then, the plaintiffs filed a Motion for Leave to Submit Reply Declaration in Further Support of Plaintiffs' Motion to Compel, along with the Declaration (#252). For the reasons discussed below, these motions shall be allowed in part and otherwise denied.

## II.    Discussion

The plaintiffs have moved for an order compelling Dexia to produce the

---

[2]

With their first motion to compel, the plaintiffs also filed under seal the supporting Declaration of Susan M. Davies.

Belgian witnesses for deposition on the grounds that the Belgian witnesses are so-called "managing agents."[3]  Dexia opposes the motions, arguing that the Belgian witnesses are all low-level employees, not managing agents, and thus cannot be deposed.

### A.    Legal Standard

Pursuant to the Federal Rules of Civil Procedure, a corporation may be examined through "an officer, director, or managing agent."  The party seeking the deposition may notice the deposition of the corporate party and designate a person who is "an officer, director, or managing agent" of the corporation.  *In re Honda American Motor Co. Inc. Dealership Relations Litigation,* 168 F.R.D. 535, 540 (D. Md., 1996).  *See also GTE Products Corp. v. Gee,* 115 F.R.D. 67, 68 (D. Mass., 1987).   The testimony of such a person is the testimony of the corporation. Rule 32(a)(2), Fed. R. Civ. P.

There is no dispute in this case that none of the Belgian witnesses is an officer or director of Dexia.  Thus, for the plaintiffs to be allowed to depose the

---

[3]

Apparently, the plaintiffs, before filing these motions, have not sought to use the Hague Convention (i.e., letter rogatory) in order to obtain the depositions of the Belgian witnesses.  However, whether they have or not does not "prejudice [their] right to seek depositions by the more conventional means available under the Federal Rules of Civil Procedure." *Dubai Islamic Bank v. Citibank, N.A.,* 99 Civ. 1930, 2002 U.S. Dist. LEXIS 9794, *3 n. 2 (S.D.N.Y., May 31, 2002) (citing *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for Southern Dist. of Iowa,* 482 U.S. 522, 536, 107 S.Ct. 2542, 2551-52, 96 L. Ed.2d 461 (1987)).

6

Belgian witnesses, those witnesses must be so-called "managing agents." That

term is not defined in the Federal Rules of Civil Procedure, but a test for

determining whether someone is a managing agent has evolved in the case law.

The following five factors are often considered in making the determination:

> 1) whether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; 4) the general responsibilities of the individual respecting the matters involved in the litigation; and 5) whether the individual can be expected to identify with the interests of the corporation.

*Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS 9794 at *7-8; *see also Surles v. Air*

*France*, 00 Civ. 5004, 2004 U.S. Dist. LEXIS 3710, *7 (S.D.N.Y., 2004)(setting

out same five-part test);  *U.S. v. The Dorothy McAllister*, 24 F.R.D. 316, 318

(S.D.N.Y., 1959)(same).   Some courts apply a three-part variant of the above-

stated test.  *See, e.g., Smith v. Shoe Show of Rocky Mount, Inc.,* 2001 WL

1757184, *1 (D. Mass., Apr. 26, 2001); *M.F. Bank Restoration Co. v. Elliott, Bray*

*& Riley, et al.,* 92-0049, 1994 U.S. Dist. LEXIS 1362, *7 (E.D. Pa., Jan. 11,

1994); *In re Honda,* 168 F.R.D. at 540.[4]

Moreover, some cases have held that "whether a witness is expected to identify himself with the interests of his principal rather than those of the other party is the 'paramount test' for determining whether an employee is a 'managing agent.'" *Boston Diagnostics Dev't Corp., Inc. v. Kollsman Mfg. Co., Div. of Sequa Corp.*, 123 F.R.D. 415, 416 (D. Mass., 1988) (citations omitted); *see also In re Honda*, 168 F.R.D. at 541 (same). Additionally, "[b]ecause the factual circumstances in which the term managing agent must be applied differ greatly among cases, the test must be a functional one and the determination made on a case-by-case basis." *In re Honda*, 168 F.R.D. at 540.

Finally, the burden on the moving party is "modest" and "all doubts are to be resolved in favor of the examining party." *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS 9794 at *9 (citations omitted). In sum, "the examining party satisfies its burden when it produces enough evidence to show that there is at least a close question whether the proposed deponent is [a] managing agent." *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS 9794 at *9 (citations and quotations

---

[4]

     The three-part test omits the factor regarding the proposed witness' responsibilities as to matters involved in the litigation and the factor regarding whether there is anyone in a higher supervisory position who possesses the same knowledge. The Court shall apply the five-part test. However, whether the three-part or the five-part test is utilized does not change the decision on the instant motions.

omitted).

### B.   The Belgian Witnesses

The Court shall address the status of each of the eight Belgian witnesses whom the plaintiffs are seeking to depose.

### 1.   *Piet Cordonnier*

Cordonnier is an in-house lawyer for Dexia "responsible for handling credit files, drawing up contracts and security agreements in accordance with what had been agreed at the business level, and making internal recommendations concerning specialized credits." (#101 at 16)[5] He has been employed by Dexia for ten years. (#101 at 8)  As to Cordonnier's specific functions, the plaintiffs explain that he:

> "prepared the credit agreement...pursuant to which [Dexia] loaned...approximately $6.9 million to the first of L&H's alleged 'strategic partners'–Dictation Consortium," (#101 at 16);

> "negotiated from L&H an 'additional return' for [Dexia] in consideration for the loan to DC" (#101 at 16);

> "had authority to co-sign, on behalf of [Dexia], amendments to a $55 million" credit facility agreement

---

[5]

Citations are to the relevant pleading rather than to the supporting documentation.  Many of the underlying facts relied upon by the parties come from transcripts of interviews done by the Belgian police. While the Court has reviewed all of those transcripts, for convenience's sake, the Court shall cite to the pleading, not to the interview transcripts.

> between Dexia and an L&H company (#101 at 17); and
>
> "was involved in legal work in connection with the $450 million Revolving Credit Facility Agreement" between L&H and a syndicate of banks, including Dexia. (#101 at 17)

Applying the five-part test set out above, it seems clear that Cordonnier could be relied upon to give testimony at Dexia's request and that he could be expected to identify with the interests of Dexia. He has been employed by Dexia for ten years, and there is nothing in the record to suggest that his interests would not align with those of Dexia. Those factors would weigh in favor of allowing the deposition of Cordonnier to go forward. However, when considering the other three applicable factors, the balance tips in favor of Dexia.

Taking the first and fourth factors together–whether Cordonnier is invested with general powers allowing him to exercise judgment and discretion in corporate matters and his general responsibilities respecting the matters involved in the litigation–it seems that Cordonnier should not be considered a managing agent. As Dexia points out, "Cordonnier was responsible for documenting loan transactions after the key decisions were made. He was not himself a key decision-maker." (Memorandum of Law in Opposition to Plaintiffs' Joint Motion to Compel Depositions #105 at 12)

10

In other words, what appears from the record is that Cordonnier had little (if any) discretion in corporate matters and that he was not heavily involved in the matters relevant to the instant lawsuit.  All of the tasks that Cordonnier undertook seem to have been at the direction of others.  For example, he was responsible for drafting contracts and security agreements, documents that put into writing deals that had been negotiated by others.  As Cordonnier himself stated, "I am involved in...contractual elaboration of what has been agreed on [at] a business level...I only start my work when the [Credit] committee has given a firm approval and when the client agrees with it." (#105 at 12)

Even the plaintiffs' description of Cordonnier's job reflects that Cordonnier did not have discretion over corporate matters–he "prepared credit agreements," "was responsible for legal documentation," and "handl[ed] credit files." (#101 at 16-17) None of what the plaintiffs have presented suggests that Cordonnier exercised independent discretion with regard to corporate matters.  And, indeed, it seems logical for an in-house counsel to be drafting the legal documents which memorialize decisions and deals made at the corporate level.[6]

---

[6] As to the plaintiffs' argument in their reply brief that the issue really is whether Dexia invested the Belgian Witnesses with general powers to exercise their judgment and discretion in a position of trust–not whether the witnesses have the authority to bind Dexia to the transaction at issue in the litigation, the Court does not disagree.  However,  there still is not enough evidence to establish that Cordonnier exercised any such judgment and discretion.  While the burden on the plaintiffs is not large, as to Cordonnier, they have

Moreover, Cordonnier does not appear to have had much responsibility regarding the issues in this litigation.  As Dexia explains, "[p]laintiffs do not argue that Cordonnier was involved in the Radial or LIC loans, or the $20 million personal loan.  This is confirmed by Cordonnier's statement to the Federal Police." (#105 at 12) As to the plaintiffs' assertions that Cordonnier was integral to the DC transaction, the supporting documents show that this was not the case.  Again, Cordonnier's role in the DC deal was one of documenting the transaction after it had already been done. (#105 at 12)

As to the third prong of the test–whether any person is employed by Dexia in a position of higher authority than Cordonnier in the area regarding which the information is sought by the deposition–the plaintiffs contend that Marc Van Keirsblick ("Van Keirsblick") was Cordonnier's supervisor from January, 1996 to June, 1999 and that Van Keirsblick's employment status is unknown. (#101 at 19)  From June, 1999 on, Cordonnier reported to Patrick Van Tiggel ("Van Tiggel") and the plaintiffs note that Dexia has not identified Van Tiggel as a managing agent or as someone who has knowledge about the subject matter of this litigation. (#101 at 18) Thus, the most that can be said is that it is unclear

---

not met that burden.

whether there is anyone employed at Dexia in a higher position who would have knowledge of the information sought by the deposition, not enough to tip the balance in favor of compelling Cordonnier's deposition.   In sum, the evidence supports the conclusion that Cordonnier is not a managing agent and therefore is not subject to be deposed by the plaintiffs.

### 2.   Bart Ferrand

Ferrand has been employed by Dexia for fourteen years, holding titles such as "Account Officer," "Corporate Banker" and "Senior Corporate Banker." (#101 at 8, 13-14) While he does not appear to have had any direct involvement with the Radial and LIC loans, he was involved in most of the credit applications made by L&H, he consulted extensively with Mssrs. Hauspie and Willaert concerning the Language Development Corporation ("LDC")[7] concept, he decided "autonomously" that for the bank's internal purposes, the income generated on loans to L&H and the LDCs should be reported collectively and in negotiating the terms of the LDF loan application, he proposed that the $20 million credit be secured by CDSs with Mssrs. Lernout, Hauspie and Willaert. (#101 at 14-15)

---

[7]   The LDCs were so-called sham corporations funded by financing from Radial and LIC. (#101 at 3)

Dexia argues that the above factors are essentially negated by the fact that Ferrand was supervised closely by his boss, Phillipe Steverlinck[8] ("Steverlinck"), that Ferrand was responsible for mundane tasks such as overseeing the cleaning crew and that final decisions were made by the Credit Committee, not by Ferrand himself. (#105 at 10-11) Whether to allow the deposition of Ferrand is a close call, but because the burden on the plaintiffs is modest, the Court finds that Ferrand is a managing agent and shall order his deposition.

In considering the five factors, the balance weighs in favor of the plaintiffs. First, as to his judgment and discretion in corporate matters, Ferrand did exercise such discretion and judgment. He himself decided that for Dexia's internal purposes, the income generated on loans to L&H and the LDCs should be reported collectively. He also, in negotiating the terms of the LDF loan application, proposed that the $20 million credit be secured by CDSs with Mssrs. Lernout, Hauspie and Willaert. While this proposal may not ultimately have been accepted by the Credit Committee, Ferrand was using his knowledge and judgment in making such a proposal.

Second, there is no reason to believe that Ferrand could not be relied

---

[8]

There seems to be a question as to the correct spelling–Steverlinck or Steverlynck. In any event, whatever the spelling, the parties are clearly referring to the same person.

upon to give testimony at Dexia's request.  Ferrand is still employed by Dexia and has been for a number of years and by all that appears is a loyal employee. The Court does not credit Dexia's argument that since Ferrand has been interviewed by the Belgian Federal Police, he may be concerned about becoming a target and therefore refuse to participate in a deposition.  Dexia's contention is seemingly mere speculation without support.  Thus, there is no real reason to believe that Ferrand would not testify at Dexia's request.

Third, as to people in higher supervisory positions with similar knowledge, the plaintiffs assert that Steverlinck, Ferrand's boss, does not have knowledge about the LDF loan, specifically Ferrand's decision to propose that a CDS with Mssrs. Lernout, Hauspie and Willaert provide security for that loan. (#101 at 18) Dexia's position is that Steverlinck monitored Ferrand closely and that the Credit Committee was the ultimate decisionmaker as to matters in this litigation. (#105 at 10-11, 13-14)  Frankly, it is unclear whether there is someone in a higher position than Ferrand with similar knowledge.  However, since "all doubts are to be resolved in favor of the examining party," the Court shall credit the plaintiffs' contention that Steverlinck does not have knowledge about the LDF loan.  *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS 9794 at *9.

Thus, this factor too tips in favor of the plaintiffs.

Fourth, as to Ferrand's general responsibilities respecting matters in the instant litigation, he admittedly had little or no involvement with the Radial or LIC loans. However, he was involved with L&H–he has knowledge about most of the credit applications made by L&H, he consulted extensively with Hauspie and Willaert concerning the LDC concept, he was responsible for day-to-day payment operations involving the L&H checking account and he made a proposal that a $20 million credit be secured by CDSs with Mssrs. Lernout, Hauspie and Willaert. Again, this factor presents a close call, but the Court finds that the plaintiffs have presented enough evidence to show at least that Ferrand had responsibility as to some of the matters in this lawsuit.

Fifth, Ferrand is expected to identify with the interests of Dexia. As discussed above, he is seemingly a loyal employee, is still employed at Dexia and has not given any indication that he is not aligned with Dexia. Thus, the Court finds that Ferrand is a managing agent and shall allow his deposition to go forward.

### 3.   Peter Rabaey

Rabaey has been employed at Dexia for eighteen years and at least as of

1999, has had the title "Senior Credit Officer, Loans Secretariat, Specialized Activities." (#101 at 10) Taking into consideration the five relevant factors, Rabaey is a managing agent and is thus subject to deposition.

First, as to discretion and judgment in corporate matters, Rabaey, on his own initiative, contacted Dexia's in-house counsel seeking legal advice as to whether the CDSs had to be disclosed in the letters of credit, communicated with Mssr. Willaert regarding whether the CDSs had to be disclosed in the letters of credit, met with the manager of Radial to discuss whether the CDSs had to be disclosed in the letters of credit, prepared and submitted to the Credit Committee detailed credit proposals that recommended extending the terms of the loans to Radial and LIC, a recommendation the Credit Committee accepted, and recommended to the Credit Committee the granting of a $20 million loan to LDF secured by the sale of a CDS to Mssrs. Lernout, Hauspie and Willaert. (#101 at 11)

Dexia argues that Rabaey's involvement in the relevant loans began only after the loans were disbursed and that he was not a decisionmaker as to the proposed LDF loan. (#105 at 7-8) But the first factor of the five part test is whether the witness exercised judgment and discretion in corporate matters. Rabaey seems to have done so. He prepared proposals for the Credit Committee

17

and even if those proposals were not ultimately accepted by the committee, Rabaey was using his judgment as to what to include in the proposals. Similarly, he, on his own volition, contacted various people to discuss whether the CDSs had to be disclosed in the letters of credit, a task in which he was using his initiative and discretion.

Next, as for the second and fifth factors (i.e., his loyalty to Dexia), Rabaey is still employed by Dexia and has been so employed for a long time. Thus, it would appear that he would give testimony at Dexia's request and that his interests would align with those of Dexia. Dexia argues that there is a good reason that Rabaey may not be willing to testify.[9] (#105 at 15) Dexia's reason is valid and is worth taking into consideration. However, it still does not show that Rabaey would not identify with the interests of the corporation. The fact that Rabaey is still with Dexia suggests his loyalty remains with Dexia. *See Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS 9794 at *16-17 ("That [witness's] interests remain aligned with [the corporation] is supported by his continuing to draw the same salary and enjoy the same position grade as he did prior to the events in question.").

---

[9] The reason that Dexia gives is confidential and thus Dexia has requested that it not be disclosed.

18

Next, as to the third factor, the plaintiffs contend that there is no one in a higher supervisory position than Rabaey with the same knowledge. During the relevant time periods, Rabaey reported to Jan van der Ven, not currently an employee of Dexia and then to Van Tiggel, someone the plaintiffs say has not been identified as a person who has any knowledge about the subject matter of this litigation. (#101 at 17-18) Dexia claims that the members of the Credit Committee were the real decisionmakers "with respect to the loan transactions relevant to this litigation...." (#105 at 13)

It may be so that the Credit Committee was the final decisionmaker as to whether to make a loan or not; however, the issue here is whether there is anyone in a higher position than Rabaey with information about the topics as to which Rabaey would be deposed. Dexia seems to suggest that the members of the Credit Committee would have such information. (#105 at 13-14) This factor presents another close call since it is unclear whether the members of the Credit Committee could testify as to the details about which Rabaey could testify. Obviously, the Credit Committee members could testify about why a certain loan was ultimately made or denied, but whether their testimony would cover the same topics as Rabaey's testimony would (such as the CDSs being disclosed in the letters of credit) is uncertain. And, "if the extent of his

19

subordination to higher authority makes the conclusion 'subject to doubt' rather than clear-cut, 'the doubt should be resolved in favor of the examining party.'" *Boston Diagnostics,* 123 F.R.D. at 417 (quoting *The Dorothy McAllister*, 24 F.R.D. at 318).

Finally, as to the fourth factor, it is not entirely clear what Rabaey's general responsibilities were with regard to the matters involved in the litigation. Dexia claims that his involvement with the relevant loans began only after the loans were disbursed whereas the plaintiffs portray Rabaey as someone who was involved with the relevant loans and especially with the CDSs. Keeping in mind that the burden on the plaintiffs is modest, the Court finds that Rabaey seems to have enough familiarity with the pertinent transactions such that this fourth factor should weigh in favor of the plaintiffs. *See, e.g., M.F. Bank Restoration,* 1994 U.S. Dist. LEXIS 1362 at *9 (holding that proposed deponent was a "managing agent" in part because he was "familiar with the relevant events, and was evidently involved in dealings with defendant....").

In sum, the Court finds that Rabaey and Ferrand are managing agents subject to deposition, and that Cordonnier is not a managing agent. The Court shall therefore allow the plaintiffs to take the depositions of Rabaey and

Ferrand, but not of Cordonnier.

### 4.    Jean-Paul Cloes

Cloes is a current Dexia employee who has worked for Dexia and its predecessors for the last ten years. (#227 Declaration at ¶ 9) Cloes has functioned as an "internal auditor" and in that capacity has, on the orders of the Credit Committee, performed an audit of Dexia's conduct in transactions with companies in the "L&H Group." (#227 Declaration at ¶ 10) The two memoranda reporting Cloes' findings were co-signed by his then-supervisor, Francoise Dankelman ("Dankelman"), who is no longer with Dexia. (#227 Declaration at ¶ 11) The two people to whom Cloes reported his findings also are no longer with Dexia. (#227 Declaration at ¶ 10)

As Dexia points out, Cloes was not directly involved in any of the loans or transactions at issue in this litigation which mainly occurred in 1998 and 1999. (#239 at 3) In sum, Cloes does not present a close call. There is very little (if anything) to suggest that Cloes is a "managing agent." There is no evidence that he was invested with discretionary authority or that he was involved in any of the matters underlying this case. Perhaps it can be inferred that his interests would align with Dexia since he is still employed there, but this in and of itself

is not enough to justify the conclusion that he is a managing agent.

The plaintiffs try to make something of the fact that a Dexia executive, Alain Probst, testified during a deposition that "the conclusions and recommendations of an audit are not debatable, they are applied." (#252 at ¶ 3) Even if this is the case, it does not mean that Cloes had the type of discretionary authority in corporate matters nor does it mean that he has relevant knowledge about the matters at the heart of this lawsuit such that he should be considered a managing agent. Thus, the plaintiffs should not be allowed to depose him and the motion to compel as to Cloes shall be denied.

### 5.   *Catherine Decoutere*

Decoutere, like Cloes, is a current Dexia employee who has been with the company for the past ten years. (#227 Declaration at ¶ 13) She is currently a legal advisor in Dexia's legal department and was previously an auditor. (#227 Declaration at ¶ 14) Her direct supervisor when she was an auditor, Dankelman, is no longer with Dexia. (#227 Declaration at ¶ 17) As an auditor, she participated in an audit of outstanding credits granted to the L&H Group that was requested in November, 2000 by the Belgian Banking and Finance Commission ("CBF") and Dexia's Audit Committee. (#227 Declaration at ¶ 14)

22

The audit's findings were distributed to the bank's most senior executives. (#227 Declaration at ¶ 15)

The audit reported concluded *inter alia* that the credit files had not been adequately monitored by management and recommended that certain procedures be put in place to address the perceived mismanagement. (#227 Declaration at ¶ 15) Among the L&H loans that were the subject of the audit was a $25 million loan to L&H's CEO Gaston Bastiens, the stated purpose of which was to finance the purchase of L&H stock in order to support the stock price. (#227 Declaration at ¶ 16)

Like Cloes, Decoutere was not a managing agent because she did not exercise the type of discretionary authority necessary for that of a managing agent nor was she involved in any of the loans or transactions underlying this lawsuit.  It can be assumed that she would be loyal to Dexia and testify on Dexia's behalf since she is still employed by the company, and her direct supervisor is no longer at Dexia, but this is not enough to tip the scales in the plaintiffs' favor.  While the Court is well aware that the burden is not a stringent one, the plaintiffs must present more than they have done in order to establish managing agent status for Decoutere.  Her deposition will not be allowed.

23

## 6.    *De Coen*

De Coen has been employed by a wholly-owned subsidiary of Dexia, Dexia Factors, S.A. ("Dexia Factors"), for the past seven years. (#227 Declaration at ¶ 18) De Coen's direct supervisor is Stefaan Decraene ("Decraene") who is a member of Dexia's Management Commitee. (#227 Declaration at ¶ 18) Before being employed by Dexia Factors, De Coen was employed by Dexia, and one of the positions he held at Dexia was Head of Structured Finance.  (#227 Declaration at ¶ 19) As the Head of the Structured Finance Department, De Coen reported to François Saverys ("Saverys").  (#227 Declaration at ¶ 22)  In that job, De Coen was involved in a loan made to DC.  (#227 Declaration at ¶ 19) De Coen's subordinate, one Patrick Faict ("Faict"), managed the DC loan file; Faict is no longer employed by Dexia.  (#227 Declaration at ¶ 20) Saverys has testified that he has no memory of doing any work on the DC credit file. (#227 Declaration at ¶ 22)

De Coen's responsibilities in connection with the DC loan included: attending a client meeting with representatives of L&H and DC in February, 1997, the purpose of which was to convince Paribas Bank to grant credit to DC; seeking legal advice concerning the structure of the transaction between L&H

24

and DC; recommending to the Management Committee of Paribas Bank that Paribas Bank should take a 50% participation in the loan to DC and should make a bridge loan to fund DC, both of which recommendations the Management Committee accepted; and co-signing Paribas Bank's letter of credit to DC. (#227 Declaration at ¶ 21) Dexia executive Jacques Janssens ("Janssens") testified at his deposition that the Management Committee made its decision to extend the line of credit to DC based in part on information prepared by De Coen. (#252 at 4)

As Dexia points out, in 1998, De Coen took over responsibility for Dexia's factoring activities which are not at issue in this litigation. (#239 at 5) However, Dexia also concedes, as it must, that De Coen was involved in negotiating and documenting the DC loan. (#239 at 5) Dexia argues further that the Management Committee, not De Coen, was ultimately responsible for deciding to make the loan to DC. (#239 at 5) Finally, Dexia explains that Saverys was not a member of the Management Committee in 1997 and thus did not participate in the decision-making with respect to the DC loan. However, Janssens who did participate in the Management Committee decisions has already been deposed and has been questioned extensively about the DC loan.

(#239 at 6)

Whether to allow the deposition of De Coen presents a much closer call than whether to allow the depositions of Cloes and Decoutere. However, the balance weighs in favor of allowing the deposition. While it is clear that De Coen was involved in the DC loan and did exercise some discretion over that matter and other matters and that De Coen would be loyal to Dexia, it is also apparent that De Coen could only testify about the DC loan since that is the only matter relevant to this litigation with which he was involved. And, Janssens, who was a member of the Management Committee and thus senior to De Coen, has already been deposed thoroughly about that same loan.

The applicable test sets out that the Court should consider whether "any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination." *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS 9794 at *7-8. Here, Janssens is that person. But, the plaintiffs explain that Janssens did not answer many of the plaintiffs' questions regarding the DC loan–either he was unresponsive or he had no memory about the issue at hand. (#252 at 5)

26

It is well-established that "the examining party satisfies its burden when it produces enough evidence to show that there is at least a close question whether the proposed deponent is [a] managing agent." *Dubai Islamic Bank*, 2002 U.S. Dist. LEXIS 9794 at *9. The plaintiffs have done enough to demonstrate that there is a close question as to whether De Coen is a managing agent. The fact that Janssens has already been deposed about the DC loan weighs against allowing the deposition, but that is only one factor in the whole equation and the other factors weigh toward allowing the deposition.[10] There is some evidence that De Coen exercised discretion over corporate matters, he could be relied upon to give testimony at Dexia's behest, he had significant responsibilities vis-à-vis the DC loan, and he can be expected to identify with Dexia's interests. Thus, given that the burden on the plaintiffs is a modest one, the Court shall allow De Coen's deposition to go forward.

### 7. *Van Helleputte*

Van Helleputte is no longer employed by Dexia but for the past four years has been employed by a wholly-owned subsidiary of Dexia, Banque Artesia

---

[10]

The Court notes that it did not locate any case which held that the factor of whether there is someone else in the corporation in a position of higher authority who can testify about the same subject matter is the prevailing factor. The consideration of that factor is complicated in the instant case since Janssens was questioned about the subject matter but did not answer many of the relevant questions.

Nederlands. (#227 Declaration at ¶ 23) From 1988 to 2000, Van Helleputte had the titles Corporate Banker and Senior Corporate Banker and functioned as a credit analyst. (#227 Declaration at ¶ 24) In 2001, Van Helleputte became the Head of the Structured Finance Department, the position held by De Coen from 1996 to 1998. (#227 Declaration at ¶ 23)

Van Hellputte and Faict were the employees mainly responsible for evaluating and following up on a credit application made on behalf of Brussels Translation Group ("BTG"). (#227 Declaration at ¶ 25) Dexia loaned a total of $22.9 million to BTG which BTG used to pay L&H for sham software licenses. (#227 Declaration at ¶ 25)

In his capacity as a credit analyst, Van Helleputte: directly advised the Management Committee concerning the granting of credit to BTG; was tasked by the Management Committee with finding a solution for Dexia's need for additional security for the loan beyond what could be provided by BTG; and, negotiated with Willaert concerning the personal guarantees given by Lernout, Hauspie and Willaert for the BTG loan. (#227 Declaration at ¶ 26) During the first half of 1998, Van Helleputte reported directly to De Coen; however, De Coen was not involved in the loan to BTG. (#227 Declaration at ¶ 27)

According to Steverlinck's deposition testimony, Van Helleputte was

responsible for advising Dexia concerning the credit risks presented by particular credit proposals, including the credit proposal for the loan to DC. (#252 at 4) Steverlinck also testified that Van Helleputte acted on his own initiative or at the request of the credit committee in preparing memoranda for other senior Dexia executives.[11] (#252 at 4)

Dexia's position vis-à-vis Van Helleputte is that Van Helleputte had no decision-making authority, that his role was simply to evaluate risks associated with proposed loans and to make recommendations to members of the Management Committee, who were the real decision-makers. (#239 at 6) Moreover, says Dexia, Janssens, who has already been deposed, was questioned extensively about the BTG loan. (#239 at 7 n. 10)

The plaintiffs respond that Janssens was unable to provide information about a lot of issues surrounding the BTG loan and that numerous memoranda had been prepared about that loan, at least one of which Jansenns testified that he had never seen. (#252 at 6) The issue of whether to allow Van Helleputte's deposition is similar to the issue of whether to allow De Coen's deposition, and

---

[11]

Steverlynck's testimony on this point is not as clear as the plaintiffs would have the Court believe. Indeed, the testimony is somewhat confusing in part due to the language translation problems. It appears that Steverlynck was explaining that Van Helleputte might prepare a report on his own initiative or at the behest of the credit committee. (#252 Exh. NN at 34-36)

the conclusion is the same: the fact that Janssens has already been deposed about the BTG loan weighs toward denying the deposition, but the other four applicable factors tip the scale toward allowing the deposition and thus the Court shall allow the plaintiffs to depose Van Helleputte.

### 8.   Nadia Van Hove

Van Hove is a current Dexia employee who has been so employed for the past eight years. (#227 Declaration at ¶ 28)  As an officer of Artesia Bank, Van Hove may have played a significant role in controlling the reports published by Artesia Securities'[12] analysts in that she was responsible for coordinating their reports with Artesia Bank's analysts. (#227 Declaration at ¶ 30) The plaintiffs argue that since they know little about Van Hove, she must qualify as a managing agent simply based on her title: Manager Corporate Research. (#227 Declaration at ¶ 32)

Dexia, in turn, asserts that Van Hove is not a managing agent.  She reported to Decraene and nobody reported to her. (#239 at 7) Moreover, she was not involved in any of the loan transactions at issue in this litigation, and

---

[12]

The entity, Artesia Securities, S.A. ("Artesia Securities") is alleged in the Complaint to have made material misrepresentations about the financial condition of L&H. (#227 Declaration at ¶ 30) Janssens has testified that Artesia Bank had authority over, and made investment decisions for, Artesia Securities. (#227 Declaration at ¶ 30)

30

there is no evidence that she had decision-making authority over anything. (#239 at 7-8) Van Hove merits little more discussion–although the burden on the plaintiffs to prove that someone is a managing agent is a modest one, the

plaintiffs have not come close to satisfying their burden as to Van Hove. Other than the fact that she is still employed by Dexia and thus would likely be loyal to the company, there is nothing else to suggest managing agent status. The plaintiffs' argument that by virtue of her title, Van Hove must be a managing agent is unavailing because "whether witnesses fall within the category of 'managing agent' under Rule 32(a)(2) requires a determination of what the employee actually did, rather than what title or position she held." *Globe Savings Bank, F.S.B. v. U.S.,* 61 Fed.Cl. 91 (Fed. Cl., 2004) (citing *Young & Assocs. Pub. Relations, L.L.C. v. Delta Air Lines, Inc.*, 216 F.R.D. 521, 523 (D.Utah, 2003)). Therefore, the Court shall not allow the plaintiffs to depose her.

## III.   *Conclusion and Orders*

For the reasons stated, it is ORDERED that the Plaintiffs' Joint Motion to Compel Depositions of Dexia Bank Belgium through Piet Cordonnier, Bart

Ferrand, and Peter Rabaey (#99 in 03cv15566, #24 in 04cv10411, #38 in 04cv10477 and #28 in 04cv10501) shall be, and the same hereby is, ALLOWED as to Ferrand and Rabaey and otherwise DENIED.  It is FURTHER ORDERED that Plaintiffs' Motion to Compel Depositions of Defendant Dexia Bank Belgium through Jean-Paul Cloes, Catherine Decoutere, Ivan De Coen, Joris Van Helleputte and Nadia Van Hove (#227 in 03cv11566, #79 in 04cv10411, #97 in 04cv10477 and #83 in 04cv10501) be, and the same hereby is, ALLOWED as to De Coen and Van Helleputte and otherwise DENIED.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

July 10, 2006.