## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        :
STONINGTON PARTNERS, INC., a Delaware   :
Corporation, STONINGTON CAPITAL         :    Civil Action No. 04-CIV-10411 (PBS)
APPRECIATION 1994 FUND L.P., a Delaware :
Partnership and STONINGTON HOLDINGS,    :
L.L.C., a Delaware limited liability company, :
                                        :
        Plaintiffs,                     :    **JURY TRIAL DEMANDED**
                                        :
        v.                              :
                                        :
DEXIA BANK BELGIUM (formerly known as   :
ARTESIA BANKING CORP., S.A.),           :
                                        :
        Defendant.                      :
_____:


## FIRST AMENDED COMPLAINT


**BERNSTEIN LITOWITZ BERGER**          **LOONEY & GROSSMAN LLP**
**& GROSSMANN LLP**                     Richard J. Grahn (BBO # 206620)
Max W. Berger                           Charles P. Kindregan (BBO # 554947)
Steven B. Singer                        101 Arch Street
Avi Josefson                            Boston, Massachusetts 02110
1285 Avenue of the Americas             (617) 951-2800
New York, New York 10019
(212) 554-1400

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................... 1

II.  JURISDICTION AND VENUE ............................................................................ 9

III. PARTIES AND PERTINENT NON-PARTIES .................................................... 9

    A.   PLAINTIFFS............................................................................................ 9

    B.   DEFENDANT DEXIA BANK BELGIUM.................................................... 10

    C.   PERTINENT NON-PARTIES ................................................................... 12

IV.  SUBSTANTIVE ALLEGATIONS ........................................................................ 14

    A.   THE DICTAPHONE TRANSACTION......................................................... 14

    B.   THE FRAUD AT L&H............................................................................ 21

    C.   ARTESIA BANKING SUBSTANTIALLY ASSISTED L&H IN THE FRAUD .................... 27

    D.   ARTESIA BANKING DIRECTLY PARTICIPATED IN THE DICTAPHONE
        TRANSACTION, AND KNEW THAT STONINGTON WAS RELYING UPON
        THE ACCURACY OF L&H'S FINANCIAL STATEMENTS ............................................ 58

    E.   THE ARTESIA ENTITIES CAUSED STONINGTON'S LOSSES ...................................... 72

    F.   ARTESIA BANKING LIED TO THE INVESTIGATORS OF THE L&H
        FRAUD TO CONCEAL ITS ROLE IN THE FRAUD ....................................................... 78

V.   THE MATERIALLY FALSE AND MISLEADING STATEMENTS ................................ 82

    A.   PUBLICLY ISSUED FALSE AND MISLEADING STATEMENTS MADE BY
        L&H IN FURTHERANCE OF THE FRAUDULENT SCHEME.......................................... 82

    B.   THE MATERIALLY FALSE AND MISLEADING ANALYST REPORTS
        ISSUED BY ARTESIA SECURITIES IN FURTHERANCE OF THE
        FRAUDULENT SCHEME.......................................................................................... 90

    C.   ARTESIA BANKING IS LIABLE FOR THE MISREPRESENTATIONS THAT
        IT CAUSED ARTESIA SECURITIES TO MAKE .......................................................... 98

VI.  ADDITIONAL FACTS AND CIRCUMSTANCES THAT DEMONSTRATE THE
    ARTESIA ENTITIES ACTED WITH SCIENTER ......................................................... 101

## TABLE OF CONTENTS (Continued)

VII.  THE FRAUD-ON-THE-MARKET PRESUMPTION ........................................................ 107

CLAIMS FOR RELIEF .............................................................................................................. 107

PRAYER FOR RELIEF ............................................................................................................. 119

JURY DEMAND ........................................................................................................................ 120

Plaintiffs Stonington Partners, Inc., Stonington Capital Appreciation 1994 Fund, L.P., and Stonington Holdings L.L.C. (collectively, "Stonington"), by their attorneys, as and for their complaint, allege the following upon knowledge as to themselves and their own actions. As to all other matters, plaintiffs' allegations are based upon investigation of counsel and upon discovery obtained in this action to date.

## I.    PRELIMINARY STATEMENT

1.    This action arises out of the massive fraud that was perpetrated at Lernout & Hauspie Speech Products, N.V. ("L&H" or the "Company") and is related to another action filed in this District, entitled *Stonington Partners, Inc. et al. v. Dammekens et al.*, Civ. No. 02-10303 (PBS) (the "Dammekens Action"). L&H is not a defendant in either action because it filed for bankruptcy and was subsequently liquidated.

2.    Plaintiffs bring the instant action against DEXIA BANK BELGIUM ("Dexia") based on evidence demonstrating that Artesia Banking Corporation, S.A., including its predecessors Banque Paribas Belgium and Bacob Bank C.V. (collectively "Artesia Banking" or "the Bank"), and Artesia Banking's subsidiary, Artesia Securities, S.A. ("Artesia Securities"), were key participants in the fraud perpetrated at L&H. Dexia is liable for the misconduct in which Artesia Banking and Artesia Securities (the "Artesia Entities") engaged because: (a) Dexia is the successor to Artesia Banking; and (b) prior to the time Artesia was merged into Dexia, the Artesia Entities engaged in conduct sufficient to impose liability upon Artesia Banking as a "controlling person" of Artesia Securities. In fact, on June 24, 2003, Dexia stated that it had been indicted (*i.e.*, placed under criminal suspicion) in Belgium for actions taken by Artesia Banking between 1998 and 2000 in connection with the fraud at L&H.

3.      Until the fall of 2000, L&H successfully convinced the investment community that it was the market leader in the field of speech recognition software and related products. In 1998 and 1999, L&H reported "record" revenues and earnings, which were largely attributable to lucrative, multi-million dollar contracts that L&H had entered into with so-called unaffiliated "strategic partners" and with customers in Korea and Singapore. L&H has since admitted that these "record" financial results were false. L&H's "strategic partners" were nothing more than shell corporations funded by entities related to L&H, and the Company's huge revenues from Asia were pure fiction. Many of L&H's customers did not even exist. As a result of this fraud, in May 2001, L&H announced that it would be restating $373 million, or nearly 70%, of its publicly reported revenues from January 1998 through June 2000.

4.      As was belatedly revealed, L&H could not have perpetrated this massive accounting fraud without the knowing assistance of Artesia Banking. Artesia Banking directly established many of L&H's sham strategic partners, providing L&H and its principals with critical off-balance sheet financing, which L&H then utilized to set up so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs"). The LDCs and CLDCs then paid these funds back to L&H in the form of licensing fees, and L&H booked these amounts as revenue. To outside investors, the LDCs and CLDCs appeared to be legitimate customers of L&H that had licensed millions of dollars worth of L&H software. In reality, however, the LDCs and CLDCs were nothing more than corporate shells utilized by Artesia Banking and L&H to enable L&H to artificially inflate its revenues and improperly remove research and development expenses from its books.

5.      At the time it financed these transactions, Artesia Banking understood that the LDCs and CLDCs were nothing more than corporate fictions, with no real assets or operations.

Indeed, Artesia Banking's own internal "risk evaluation" documents, which are quoted in a confidential May 28, 2001 internal report prepared by a panel of experts for prosecutors in Belgium (the "Prosecutors' Report"), summed up the strategic partners as follows: "In actuality *these companies represent nothing (no activities, no assets)*."  (Emphasis supplied).

6.     Artesia Banking also understood that L&H was responsible for ensuring that the loans would ultimately be repaid.  Indeed, because Artesia Banking understood that the LDCs were shams, Artesia Banking demanded that L&H's most senior officers, Pol Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert") (collectively, the "L&H Principal Officers") personally guarantee the loans Artesia Banking extended.  This presented an enormous problem for L&H, however.   As Artesia Banking knew, under U.S. Generally Accepted Accounting Principles ("GAAP"), if L&H's officers personally guaranteed these loans, L&H could not book revenue from these purported licensing agreements.  Moreover, the LDCs would be considered "related parties" to L&H, and that fact would have to be disclosed on L&H's financial statements, thus revealing the sham nature of these agreements.

7.     To solve this problem, Artesia Banking devised a scheme that would still protect its interests and, at the same time, conceal the fact that Hauspie, Lernout and Willaert were personally guaranteeing the loans to the strategic partners.  Specifically, Artesia Banking entered into secret side agreements with these L&H officers called "credit default swaps."   In effect, these agreements were nothing more than guarantees that were contained in side letters and not in the loan documents.  By not disclosing the existence of these side letters to the SEC or the investing public, Artesia Banking was able to hide the fact that the L&H Principal Officers were personally guaranteeing the loans, and L&H was able to fraudulently record the entire amount of the licensing fees as revenue without making any "related party" disclosure.  Artesia Banking's

nefarious conduct had a dramatic impact on L&H's publicly reported financial results.  In total, Artesia Banking made loans worth almost $60 million to L&H-related parties between 1997 and 1999, all of which L&H improperly booked as revenue.

8.     Artesia Banking's own internal documents confirm that it knowingly entered into these credit default swaps for the express purpose of defrauding the SEC and the investing public.  For example, an email from P. Rabaey at Artesia Banking to G. Dauwe and other Artesia Banking employees, dated September 21, 1999, which is also quoted in the Prosecutors' Report, states, "[t]he private guarantees, however, were not signed by Jo [Lernout], Pol [Hauspie] and Nico [Willaert] in order to avoid possible problems with the SEC.  We therefore do not have the guarantees, and a solution is sought via credit default swaps." (Emphasis added).

9.     Perhaps the largest victim of this fraud was Stonington.  On or about May 5, 2000, Stonington sold its 96% ownership interest in Dictaphone Corporation ("Dictaphone") to L&H in exchange for approximately $490 million in L&H stock (the "Dictaphone Transaction").  Within approximately six months of that transaction, Stonington's L&H stock was worthless.

10.     Artesia Banking directly participated in L&H's fraudulent acquisition of Dictaphone.  Indeed, Artesia Banking directly facilitated the Dictaphone Transaction by providing to L&H the critical financing it needed to acquire  Dictaphone.  Artesia Banking provided that financing despite its knowledge that the Dictaphone Transaction was a stock-for-stock deal in which Stonington would be receiving nearly $500 million in L&H stock, and that Stonington would necessarily rely on L&H's previously reported financial results in entering into the Transaction.  In addition, Artesia Banking, concerned that it would not be repaid for its extensive funding of the sham LDCs expressly conditioned its financing of L&H's acquisition of

Dictaphone on L&H's agreement to have Artesia Banking's loans to finance the sham LDCs repaid – a true quid pro quo that directly benefited Artesia Banking.

11.    Among other reasons, Artesia Banking knowingly engaged in this fraudulent scheme to manipulate the market price of L&H securities so that the Bank could sell shares of L&H at inflated prices and reap substantial profits.  In particular, according to internal Artesia Banking documents produced in discovery, the Bank held nearly one million shares of L&H stock between 1996-2000 and received pledges of several hundred thousand additional shares of L&H stock as collateral for loans that Artesia Banking extended to L&H, the L&H Principal Officers, or entities controlled by L&H.  Thus, Artesia Banking had a powerful financial incentive to participate in the fraudulent scheme and to cause L&H to falsely inflate the value of the Company's shares, as such inflation would increase the worth of Artesia Banking's L&H shares and the above-mentioned collateral.

12.    Indeed, Artesia Banking directly benefited from the fraudulent inflation of the price of L&H securities by selling hundreds of thousands of shares of L&H stock for substantial profits.  In particular, according to documents produced by Dexia in discovery, Artesia Banking sold the following amounts of L&H common stock at a substantial profit in the years noted below:

| YEAR | # OF SHARES SOLD |
| --- | --- |
| 1996 | 100,588 |
| 1997 | 301,176 |
| 1998 | 255,176 |
| 1999 | 52,000 |
| 2000 | 570,472 |

In fact, Artesia Bank received a profit in excess of $10 million just on the 570,472 shares of L&H stock it sold in 2000 alone, including thousands of shares it sold at the same time that it was facilitating the Dictaphone Transaction.

13.     Artesia Banking furthered the fraudulent scheme perpetrated by L&H's officers and Artesia Banking by causing its wholly-owned subsidiary, Artesia Securities, to repeatedly issue glowing analyst reports concerning L&H's financial performance and prospects. The false positive statements made in those analyst reports were attributable to Artesia Banking because they were made at Artesia Banking's direction and within the scope of Artesia Securities' role as Artesia Banking's agent. Furthermore, by causing its agent, Artesia Securities, to issue those positive reports, Artesia Banking became obligated to disclose to Plaintiffs and other investors the adverse information in Artesia Banking's possession concerning L&H, including Artesia Banking's role in creating fraudulent revenue for L&H through the use of the LDCs. Artesia Banking did not disclose that material information, however, and the market only gradually became aware in late 2000 that the revenue generated by means of the fraudulent scheme in which Artesia Banking participated was the product of fraud.

14.     In return for its knowing participation in this fraud, in addition to the substantial money the Bank received from selling fraudulently inflated shares of L&H stock, Artesia Banking was able to continue to receive lucrative banking and investment fees, while providing L&H's major shareholders, including Lernout, Hauspie, and others, with substantial wealth through their fraudulently inflated L&H stock. In addition, Artesia Banking charged excessive interest rates in connection with these loans and received equity "kickers" based on an understanding that L&H ultimately would arrange for buy-outs of the strategic partners at a

premium. In effect, Artesia was guaranteed high returns and a future pay-off in return for financing the fraudulent transactions at the outset.

15. Ultimately, a substantial portion of Artesia Banking's loans were repaid with funds obtained by L&H from unsuspecting investors in the LDCs initially financed with Artesia Banking's funds. Artesia Banking and L&H thereby consummated a classic Ponzi scheme in which Artesia Banking provided the initial funding of the LDCs to create the illusion that the LDCs had actual investors and capital, in order to lure new investors to fund the LDCs, at which point Artesia Banking's loans were repaid.

16. The fraud at L&H began to unravel in August 2000 when reporters at *The Wall Street Journal* investigating L&H's skyrocketing sales discovered that a number of customers whom L&H claimed to do business with disputed that claim. Thereafter, L&H's Audit Committee commenced an investigation and, over the course of several weeks, it was revealed that the LDCs and CLDCs financed by Artesia Banking were shams, and that the licensing fees L&H received from these entities should never have been booked as revenue.

17. On November 8, 2000, the Company announced that, as a result of accounting "errors and irregularities," it would be required to restate its financial results for fiscal years 1998 and 1999 and first two quarters of 2000. "Irregularities" is a term of art in the accounting profession that signifies intentional accounting improprieties.

18. Since that time, L&H has been liquidated and Lernout, Hauspie, and Willaert have all been arrested in Belgium.

19. On June 24, 2003, Dexia announced that the Belgian prosecutor investigating the L&H fraud had indicted Dexia for actions taken by Artesia Banking in connection with L&H in 1998 through 2000. Until then, Artesia Banking's role in the fraud had not been disclosed. The

next day, on June 25, 2003, an article in *De Financieel Economische Tiqd* (a/k/a/ the "*Belgian Financial Times*") entitled "Artesia Knew [L&H] Was Playing With Fire" reported that, according to the Belgian investigators, Artesia Banking was "an exceptionally important banker to [L&H] involved in just about everything surrounding [L&H]." Belgian prosecutors had secretly seized records from Artesia Banking in February 2001 which "contained a treasure of information" regarding the L&H fraud. According to the article, these records (which are not available to Stonington or the public) show that Artesia Banking made multiple loans in 1998 and 1999 totaling tens of millions of dollars, which were then used to artificially inflate L&H's revenues. The article also reported that, according to the Belgian Justice Department, Artesia Banking "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC."

20. In 2005, Plaintiffs learned that, in addition to Dexia itself, the Belgian prosecutor had also personally indicted two employees of Artesia Banking: Geert Dauwe, who served as the Director of Artesia Banking's Management Committee before leaving the Bank in the wake of the criminal investigation; **REDACTED** **REDACTED** **REDACTED** **REDACTED** **REDACTED** **REDACTED** **REDACTED** **REDACTED**. The prosecutor subsequently determined to bring formal charges against Dexia and Geert Dauwe.

II.    **JURISDICTION AND VENUE**

21.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and the rules and regulations promulgated thereunder, including Securities Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5, and under state law.  In connection with the acts, conduct, and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities markets.

22.    This Court has subject matter jurisdiction pursuant to Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

23.    Venue is proper in this District under Section 27 of the 1934 Act, 15 U.S.C. §78aa, and Section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b).  L&H maintained its United States offices in this district.  Further, the wrongs alleged herein occurred in substantial part in this district, including the preparation and dissemination of false and misleading information.

III.    **PARTIES AND PERTINENT NON-PARTIES**

A.    **PLAINTIFFS**

24.    Plaintiff Stonington Partners, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Stonington Partners, Inc. is the management company of plaintiff Stonington Capital Appreciation 1994 Fund, L.P.

25.    Plaintiff Stonington Capital Appreciation 1994 Fund, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.  Prior to May 5, 2000, Stonington Capital Appreciation 1994 Fund, L.P. owned approximately 96% of the issued and

outstanding capital stock of Dictaphone Corporation. Pursuant to the Merger Agreement between L&H and Dictaphone, Stonington Capital Appreciation 1994 Fund, L.P. (the "Capital Appreciation Fund") is the beneficial holder of 9,064,329 shares of L&H common stock.

26.    Plaintiff Stonington Holdings, L.L.C. is a Delaware limited liability company with its principal place of business in New York, New York. Pursuant to the Merger Agreement between L&H and Dictaphone, Stonington Holdings, L.L.C. is the record holder of 8,478,929 shares of L&H common stock (with another 585,400 shares held in escrow for the benefit of Stonington so that the Capital Appreciation Fund is the beneficial owner of a total of 9,064,329 shares).

## B.    DEFENDANT DEXIA BANK BELGIUM

27.    Defendant Dexia Bank Belgium is a wholly-owned subsidiary of Dexia S.A. and at all relevant times regularly transacted business in the United States by virtue of having its Dexia Bank New York branch headquartered in New York City. Dexia Bank Belgium has conceded in prior pleadings in the consolidated actions that it is subject to personal jurisdiction in the District of Massachusetts for purposes of this litigation.

28.    Until in or about July 2001, Artesia Banking was a wholly-owned subsidiary of Acrofin CVBA, a Belgian financial services group. On March 31, 2001 Dexia S.A. announced that it was acquiring Artesia Banking from Acrofin, and that Artesia Banking would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium. That merger was consummated in or about April 2002.

29.    Artesia Banking continuously and systematically transacted business in the United States prior to its acquisition by Dexia through its subsidiaries. Artesia Banking's wholly-owned subsidiary Artesia Mortgage Capital Corp. ("Artesia Mortgage"), conducted

business in the United States through its headquarters in Delaware and offices at 1180 NW Maple St. Suite 202, Issaqua, Washington 98027. Artesia Mortgage continues to conduct business under the same name although it is now owned by Dexia instead of Artesia Banking, and since 1996, has closed loans with a principal balance of approximately $2 billion. Artesia Banking also conducted business in the United States prior to its acquisition by Dexia through its wholly-owned subsidiary Artesia North America (which was headquartered in Delaware), and Artesia Securities, which had offices in New York. Finally, Artesia Banking was a member of the bank lending syndicate that provided $430 million in financing to L&H for the acquisition of Dictaphone. The borrowers of the funds were Dictaphone (of Stratford, Connecticut), L&H, and the FLV Fund, jointly and severally.

30. During the time period prior to July 2001, Artesia Securities was a "societe anonyme" that conducted business primarily in Belgium from its offices in Brussels. Artesia Securities was a wholly-owned subsidiary of Artesia Banking, which also served as the "reference shareholder" of Artesia Securities. A reference shareholder is a shareholder who exercises controlling influence on the manner in which a company is run and which is actively involved in devising the company's business strategy. As set forth in greater detail at ¶¶ 265 to 277 below, by virtue of its status as reference shareholder of Artesia Securities, Artesia Banking exercised absolute control over the operations of Artesia Securities, particularly with respect to Artesia Securities' actions related to the issuance of analyst reports concerning L&H. In February 2002, after Dexia had acquired Artesia Banking, Artesia Securities changed its name to Dexia Securities Belgium S.A. ("Dexia Securities"). In April 2002, Artesia Banking was merged into Dexia Belgium, with Dexia Belgium as the surviving entity.

### C.   PERTINENT NON-PARTIES

#### 1.   L&H

31.    L&H was formed in 1987 by Lernout and Hauspie.  Its three core technologies were automatic speech recognition, text-to-speech conversions, and digital speech compression. L&H was jointly headquartered in Ieper, Belgium, and in Burlington, Massachusetts and, until November 9, 2000, it was listed on the NASDAQ exchange under the symbol LHSP.  On November 29, 2000, L&H filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware and, shortly thereafter, commenced bankruptcy proceedings in Belgium.  L&H has since been liquidated.

#### 2.   L&H's Senior Officers

32.    Jo Lernout was a co-founder of L&H and served as the Managing Director of its Board from L&H's organization in 1987 through 2000; L&H's President from January 1994 until October 1996; L&H's Co-Chairman from October 1996 through 2000; member of L&H's Office of the Chief Executive from February 1996 through 2000; and L&H's Co-Chairman in the Office of the Chief Executive from October 1996 through 2000.  Lernout resigned his management position with the Company on November 9, 2000 and director position on January 16, 2001.

33.    Pol Hauspie was a co-founder of L&H and served as a Managing Director from L&H's organization in 1987 through 2000; Chairman from January 1994 until October 1996; Co-Chairman from October 1996 through 2000; member of the Office of the Chief Executive from February 1996 through 2000; and Co-Chairman in the Office of the Chief Executive from October 1996 through 2000.  Defendant Hauspie resigned his management positions on November 9, 2000 and director position on November 22, 2000.

34.     Gaston Bastiaens was the President of L&H from October 1996 and Chief Executive Officer from May 1997 until his resignation on August 25, 2000. Bastiaens resigned his director position on November 22, 2000. Bastiaens is a defendant in the *Stonington, et al. v. Bastiaens*, Civ. No. 1:03-10642 (PBS), which is pending in this Court and has been consolidated with the Dammekens Action.

35.     Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller and served as Senior Vice President of Finance from 1993 to 1996, and as Acting Chief Financial Officer of L&H from 1996 to July 1999. Dammekens was appointed Chief Financial Officer on July 7, 1999. Dammekens resigned his position with the Company as Chief Financial Officer on November 9, 2000. Dammekens was a defendant in the Dammekens Action brought by Stonington. Stonington asserted claims against Dammekens pursuant to Section 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and negligent misrepresentation. Dammekens never appeared in that action and is in default.

36.     Nico Willaert was, at all relevant times, Managing Director and Vice Chairman of L&H until his resignation on November 9, 2000. Willaert was a director of L&H until his resignation from that position on November 22, 2000.

37.     Lernout, Hauspie, and Willaert are not named defendants in this Action because they are named as defendants in another action filed by Stonington in the Court of Chancery of the State of Delaware (the "State Court Action"), which sought rescission of the Dictaphone Transaction and monetary damages. Default judgments have been entered in that action against Lernout, Hauspie and Willaert. Lernout, Hauspie, and Willaert would be named as defendants here were it not for the pendency of the State Court Action.

IV.    **SUBSTANTIVE ALLEGATIONS**

38.    In 1995, L&H completed its initial public offering and commenced trading on NASDAQ.  From 1987 through 1995, the Company was never profitable and only produced a few million dollars in annual revenues.

39.    Beginning in the third quarter of 1996, L&H started rapidly expanding its business, primarily through a dizzying array of acquisitions.  As a result, L&H's sales quadrupled from 1995 to 1996, kicking off a period of unprecedented growth for L&H which made the Company an international success story and the pride of Belgium.

40.    From 1997 to June 2000, L&H reported incredible revenue growth – which, as it turns out, was largely the consequence of undisclosed related-party transactions and fraudulent accounting.  In 1997, the Company's total revenues increased 320% to $99.4 million from $31 million in 1996.  In 1998, L&H's revenues purportedly rose 213% to $211.6 million, and by 1999, the Company reported total annual revenues of $344 million.

A.    **THE DICTAPHONE TRANSACTION**

41.    In July 1999, Stonington was approached by L&H and SG Cowen Securities Corporation, a securities and investment banking firm, regarding a proposed acquisition of Dictaphone.  Although this initial overture was not fruitful, L&H tried again in early 2000.  At the time, Dictaphone was one of L&H's competitors in the "speech and language applications" sector.  Unbeknownst to Stonington, which owned 96% of Dictaphone's outstanding stock, Dictaphone was about to become merely the latest in a series of acquisitions completed by L&H through the use of its artificially inflated stock.

42.    At the time of the Dictaphone Transaction, Dictaphone was headquartered in Stratford, Connecticut, and was a leader in selected vertical markets in the development,

manufacture, marketing, service and support of integrated voice and data management systems and software, including dictation, voice processing, voice response, unified messaging, records management, call center monitoring systems and communications recording.

43.     Dictaphone was known worldwide for its medical record workflow systems and its transcription business.  Indeed, Dictaphone's market penetration in this sector is noteworthy: according to industry analysts, as many as 400,000 physicians in the United States used Dictaphone to dictate 100,000 hours of dictation each day for clinical record processing.

44.     At the time of the Dictaphone Transaction, Dictaphone's healthcare market assets included its 5,000 medical industry customers worldwide, its 100 sales representatives, its strong national network of technical service representatives, its experienced executive management team, and its broad range of solutions for medical industry dictation and data management.

45.     The acquisition of Dictaphone, recognized by L&H management as "a leader in the medical dictation and patient record management market," was therefore an integral step in L&H's plans to form a powerful Healthcare Enterprise business group with immediate access to Dictaphone's large customer base and the opportunity to integrate leading technologies to create new healthcare enterprise market solutions.  The acquisition of Dictaphone would also provide L&H with a wide range of assets with which to further its healthcare business strategies.

46.     In acquiring Dictaphone, L&H intended to capitalize on Dictaphone's healthcare market revenues of $130 million in 1999, and its noteworthy market penetration in this area.

47.     L&H also recognized that access to Dictaphone's products and other resources, such as Dictaphone's document creation solutions, including its digital portable hand held voice recorders, transcription job administration and document distribution offerings, would further enable L&H to realize its plans for development of its enterprise healthcare solution.

48.    For its part, Stonington was intrigued by L&H's overtures because of L&H's apparent financial success in a market compatible with Dictaphone's.    Moreover, L&H's revenues and stock price were rising and continued to rise throughout the course of the discussions between Stonington and L&H.

49.    In agreeing to negotiate with, and ultimately enter into an agreement with L&H, Stonington believed that it would realize the potential synergies that a combination of the two companies and their technology and geographic market coverage promised.

50.    Specifically, based on what L&H represented as its extraordinarily positive results in the Asian and European markets, and Dictaphone's well-established United States presence, Stonington entered into the transaction with an expectation that an integration of the two companies would make the combined entity a worldwide leader in the speech recognition business.

51.    In deciding to enter into the Dictaphone Transaction, Stonington relied on L&H's publicly reported financial results for 1997, 1998, and 1999.  Indeed, on February 9, 2000, L&H issued a press release reporting its results for the fourth quarter and full year 1999, and republishing its financial results for the fourth quarter and full year 1998.  L&H reported "record" revenues of $344 million in 1999, an increase of nearly 63% over 1998 reported revenues.

52.    The proposed transaction was a stock-for-stock swap pursuant to which Stonington would receive not cash but shares of L&H common stock.  In addition, as part of the transaction, Stonington was precluded for two years from selling approximately 4 million of the 9 million shares of L&H common stock it received.  For that two-year period, Stonington was

required to assign certain voting rights to all the L&H shares it held to a voting trust controlled by Jo Lernout and Pol Hauspie.

53.    With these facts in mind, Stonington retained legal and financial advisors to conduct due diligence of L&H in the months leading up to the Closing Date of May 5, 2000 (the "Closing Date"). Stonington was assisted in its accounting due diligence by the accounting firm of Deloitte & Touche LLP ("D&T"). As part of the due diligence, Stonington and D&T held a series of face-to-face and telephonic meetings with L&H, its outside auditors (KPMG Belgium and KPMG U.S.), and its investment bankers (SG Cowen Securities Corp.), visited certain L&H facilities, and reviewed L&H's financial statements and documents provided by L&H and KPMG. During this process, Stonington requested copies of the most significant contracts L&H had entered into in 1999, and reviewed a number of contracts with strategic partners.

54.    From an accounting standpoint, Stonington identified L&H's revenue recognition practices as a key area and focused on it throughout the due diligence process. Stonington asked many questions relating to (a) revenue recognition and the Company's licensing arrangements, (b) the nature of L&H's most significant contracts, including royalty agreements, licensing agreements, and contracts with strategic partners; (c) L&H's billing practices, including the nature of unbilled receivables; (d) the nature of all of L&H's related-party arrangements; and (e) the accounting for contract revenues on various consulting and services contracts. Stonington also specifically asked if the Company's revenue recognition practices were consistent at all L&H locations and made a request for L&H's revenue recognition policies for all significant revenue streams within each business segment. During these discussions, Stonington was repeatedly assured by L&H management, and the Company's auditors, KPMG Belgium, and KPMG LLP that the Company's financial statements complied with U.S. GAAP and were

accurate and reliable. Stonington was also assured by these individuals and entities that KPMG's audit of the 1999 financial statements was nearly complete, and that there would be no material changes to L&H's previously published financial results when the audit was finished. Further, Stonington was specifically assured that all of the revenue attributable to L&H's strategic partners that L&H had recorded in 1998 and 1999 had been recorded in accordance with U.S. GAAP.

55.     In spite of Stonington's reasonable due diligence conducted in early 2000, Stonington did not learn of Artesia Banking's role in the fraud. The underlying information relating to defendant's misconduct and the particulars thereof were not available to Stonington and the public, and remained exclusively within the possession and control of L&H and Artesia Banking. Stonington first learned of Artesia Banking's role in the fraud when a story in the Belgian press, dated June 25, 2003, reported that Dexia had been placed under criminal investigation and indicted by the Belgian prosecutor.

56.     Following this due diligence process, L&H, Stonington and Dictaphone entered into a series of agreements beginning on or about March 7, 2000 pursuant to which L&H would acquire Dictaphone from Stonington in a stock-for-stock deal. L&H agreed to acquire all of the outstanding stock of Dictaphone, in exchange for 9,064,329 shares of L&H common stock and the assumption of approximately $400 million of Dictaphone debt and other obligations.

57.     This series of agreements included several documents detailing the terms of the transaction: (1) the Agreement and Plan of Merger among L&H, Dark Acquisition Corp. and Dictaphone Corporation, dated March 7, 2000; (2) a Stockholder Letter of Transmittal, Indemnity and General Release Pursuant to Agreement and Plan of Merger; (3) an Indemnity and Escrow Agreement by and among L&H, Stonington and other Dictaphone Stockholders and

State Street Bank and Trust Company as escrow agent, dated as of May 5, 2000; (4) an Agreement of Limited Liability Company between Stonington Capital Appreciation 1994 Fund, L.P. and L&H Holding N.V., dated as of May 5, 2000; (5) a Stockholders Agreement among Stonington Holdings, L.L.C., LEHA, L&H Holding N.V., L&H Holding III, Oldco N.V., L&H Investment Company N.V. and L&H, dated as of May 5, 2000; (6) a Voting Agreement and Waiver by and among L&H, Dark Acquisition Corp. and Stonington Capital Appreciation 1994 Fund, L.P., dated March 7, 2000; and (7) a Registration Rights Agreement among L&H and the Dictaphone Stockholders, dated May 5, 2000. These documents are collectively referred to herein as the "Merger Agreements."

58.    The Merger Agreements contained various representations and warranties pursuant to which L&H warranted the truth and accuracy of its financial statements and SEC filings. In Section 4.4 of the Agreement and Plan of Merger, L&H (referred to as "Buyer") represented that:

> (a)   Buyer has filed and made available to [Dictaphone] all forms, reports and documents required to be filed with the SEC since January 1, 1997. Buyer's Registration Statement on Form F-3 (File No. 333-11324), filed with the SEC on January 7, 2000 . . . (i) was prepared in compliance in all material respects with the applicable requirements of the Securities Act and the Exchange Act, as the case may be, and the rules and regulations of the SEC thereunder applicable to such Buyer Registration Statement, and (ii) does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

> (b)   Each of the consolidated financial statements, as amended (including, in each case, any related notes or schedules), contained in the Buyer Registration Statement were prepared in accordance with US GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes to such financial statements or, in the case of unaudited statements as permitted by the SEC on Form 6-K under the Exchange Act) and fairly presented in all material respects the consolidated financial position of Buyer and its

> Subsidiaries as of the dates of the consolidated results of its operations
> for the periods indicated, consistent in all material respects with the
> books and records of Company and its Subsidiaries . . .

59.     L&H also represented in the Merger Agreements that there had been no material

adverse changes in its business since the date of its most recently filed quarterly financial

statements, which were for the quarter ended September 30, 1999.  In Section 4.6 of the

Agreement and Plan of Merger, L&H represented that:

> Except as expressly contemplated by this Agreement, as disclosed in the
> Buyer SEC Reports or Company press releases filed or issued prior to the
> date hereof, or in connection with the matters disclosed at Section 4.5 of
> the Buyer Disclosure Schedule that Buyer has discussed with Company
> prior to the date hereof, since September 30, 1999, there has not been (i)
> any change in the financial condition, results of operations, business, or
> properties of Buyer and its Subsidiaries, taken as a whole, that has had, or
> is reasonably likely to have, a Buyer Material Adverse Effect; (ii) any
> damage, destruction or loss to property (whether or not covered by
> insurance) with respect to Buyer or any of its Subsidiaries having a Buyer
> Material Adverse Effect; (iii) any revaluation by Buyer of its assets having
> a Buyer Material Adverse Effect, exclusive of any revaluations (including
> write-downs or write-offs) of good will; or (iv) any other action or event
> that would have required the consent of Company pursuant to Section 5.3
> of this Agreement had such action or event occurred after the date of this
> Agreement

"Buyer Material Adverse Effect" is defined in Section 4.1 of the Agreement and Plan of Merger

as "a material adverse effect on the ability of Buyer to consummate the transactions

contemplated by this Agreement."

60.     Stonington was entitled to terminate the Merger Agreements prior to closing if it

learned that L&H's financial statements or results were materially misstated.  The Merger

Agreements made the lack of a material adverse change in L&H's financial condition a

precondition to the obligation of Stonington to complete the merger.  Section 7.3(a) of the

Agreement and Plan of Merger provides in relevant part:

(i) The representations and warranties of Buyer and Sub set forth in this Agreement that are not qualified as to Buyer Material Adverse Effect shall be true and correct, except where failure to be true and correct would not have a Buyer Material Adverse Effect, as of the Closing Date, as though made at and as of the Closing Date, except that those representations and warranties that address matters only as of a particular date shall so remain true and correct as of such date.

(ii) The representations and warranties of Buyer and Sub set forth in this Agreement that are qualified as to Buyer Material Adverse Effect shall be true and correct in all respects as of the Closing Date, as though made at and as of the Closing Date, except that those representations and warranties that address matters only as of a particular date shall remain so true and correct in all respects as of such date . . .

61.    As alleged below at ¶169, Artesia Banking had actual knowledge of the representations and warranties (and other terms) set forth in the Merger Agreements, and thus knew that Stonington was relying upon the accuracy and integrity of L&H's financial statements when Artesia Banking financed the Transaction..

62.    On April 27, 2000, KPMG issued a clean and unqualified audit report on L&H's financial statements for 1999, confirming what Stonington had been told during the due diligence process.   Ten days later, on May 5, 2000, the Dictaphone Transaction was consummated. Stonington received 9,064,329 shares of L&H common stock in exchange for its interest in Dictaphone, which, based upon the trading price of L&H stock on the Closing Date ($53.97 per share), were valued at approximately $490 million.   Only six months later, after the fraud was disclosed, Stonington's shares of L&H stock would be worthless.

**B.    THE FRAUD AT L&H**

63.    As has now become apparent, and as more fully detailed in the Amended Complaint filed in connection with the *Dammekens* action, discussed *supra*, L&H's business was a complete sham.

21

64.    As a result of the Dictaphone Transaction, L&H became subject to additional SEC reporting requirements, including providing a geographic breakdown of revenues in its SEC filings.  This information, which was disclosed for the first time in L&H's quarterly report filed on SEC Form 10-Q on June 30, 2000, revealed that a significant portion of the Company's total revenues in 1999 were from two countries in Asia:  Singapore and Korea.  In 1999, L&H's revenue totaled $344.2 million.   Of that amount, Korea accounted for $62.9 million and Singapore accounted for $80.3 million in revenue.  By comparison, in 1998, those two countries accounted for less than $300,000 in combined sales.

65.    After the June 30, 2000 Form 10-Q was filed, reporters from *The Wall Street Journal* commenced an investigation into L&H's customers in Singapore and Korea.  It began reporting the results of this investigation in an article published on August 8, 2000.  The article disclosed that many of the companies which L&H had identified as customers had denied that they did business with L&H:

> *. . . [S]ome companies that L&H has identified as Korean customers say they do no business at all with L&H.  Others say their purchases have been smaller than L&H says.*  L&H officials now acknowledge they made some mistaken initial representations about customers.  But the company disputes other accounts given by some of the Korean companies, and it insists its Korean revenue figures are accurate.
>
> . . .   In all, 18 of about 30 companies claimed by L&H as customers were contacted by this newspaper.
>
> Three of the companies say they aren't, in fact, L&H customers.  L&H says one of those was a former Bumil customer, and was mistakenly put on its list.   Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens or Sam Cho, vice president of L&H Korea.  One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims.   Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the

company itself, had purchased products from L&H.    Later, the company retracted this initial version.

All told, of the 13 companies that responded to inquiries about their purchases from L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million.  From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million. . . .

[Emphasis added.]

66.    Although L&H attempted to deny these allegations and claimed that all Korean revenues were accurate, on August 15, 2000, *The Wall Street Journal* reported that L&H had commissioned a mid-year interim audit of the company by KPMG.  The goal of the audit was to "allay concerns about the financial results of [L&H's] South Korean division."

67.    On August 25, 2000, L&H announced that Bastiaens had resigned from his position as president and CEO of L&H.  Bastiaens was replaced by John Duerden, the former CEO of Dictaphone.  Bastiaens remained a director of L&H.

68.    On September 22, 2000, *The Wall Street Journal* reported that the SEC had commenced an investigation into L&H's accounting practices in January 2000.  In fact, on or about January 24, 2000, the SEC had issued a request for documents to L&H, which focused on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners."  Subsequently, the SEC raised the status of the investigation to "formal."

69.    On September 22 and 26, 2000, *The Wall Street Journal* also raised significant additional questions about L&H's revenue and the strategic partners, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999.

23

70.    On September 26, 2000, *The Wall Street Journal* reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H.

71.    On October 18, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the Company's 1999 revenues and 10% of its 1998 revenues.  While L&H admitted that it had helped start the 30 companies and initially financed their operations, the Company maintained that the firms were owned by independent investors interested in developing new applications for L&H speech software.  L&H released new details about the operations of 17 of the 30 companies, which revealed that these companies had no real corporate existence whatsoever, and certainly no economic substance apart from L&H.  Of these 17 companies, none had any direct employees. Seven companies were relying on L&H employees to do work for them and had agreed to repay L&H for its services.  The other 10 had not started developing software, though they had paid hefty licensing fees to L&H.  According to *The Wall Street Journal*, the 30 companies were all registered at just a few common addresses in Belgium and Singapore, and many had common officers and nominee shareholders.

72.    On November 9, 2000, L&H issued a press release announcing that as a result of accounting "errors and irregularities," the Company would need to restate its previously issued financial statements for 1998, 1999 and the first two quarters of 2000:

> [a]s a result of certain errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000. Although the audit committee is working diligently to determine the impact of these discrepancies on L&H's financial statements for these periods, L&H does not expect the audit and necessary restatements to be completed by November 14, 2000. Accordingly, the Company does not believe that its Form 10-Q for

> the third quarter ended September 30, 2000 will be filed in a timely
> manner.

The Company also warned that its third quarter 2000 revenues would "be at least $40 million below its previously published range of $165 to $185 million." The Company also announced that: (1) Lernout and Hauspie had both resigned their posts as executive co-chairmen, but intended to remain on L&H's Board of Directors; (2) John Duerden, the newly appointed CEO, had been appointed the sole Managing Director; (3) Roel Pieper had been appointed Chairman of the Board; (4) a new CFO would be appointed by Duerden; and (5) Willaert would step down as managing director.

73.     L&H's announcement of "accounting irregularities" was, in accounting terms, tantamount to an admission of fraud. Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements, meaning that there was fraud in their preparation.

74.     In response to these revelations, on November 9, 2000, both NASDAQ and EASDAQ suspended trading in L&H stock. Prior to the suspension, the price of L&H on the NASDAQ market fell as low as $6.2188. After trading finally resumed on December 8, 2000, the stock fell to $1.40 per share and, by December 12, 2000, the stock was trading at less than $1.00 per share.

75.     On November 17, 2000, following months of allegations, investigations and admissions of irregularities, *The Wall Street Journal* reported that KPMG had finally withdrawn its audit report on L&H's 1998 and 1999 financial statements, stating that its prior audit opinions "should no longer be relied upon."

76.     On November 29, 2000, L&H filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware.

77.     On December 14, 2000, *The Wall Street Journal* again reported on the thirty "strategic partners" that comprised a significant portion of L&H's revenues.

78.     On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report, which had previously been presented to the L&H Board of Directors on November 20, 2000.  The Audit Committee Report concluded, in part, that:  (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) many of the "strategic partners" were in fact related parties to L&H; and (c) L&H had improperly booked tens of millions of dollars in revenue attributable to the LDCs and CLDCs.

79.     On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

80.     On March 2, 2001, L&H announced that co-founder Lernout had been forced to step down as chief technology officer.  Lernout had been the last remaining senior executive from the time the accounting scandal erupted.

81.     On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation.  On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant.  Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation, and accounting law violations.

C.    ARTESIA BANKING SUBSTANTIALLY ASSISTED L&H IN THE FRAUD

82.    As detailed below, Artesia Banking knowingly participated in the fraud at L&H by providing loans that it knew L&H was fraudulently booking as revenue.  Artesia Banking knew that it was making the loans to shell corporations created and controlled by L&H, which, in turn, were paying these funds to the LDCs and CLDCs, which had no legitimate business operations.  Artesia Banking also knew that these funds were then being paid back to L&H in the form of licensing fees that L&H improperly booked as revenue.  Furthermore, Artesia Banking devised a scheme to minimize its own risks relating to these loans through the use of credit default swaps.  This scheme allowed L&H's senior officers to guarantee Artesia Banking's loans while, at the same time, fraudulently concealing that fact from the SEC and investors.

83.    Recognition of revenue by L&H from these Artesia Banking loans was improper under U.S. GAAP for at least two reasons.  First, because the LDCs were related parties, under GAAP the "revenue" which L&H recorded should actually have been recorded as liabilities of the Company.  It is axiomatic under U.S. GAAP that L&H cannot recognize as revenue loans that it ultimately must repay.   Second, revenue recognition was improper because the transactions with the LDCs and CLDCs lacked any economic substance.  The LDCs and the CLDCs had no operations, employees, assets, products, or customers.  There simply were no end-users purchasing any products from the CLDCs, LDCs or L&H.  Accordingly, the revenue recognized by L&H from these Artesia Banking loans was a flagrant violation of U.S. GAAP, and Artesia Banking was fully aware of this fact.  Furthermore, even if there was some economic substance to these transactions, L&H's financial statements would still have been materially false and misleading, for, at best, the transactions between L&H and the strategic parties were

27

"related party" transactions, the nature of which had to be fully disclosed to investors under the most basic provisions of GAAP.

### Artesia Banking's Loan to Dictation Consortium

84.     The groundwork for the LDC/CLDC element of the L&H fraud was laid in the early days of L&H's existence as a public company. In 1996, L&H formed a shell company, Dictation, to develop software for L&H. L&H then turned to friends as "outside" investors to fund Dictation. As a result of L&H's efforts, on December 31, 1996, FLV Fund and FLV Management purchased a total of 61% of Dictation. In 1997, this stake was reduced to 43%. On December 7, 2000, The Wall Street Journal reported that the remaining unnamed private investors "were companies incorporated in the secrecy and tax havens of Luxembourg and the British Virgin Islands, their owners undisclosed." In December 1996, L&H entered into a very profitable licensing agreement with Dictation. Pursuant to this agreement, Dictation provided L&H with a $26.6 million "licensing fee," a payment that constituted 25% of L&H's 1996 sales, and 19% of L&H's 1997 sales.

85.     At the behest of L&H, Artesia Banking provided financing that was instrumental to the Dictation project and in so doing took its first steps to join in the fraudulent scheme to falsely inflate the revenues of L&H.

86.     According to internal Artesia Banking documents obtained from Dexia in discovery, it was during the negotiations for the Dictation financing (sometime in 1996) that Artesia Banking first learned – from L&H's lawyers and auditors – that under U.S. accounting rules L&H could not recognize any revenue on deals with third parties such as Dictation unless Dictation and its financing were kept absolutely independent of L&H. In particular, L&H

provided an accounting opinion to Artesia Banking in 1996, which the Bank documented in its

loan files.  That opinion stated:

> 'At your request, we herewith wish to provide a brief commentary
> concerning the loan agreement that will be concluded with your
> bank for the 'DICTATION CONSORTIUM' project. . .
> LERNOUT & HAUSPIE SPEECH PRODUCTS, N.V. is a
> company whose shares are listed on the NASDAQ exchange in the
> USA and … the **particular reporting requirements under US
> standards are applicable (the US GAAP and FASB standards).**
> Should LERNOUT & HAUSPIE SPEECH PRODUCTS NV be a
> related party in any way to this loan agreement, under these
> regulations, this would be a related party transaction and then
> under FAS 57 be subject to special reporting requirements and
> regulations. . . .  **It is especially important that LERNOUT &
> HAUSPIE SPEECH PRODUCTS N.V. can book [the 750
> million BEF to be paid by Dictation] as revenue . . .** It seems to
> us that **under the governing regulations in the United States,
> this transaction must have at least the following
> characteristics**:
> **(1) LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.  is in
> no way involved, neither directly nor indirectly, in the
> financing of DICTATION CONSORTIUM NV;**
> **(2) LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.  shall
> never be made liable, neither directly nor indirectly, nor as a
> guarantor, for the repayment of the financing that should be
> granted to DICTATION CONSORTIUM N.V. . . .**
> **(3) DICTATION CONSORTIUM N.V. shall not have the
> possibility to sell back to LERNOUT & HAUSPIE SPEECH
> PRODUCTS N.V. the developed technology or to insist on
> recovery of any research and development payments it made. .
> . .**
>
> (Emphasis supplied).

87.     In June 1997, L&H's U.S. lawyers provided Artesia Banking with similarly

detailed information concerning L&H's intention to recognize payments from Dictation as

revenue, and the U.S. regulations applicable to L&H's financial statements, including the

following:

> L&H and Dictation Consortium have signed a development
> agreement whereby Dictation Consortium has engaged L&H to

develop dictation products on behalf of Dictation Consortium for a research and development fee of BEF 750 million…. **It is important to L&H that the fee be characterized as a research and development fee for purposes of United States generally accepted accounting principles (US GAAP), such that L&H will be able to include the fee in income when paid…. [T]he transaction must have the characteristics of an arm's length development contract between independent companies in order to ensure that the transaction will not be recharacterized as a financing transaction. If the transaction were characterized as a financing transaction, the BEF 750 million in funding would be treated as the proceeds of a loan that is not includible in L&H's income. In order to meet these tests the transaction must at a minimum have the following characteristics: 1. The financing of Dictation Consortium must be wholly independent of L&H.**

**2. L&H may not be liable in any manner (directly or through any guarantees, whether written or oral) to repay any bank or other financing to be received by Dictation Consortium….**

**3. Dictation Consortium may not have an option to require L&H to repurchase the licenses and developed technology, or other4wise repay the research and development payments received.**

**4. Any option that L&H has to repurchase the licensed technology or market the developed products must be arm's length. Dictation Consortium must bear the risk that L&H may choose not to exercise any of those options.**

(Emphasis supplied.)

88.    Elsewhere in Artesia Banking's Dictation loan files, the Bank acknowledged that

Due to the American accounting rules and the stock market regulations (revenue recognition), L&H cannot take this [Dictation] loan directly. To resolve these problems, L&H, Flanders Language Valley Fund and several private investors, in particular, two companies from Luxembourg, Syllabus and Cevennes, were prepared to participate in this "Dictation Project" and the company, Dictation Consortium NV, was incorporated. This would make the management and the Board of Directors of Dictation and L&H completely independent [of one another].

89.    From the outset, Artesia Banking knew that the revenue-recognition requirements

carefully outlined by L&H's auditors and lawyers could not be satisfied by the agreement

between L&H and Dictation. Dictation was merely a shell entity created by L&H that was not independent from L&H. Notes in Artesia Banking's loan files dated May 14, 1997 confirm that the Bank was well aware of the "artificial" structure of Dictation, noting that "Dictation Consortium is an empty company, without clients, without contact with clients, actually without any commercial activity that was incorporated with an eye on the NASDAQ listing." Thus, Artesia Banking knew that Dictation and L&H were not "independent companies" engaged in an "arm's length development contract" as required by U.S. GAAP. Moreover, Artesia Banking knew that its loan to Dictation was not "wholly independent of L&H." To the contrary, it was L&H -- and not any representative of Dictation -- that first approached Artesia Banking about financing the Dictation project, and that negotiated the terms of the financing with Artesia Banking. In addition, L&H provided Artesia Banking with $500,000 worth of free L&H warrants as "additional compensation" for making the loan to Dictation. Thus, Artesia Banking knew that L&H was "involved … directly" in the financing of Dictation. Further, as demonstrated by its conduct, Artesia Banking knew that the guarantee provided by the L&H Principal Officers constituted an "indirect" involvement by L&H in the Dictation financing: for this reason, Artesia Banking agreed that the guarantee would be concluded in a secret side letter and would not be disclosed in the Dictation loan documents. Finally, Artesia Banking knew that L&H had secretly committed to acquire Dictation, thus effectively giving Dictation the right to require L&H to repurchase the licensed and developed technology. For all of the above reasons, including Artesia Banking's own conduct in entering into secret guarantees with the L&H Principal Officers, Artesia Banking knew that L&H's recognition of payments from Dictation as revenue violated U.S. accounting rules.

90.     In or about June 1997, Artesia Banking made a bridge loan of $4.5 million to Dictation in anticipation of approval of a loan of 450 million BEF (approximately $12.6). The bridge loan was secretly guaranteed by the L&H Principal Officers and Fernand Cloet. An internal Artesia Banking memorandum dated June 19, 1997 from Mr. I. De Coen to Mr. Janssens confirms Artesia Banking's understanding that the L&H Principal Officers' guarantee violated U.S. accounting rules and had to be hidden:

> As a guarantee, a security pledge has been requested from the four referenced-shareholders of L&H: Jo Lernout, Paul Hauspie, Fernand Cloet, Nico Willaert. ***These security pledges must be agreed to in a side letter. The security pledges may not be recorded in the loan agreement…Advice: Approved, given the resources of the four people pledging.***

(Emphasis supplied.)

91.     Artesia Banking's failure to record this guarantee in the Dictation loan documents also violated Belgian banking regulations and the Bank's own policy of requiring all securities to be recorded in the loan contract. In August-September 1997, Artesia Banking agreed to provide Dictation with a rollover credit in the amount of 500 million BEF (approximately $14 million). The loan agreement for this financing also violated Artesia Banking's own policy by not reflecting the L&H Principal Officers' guarantees. Artesia Banking accepted the secret side letter guarantees, and did not disclose them in the Dictation loan documentation, in order to conceal the guarantees from L&H's auditors, the SEC and L&H investors, and to allow L&H to improperly recognize revenue on L&H's licensing transactions with Dictation. As additional compensation to Artesia Banking for its illicit role in the Dictation financing, L&H granted Artesia Banking 300,000 L&H stock warrants worth at least $300,000.

92.     As evidenced by Artesia Banking's agreement to document the guarantee provided by the L&H Principal Officers in a side letter, Artesia Banking knew that the

prohibition on L&H's "direct or indirect" involvement in the financing of Dictation extended to the participation of the L&H Principal Officers in the Dictation loan, including their agreement to guarantee that loan.

93.    Between December 1996 and early 1998, Dictation "developed" L&H's core speech recognition software, purportedly bearing the research and development costs.  However, Dictation did not actually perform any of the work to develop the software.  Rather, L&H employees wrote Dictation's business plan and did the software work under contract, as Lernout later acknowledged.

94.    Once the development was completed, L&H had the option to purchase Dictation. Indeed, according to an internal Artesia Banking document, at inception L&H had made a commitment to repurchase Dictation, which the Bank characterized as "moral support."  In May of 1998, L&H exercised that option and purchased Dictation for $40 million, resulting in a significant gain to Dictation's investors.  In effect, L&H purchased the software it created at a significant premium.  Then, L&H booked the goodwill associated with the purchase as an asset and amortized the transaction costs over a period of years, rather than recording the research and development expenses as current expenses.

### Artesia Banking's Loan to Brussels Translation Group

95.    Bolstered by the success of the Dictation arrangement, in May of 1997, L&H entered a similar relationship with Brussels Translation Group NV ("BTG").  On March 13, 1997, BTG was established as a limited liability company in Belgium, "primarily engaged to acquire, develop, commercialize and license machine translation software."  As was the case with Dictation, Artesia Banking was a key factor in the creation of BTG.  The Bank provided the initial financing to allow BTG to operate, lending a total of $22.9 million to BTG with the intent

that L&H would find external investors to repay the loan. L&H never disclosed the owners of BTG, and a December 7, 2000 *Wall Street Journal* article was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but no further." Artesia Banking recognized that BTG lacked the financial resources and technical capability necessary to develop L&H's software but, nevertheless, pursuant to the fraudulent scheme alleged herein, Artesia Banking loaned funds to BTG so that the money could be passed off as legitimate licensing fees paid to L&H.

96.     In March of 1997, BTG entered a software development and commercialization agreement with L&H, under which L&H agreed to provide engineering services for the development of machine translation for L&H's iTranslator. L&H also licensed certain software to BTG. The agreement called for BTG to pay L&H $3.5 million in license fees, plus royalties, which was increased to $5 million in May 1997. L&H also entered into an agreement to provide BTG with engineering services, under which BTG paid L&H approximately $30 million.

97.     As with Dictation, Artesia Banking again provided the financing that allowed L&H's deal with BTG deal to be consummated. According to documents obtained from Dexia in discovery, during the negotiations for the financing of BTG in late 1997 and early 1998, Artesia Banking was once again clearly informed that L&H intended to recognize payments from BTG as revenue, and that under U.S. accounting rules L&H could not recognize such payments as revenue unless BTG and its financing were kept absolutely independent of L&H. The credit proposal for a $14 million rollover credit for BTG -- prepared by Artesia Banking personnel and submitted to Artesia Banking's Management Committee on March 31, 1998 -- reflects the advice previously given to the Bank by L&H's professionals in connection with the financing of Dictation:

US-GAAP restricts the possible structuring of the operation. This operation has two benefits for L&H:

1. the loan for the financing of the development costs is granted to a third party, that is BTG, and will consequently not affect the balance sheet of L&H;

2. the compensation for development costs which BTG will pay to L&H will constitute company income for L&H.

***To realize these benefits it is essential under US GAAP that the transaction between BTG and L&H needs to be considered as a mere commercial transaction taking place between independent and free parties under normal*** economic circumstances. Taking the stock exchange quotation of L&H on the NASDAQ into consideration, the US GAAP regulations will need to be applied in a stringent manner which will be monitored strictly by the American Securities and Exchange Commission.

Concretely, the transaction, in accordance with the applicable regulations, needs to evidence the following characteristics (in conformity with a letter from KPMG within the framework of the similar Dictation project):

- ***L&H will I no manner whatsoever be involved, directly or indirectly, in the financing of BTG;***
- ***L&H may never be held liable, directly or indirectly, nor by means of a guarantee, with regards to the repayment of the financing which would be granted to BTG....***
- BTG will not have the possibility to impose the buy back of the developed technology....
- In the event L&H has the possibility to buy back the developed technology from BTG this will need to take place in normal economic market circumstances.....”

(Emphasis supplied.)

98.     The $14 million rollover credit to BTG was secretly guaranteed by the L&H Principal Officers.  These guarantees were documented in a side letter and, in violation of Belgian banking regulations and Artesia Banking's own policies, were not reflected in the loan agreement with BTG.  Artesia Banking recognized that the L&H Principal Officers' guarantee constituted an indirect involvement by L&H in the financing of BTG, and therefore agreed to accept the secret side letter guarantees, and to not disclose them in the BTG loan documentation,

in order to conceal the guarantees from L&H's auditors, the SEC and L&H investors, and to allow L&H to improperly recognize revenue on L&H's licensing transactions with BTG.

99.     In June 1999, at the end of the contract and pursuant to its prior commitment to do so, L&H purchased BTG for $59 million. The purchase consideration consisted of a cash payment of approximately $42.3 million and the assumption of approximately $17 million of debt. The purchase price exceeded the fair value of the net assets acquired, and was allocated to goodwill or other intangible assets. Thus, as was true of the Dictation transaction, L&H was able to utilize BTG to develop products so that L&H did not have to immediately recognize the R&D expenses, as would have been required had L&H developed the products itself. When it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset. Furthermore, L&H's transactions with BTG allowed L&H to record nearly $35 million in revenues from 1997 through 1999.

100.     From 1997 though 1999, L&H incurred $9 million in expenses to develop the BTG software. The net result of this transaction was therefore that L&H paid BTG approximately $50 million over BTG's own direct costs to acquire software that L&H developed. Thus, it is clear that the sole purpose of the BTG transaction was to inflate L&H's reported financial results.

### "Dictation Consortium . . . on steroids"

101.     Following the transactions with Dictation and BTG, L&H and Artesia Banking expanded their fraudulent scheme into what ultimately would be described by *The Wall Street Journal* as "Dictation Consortium-type structure – but on steroids." Instead of creating one shell company (i.e., Dictation Consortium or BTG) to funnel false revenues to L&H, L&H created a

series of holding companies financed by Artesia Banking. These holding companies, in turn, financed multiple LDCs, which then paid "licensing fees" back to L&H.

102. Throughout 1998 and 1999, L&H publicly touted the expansion of its relationships with strategic partners, which the Company described as independent companies funded by unidentified private investors whom L&H insisted were "unaffiliated with us." For example, in an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H began] development of approximately 20 additional exotic languages with its financial and technological partners. During 1998, contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies.… In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

103. Similarly, in its 1998 Annual Report on Form 20-F, L&H represented:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that are unaffiliated with us to develop and localize our technology for specified new languages. Our strategic partners also have exclusive rights … to develop, market, and distribute products incorporating the developed technology. In addition to one-time license fees, we have rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

> (Emphasis added.)

104. The license fees paid by these "unaffiliated strategic partners" were highly material, accounting for 10% of L&H's 1998 revenue and 25% of the Company's 1999 revenue.

105.    As set forth below, Artesia Banking established many of the sham LDCs, providing millions of dollars to fund those "strategic partners" by extending loans to LDCs with the knowledge that those loans would be passed directly to L&H as sham revenues.

### Artesia Banking's Loan to Radial Belgium N.V. -- Guaranteed by Sham Credit Default Swaps

106.    One such holding company was Radial Belgium N.V. ("Radial"). On September 29, 1998 – one day before the end of L&H's 1998 third quarter – Artesia Banking established three LDCs: the Slavic Development Company N.V., the Farsi Development Company N.V., and the Bahassa Development Company N.V., which were purportedly supposed to develop speech recognition products in Slavic, Farsi and Bahassa (an Indonesian dialect), respectively. Specifically, on September 29, Artesia Banking loaned $6 million to Radial, which in turn wired the $6 million directly to the bank accounts of these three LDCs, which were only established that very same day. Then, either later on September 29 or on September 30, 1998, these LDCs transferred every penny of the $6 million they had received from Artesia Banking to L&H, which then booked this entire amount as revenue. Indicative of the wholly fraudulent nature of these transactions is the fact that the LDCs transferred all of their capital to L&H on the same day they were "established," leaving these "companies" with no assets whatsoever. In fact, none of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products. The "revenue" attributable to the sham LDCs established by Artesia Banking accounted for approximately 11% of the "record" $54.9 million in revenue L&H reported for the third quarter of 1998, and a material percentage of the Company's "record net profits of $12.1 million."

107.    Internal Artesia Banking documents quoted in the Prosecutors' Report and obtained in discovery demonstrate that Artesia Banking knowingly granted the loan to Radial in

furtherance of, and pursuant to, a scheme to defraud L&H investors.  The documents show that Artesia Banking knew that its loan was to be used by Radial to create and finance the three LDCs (all of which had the same business address), and that all of the money loaned by Artesia Banking would be used by the LDCs to pay licensing fees to L&H, thereby leaving the LDCs with no money to perform their supposed task of developing L&H's software.

108.   Artesia Banking recognized from the outset that the "strategic partners" it was establishing had no equity investors and were mere shell companies located at one address.  In an e-mail dated September 21, 1999 by P. Rabaey at Artesia Banking to G. Dauwe and other Artesia Banking employees, Rabaey stated,

> ***Our loan . . . was used for the establishment of 3 Language Development Companies:*** Slavic, Farsi and Bahassa.  Starting capital per company: $2 million.  The 3 companies bought first of all software licenses from [L&H].  The objective is to repay our loan to Radial Belgium by attracting investors and to further increase the capital per Language Development Company.
>
> (Emphasis supplied).

109.   Another Artesia Banking document quoted in the Prosecutors' Report states:

> [On September 29, 1998 Artesia Bank advances loan to Radial] by way of a bridge financing for the establishment of the following language development companies THE SLAVIC DEVELOPMENT COMPANY N.V., THE FARSI DEVELOPMENT COMPANY N.V., and THE BAHASSA DEVELOPMENT COMPANY N.V., ***all based at 2370 Arendonk, Schoolstraat 1A***, in anticipation of the establishment of the Language Development Fund and the sign-up of investors.
>
> (Emphasis supplied).

110.   Artesia Banking also knew that the LDCs would not and could not generate any real revenue to repay the loans, and that L&H intended to seek new investors who would act as a new source of funds.  As P. Rabaey stated in a September 21, 1999 email: "The objective is to

repay our loan to Radial Belgium by attracting investors and to further increase the capital per Language Development Company."   Another internal Artesia Banking document quoted in the Prosecutors' Report states:

> The repayment of loans granted by Artesia to the holding company (=Radial Belgium) is totally dependent on whether investors can be found, which is very difficult to tie with a set time schedule. The subsidiaries (language development companies) themselves deploy almost no activities as long as there are no investors…. In actuality these companies represent nothing (no activities, no assets).

111.    Recognizing that Radial and the LDCs were sham entities, with no ability to repay the financing, Artesia Banking insisted that its loan to Radial be guaranteed by the L&H Principal Officers.   However, based on its previous experience with the Dictation and BTG loans, Artesia Banking knew that the L&H Principal Officers would have to conceal their roles as guarantors because that constituted the "indirect involvement" of L&H in the financing of the purportedly independent LDCs.   However, this time around, the L&H Principal Officers were unwilling even to sign guarantees contained in side letters.   According to the September 21, 1999 e-mail from P. Rabaey to G. Dauwe, the L&H Principal Officers refused to sign private guarantees "so as to avoid possible problems with the SEC.   We have therefore no security and look for a solution via credit default swaps."   (Emphasis supplied).

112.    Artesia Banking knew that it was highly unusual for an individual to participate as a counterparty to a credit default swap, and proposed the use of credit default swaps in connection with the Radial loan (and subsequently in connection with a loan to LIC, described below) solely to accomplish the deception of L&H's auditors, the SEC and L&H's shareholders. An internal Artesia Banking memorandum entitled "Direction Internal Audit" from J.P. Cloes and F. Dankelman to K. Claessens and others, dated January 31, 2000, notes that the credit

default swaps executed by the L&H Principal Officers had "special characteristics (they are the only contracts of this type concluded with natural persons)." Indeed, reflecting how unusual this was, the Radial loan was not submitted to and unanimously approved by the Bank's Credit Committee as was the Bank's regular practice. Instead, the Radial loan was proposed directly to three of the Bank's most senior officers, two of whom sat on the Bank's Management Committee, its highest ranking committee: Geert Dauwe, the Director of Corporate Banking and a member of the Management Committee; Rene Avonts, the Director of Financial Market Activities and a member of the Management Committee; and J. Van der Ven, the Secretary of Special Credit Activities. Geert Dauwe, who has been personally indicted in Belgium for his role in the L&H fraud, personally approved the Radial loan.

113. The sham nature of the credit default swaps that Artesia Banking entered into with the L&H Principal Officers is further confirmed by the fact that they were not supported by any consideration. In the case of a real credit default swap, the sellers of the swap – in this case the L&H Principal Officers – receive a premium in exchange for the credit protection (i.e. guarantee) provided to the buyer of the swap – in this case Artesia Banking. However, internal Artesia Banking documents indicate that the Bank never paid any premiums to the L&H Principal Officers for the credit default swaps used to guarantee the Radial loan, and only paid them a portion of the premiums they were supposed to receive for the credit default swaps used to guarantee the LIC loan. Moreover, as explained in ¶ 127 below, Artesia Banking and the L&H Principal Officers ultimately agreed that no premiums were owed for any of the credit default swaps, and the L&H Principal Officers repaid the Bank the premiums they had received for the LIC credit default swaps. The sham nature of these credit default swaps is further evidenced by the fact that, as noted in an April 21, 1999 memorandum prepared by the Bank's

Internal Audit Department, they were concluded in violation of the Bank's own procedures for the execution, processing, and reporting of credit default swaps.

114.     Artesia Banking's internal documents leave no doubt that, as reflected in a February 10, 2000 interoffice memorandum sent by Claude Piret, "the aim of these transactions [the credit default swaps with the L&H Principal Officers] was to protect [the Bank] from any risk of non-repayment of the credits and was an alternative to a joint guaranty." Artesia Banking's Geert Dauwe put the matter even more bluntly in his February 14, 2000 interoffice memorandum: "the credit default swaps were concluded <u>in order to get around the guarantees</u> that the other parties (= J. Lernout + P. Hauspie + N. Willaert…) did not wish to provide." (Emphasis supplied). Artesia Banking chose to disguise the L&H Principal Officers' loan guarantees as sham credit default swaps because it believed these instruments would be easier to hide than guarantees reflected in the side letters. Thus, Artesia Banking's sole reason for structuring the L&H Principal Officers' guarantees as sham credit default swaps was to further the fraudulent scheme by concealing the relationship between L&H and the strategic partners, which concealment the Bank knew would render L&H's financial statements misleading in violation of auditing standards and applicable law.

115.     No reference to the L&H Principal Officers' guarantee or the credit default swaps appears in the loan agreement between Artesia Banking and Radial, or in any of the documents referred to therein. As explained in detail below, Artesia Banking's failure to disclose the credit default swaps in the Radial loan documents was contrary to the advice of the Bank's in-house lawyers, and a violation of Belgian banking regulations and the Bank's own policies.

**Artesia Banking's Loan to Language Investment Company –
Guaranteed by Sham Credit Default Swaps**

116.    After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia Banking replicated this scheme in the fourth quarter.  The name of the holding company utilized to generate fraudulent revenue for L&H at this time was Language Investment Co. ("LIC").  On December 22, 1998 (9 days before the end of L&H's fourth quarter and year), Artesia Banking loaned LIC 220 million BEF (approximately $6 million) to establish four more LDCs.  LIC then sent these funds in four installments of $1.5 million to the four separate LDCs: the (1) Greek, (2) Hungarian, (3) Polish, and (4) Czech development companies.  These LDCs then immediately paid to L&H as "licensing fees" all of the funds provided by Artesia Banking through LIC so that L&H could book this approximately $6 million as "revenue" prior to year-end.  This ruse, which was completed pursuant to the fraudulent scheme in which Artesia Banking engaged, was intended to permit L&H to book all $6 million advanced by Artesia Banking as revenue at year-end 1998, and thereby meet the revenue and earnings numbers L&H had led investors to expect.

117.    The internal Artesia Banking credit proposal for the LIC loan makes explicit that the loan to LIC – to establish companies that would provide revenue to L&H – was designed in the same mold as the Dictation Consortium, Brussels Translation Group and Radial schemes funded by Artesia Banking.  Indeed, the LIC credit proposal prepared for the consideration of the Bank's Credit Committee states that the project is "comparable to projects such as dictation consortium, Belgian [sic] translation group …" and that the "working method" was already applied in the case of Radial.

118.    Artesia Banking knew that the Greek, Hungarian, Polish and Czech LDCs lacked the financial resources and technical knowledge necessary to develop L&H's software for use

with additional languages.   In fact, an internal Artesia Banking document quoted in the Prosecutors' Report makes clear that Artesia Banking knew that the proceeds of its loan would be used immediately by these newly formed LDCs to pay for licensing fees to L&H, leaving the LDCs with no capital and no ability to perform their contractual obligation to develop L&H software for use with other languages.   One internal document noted that the amounts financed by Artesia Banking would provide the "start-up capital" for the four LDCs and "these amounts are used in each case as partial payment to [L&H] for the up-front fee of US$3,000 [meaning $3 million].   The balance of the capital underwritten by LIC NV … is to be paid in full in the course of the first half of 1999.   LIC NV will do everything possible to find the necessary funds for this purpose."

119.    As had been the case with Radial, Artesia Banking insisted that repayment of the loan to LIC be guaranteed by L&H or the  L&H Principal Officers.   Internal Artesia Banking documents reflect that the Bank viewed a guarantee by the L&H Principal Officers as equivalent to a guarantee by L&H itself and, thus, that the L&H Principal Officers' involvement in the financing of LIC was equivalent to involvement by L&H for purposes of U.S. accounting rules. The minutes of Artesia Banking's credit committee reflecting approval of the LIC loan proposal on December 17, 1998 state:  "The committee agrees on the condition that the loan is extended within the context of the L&H lines [of credit] and that the latter [i.e. L&H] guarantees repayment upon maturity."   A December 29, 1998 e-mail from Artesia Banking's Jan Van der Ven regarding the LIC loan states:  "Approval to start with operation now.   The credit default swap with L&H will take effect on 1/4/99."   In fact, the credit default swap entered into on January 4, 1999, was between Artesia Banking and the L&H Principal Officers.

120.    The initial loan agreement between Artesia Banking and LIC, dated December 22, 1998, made no reference to the L&H Principal Officers' guarantee or a credit default swap. Subsequently, on or about June 17, 1999, Artesia Banking and LIC entered into an amendment of the December 22, 1998 LIC loan agreement.  The amendment stated that "henceforth" – that is, from the date of the amendment – the loan would be guaranteed by "Credit Swap Transaction number 001/PR/AV/001 closed with our Bank."  In order to further the fraudulent scheme, the amendment did not disclose the fact that the L&H Principal Officers were the counterparties to the swaps, because, as explained in a June 15, 1999 e-mail from Peter Rabaey to in-house counsel Bernard Mommens, "then the link between the debtor [LIC] and these private persons [the L&H Principal Officers] could be made.  For the client [L&H], it is not desirable that there is a direct link known to the outside world."

121.    Artesia Banking's Internal Audit Department subsequently concluded that the June 17, 1999 amendment to the LIC loan agreement "contradict[ed] the truth" because it stated that the loan would "henceforth" be guaranteed by a credit default swap when, in fact, the loan had been guaranteed by a default swap from the time it was first granted, more than six months earlier.  The January 30, 2000 audit report concluded that:  "[i]f the reference to 'henceforth' was made knowingly, it would involve a false declaration, with all the legal consequences that such could entail."

### Artesia Banking's Deceptive Acts to Conceal the Fraudulent Nature of the Radial and LIC Loans in 1999 and 2000

122.    Throughout 1999 and 2000, Artesia Banking engaged in additional conduct designed to ensure that the fraudulent nature of the Radial and LIC loans would remain concealed from L&H's auditors, the SEC and L&H investors, and thereby to ensure that L&H could continue to report fraudulently inflated revenues for 1998 and 1999.  Indeed, as alleged

below, during this period Artesia Banking (1) entered into additional credit default swaps with the L&H Principal Officers to guarantee the still-outstanding Radial and LIC loans; (2) deliberately and intentionally failed to disclose the existence of these guarantees in the Radial and LIC loan documents that were generated during this period, in direct contravention of the advice of the Bank's Legal Department; (3) ignored, and took no action in response to, Internal Audit reports that opined that the Bank had violated Belgian banking regulations by failing to disclose the credit default swaps in the Radial and LIC loan documents; and (4) evaded Belgian tax laws that would have required the Principal Officers to disclose the credit default swaps in their tax filings.

123.    The loan to Radial, granted by Artesia Banking on September 29, 1998, was scheduled to be repaid by December 21, 1998, and the credit default swap that secured this loan had an expiration date of June 30, 1999.  However, the Radial loan was not timely repaid. Accordingly, in furtherance of the fraudulent scheme, on or about June 30, 1999, Artesia Banking entered into a second credit default swap with the L&H Principal Officers to continue to guarantee the still-outstanding Radial loan.  This second Radial credit default swap had an expiration date of December 15, 1999.

124.    Similarly, the LIC loan, granted by Artesia Banking on December 22, 1998, was scheduled to be repaid by June 30, 1999, and the credit default swap that secured this loan expired on the same date.  The LIC loan was not timely repaid and, in furtherance of the fraudulent scheme, on or about June 30, 1999, Artesia Banking entered into a second credit default swap with the L&H Principal Officers to continue to guarantee the still-outstanding LIC loan.  This second LIC credit default swap had an expiration date of December 15, 1999.

125.    On September 20, 1999, Artesia Banking's credit committee, comprised of senior management of the Bank, considered extending the terms of the Radial and LIC loans until December 15, 1999, the date on which the credit default swaps guaranteeing these loans were scheduled to expire.    Among the information presented to, and considered by, the credit committee was the advice of Artesia Banking's Legal Department that the loan documents must mention the fact that the loans were guaranteed by credit default swaps.    However, Artesia Banking ignored the instruction or its own lawyers.    The credit committee approved the extension of the terms of the Radial and LIC loans until December 15, 1999 and, in contravention of the advice of the Bank's Legal Department and in furtherance of the fraudulent scheme, the credit committee determined "that the CDS will not be expressly repeated in the credit offers."    In October 1999, Artesia Banking entered into agreements with Radial and LIC extending their respective loans until December 15, 1999.    These agreements made no reference to the guarantees of the L&H Principal Officers or the credit default swaps.

126.    Artesia Banking's own documents make clear that the Bank knew that it was committing a fraud.    On January 20, 2000, Artesia Banking's Internal Audit Department reported to the Chairman of Artesia Banking's Management Committee, Dirk Bruneel, that the Bank's failure to mention the credit default swaps in any of the Radial loan documents, and in the December 22, 1998 and October 26, 1999 LIC loan agreements created "a risk that Banque Artesia will be accused of having engaged in a special mechanism," that is, failure to disclose the existence of a guarantee in violation of regulations promulgated by the Belgian Banking and Finance Commission ("CBF"), the agency responsible for supervising Belgian banks.    The January 20, 2000 audit report noted that "Bank lawyers are unanimous:  The CDS should have been mentioned in the letters of understanding sent to borrowers" and concluded that the credit

committee that authorized the non-disclosure of the Radial and LIC credit default swaps did not have authority to waive this regulation. Artesia Banking took no action in response to these audit findings.

127.    In January 2000 – after the Radial and LIC loans had been repaid and before KPMG had certified L&H's 1999 financial statements that included fictitious "revenues" from LDCs financed by Artesia Banking – the Bank's Internal Audit Department notified the Bank's senior management of the Bank's failure to comply with tax laws applicable to the Radial and LIC credit default swaps. In a January 31, 2000 memorandum to, among others, Claude Piret and Geert Dauwe – both members of the Bank's Management Committee – auditor Jean-Paul Cloes pointed out that (a) under the terms of the credit default swap agreements with the L&H Principal Officers, Artesia Banking still owed the L&H Principal Officers premiums totaling 809,162 BEF for the Radial credit default swap and 76,389 BEF for the LIC credit default swap; and (b) under Belgian tax laws, Artesia Banking, as payor, was required to establish a "281.50 file" reflecting the L&H Principal Officers' receipt of these taxable commissions. Artesia Banking's senior management knew that if the L&H Principal Officers were to declare the premiums received on the credit default swaps as taxable income, their connection to Radial and LIC – and the fraudulent inflation of L&H's 1999 revenues – would be revealed. Accordingly, in furtherance of the fraudulent scheme and in order to avoid disclosure of the credit default swaps in the L&H Principal Officers' tax filings due in March/April 2000, Artesia Banking proposed that the credit default swaps simply be nullified. On information and belief, sometime in March or April of 2000, Artesia Banking and the L&H Principal Officers agreed that the Bank would not pay the credit default swap premiums it still owed to the L&H Principal Officers, and the L&H Principal Officers would repay to the Bank the premiums they had received in

connection with the LIC credit default swap.  In sum, Artesia Banking took the extraordinary step of pretending that the credit default swaps never existed.  In this way, Artesia Bank furthered the fraudulent scheme by, once again, preventing the disclosure of the L&H Principal Officers' connection to Radial and LIC.

### Artesia Banking's $20 Million Loan to the L&H Principal Officers for the Use of the Language Development Fund

128.    Artesia Banking expanded its participation in the fraudulent L&H scheme in 1999.  On March 31, 1999, L&H established the Language Development Fund ("LDF") and transferred $12 million to the bank accounts of seven LDCs at Artesia Banking.  The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each.  The source of this $12 million in funding was Mercator & Noordstar, which made a $2 million capital contribution and a $10 million loan to LDF.  All of these funds made their way into L&H's 1999 financial statements as revenue.

129.    Internal Artesia Banking documents quoted in the Prosecutors' Report leave no question that Artesia Banking knew that these LDCs were also shell entities created for the purpose of fraudulently inflating the Company's revenue.  A fax dated March 1999 from Ph. Depecker at L&H to Artesia Banking stated:

> The following companies are to be established, for which I need an account number: Thai Language Development Company N.V., Hindi Language Development Company N.V., and Tamil Language Development Company N.V.
>
> The representative-director of these companies is in each case Mr. Tony Snauwaert, and the company seat will be 9900 Eekloo, Stationstraat 83.  Could you get me three account numbers as soon as possible?

130.    In the second quarter of 1999, L&H requested that Artesia Banking provide a $20 million loan to LDF.  Artesia Banking's internal documents relating to the LDF loan application reveal that the Bank was fully aware that the purpose of the LDF loan was the same as the fraudulent purpose for the loans to Radial and LIC.  Specifically, according to an internal e-mail from B. Ferrand, dated June 21, 1999:

> LDF as overarching holding company is now already 100% shareholder in 3 Language Development Companies ("LDC"): Tamil DC, Hindi DC and Thai DC.  [Six million dollars] of capital stock and the Mercator-Noordstar loan was channeled to these various LDCs which used it to buy licenses from [L&H] in the first quarter of 1999.
>
> * * *
>
> In view of the fact that [L&H] books the sale of licenses as revenue, it is essential under GAAP rules that LDF be totally independent from [L&H].  Therefore, [L&H] cannot under any circumstances be a party involved in an agreement whose subject is the repayment of the requested financing.
>
> * * *
>
> The system offers [L&H] two advantages: 1) the R&D takes place outside their own profit and loss structure; 2) the royalties received can be booked immediately as revenue.

Another internal document from Artesia Banking's credit file quoted in the Prosecutors' Report noted: "Purpose of the [LDF] loan:  bridge loan to capitalize subsidiaries of borrower for payment of license fees by subsidiaries to [L&H]."

131.    A credit proposal for a $20 million loan to LDF to be guaranteed by a credit default swap with the L&H Principal Officers was presented to Artesia Banking's credit committee on June 25, 1999.  However, questions had been raised within the Bank concerning the need to disclose the credit default swaps in loan documents.  The members of Artesia Banking's senior management who comprised the credit committee were no longer certain that disguising the L&H Principal Officers' guarantees as sham credit default swaps would be an

effective way to conceal the L&H Principal Officers' connection to L&H. Thus, the credit committee's minutes reflect a decision by the committee to withdraw the $20 million LDF loan application and to instead make the loan directly to the L&H Principal Officers: "In its stead and place agreement (to be ratified) for a loan of the same amount owed severally and jointly by Messrs. Jo Lernout, P. Hauspie, and Nico Willaert." This time, however, Artesia Banking demanded that the L&H Principal Officers pledge 650,000 registered shares of L&H as collateral for the loan.

132.    Although Artesia Banking's internal documents reflect the Bank's knowledge that the $20 million loan to the L&H Principal Officers would "be lent immediately to the Language Development Fund, N. V. ('LDF')," which in turn would use the funds "to capitalize subsidiaries … for payment of license fees by subsidiaries to [L&H]." However, the Bank knew that if the L&H Principal Officers funded the LDCs, L&H could not book that revenue. Accordingly, to cover up the true purpose of the loan, the June 25, 1999 loan agreement between the Bank and the L&H Principal Officers misleadingly states that the loan is "be used exclusively for financing of [the L&H Principal Officers'] professional activities." Thus, in furtherance of the fraudulent scheme, the Bank deliberately concealed the true purpose of the loan in the documents provided to the L&H Principal Officers.

133.    The vast majority of the $20 million was used, as Artesia Banking had anticipated, to establish six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money was then booked as revenue on L&H's 1999 financial statements. L&H did not reveal the source of the funds received by these LDCs in L&H's Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10K for the year ended December 31, 1999.

134.    The $20 million loan to the L&H Principal Officers, which was scheduled to be repaid on October 10, 1999, was not timely repaid.  In September, Willaert assured Artesia Banking's Bart Ferrand that "all loans made by Artesia within the framework of the establishment of the Language Development Companies will be repaid for sure around December 31, 1999 (Radial [$6 million], LIC [$6 million] and Lernout/Hauspie/Willaert [$20 million])."

135.    By late 1999, the LIC and Radial loans had also not been repaid, and Artesia Banking grew increasingly concerned that those loans, and the loan to the L&H Principal Officers, would not be repaid.  As set forth below, Artesia Banking ultimately made the repayment of those loans a pre-condition of its agreement to finance L&H's acquisition of Dictaphone.  On December 27, 1999 – more than a week after the loans were due to be repaid – Piet Cordonnier at Artesia Banking reported in an e-mail to Bart Ferrand and other Artesia Banking employees that he had received a telephone call from Willaert, who stated that "on Wednesday December 29, 1999, (sufficient) US$ will be available in an account of a Singapore bank to pay back the loans to LIC and Radial."  Willaert also gave Mr. Cordonnier the details of the contact person in Singapore.

136.    However, the loans were not repaid as of year-end 1999, but in January 2000. While the funds to repay these loans were not transferred to Artesia Banking until January 5, 2000, the Bank credited these loans on its books as having been repaid in 1999.  The reason: Artesia Banking was being asked by KPMG, L&H's auditor, whether, as of December 31, 1999, the Bank had any loans outstanding to Messrs. Lernout, Hauspie or Willaert.  Indeed, on or about March  17,  2000 – only ten days after L&H publicly announced its intention to acquire Dictaphone from Stonington – Artesia Banking provided a written attestation to KPMG, which

falsely stated that on December 31, 1999, the Bank had no personal loans outstanding to L&H officers. The Bank made this false statement in furtherance of the scheme to defraud L&H's auditors, the SEC and L&H investors, at a time when the Bank knew that KPMG had not yet certified L&H's 1999 financial results. Artesia Banking thus again concealed the fraud, and thereby enabled L&H to issue its false and misleading audited financial results for 1999, by misstating the repayment date of its $20 million loan.

137.    In summary, beginning in 1997 and continuing until at least March/April 2000, Artesia Banking knowingly participated in a fraudulent scheme in which funds guaranteed by, and in one instance loaned directly to, the L&H Principal Officers were utilized by L&H to enter into sham transactions that fraudulently inflated the Company's revenues and earnings. Artesia Banking recognized and intended at the time it extended loans to finance the inflation of L&H's revenues and earnings that L&H would repeatedly make false representations that those revenues were legitimate and properly recognized in compliance with US GAAP. It was integral to the fraudulent scheme in which Artesia Banking knowingly participated that all participants in the scheme – including Artesia Banking – would continually conceal from L&H's auditors, the SEC and L&H investors the fraudulent nature of Artesia Banking's conduct and the L&H Principal Officers' connection to the LDCs, and Artesia Banking did so. During the period after Artesia Banking became aware of L&H's intention to acquire Dragon in exchange for L&H shares, the Bank took the following steps to keep the fraudulent scheme concealed: (1) the Bank ignored, and took no action in response to, Internal Audit Reports that opined that the Bank had violated Belgian banking regulations by failing to disclose the credit default swaps in the Radial and LIC loan documents; (2) the Bank evaded Belgian tax laws that would have required the Principal Officers to disclose the Radial and LIC credit default swaps in their tax filings; (3) the Bank

falsified its own books to make it appear that the loans to Radial, LIC and the $20 million loan to the Principal Officers had been repaid in 1999, even though they were not repaid until January 5, 2000; and (4) the Bank lied to L&H's auditors about the existence of the $20 million loan to the Principal Officers.

### Belgian Prosecutors Concluded That Artesia Banking Knowingly Participated in the L&H Fraud by Funding LDCs and Using CDSs

138.    Based on internal documents obtained from Artesia Banking, a panel of experts retained by the Belgian Prosecutors concluded that Artesia Banking intentionally participated in the L&H fraud. The conclusions are damning:

Evaluation of the Financing

Three of the four members of L&H's executive committee [Lernout, Hauspie and Willaert] are negotiating credit default swaps with Artesia Bank for the loans to Radial, LIC and LDF (loan to LDF not approved). These loans are guaranteed by members of L&H's executive committee via credit default swaps for paying license fees to L&H (booked as revenue). The loan denied to LDF was approved for an identical amount to the three members of L&H's executive committee and also used for paying license fees to L&H (booked as revenue).

These loans were concluded at great urgency and just before the quarterly closing of accounts at L&H. Decisions had to be made always "on the double," which only can be explained by the approaching quarterly or yearly closings.

The choice of credit default swaps as financial guarantee is inspired by the intention of not having to report this sort of financial guarantee on the letter of credit of the borrower and so as to avoid possible problems with the US SEC. ***The efforts of the members of L&H's executive committee to prevent that the credit default swaps appear on the letter of credit show that there was an awareness that this could lead to problems with revenue recognition and related parties.***

* * *

It is irrelevant that Artesia Bank does <u>not</u> utilize the provided guarantees in which members of L&H's executive committee are

involved . . . . Of crucial importance is the following finding: the provided guarantees (credit default swaps, the pledge of 650,000 L&H shares) in which 3 of the 4 members of L&H's executive committee are involved are a basic condition for granting of the loans to Radial, LIC and to Lernout/Hauspie/N. Willaert (3 members of the L&H executive committee), whereby these financial resources flow to the LDCs and subsequently to L&H for payment of license fees that are booked as revenue just before a quarter or a fiscal year closing. ***Because of the financing of license payment (credit default swap, loan to 3 members of the executive committee, pledging L&H shares) we consider the revenue based on the license agreements with the LDCs fictitious.*** (Emphasis supplied).

### Artesia Banking's Role in Directly Manipulating the Price of L&H Securities

139.     Artesia Banking's efforts to falsely inflate and manipulate the price of L&H's securities went well beyond its participation in the falsification of L&H's financial statements. Indeed, the degree to which Artesia Banking was willing to go to further the illicit purposes of the fraudulent L&H scheme is exemplified by the Bank's conduct concerning a proposed loan of $25 million in March 1999 to L&H-affiliated companies.

140.     In a March 8, 1999 memorandum to the Bank's Management Committee, Bernard Mommens, an officer and in-house legal counsel of Artesia Banking, acknowledged that the express purpose of the proposed $25 million financing was to "manipulate" L&H's share price. In that memorandum, Mommens also acknowledged that at that time Artesia Banking held 500,000 shares of L&H in its own account. With that background, he then examined whether the proposed loan "could be qualified as market manipulation, which will be sanctioned by means of criminal proceedings." In answering that question, Mommens conceded that such manipulative transactions were likely illegal under U.S. law:

> [It] appears that US Regulations (article 15 under c of the Exchange Act) are stricter [than EASDAQ] as a broker-dealer will be prohibited from any form of market manipulation or price stabilization. Without being a US jurist, nor having the time to

examine the matter under US law, it seems desirable to only conduct the [proposed] sale on the EASDAQ, unless a US law firm confirms us that no issues are expected with the NASDAQ or any other US authorities.

141.    Notwithstanding the clear prohibitions outlined in Mommens' memorandum, Artesia Banking expressed its willingness to engage in the proposed transactions even though it was specifically designed to manipulate L&H's stock price.

142.    Artesia Banking financed stock purchases by another L&H related company, L&H Investment Company N.V. ("LHIC") in furtherance of the fraudulent scheme to falsely inflate the market price of L&H stock.  LHIC was an investment fund founded by Hauspie and Lernout in 1998, through which Hauspie and Lernout controlled 7.6% of L&H's stock.  Both Hauspie and Lernout sat on the Board of Directors of LHIC.  Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and acted as advisors to LHIC and its investments.  The President and Managing Director of LHIC since its inception was Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001.  Hauspie and Lernout purportedly established LHIC to make long-term strategic investments in companies in the information technology industries such as speech, language, and artificial intelligence.  In fact, however, LHIC was used to further the fraudulent scheme of falsely inflating L&H's financials and the price of its securities.

143.    Artesia Banking was LHIC's principal source of financing.  Artesia Banking was well aware that, although LHIC purported to be an independent entity, the company was controlled by Hauspie and Lernout and the financing the Bank provided to LHIC would be used to further the goals of the fraudulent scheme.  In or about December 1998, Artesia Banking provided a credit line of $160 million to LHIC, of which Artesia Banking would provide $55 million and the balance would be provided by other banks selected by Artesia Banking in "close

consultation with the borrower." The purpose of the credit facility was "to provide funding for future acquisitions by the borrower" and a maximum of $20 million could be used for "general corporate purposes." In April 2000, LHIC and Artesia Banking amended the credit facility to increase the Bank's commitment by $25,000,000. According to Artesia Banking documents, the purpose of this increase was to "finance the exercise price of a call option relating to 1,250,000 shares of common stock of Lernout & Hauspie Speech Products N.V." The April 2000 loan was used by LHIC to purchase L&H stock, which helped to prop up the L&H stock price.

144.    Moreover, the loans Artesia Banking extended to LHIC were directly tied to L&H. Those loans were made at the behest of Hauspie and Lernout and were secured by pledges of L&H stock. In fact, a June 2000 report by Peter Rabaey expressly noted that LHIC's multi-million dollar credit line was "indirectly covered by 200% shares of L&H SP." This significant pledge of collateral gave Artesia Banking still further incentive to partake in the scheme to inflate the value of L&H stock to ensure that the Bank had a means to collect on the LHIC loans.

145.    In July 2000, Artesia Banking again provided financing to prop up the price of L&H stock. Willaert approached Artesia Banking to obtain $25 million in financing so that L&H's CEO Bastiaens could purchase $25 million of L&H stock on the open market. The stated purpose of this transaction was, again, to bolster L&H's share price. Because Artesia Banking itself still had a significant investment in L&H stock, it again expressed its willingness to engage in this manipulative act. In fact, based upon documents recently obtained from Dexia in discovery, it is clear that Artesia Banking's Management Committee approved the $25 million loan to Bastiaens with full knowledge that the purpose of the transaction was to "support" L&H's share price.

146.    After the $25 million Bastiaens loan was approved, the L&H Principal Officers decided to change the transaction, using the money to finance Bastiaens' purchase of L&H shares at a premium from L&H Holding Company rather than on the open market.  Inexplicably, Artesia Banking paid the proceeds of that $25 million loan directly to the L&H Principal Officers, rather than to the seller of the L&H shares, L&H Holding Company.  Artesia Banking was thus instrumental in allowing the L&H Principal Officers to obtain millions of dollars from the fraudulent scheme to inflate the shares of L&H stock.

### D.    ARTESIA BANKING DIRECTLY PARTICIPATED IN THE DICTAPHONE TRANSACTION, AND KNEW THAT STONINGTON WAS RELYING UPON THE ACCURACY OF L&H'S FINANCIAL STATEMENTS

147.    L&H's acquisition of Dictaphone was the culmination of the L&H fraud.  After years of falsifying its financial results and artificially inflating its stock price through sham transactions financed by Artesia Banking, L&H used  nearly half a billion dollars worth of its stock to purchase Dictaphone from Stonington.  The Dictaphone Transaction was intended to transform L&H from a house of cards built on phantom revenues to a real company anchored by Dictaphone's well-established business and client base.  From Artesia Banking's perspective, the Dictaphone Transaction provided both the leverage for the Bank to demand the repayment of its loans to the LDCs, and a lucrative opportunity to solidify its relationship with its largest client.

148.    Artesia Banking directly participated in the financing of the Dictaphone Transaction.  Specifically, the Bank loaned $50 million to L&H to enable it to acquire Dictaphone even though the Bank was aware of, and facilitated, L&H's fraudulent scheme to inflate its stock price and had actual knowledge that the Dictaphone acquisition was a stock-for-stock transaction.  As a condition to financing that Transaction, Artesia demanded that its loans to Radial and LIC, and the $20 million line of credit to Lernout, Hauspie and Willaert, first be repaid.

149.    By no later than early December 1999, Artesia Banking knew that L&H was seeking to make major acquisitions of companies in the United States that were "like LHSP, considered one of the technological leaders in the market in speech and language technology." Indeed, L&H requested Artesia Banking's involvement in the financing of a then unnamed "target" company in early December 1999.  Although the credit proposal prepared by Artesia Banking did not identity the "target" company by name because of confidentiality concerns, it noted that the company was "active in the speech and language technology" industry and derived a substantial percentage of its revenue from North America.

150.    Artesia Banking's Credit Committee reviewed that credit proposal at its December 8, 1999 meeting.  However, at set forth above at ¶¶ 122-37, at the time L&H approached Artesia Banking about funding this acquisition, Artesia Banking was extremely concerned that its loans to the sham LDCs, including LIC and Radial, would not be repaid.  Peter Rabaey summarized the status of the LIC and Radial loans in an e-mail to members of the Management and Credit Committees in which he warned that "The aforementioned credits could not be repaid on the expiration date."  Artesia Banking subsequently had multiple discussions with Hauspie, Lernout and Willaert to closely track their progress in attracting potential new investors in the LDCs, whose funds would be used by L&H to repay Artesia Banking.

151.    Accordingly, the credit proposal for the financing of L&H's acquisition advised that the Bank should finance the acquisition, but should not increase its total exposure to L&H and its related companies.  Thus, Artesia Banking's Credit Committee, at their December 8, 1999 meeting, expressly conditioned Artesia Banking's financing of the acquisition on the prior repayment of the Bank's loans to LIC and Radial, as well as its $20 million loan to Lernout, Hauspie, and Willaert – a true quid pro quo.

152.    By no later than January 5, 2000, Artesia Banking knew that the proposed transaction would be achieved through the payment of L&H stock.  On January 5, 2000, Bart Ferrand forwarded to the Management Committee an updated version of the credit proposal originally considered by the Credit Committee on December 8, 1999.  This proposal contemplated the acquisition by L&H of the still unnamed target for a total of $550,000,000 – roughly half of which would be paid in L&H stock.

153.    The January 5, 2000 memorandum also confirmed that L&H had seen to it that its part of the quid pro quo had been completed, stating that the LIC, Radial and Lernout/Hauspie/Willaert loans had been fully repaid in response to the Credit Committee's conditions.

154.    By no later than February 2000, Artesia Banking knew that L&H intended to acquire Dictaphone in a stock for stock transaction and that the Bank would be asked to finance the acquisition.  On March 7, 2000, L&H issued a press release announcing its intention to acquire Dictaphone in a stock-for-stock transaction:

> Lernout & Hauspie (NASDAQ: LHSP, EASDAQ: LHSP) (L&)(TM) announced today that it has signed a definitive agreement to acquire Dictaphone Corporation of Stratford Conn., a privately held leader in dictation and telephony call center recording systems and solutions.
> . . .
> The transaction calls for L&H to acquire all of the outstanding stock of Dictaphone for approximately 4.75 million shares of L&H Common Stock.  Dictaphone is controlled by a fund managed by Stonington Partners, a New York private investment fund. Stonington has agreed to hold 2 million of the shares it will receive for a period of 2 years and has agreed to assign voting rights to these shares during this two year period to an entity controlled by Messrs. Lernout & Hauspie.
> . . .

155.    As Artesia Banking knew, the Dictaphone Transaction could not be completed unless L&H obtained financing in the amount of approximately $400 million to pay off Dictaphone's outstanding debt.  Accordingly, in or around February 2000, L&H approached Artesia Banking and asked it to participate in the financing of the Dictaphone Transaction. Artesia Banking quickly agreed, recognizing that participation in this deal was critical to maintaining its lucrative relationship with L&H.

156.    A credit proposal submitted to the Management Committee on April 25, 2000, identified the Dictaphone Transaction and provided extensive detail about the financial condition of both Dictaphone and L&H, as well as the terms of the proposed acquisition.  That document (the "Dictaphone Credit Proposal") summarized the Credit Committee's December 8, 1999 findings and recommendations, including the fact that Artesia Banking would not have agreed to facilitate the Dictaphone Transaction unless its loans to the sham LDCs were repaid:

> Previous decisions (significant elements)
> **CKC1** 12/8/99
> Opinion positive in principle, but this is still a maximum
> <u>Conditions to be met in advance</u>:
> Effective reimbursement of LIC, Radial, Lernout/Hauspie/Willaert
> credits in the amount of 30,875 Euros
> Partial reimbursement of LHIC in the amount of 30,000 Euros
> Reduction of LHS RO in the amount of 4,250 Euros
> Submit to CD after receiving figures from Target

> (Emphasis in original).

157.    The Dictaphone Credit Proposal presented to the Management Committee also specified that L&H would buy Dictaphone using L&H stock and specifically established that Artesia Banking knew that Stonington would "bear the risks of fluctuations of the value of LHSP shares which they accepted":

> The acquisition price will be paid via a share swap, for which
> LHSP issues 4.69 million new shares (7% of the total amount of

shares after issuance).  The sellers bear the risk of fluctuations of the value of LHSP shares which they receive.  The aforementioned acquisition price is calculated on the basis of a share swap where by the LHSP shares are valued at 99 USD, which is the share value at the time of the agreement in principle.

The net worth of Dictaphone Corp. amounted to 231 million USD per 12/31/1999.  Since the acquisition price is completely paid via a share swap, the consolidated net worth of LHSP thus decreases with circa 231 million USD plus transaction costs because of the transaction.

158.    The Dictaphone Credit Proposal also assigned a transaction value to the Dictaphone acquisition of $921 million, which included $447 million to purchase the equity of Dictaphone from Stonington.  According to the credit proposal, the equity component of the transaction would be accomplished through the payment of 4.69 million shares of L&H, valued at $467 million based on the $99 market value of L&H stock.  The remainder of the acquisition price – which reflected the amount of Dictaphone debt that was to be refinanced – was to be achieved through the syndicated loan in which Artesia Banking participated.

159.    Significantly, the Dictaphone Credit Proposal detailed the benefits of the proposed transaction to both Artesia Banking and L&H.  The Bank would benefit by converting its loans to LIC and Radial into a loan to L&H, and the Dictaphone Credit Proposal highlighted the fact that L&H was far more credit-worthy than the LDCs: "A short term deferral of the credit risk:  We extend credit to Lernout & Hauspie Speech Products (listed), which is better in terms of risk than credit to an investment company (LIC and Radial Belgium.)"   In addition, the proposal touted the fact that Artesia Banking secured for itself the role of "arranger" for the loan syndicate and, as a result, would receive 25% of the arranger fees.  The credit proposal also explained how L&H – one of Artesia Banking's most important clients and a major debtor to the

Bank – would benefit from the acquisitions: "L&H SP becomes a bigger market player through the acquisition of Dragon and Dictaphone and will be able to generate synergy effects."

160.    The Artesia Banking Credit Officer responsible for the proposed financing of the Dictaphone Transaction was Peter Rabaey – the same senior credit analyst who handled Artesia Banking's sham loans to the LDCs, including LIC and Radial, as well as the use of credit default swaps to conceal L&H's involvement in those loans.    **REDACTED    REDACTED REDACTED    REDACTED    REDACTED**.

161.    Despite his detailed knowledge of Artesia Banking's involvement in the L&H fraud, Mr. Rabaey recommended that Artesia Banking participate in and facilitate the Dictaphone transaction.    Indeed, the credit proposal noted the importance of this loan to maintaining the Bank's lucrative relationship with L&H:  "Because of the strong competition by other Belgian and international banks (which are also now getting into the L&H SP dossier), it is absolutely necessary that we take on a participation in this Club Deal so as to maintain the strategic advantage created in the past."

162.    On April 25, 2000, pursuant to the terms of the credit proposal discussed above, the Management Committee preliminarily approved Artesia Banking's participation in a "Club Deal" of $400 million to be used by L&H to refinance the financial debts of Dictaphone as part of L&H's acquisition of the company.  Artesia Banking would provide $50 million as part of the deal, with the remaining funds coming from KBC Bank ($200 million) and Fortis Bank ($150 million).

163.    However, the Management Committee conditioned its approval on certain conditions being met.  Specifically, the Management Committee required a formal engagement to repay certain LHIC, L&H, and Delcredere credits/loans.  Artesia Banking's loans to LIC,

Radial, and Lernout, Hauspie, and Willaert, having been repaid in January 2000 after the Credit Committee first made repayment of those loans a condition of Artesia Banking's agreement to finance any future L&H acquisitions, were no longer at issue.

164.    On April 27, 2000, Artesia Banking's Credit Committee met to discuss the Management Committee's decision and to review and analyze the current credit proposal.  The Credit Committee proposed that the Bank request an additional guarantee from Dictaphone on the loan to L&H and noted that L&H desired to increase the amount of the loan in order to finance the compensation of options granted to Dictaphone personnel.

165.    On May 2, 2000, the Management Committee met to follow-up on its April 25 meeting and Credit Committee's April 27 meeting.  The Management Committee reviewed and approved the advice of Credit Committee.  Artesia Banking signed the Credit Facility setting forth the details of its participation in the Club Deal financing L&H's acquisition of Dictaphone. Artesia Banking contributed $50 million of the final loan amount of $430 million, with the remaining funds coming from KBC Bank ($176,500,000), Fortis Bank ($150 million), Deutsche Bank ($30 million), and Dresdner Bank ($23,500,000).  The syndicated loan was structured as a $200 million short term loan and a $230 million long term loan, with Artesia Banking contributing $25 million to both loans.  Further, one of the conditions to the loan agreement was that L&H had to, within one month of the Effective Date, cause a "first demand guarantee" to be issued by Dictaphone in favor of the banks guaranteeing L&H's payment obligations under the Credit Facility.  Thus, in sum, the Credit Facility required Dictaphone to guarantee the loans to L&H.  As noted above, the Dictaphone Transaction closed on May 5, 2000.

166.    As a participant in the Credit Facility, Artesia Banking knew about, and was fully familiar with, the representations and warranties (and other terms) in the L&H/Dictaphone

merger agreement, and clearly knew that Stonington was relying on the accuracy and integrity of L&H's financial statements. Indeed, Artesia Banking's own documents – the $430 million Credit Facility which was signed by Artesia Banking – shows that Artesia Banking received and reviewed the L&H/Dictaphone merger agreement in connection with Artesia Banking's financing of the acquisition. That Credit Facility specifically defines "Dictaphone Corporation" as "a Delaware corporation which will be merged with and into Dark Acquisition Corporation, a Delaware corporation *pursuant to a merger as agreed in the Agreement and Plan of Merger between the Borrower [L&H], Dark Acquisition Corp. and Dictaphone Corp. dated March 7, 2000*, which is anticipated to close on May 5, 2000 and pursuant to which Dark Acquisition Corp. will be the surviving entity." (Emphasis supplied).

167. Moreover, Bank documents show that the Artesia Banking Management Committee, as part of its decision-making process, reviewed and relied upon L&H's financial results from 1996, 1997, 1998, and 1999, as well as estimated financial information for 2000, in deciding to approve the financing for the Dictaphone Transaction. This information included, *inter alia*, L&H's year-end 1998 and 1999 consolidated balance sheets; 1998 and 1999 consolidated statements of operations; 1997, 1998, 1999, and projected 2000 income statements; and a "balance sheet analysis" that contained 1996, 1997, and 1998 assets, liabilities, revenue, and cash flow. As a sophisticated bank participating in a high-profile billion dollar transaction, Artesia Banking knew that Stonington was relying on the same information in deciding to sell Dictaphone.

168. Similarly, the Dictaphone Credit Proposal shows that the Management Committee, as part of its decision-making process, also reviewed and relied upon Dictaphone's year-end consolidated income statement for 1997, 1998 and 1999 and projected income

statements for 2000 and 2001. In addition, the Dictaphone Credit Proposal included "pro-forma" financial results for the merged L&H/Dictaphone entity.

169.    According to a former L&H director and the individual who led L&H's negotiations with the bank syndicate to obtain the financing for the Dictaphone Transaction, the financing to which Artesia Banking contributed $50 million was an integral component of the Dictaphone Transaction. The Transaction could not have been consummated without it.

### Artesia Banking Touted L&H Stock And Acted To Conceal The L&H Fraud Contemporaneously With Its Financing Of The Dictaphone Transaction

170.    As set forth above, in January 2000 – just as Stonington and L&H began to negotiate the sale of Dictaphone, the Internal Audit Department at Artesia Banking was issuing reports questioning Artesia Banking's use of credit default swaps, specifically the failure to pay the L&H Principal Officers the consideration due under the Radial and LIC credit default swaps and the failure to issue 281.50 forms for the taxes due on that consideration. Artesia Banking could not resolve that deficiency because the payment of those taxes, and the necessary late-payment penalties, would have garnered extensive attention and revealed L&H's connection to the LDCs.

171.    Artesia Banking's response was to simply pretend that the credit default swaps had never even existed. Specifically, Artesia Banking agreed to "unwind" the credit default swaps by having the L&H Principal Officers return any consideration they had received and waive their right to any unpaid consideration. On February 10, 2000 – while Stonington was conducting its due diligence of L&H – Claude Piret proposed this solution to Geert Dauwe:

> It seems to me that the aim of these transactions was to protect us from any risk of non-repayment of credits and was an alternative to joint guarantee (given to us as any good guarantee).
> I think that the simplest solution for these Credit Default Swaps is to reach an agreement with our clients that no sum is due to them

for these transactions and to consequently adjust (i.e. to naught) the
sums due to them.
Could you sort out this little "business" problem and inform the
persons concerned listed at the top of the attached memo.

172.    Mr. Dauwe, in turn, delegated the matter to Francois Saverys, the Director of

Global Credit Risk and a member of the Credit Committee.  Just days before Stonington entered

into the Dictaphone Transaction, and mere weeks before the Transaction closed, Saverys warned

that the proposed unwinding of the credit default swaps made it more likely  that the Bank would

be found to have employed a "special mechanism" – that is, to have engaged in fraud.  On March

6, 2000, Saverys wrote Piret and Dauwe that Artesia Banking had effectively backed itself into a

corner:  the Bank's only rationale (though rejected by its own Internal Audit Department) for not

disclosing the L&H connection in the Radial and LIC credit agreements was the narrow

distinction between credit default swaps and personal guarantees, that is, the payment of

consideration.  However, to avoid the tax implications of using credit default swaps, Artesia

Banking had to rescind the consideration paid and not pay any outstanding consideration,

reducing the credit default swaps to simple guarantees.

173.    Notwithstanding Mr. Saverys' warning, Artesia Banking determined to unwind

the credit default swaps.  An internal document produced by the Bank outlines this strategy:

Solution: the CDS counterparts shall reimburse us for the amounts
paid by Artesia.
-> Artesia is not filling out the 281.50 forms.
What is the solution so that does not run any risk and so that the
counterparties for the CDS also do not run any risks?

174.    Artesia Banking ultimately prepared "Out-Of-Court Settlement" agreements with

the counterparties to the Radial and LIC credit default swaps.  The agreements stated that Artesia

Banking "suffered a loss" because the Radial and LIC loans, which were due on December 15,

1999, were not repaid until December 24, 1999.  In exchange for Artesia Banking releasing its

rights under the credit default swaps, the counterparties in turn agreed to reimburse the Bank for any consideration they received under the credit default swaps, and to waive their right to any unpaid consideration.  Artesia Banking never issued the required tax forms for the consideration required to be paid under the Radial and LIC credit default swaps.

175.    Contemporaneously, Cordius Asset Management ("Cordius"), an Artesia Banking subsidiary, was issuing glowing reports on L&H and maintaining a "Buy" rating that encouraged investors to purchase L&H stock.  For example, on February 8, 2000, the day before L&H released its financial results for the fourth quarter and year ending December 31, 1999, Cordius issued a report that rated L&H a "Buy."  The February 8 report, which included selected L&H financial results for 1998 and expected results for 1999, 2000, and 2001, as well as a chart tracking L&H's stock price since February 1998, stated "At the moment, we do believe that L&H's stock is fairly priced...  We continue to rate L&H as a BUY as we are unwilling to change recommendations just before the release of Q4 results, which will be disclosed tomorrow after Nasdaq close."

176.    On February 10, 2000, immediately following L&H's announcement of its of its 1999 financial results, Cordius issued a report that reiterated its "Buy" rating:  "Although the stock is at present fairly priced, we continue to give the stock a buy recommendation due to its increasingly improving fundamentals."  In that report, Cordius republished certain L&H financial information from 1998 and 1999, as well as projected results for 2000 and 2001, and provided a chart tracking L&H's stock price since February 1998.

177.    Indeed, on March 9, 2000, in response to the public announcement of the Dictaphone Transaction, Cordius issued a report that discussed the terms of that transaction and its projected impact on L&H.  The March 9 report noted that L&H would pay for Dictaphone in

stock, and reiterated the "Buy" recommendation for L&H.  Once again, Cordius provided select L&H financial results for 1998 and 1999, and historical stock prices going back to March 1998. Cordius reported that the acquisition of Dictaphone was "good for L&H" and concluded "We continue to recommend buying the shares."

### The Harm Suffered By Stonington Was Foreseeable

178.    The losses suffered by Stonington as a result of the Dictaphone Transaction were reasonably foreseeable to Artesia Banking.  As set forth above, Artesia Banking directly participated in the Dictaphone Transaction by providing the financing needed for the Transaction to close.  It did so with the knowledge that Stonington was receiving L&H stock in exchange for its interest in Dictaphone, and that the value of that stock was artificially inflated as a result of the fraud in which Artesia Banking had participated for years.  In addition, Artesia Banking knew that Stonington was relying on L&H's previously reported financial results for, at a minimum, 1999 and 1998, in agreeing to sell Dictaphone for stock.  Indeed, Artesia Banking itself considered and relied upon the financial results of both L&H and Dictaphone for those years, and additional financial information going back to 1997 and 1996, when it  agreed to finance the Dictaphone Transaction.   Moreover, through March 2000, Cordius, Artesia Banking's own subsidiary issued reports on L&H to its customers that included L&H's 1998 financial results and L&H's stock price going back to early 1998.

179.    Further, before Artesia Banking first began to participate in the L&H fraud, the Bank knew of L&H's long history and aggressive strategy of acquiring companies and technology using L&H shares as consideration. By no later than April 1997 – before it had made loans to Dictation, BTG, Radial, LIC, and the $20 million loan to Lernout, Hauspie and Willaert – Artesia Banking knew that:

- in September 1996, L&H had acquired the Belgian translation service company Mendez in exchange for a combination of cash and a bond mandatorily convertible into L&H common stock upon maturity,

- from November 1996 through March 1997, L&H had acquired the Spanish company Lexitrans and the German company Translingua, each in exchange for a combination of cash and a bond mandatorily convertible into L&H common stock upon maturity,

- in April 1997, L&H had entered into an agreement to acquire substantially all of Lay Up, a leader in machine translation technology, in exchange for $10 million in cash and $15 million in L&H common stock, and

- in April 1997, L&H had entered into an agreement to acquire Trappist, a leading developer of dictation software, in exchange for a combination of cash (80%) and L&H common stock (20%).

180.   By no later than June 1997, Artesia Banking also knew that:

- in April 1997, L&H had entered into an agreement to acquire Kurzweil, a leading developer of dictation software and products, in exchange for a combination of cash (80%) and L&H shares (20%),

- in May 1997, L&H had acquired the German company GMS for a combination of cash, a bond, L&H shares and L&H warrants, and

- L&H intended to continue to pursue this strategy of acquiring complementary business and technologies.

181.   By no later than July 1997, Artesia Banking also knew that:

- in June 1997, L&H had agreed to acquire Kurzweil Applied Intelligence, a company active in the field of speech technology, in exchange for $40.7 million in cash and L&H shares purportedly worth $13.3 million.

182.   At a meeting on July 7, 1997 – before Artesia Banking had made loans to Radial,

LIC, and the $20 million loan to Lernout, Hauspie and Willaert – Artesia Banking's

Management Committee considered L&H's acquisition strategy, specifically including L&H's acquisitions of Mendez, Lexitrans, Translingua, Kurzweil and GMS, and was informed that L&H's acquisitions since the fourth quarter of 1996 were "for the greater part financed by an issuance of new [L&H] shares."

183.    By no later than September 1997, Artesia also knew that:

- in June 1997, L&H had acquired the text-to-speech technology of Centigram in exchange for 180,050 shares of L&H common stock purportedly valued at $5.2 million.

184.    By no later than April 1998, Artesia Banking also knew that:

- L&H had entered into an agreement to acquire the linguistic components division of U.S. company INSO Inc., in exchange for a combination of cash (50%) and L&H shares (50%).

Moreover, Artesia assisted L&H to complete the acquisition of INSO Inc. by providing a standby letter of credit in the amount of $9.5 million.

185.    By no later than August 1998, Artesia also knew that:

- L&H had entered into an agreement to acquire the German company Heitmann International in exchange for a note convertible to L&H shares.

Again Artesia assisted L&H, by providing the sellers of Heitmann International with a $15 million bank guarantee in connection with this acquisition.

186.    By no later than May 1999, Artesia Banking also knew that:

- in March 1998, L&H had acquired Applications Technology Inc. in exchange for $8.3 million and L&H shares purportedly valued at $2 million, and

- in September 1998, L&H had acquired Globalink, Inc., a developer and provider of translation software and translation services, in exchange for 1,520,603 L&H shares.

187.    Given Artesia Banking's knowledge of L&H's extensive history of using its own shares to purchase competing companies and technologies, it is evident that at all material times the Bank knew that the investors whom L&H intended to deceive, and did in fact deceive, through its false financial statements and the fraudulently inflated price of its shares included investors acquiring new L&H shares from L&H in non-market transactions.  Artesia Banking also should reasonably have foreseen that such non-market investors would rely on, and be deceived by, L&H's false financial statements and inflated stock price, and would suffer losses as a result.

E.    **THE ARTESIA ENTITIES CAUSED STONINGTON'S LOSSES**

188.    As described herein, the Artesia Entities participated in a fraudulent scheme and course of conduct that deceived Plaintiffs, made and caused to be made a series of false statements and failed to disclose various material information concerning L&H.

189.    At all material times, the fraudulent scheme and deceptive conduct described herein and the misrepresentations made by L&H, the Artesia Entities and other participants pursuant to that fraudulent scheme had the effect, *inter alia*, of either inflating the market price of L&H securities or of maintaining the price of those securities at values those securities would not have traded had the truth concerning the Company's operations been disclosed to investors. Likewise, at all material times, the Artesia Entities' material misrepresentations and omissions and other acts in furtherance of the scheme to defraud alleged herein had the effect of maintaining the prices of L&H's securities at levels at which those securities would not have traded had the truth concerning the Company's operations been disclosed to investors.

190.    The truth as described herein – including that a substantial portion of L&H's revenue was false and that the LDCs were in fact shams and were propped up with loans made by Artesia Banking and guaranteed by the  L&H Principal Officers with sham credit default

swaps – was not known to, and through the exercise of reasonable diligence could not have been known to, Plaintiffs.

191.    The fraudulent course of conduct in which Artesia Banking engaged, including the false and misleading statements made by Artesia Securities for which Artesia Banking is responsible, caused L&H securities to trade at prices significantly in excess of the actual value of those securities.  In reliance on the integrity of the market in which the fraudulent scheme was directed and in which the false and misleading statements were made, Stonington agreed to accept 9,064,329 shares of L&H common stock in exchange for its interest in Dictaphone, which were valued at approximately $490 million, based upon the trading price of L&H stock on the Closing Date ($53.97 per share).   The price of that stock was attained only because the fraudulent scheme and devices employed by Artesia Banking, including the false and misleading statements made by Artesia Securities for which Artesia Banking is responsible, allowed L&H to generate false revenue and conceal the true nature of the Company's financial condition.

192.    When the market learned information about the fraudulent scheme in which the Artesia Entities were integral participants and information that was inconsistent with the disclosures made by the Artesia Entities and pursuant to that fraudulent scheme, the price of L&H securities declined dramatically in value.  When *The Wall Street Journal* began to question the legitimacy of L&H's revenues in an article published on August 8, 2000, investors also began to question whether the revenues generated by L&H through the use of the LDCs and CLDCs were legitimate and whether L&H was employing transactions with related parties to unlawfully improve the Company's financial results.  Thus, as a result of investor concerns regarding the legitimacy of the revenue generated by L&H, including the revenue generated by means of what was later admitted to be the fraudulent LDC transactions engineered by Artesia

Banking, L&H stock price dropped by 19.4% (or $7.17/ share) from $36.99 to $29.81 on August 8, 2000 and by an additional 10.3% (or $3.06/share) on August 9, 2000, to close at $26.75.

193.    L&H stock recovered somewhat in the ensuing weeks, but dropped by 13.3%, to close at $30.06, when Bastiaens was forced to resign as the Company's CEO on August 25, 2000. That move caused investors to grow increasingly nervous concerning the legitimacy of L&H's previously reported revenue, including the revenue generated by means of the fraudulent LDC transactions engineered by Artesia Banking.

194.    L&H stock continued its decline on September 20, 2000 and September 21, 2000, when L&H announced that the SEC would investigate the Company's financial statements. Because of investor concerns that the SEC investigation would result in a downward revision of L&H's reported results, including a revision related to the fraudulent LDC transactions engineered by Artesia Banking, L&H stock fell by 14.1% on September 20, 2000 and by 28.8% on September 21, 2000, to close at $15.13.

195.    On September 27, 2000, these concerns were further aggravated, leading to a 30.4% decline in the price of L&H stock, to $9.75. That decline followed L&H's announcement that it expected that its third quarter revenues and earnings would fall short of the range the Company had previously conditioned investors to expect. That announcement caused investors to question whether the past announcements made by L&H concerning its financial performance were also inflated, a fear that was later shown to be legitimate when the fraudulent nature of the LDC transactions engineered by Artesia Banking and the phony revenue derived from those transactions was revealed.

196.    The downward trend in L&H's stock price continued on October 18, 2000, when L&H stock fell from $9.75 to $8.44, and on October 19, 2000, when L&H stock further declined

by 10.4%, to $7.56. Those declines followed L&H's announcement that it would refuse to disclose to the SEC the identities of the investors in the LDCs that had produced substantial fraudulent "revenue" for L&H (including the investors in the fraudulent LDC transactions engineered by Artesia Banking). That announcement again caused investors to question the legitimacy of the revenue L&H generated by means of transactions with the LDCs, including the fraudulent transactions in which Artesia Banking played an integral role.

197.    The legitimacy of the revenue produced by L&H pursuant to the fraudulent scheme in which Artesia Banking participated was again called into question on October 26, 2000, when *The Wall Street Journal* reported that L&H's claim that it received $3 million in payments from four Belgian companies in late 1998 was not supported by financial statements filed by those entities with Belgian regulators. Because of investor concern regarding the legitimacy of the LDC transactions, including the fraudulent LDC transactions engineered by Artesia Banking, L&H stock fell by 35.4%, to $5.13 per share.

198.    On November 9, 2000, L&H announced that it would have to restate its financial results for 1998, 1999 and the first half of 2000 as a result of the improper manner in which L&H accounted for its transactions with the LDCs and CLDCs and its Korean operations. Trading in L&H stock did not commence again until December 8, 2000, at which time L&H stock fell 77.5%, to $1.40. Again, the fraudulent nature of L&H's transactions with the LDCs, including the fraudulent transactions engineered by Artesia Banking, was the cause of that decline in L&H stock. Because L&H was unable to produce revenue and earnings growth without recording that fraudulent revenue, investors drove the price of L&H stock down severely.

199.    In addition to the foregoing, the Artesia Banking's actions also caused Stonington's losses because, in the absence of the fraudulent transactions engineered by Artesia

75

Banking, L&H securities would never have attained the prices at which they traded in March 2000. Indeed, L&H stock traded at substantial multiples of L&H's revenue and earnings based upon investors' perception that L&H was a "growth" stock. Had L&H and Artesia Banking not employed their fraudulent scheme, L&H would not have been able to report the substantial revenue and earnings growth that fueled L&H's stock price. In such circumstances, L&H's stock price would have remained substantially lower.

200.    The materially false and misleading analyst reports issued by Artesia Securities at the direction of Artesia Banking were also a contributing factor to the losses suffered by Stonington. Those reports contributed to investors' perception that L&H was a legitimate company that was producing substantial revenue and earnings growth. The fact that a large, seemingly reputable bank such as Artesia Securities consistently touted L&H's financial performance and prospects significantly enhanced L&H's profile among investors and thereby played a significant role in increasing and maintaining the market prices of L&H securities.

201.    Thus, the Artesia Entities' conduct and the materially false and misleading representations made pursuant to the fraudulent scheme in which they knowingly participated resulted in Stonington's purchase of L&H securities at prices significantly in excess of the actual value of those securities. Stonington would not have exchanged its interest in Dictaphone for L&H securities had it been aware of the true facts concerning the Company's business operations and prospects.

202.    Had either of the Artesia Entities disclosed – as they were obligated to do – their role in the L&H fraud prior to the Dictaphone Transaction agreement or the closing of that Transaction, the market prices of L&H securities would have fallen to the levels at which they traded immediately prior to the suspension of trading on November 9, 2000. Thus, the

fraudulent conduct of the Artesia Entities was a substantial contributing cause of Stonington's losses.

203.    The secret guarantees and sham credit default swaps were integral components of the fraudulent devices and scheme used to finance the LDCs that provided fictitious revenue to L&H.  By employing the secret guarantees and sham credit default swaps, Artesia Banking prevented L&H's auditors from detecting the fraudulent scheme and devices when the auditors conducted their year-end audits of L&H's financial statements for 1998 and 1999.  Had Artesia Banking disclosed these secret guarantees and credit default swaps, the purpose of the $20 million loan to the L&H Principal Officers, or Artesia Banking's role in the fraudulent scheme that Plaintiffs have alleged, L&H's auditors would not have certified L&H's financial statements for 1998 and 1999.  Without those certifications, L&H's false financials would not have been disseminated in the market, the scheme would not have succeeded in falsely inflating the market price of L&H's securities and Stonington would not have suffered any losses

204.    Additionally, by engaging in the fraudulent scheme and employing deceptive devices to fund sham LDCs to provide phony revenue to L&H, Artesia Banking concealed the true dire state of L&H's financial condition and the true risks inherent in L&H's ability to generate revenues to continue as a going concern.  Eventually, these concealed risks materialized, directly causing the Company's bankruptcy, which completely wiped out the market value of L&H's securities, rendering them worthless.  It was foreseeable to the Artesia Banking that the realization of the financial risks that they concealed through their fraudulent acts would ultimately cause (a) the steep decline in the market price of L&H's securities, and (b) the L&H's ensuing bankruptcy, which resulted in the total decimation of the value of the Company's securities.  Thus, Artesia Banking may be held accountable for Stonington's losses.

205.    Accordingly, the material misrepresentations, omissions, acts, practices, devices and fraudulent schemes alleged herein were the proximate causes of the damages sustained by Stonington in connection with its purchases of the Company's common stock.

**F.    ARTESIA BANKING LIED TO THE INVESTIGATORS OF THE L&H FRAUD TO CONCEAL ITS ROLE IN THE FRAUD**

206.    Artesia Banking took significant affirmative steps to cover up its role in the L&H fraud.  As discussed above, Artesia Banking specifically ensured that the credit default swaps provided by the Lernout, Hauspie, and Willaert were not mentioned in the loan documents – despite receiving the advice of the Legal Department that such disclosure was necessary.  Artesia Banking took that step to conceal from investors and L&H's auditors that the agreed purpose of the loans made by Artesia Banking was to permit L&H to report fraudulently inflated revenue.  Thus, by concealing the credit default swaps and the guarantees from investors, Artesia Banking enabled L&H to continue to attract new investors.  Artesia Banking then unwound the credit default swaps to avoid the tax implications that would have revealed the fraud.  Had Artesia Banking not taken those affirmative steps to conceal the credit default swaps and guarantees executed by Lernout, Hauspie and Willaert, L&H would not have been able to report revenue growth to investors, and would therefore have traded at substantially lower prices during the relevant time period.  Moreover, the revelation of the LDC fraud to investors would have prevented L&H from acquiring its Korean operations and engaging in the fraudulent conduct that occurred in Korea.

207.    Even after the L&H fraud began to come to light in November 2000, Artesia Banking concealed the integral role that it played in the fraudulent scheme by deliberately misleading investigators hired by L&H's Audit Committee to determine the scope of the Company's accounting irregularities.

208.    For example, Artesia Banking concealed its role in the fraudulent scheme Plaintiffs allege by providing false and misleading information to Loeff Claeys Verbeke ("Loeff Claeys"), one of the law firms charged with that investigation and the co-author of the Audit Committee Report,. Loeff Claeys specifically asked Artesia Banking about L&H's possible role in securing financing for LIC. On November 24, 2000, Artesia Banking sent a letter to Loeff Claeys in response to that inquiry. According to the Prosecutors' Report, Artesia Banking's letter stated: "On December 22, 1998, ARTESIA BANK N.V. granted a credit line to N.V. LANGUAGE INVESTMENT COMPANY in the amount of BEF 220,000,000; L&H provided no bank guarantees for this loan." (Emphasis added.)

209.    This intentionally misleading response made no mention of the credit default swaps executed by Lernout, Hauspie and Willaert in connection with the LIC transaction in order to conceal Artesia Banking's critical role in the fraudulent scheme Plaintiffs allege. As a result, the Audit Committee Report makes no mention of Artesia Banking's role in the fraud. Likewise, none of the *Wall Street Journal* articles that initially suggested that L&H was engaged in fraudulent activities mentioned any role played by Artesia Banking, although those articles revealed the fraudulent nature of the transactions with the LDCs in which Artesia Banking was an integral participant.

210.    Also in November 2000, the CBF (the agency responsible for supervising and regulating Belgian banks) sought information from Artesia Banking concerning its relationship with L&H and "companies of the L&H group". Within the Bank, Dictation, BTG, Radial and LIC were consistently referred to as part of the "L&H Group." However, Artesia Banking's responses to the CBF's request for information did not include any information about the loans to these companies. The CBF also requested that Artesia Banking's Internal Audit Department

undertake an evaluation of the Bank's compliance with "legislation and ethical regulations" in connection with "credits directly allocated to companies of the L&H group."  As far as Plaintiffs have been able to ascertain, Artesia Banking conducted no such evaluation of the loans to Dictation, BTG, Radial and LIC.  Moreover, Artesia Banking did not inform the CBF about the negative findings its Internal Audit Department had made previously, in January 2000, concerning the Bank's failure to disclose the credit default swaps in the Radial and LIC loan documents, and failure to comply with tax regulations applicable to credit default premiums. (*See* ¶¶ 126-27, above.)  According to an April 26, 2001 letter from the CBF to Dirk Bruneel, Chairman of the Artesia Banking Management Committee, Artesia Banking withheld from the CBF findings by Artesia Banking's Internal Audit Department concerning the Bank's improper handling of the Radial and LIC credit default swaps:  "I also await your explanation regarding the fact that the findings made by your auditors were not mentioned in the Internal Audit Reports sent to the CBF and to your Audit Committee regarding the evaluation of compliance with rules and regulations of professional conduct in the Lernout & Hauspie files."  Artesia Banking withheld this information from the CBF in order to conceal its role in the L&H fraud.

211.    Artesia Banking and later Dexia again took steps to conceal the Bank's role in the fraudulent scheme by publicly and falsely portraying the Bank as a victim of the L&H fraudulent scheme.  For example, on or about March 16, 2001, the Belgian newspaper *L'Echo* published a story entitled, "L&H:  The Courts Have Heard from a Director of Artesia."  The article reports that Geert Dauwe, one of Artesia Banking's then-directors, was interviewed by Belgian authorities as part of the criminal investigation of L&H.  The article quotes a Dexia spokesperson as stating:  "The police invited Mr. Dauwe to respond to questions regarding the L&H case. ***Nobody else from the bank has been interrogated.***"  (Emphasis added).  As shown below, this

80

statement was false and misleading when made and designed to conceal Artesia Banking's primary role in the scheme to defraud that Plaintiffs have described.

212.    Contrary to Artesia Banking's suggestion, the interview of Dauwe was not a lone interview with an innocent victim of the fraud.  In fact, unbeknownst to Plaintiffs and the public, at the time of the March 16, 2001 article: (a) the Belgian prosecutor's criminal investigation was aimed directly at Artesia Banking as a participant in the L&H fraud; and (b) the Belgian authorities had in fact interrogated at least five other present or former officers, directors or managers of Artesia Banking in connection with the L&H criminal investigation – some on more than one occasion.  Thus, Artesia Banking's false public statement that only one of its employees had been interrogated in the L&H criminal investigation was designed to and did further conceal Dexia's role in the fraudulent scheme that Plaintiffs have described.

213.    Notwithstanding Artesia Banking's substantial role in the L&H fraudulent scheme, while actively pursuing claims in the L&H bankruptcy proceedings in both the U.S. and in Belgium, Dexia again falsely portrayed itself as a legitimate creditor victimized by L&H and allegedly entitled to priority over other creditors of the Company.  In fact, on or about April 17, 2001, Dexia was awarded 44 million Euro from the Commercial Court in Belgium, and thereafter continued to proceed with claims as a "victim" in the bankruptcy proceedings.  Had the Court been aware of Artesia Banking's role in the fraudulent scheme as described herein, Dexia would likely not have been awarded any money from the L&H bankruptcy estate.

214.    As a consequence of the successful efforts of Artesia Banking and Dexia to conceal Artesia Banking's role in the L&H fraud, Plaintiffs did not discover, or even suspect, that role until the article was published in *The Belgian Financial Times* on June 24, 2003.  Prior

to that time, despite diligent efforts by Plaintiffs and counsel, Plaintiffs were unaware of Artesia

Banking's role in the fraud at L&H.

## V.     THE MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     PUBLICLY ISSUED FALSE AND MISLEADING STATEMENTS MADE BY L&H IN FURTHERANCE OF THE FRAUDULENT SCHEME

215.    On April 28, 1998, L&H issued a press release via Business Wire entitled

"Lernout & Hauspie Reports Record Q1 Revenues of $35 Million; Strong Earnings of $0.13 Per

Share Before One Time Charge for First Quarter."  This press release stated, in relevant part:

> For the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997.
>
> * * *
>
> Net income before one time charges and unusual items for the first quarter of 1998 reached $7 million, or $0.13 per share on 52.5 million average diluted shares outstanding which is a 62.5% increase when compared to $2.7 million in net income, or $0.08 per share on 34.4 million average outstanding shares for the first quarter of 1997.

216.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of

Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of

1934, filed with the SEC on May 1, 1998.

217.    These statements regarding L&H's financial results for the first quarter of 1998

were materially false and misleading because revenues and accounts receivable were artificially

inflated by at least $11.7 million and earnings were materially overstated, as admitted by L&H's

restatement of its financials for this period.

218.    On July 28, 1998, L&H issued a press release via Business Wire entitled "Lernout

& Hauspie Reports Record Q2 Revenues of $45 Million; Record Net Profits of $9.5 Million or

$0.17 EPS Before Exceptional Items."  This press release stated, in relevant part:

> For the second quarter of 1998, L&H's total revenues were $45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997.
>
> * * *
>
> Net income before one time charges and unusual items for the second quarter of 1998 reached $9.5 million. This represents $0.17 per share on 55.1 million average diluted shares outstanding which is a 138% increase when compared to $4.0 million in net income, or $0.11 per share on 36.1 million average outstanding shares for the second quarter of 1997.

219.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on August 7, 1998.

220.    These statements regarding L&H's financial results for the second quarter of 1998 were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $9.4 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

221.    On October 27, 1998, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Record Q3 Revenues of $54.9 Million; Record Net Profits of $12.1 or $0.22 EPS Before Exceptional Items." This press release stated, in relevant part:

> For the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997.
>
> * * *
>
> Net income before one-time charges and unusual items for the third quarter of 1998 reached $12.1 million. This represents $0.22 per share on 55.9 million average diluted shares outstanding which is a 133% increase when compared to $5.2 million in net income, or $0.13 per share on 40.5 million average outstanding shares for the third quarter of 1997.

222.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on October 29, 1998.

223.    These statements regarding L&H's financial results for the third quarter of 1998 were materially false and misleading, as admitted by L&H's restatement of its financials for this period.  Revenues and accounts receivable were artificially inflated by at least $15.8 million, including approximately $6 million of licensing fees paid by the LDCs and CLDCs from funds borrowed from Artesia Banking, as set forth above.  Earnings were also materially overstated.

224.    On April 7, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues and Record Earnings Before One-Time Charges for Fourth Quarter 1998 and Fiscal Year 1998."  This press release stated, in relevant part:

> Lernout & Hauspie (Nasdaq: LHSP) (Easdaq: LHSP) (L&H), a worldwide market leader in speech and linguistic technologies, products and services, today announced results for the fourth quarter of $76.7 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997.  For the fiscal year 1998, the company reported total revenues of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for 1997.
>
> * * *
>
> The Company reported approximately $12.9 million in net income, before one-time charges and exceptional items, for the fourth quarter of 1998 or EPS (Earnings Per Share) of $0.22 cents per share on 58.3 million average diluted shares outstanding.  The Company's fourth quarter net income includes an increase in goodwill amortization expense of approximately $1.5 million or $0.03 per share, relating to the company's previously announced revaluation of in-process research and development acquired in prior quarters, to reflect new United States Securities and Exchange Commission (the "SEC") guidelines.  If not for this change, the Company's net income before one-time charges would have been $0.25 per share.
>
> * * *

> Net income for the full year of 1998, excluding one-time charges, totaled $37.8 million or $0.69 per share on 55.2 million average diluted shares compared to $20 million or $0.53 per share on 38.9 million average diluted shares during 1997.

225.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on April 19, 1999.

226.    In the same April 7, 1999 press release, L&H touted the expansion of its relationships with strategic partners, which the Company falsely described as independent companies funded by unidentified private investors whom L&H insisted were "unaffiliated with us." L&H announced the following:

> [L&H began] development of approximately 20 additional exotic languages with its financial and technological partners. During 1998, contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies.… In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

227.    On June 30, 1999, L&H filed with the SEC its Form 20-F Annual Report pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1998 (the "1998 20-F"). The 1998 20-F included the same financial information contained in L&H's April 7, 1999 press release.

228.    These statements regarding L&H's financial results for the fourth quarter of 1998 and for the 1998 fiscal year were materially false and misleading, as admitted by L&H's restatement of its financials for this period. Fourth quarter revenues and accounts receivable were artificially inflated by at least $27.1 million, including approximately $6 million

attributable to sham LDCs established by Artesia Banking, as set forth above. Year-end revenues were also artificially inflated by at least $64 million ($12 million of which was attributable to sham LDCs established by Artesia Banking) and earnings were materially overstated.

229. In its 1998 Annual Report on Form 20-F, L&H again falsely represented that the strategic partners were "unaffiliated" entities with the ability to develop and market speech recognition products:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that **are unaffiliated with us** to develop and localize our technology for specified new languages. Our strategic partners also have exclusive rights … to develop, market, and distribute products incorporating the developed technology. In addition to one-time license fees, we have rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

> (Emphasis added.)

230. On May 18, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues and Strong Earnings For First Quarter; Company Achieves Revenues of $70.7 Million and EPS of $0.12 Before Exceptional Items." This press release stated, in relevant part:

> For the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.

> * * *

> Net income before exceptional items for the first quarter of 1999 reached $7 million, or $0.12 per share on 58.1 million average diluted shares outstanding which is a 13% increase when compared to $6.2 million in net income, or $0.12 per share on 52.5 million average outstanding shares for the first quarter of 1998.

231.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on June 1, 1999.

232.    These statements regarding L&H's financial results for the first quarter of 1999 were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $20.1 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

233.    On July 28, 1999, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Strong Revenues, Earnings and Cash Flow For Second Quarter; Company Achieves Revenues of $76 million and EPS of $0.17; Reduced DSO's."   This press release stated, in relevant part:

> For the second quarter of 1999, L&H's total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million for the second quarter of 1998.  L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998.   The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.
>
> * * *
>
> Net income for Q2 1999 reached $10.1 million, or $0.17 per share on 59.4 million shares which is a 21% increase when compared to $8.3 million, or $0.15 per share on 55.1 million shares for the second quarter of 1998.  Net income for the first six months ended June 30, 1999 reached $17.1 million, or $0.29 per share on 58.8 million average diluted shares outstanding, which is a 17% increase when compared to $14.6 million in net income, or $0.28 per share on 52.5 million average outstanding shares for the six months ended June 30, 1998.

234. This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on August 6, 1999.

235. These statements regarding L&H's financial results for the second quarter of 1999 were materially false and misleading, as admitted by L&H's restatement of its financials for this period. Revenues and accounts receivable were artificially inflated by at least $26.2 million, including approximately $20 million of revenues attributable to sham LDCs established by Artesia Banking, as set forth above. Earnings were also materially overstated.

236. On October 27, 1999, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Record Revenues of $87.5 Million and Strong Earnings of $0.16 for Third Quarter; Record Earnings Before Goodwill Amortization of $18.5 Million or $0.31 per Share." This press release stated, in relevant part:

> For the third quarter of 1999, L&H's total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998.
>
> * * *
>
> Net income for Q3 1999, before goodwill amortization, reached $18.5 million, or $0.31 per share on 60.5 million shares. This is a 25% increase compared to $14.7 million before goodwill amortization and one-time charges, or $0.26 per share on 55.8 million fully diluted shares, for the third quarter of 1998. Net income for the nine months ended September 30, 1999 reached $50 million before goodwill amortization and one-time charges, or $0.85 per share on 59.1 million fully diluted shares which is a 43% increase when compared to $34.7 million in net income, or $0.64 per share on 54.1 million fully diluted shares for the nine months ended September 30, 1998. Net income for the third quarter of 1999 was $9.8 million or $.16 per share on a fully-diluted basis versus a net loss of $35.6 million or $.70 per share net loss for the third quarter of 1998.

237. This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on November 4, 1999.

238. These statements regarding L&H's financial results for the third quarter of 1999 were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $45.5 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

239. On February 9, 2000, L&H issued a press release via Business Wire entitled "Lernout & Hauspie Reports Record Revenues of $110 Million and Earnings Per Share of $0.22 for Fourth Quarter (Before Exceptional Items); Strong Fiscal Year 1999; Announces 2-For-1 Stock Split; Record Earnings of $22.6 Million or $0.37 Earnings Per Share Before Goodwill Amortization and Exceptional Items; Cash Flow of $68 Million from 1999 Operations and DSO's Reduced to 86 Days." This press release stated, in relevant part:

> For the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter 1998. For fiscal 1999, the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998.

> The company reported approximately $13.4 million in net income for the fourth quarter of 1999, before exceptional items, or EPS (Earnings Per Share) of $0.22 cents per share on 60.7 million average diluted shares outstanding. Net income for fiscal 1999, excluding exceptional items, totaled $40.2 million or $0.67 per share on 59.6 million average diluted shares compared to $38.2 million or $0.69 per share on 55.2 million average diluted shares

during 1998. The exceptional items for the fourth quarter of 1999 resulted in a $2.7 million net loss (unrealized currency exchange loss). For fiscal 1999 the exceptional items resulted in a $2.5 million net benefit (mainly unrealized currency exchange gain).

240.    These statements regarding L&H's financial results for the fourth quarter of 1999 and for the 1999 fiscal year were materially false and misleading because fourth quarter revenues and accounts receivable were artificially inflated by at least $69.3 million, year-end revenues were artificially inflated by at least $161.1 million (including approximately $20 million of revenues attributable to sham LDCs established by Artesia Banking), and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

**B.    THE MATERIALLY FALSE AND MISLEADING ANALYST REPORTS ISSUED BY ARTESIA SECURITIES IN FURTHERANCE OF THE FRAUDULENT SCHEME**

241.    In furtherance of the fraudulent scheme alleged by Plaintiffs, Artesia Banking also caused its Artesia Securities subsidiary to make numerous false representations in analyst reports issued by Artesia Securities during the relevant time period and failed to correct those materially misleading representations although Artesia Banking was obligated to correct Artesia Securities' false statements.

242.    The analyst reports issued by Artesia Securities are no longer publicly available on the databases that typically contain such reports. Thus, Plaintiffs have been unable to locate all of the materially false and misleading analyst reports issued by Artesia Securities at the direction of Artesia Banking during the relevant time period. Nevertheless, the limited number of reports produced by Artesia Banking in the course of discovery reveal that Artesia Banking employed Artesia Securities to further the goals of Defendants' fraudulent scheme, namely to provide investors with materially false and misleading information concerning L&H's financial performance and prospects in order to advance the Defendants' financial interests.

243.    Pursuant to and within the scope of his role as Artesia Banking's agent, Artesia Securities analyst Pierre-Paul Verelst issued one of numerous materially false and misleading reports concerning L&H on May 19, 1999. In that report, Artesia Securities rated L&H a "Buy."

244.    The Artesia Entities' decision to tout L&H and its prospects imposed upon them an obligation to disclose material adverse facts in their possession concerning L&H. By the time the May 19, 1999 report was issued, Artesia Banking had joined the fraudulent scheme to inflate L&H's reported revenue, earnings and other financial results. In particular, Artesia Banking had loaned funds to finance the payment of fraudulent "license fees" to L&H in the total amount of $12 million during the third and fourth quarters of 1998 with the knowledge and intention that L&H would report those fraudulent payments to investors as legitimate revenue. Furthermore, Artesia Banking had devised the use of the fraudulent device of credit default swaps executed by the L&H Principal Officers to conceal their guarantee of the loans made to the LDCs from L&H's investors and auditors. Accordingly, the Artesia Entities' uniformly positive report concerning L&H was materially false and misleading.

245.    Artesia Banking, Artesia Securities and Verelst issued another materially false and misleading report concerning L&H on July 13, 1999. In that report, Verelst issued a "Buy" recommendation with respect to L&H stock. Verelst also commented positively that L&H had secured "several contracts for its (already awarded) breakthrough RealSpeak product." According to the report:

> We consider these examples of recent contracts for the L&H RealSpeak [product] as . . . strong support for our already very positive feeling about Lernout & Hauspie. The fast development of the telephony applications market, in which L&H wants to play an important role, is likely to bring substantial results to the company. Moreover, the strategic alliances with Intel, GTE [and] Motorola, have strengthened the position of L&H in this market.

> The persistent sluggishness of the share price is, according to us,
> not justified given the excellent perspectives of the company.  The
> 2nd quarter results to be published [sic] end of this month may be a
> positive surprise.

> We still firmly recommend BUY.  (Emphasis in original).

246.    The July 13, 1999 report was materially false and misleading for the same reasons
as the Artesia Entities May 19, 1999 report.  In addition, by the time the July 13, 1999 report was
issued, Artesia Banking had deepened its involvement in the L&H fraud by extending a $20
million loan to the L&H Principal Officers in June of 1999 for the agreed purpose of allowing
them to arrange for fraudulent payments to L&H designed to artificially inflate L&H's reported
revenues, earnings and other financial results.  Again, at the time Artesia Banking agreed to
extend that loan, it agreed that it would conceal the loan and its fraudulent purpose from L&H's
investors and auditors.  Thus, at the time the July 13, 1999 report was issued, the Artesia Entities
had an affirmative obligation to disclose to investors the adverse facts concerning the manner in
which L&H was producing fraudulent revenues.  Instead, the Artesia Entities employed the July
13, 1999 report as another opportunity to further the fraudulent L&H scheme by touting L&H's
financial performance and prospects.

247.    Artesia Banking, Artesia Securities and Verelst issued another materially false
and misleading report concerning L&H on July 29, 1999.  In that report, Verelst again issued a
"Buy" recommendation with respect to L&H stock.  The report also contained a variety of
misleading information concerning L&H's financial results.  In particular, the report contained
the following chart regarding L&H's historical and projected financial results:

| USD '000 | 1998 O2 | 1999 O2 | y-o-y change | 1998 H1 | 1999 H1 | y-o-y change | FY 99 E |
|---|---|---|---|---|---|---|---|
| **Revenues Total**<br>*Technologies & Solutions* | 44,991<br>20,261 | 78,015<br>23,485 | + 69%<br>+ 15% | 80,058<br>35,682 | 146,723<br>51,211 | + 83%<br>+ 43% | 356,000 |

92

| USD '000 | 1998 O2 | 1999 O2 | y-o-y change | 1998 H1 | 1999 H1 | y-o-y change | FY 99 E |
|---|---|---|---|---|---|---|---|
| *Applications Consulting* | 11,373 | 28,984 | + 154% | 19,264 | 51,652 | + 167% | |
| *Services* | 13,357 | 20,546 | + 53% | 25,210 | 43,960 | + 74% | |
| Cost of Revenues | 15,175 | 19,297 | + 27% | 27,117 | 40,037 | + 47.6% | |
| Gross Profit | 28,818 | 58,719 | + 90% | 52,939 | 106,687 | + 101% | |
| Gross Margin | 66.3% | 74.6% | | 55.1% | 72.7% | | |
| G & A expenses | 5,139 | 7,953 | + 55% | 9,979 | 18,313 | + 63.5% | |
| M & S expenses | 7,518 | 14,923 | + 98.5% | 12,479 | 27,937 | + 124% | |
| R & D expenses | 6,105 | 10,810 | + 112% | 9,857 | 20,615 | + 109% | |
| EBIT | (17,990) | 15,532 | | (22,937) | 26,471 | | |
| | | | | | | | |
| Net Income | (20,626) | 10,114 | | (21,443) | 22,418 | | 55,000 |
| EPS | 0.15 | 0.17 | | 0.28 | 0.29 | | 0.95 |
| P/E | | | | | | | 34.6 |

248.    Verelst also reported that L&H's "[s]ales for the second quarter rose by 69% [year-over-year], the rise being mainly due to the outstanding performances of the Application division (+154%)."  In addition, the report stated, "The costs of revenues being under control, the gross margin improved from 66.3% to 74.6% for Q2 and from 66.1% to 72.7% for H1."  Verelst also stated that L&H's "R&D expenses rose by 112% [year-over-year] for Q2 and by 109% [year-over-year] for H1."

249.    Verelst summed up his report by stating:

> These encouraging results clearly illustrate the healthiness of the company.  We estimate the EPS for the full year 1999 at USD 0.95, considering that sales will continue to rise sharply for the Applications division (especially Clinical transcriptions applications or translation) and that the sales for the Technology & Solutions division will register an excellent growth thanks to the RealSpeak product.  The management announced that the RealSpeak will be available in German in 99 Q3 and in French, Spanish, Italian and Japanese in 99 Q4.  4 additional languages by quarter will be available.  According to us, Marketing and Sales and Research & Development expenses will have to remain high to maintain L&H's market position against the competitors.

> We estimate the Price Earnings to Growth Ratio at 0.69 (assuming a CAGR of 50%) and therefore consider the share as undervalued.

> We firmly recommend to Buy.

250.    The July 29, 1999 report was materially false and misleading for the same reasons as the May 19, 1999 report and the July 13, 1999 report, as specified in ¶¶ 243-46, *supra*.  In addition, in reporting upon L&H's future prospects in the July 29, 1999 report, the Artesia Entities fraudulently failed to disclose that L&H would not be able to achieve the revenue and earnings "growth" the Artesia Entities represented L&H would achieve without continuing to employ the fraudulent accounting manipulations in which Artesia Banking knowingly engaged.

251.    Verelst, Artesia Securities and Artesia Banking reiterated their "Buy" recommendation and glowing statements concerning L&H stock in a report issued on September 15, 1999.  That report included the following chart that misrepresented L&H's actual financial results and vastly overstated the Company's projected financial results for 1999 and 2000 because those projections assumed that L&H would continue to generate fraudulent revenue pursuant to the fraudulent scheme in which Artesia Banking and Artesia Securities were knowing participants.

| USD '000 | FY 97 | FY 98 | FY 99 E | FY 00 E | FY 01 E |
|---|---|---|---|---|---|
| Revenues | 99,372 | 211,593 | 349,128 | 523,692 | 785,538 |
| EBIT | (13,221) | (40,037) | 69,825 | 104,738 | 157,107 |
| Net Result* | 20,480 | 37,845 | 56,382 | 83,790 | 125,685 |
| EPS (USD) | 0.53 | 0.69 | 0.95 | 1.41 | 2.12 |

* Before amortization of goodwill

252.    The September 15, 1999 report also positively reported on L&H's acquisition of Bumil Information & Communications Ltd., the entity that became L&H Korea and further aggravated the fraudulent conduct committed by Defendants.  Artesia Securities claimed that "[t]he transaction will be 'slightly dilutive' for 1999 and accretive in year 2000."

253.    The report also stated:

According to our own financial projections, EPS should grow following a 4 year[] CAGR of 45.4.  As a result, EPS 99 is estimated at USD 0.95, EPS 00 at USD 1.41 and EPS 01 at USD 2.12.  Hence, estimated P/E are the following: P/E 99: 38.8, P/E 00: 24.8, P/E 01: 16.5. . . .

The estimated PEG (P/E 99 divided by the 4 years CAGR is 0.81, [which] demonstrates that Lernout & Hauspie is a real bargain!

Until now, the share still suffers from short selling and we can't predict when this will be over.  For now, the market therefore does not work as it should do.

Technically speaking, our short term price target is USD 40.  Fundamentally speaking, the share is worth USD 43 (using the PEG methodology).  We have a 12 month price target of USD 63.45.

We therefore still firmly recommend to BUY. [Emphasis in original].

254.    The September 15, 1999 report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 19, 1999, July 13, 1999 and July 29, 1999, as specified in ¶¶ 243-50, *supra*.

255.    Artesia Banking, Artesia Securities and Verelst reiterated their uniformly positive statements concerning L&H in a report published on October 6, 1999.  That report contained the following materially false and misleading chart concerning L&H's results for 1998 and estimated results for 1999, 2000 and 2001:

| USD '000 | FY 97 | FY 98 | FY 99 E | FY 00 E | FY 01 E |
|---|---|---|---|---|---|
| Revenues | 99,372 | 211,593 | 349,128 | 523,692 | 785,538 |
| EBIT | (13,221) | (40,037) | 69,825 | 104,738 | 157,107 |
| Net Result* | 20,480 | 37,845 | 56,382 | 83,790 | 125,685 |
| EPS (USD) | 0.53 | 0.69 | 0.95 | 1.41 | 2.12 |

* Before amortization of goodwill

256.    In addition, the report contained the following investment summary:

We maintain our financial projections for the years 1999, 2000 and 2001.  We estimate the 1999 P/E at 36 and the PEG is estimated at 0.79.  We therefore consider Lernout & Hauspie as very cheap relative to its growth potential.

Until now, the share still suffers from short selling and we can't predict when this will be over.  There was a new contest of short selling recently organised and L&H remains one of the favourite stock[s] of short sellers.

Our short term (end of the year) target stays at USD 43 and we have had a 12 month price target of USD 63.45. . . .

Once again, we recommend to BUY.  (Emphasis in original).

257.    The October 6, 1999 report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 19, 1999, July 13, 1999, July 29, 1999 and September 15, 1999, as specified in ¶¶ 243-54, *supra*.

258.    Artesia Banking, Artesia Securities and Verelst issued another uniformly positive report concerning L&H on October 28, 1999.  The report included the following materially false and misleading chart concerning L&H's reported and projected financial results.

| USD '000 | 98 Q3 | 99 Q3 | 98 Nine Months | 99 Nine Months | FY 99 E | FY 00 E | FY 01 E |
|---|---|---|---|---|---|---|---|
| Total Revenue | 54,850 | 87,473 | 134,918 | 234,198 | 349,128 | 523,692 | 785,538 |
| Gross Profit | 38,930 | 63,503 | 59,889 | 170,188 | | | |
| Gross Margin (%) | 57% | 72.6% | 44.4% | 72.7% | | | |
| G & A expenses | 5,855 | 8,532 | 15,854 | 26,245 | | | |
| M & S expenses | 8,875 | 15,577 | 21,354 | 43,511 | | | |
| R & D expenses | 6,496 | 12,473 | 16,293 | 33,088 | | | |
| Amortisation of Goodwill | 3,970 | 8,703 | 9,416 | 23,122 | | | |
| EBIT | (34,640) | 16,827 | (57,576) | 43,296 | 69,825 | 104,739 | 157,107 |
| EBIT Margin | -63% | 19% | -42.7% | 18.5% | 20% | 20% | 20% |
| Net Result | (39,749) | 10,446 | (61,191) | 31,096 | 56,382 | 83,790 | 125,685 |
| EPS (USD) | (0.71) | 0.17 | (1.25) | 0.53 | 0.96 | 1.41 | 2.12 |

259.    The report contained a number of additional positive representations concerning L&H.  For example, Artesia, Artesia Securities and Verelst stated that: (a) L&H "reported strong revenues for its Q3 and nine months ended FY 1999"; (b) "[c]ompared to the same periods of last year, the rise is outstanding as EBIT was then deep in the red (mainly due to write-off of In-

Process R&D)"; (c) "we consider L&H as undervalued relative to its growth potential"; and (d) "[w]e definitely stick to our BUY recommendation and stick to our twelve months target of USD 63.45." The report also emphasized that L&H's quarterly earnings per share of $0.17, which was slightly above the consensus analysts' estimate of $0.155, "gives . . . significant support to our positive opinion about this company."

260.    The October 28, 1999 analyst report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 19, 1999, July 13, 1999, July 29, 1999, September 15, 1999 and October 6, 1999, as specified in ¶¶ 243-57, *supra*.

261.    Artesia Banking, Artesia Securities and Verelst issued another uniformly positive report concerning L&H on November 18, 1999. That report contained the following materially false and misleading chart concerning L&H's reported and projected financial results:

| USD '000 | FY 97 | FY 98 | FY 99 E | FY 00 E | FY 01 E | FY 02 E |
|---|---|---|---|---|---|---|
| Total Revenues | 99,372 | 211,593 | 330,500 | 446,175 | 624,645 | 905,735 |
| Gross Profit | 63,065 | 144,950 | 231,350 | 312,323 | 437,252 | 634,015 |
| EBIT | -13,221 | -40,037 | 61,143 | 111,544 | 187,394 | 226,434 |
| Net Result | 20,480 | 37,845 | 49,675 | 71,388 | 106,189 | 163,032 |
| EPS (USD) | 0.53 | 0.69 | 0.84 | 1.20 | 1.79 | 2.75 |

262.    In that report, Artesia Banking, Artesia Securities and Verelst also noted that L&H "will create new entities to host their medical applications, their translation services and[,] later on[,] the telecom and related applications. The report also emphasized that "the share is still undervalued relative to its growth potential" and that, "[o]nce again, we confirm our BUY rating and have a 12 months target of USD 55."

263.    The November 18, 1999 analyst report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 19, 1999, July 13, 1999, July 29, 1999, September 15, 1999, October 6, 1999 and October 28, 1999, as specified in ¶¶ 243-60, *supra*.

264.    The Artesia Entities continued to serve the objectives of the fraudulent scheme described herein during late 1999 and 2000 by issuing glowing reports concerning L&H.   On December 28, 1999, for example, the Artesia Entities and Verelst issued a report in which they continued to rate L&H as a "Buy."   The Artesia Entities and Verelst also issued a report on January 10, 2000 in which they reiterated their "Buy" recommendation with respect to L&H stock and established a twelve-month price target for L&H shares of $75 (at a time when the stock was trading at $58 per share).   The December 28, 1999 and January 10, 2000 analyst reports issued by the Artesia Entities were materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 19, 1999, July 13, 1999, July 29, 1999, September 15, 1999, October 6, 1999, October 28, 1999 and November 18, 1999, as specified in ¶¶ 243-63, *supra*.

### C.    ARTESIA BANKING IS LIABLE FOR THE MISREPRESENTATIONS THAT IT CAUSED ARTESIA SECURITIES TO MAKE

265.    Artesia Banking is liable for all of the false representations made in the analyst reports issued by Verelst.   Numerous factors demonstrate that Verelst and Artesia Securities acted as an agent of Artesia Banking in issuing those reports.   During the relevant time period, Artesia Banking owned 100% of the shares of Artesia Securities and was the "reference shareholder" of Artesia Securities.   Under Belgian law, a reference shareholder is a shareholder who exercises controlling influence on the manner in which a company is run and which is actively involved in devising the company's business strategy.   By virtue of its status as

reference shareholder of Artesia Securities, Artesia Banking exercised absolute control over the operations of Artesia Securities, particularly with respect to Artesia Securities' actions related to the issuance of analyst reports concerning L&H.

266.    According to internal Artesia Banking documents recently obtained from Dexia in discovery, Artesia Banking set up Artesia Securities to begin operations in approximately March 1999.  This was done, in part, to provide analyst coverage and to market discount notes and warrants for L&H, with whom Artesia Banking already had extensive dealings.

267.    Artesia Banking maintained complete control over Artesia Securities' day-to-day operations by installing a member of the Bank's Executive Committee, Rene Avonts, as the ultimate head of Artesia Securities and by requiring that any significant actions of Artesia Securities be approved by the Executive Committee of Artesia Banking.

268.    The degree to which Artesia Banking dominated and controlled the day-to-day activities of Artesia Securities is further demonstrated by the following facts, much of which were gleaned from documents recently produced by Dexia in discovery:

> (a) Artesia Banking bore a significant amount of the costs of Artesia Securities' operations;
>
> (b) Artesia Banking set up Artesia Securities' operations in the very same building as Artesia Banking so that it could monitor the activities of Artesia Securities;
>
> (c) Artesia Banking's Management Committee dictated the investment policies of Artesia Securities;
>
> (d) The equity activities of Artesia Securities was subject to the policies direction of Artesia Bank's Credit Department;
>
> (e) During the relevant time period accounts of customers of Artesia Banking were commingled with accounts at Artesia Securities so that Artesia Banking maintained the accounts of customers of both the Bank and Artesia Securities; and

(f) Artesia Securities used the same branding and logo as Artesia Banking, so that they appeared to be part of a single entity.

269.    The fact that Artesia Banking controlled the conduct of Artesia Securities is also demonstrated by the fact that all employees of the Artesia Entities shared a single integrated computer system.    Thus, Verelst's e-mail address was a general Artesia address (pierre-paul_verelst@artesia. com), not one specific to Artesia Securities.    Likewise, all other Artesia Securities employees shared a common e-mail domain with the employees of Artesia Banking.

270.    Moreover, while Artesia Banking and Artesia Securities purported to have a "Chinese Wall" separating their respective dealings to ensure that Artesia Securities' analyst coverage of public companies such as L&H would not be influenced by Artesia Banking's relationships with such companies, in reality there was no such separation.    To the contrary, Artesia Banking exerted considerable and undue influence over the analyst reports disseminated by Artesia Securities to ensure that the recommendations of Artesia Securities analysts served the purposes of the Bank.    For example, according to an internal Artesia Securities memorandum dated May 7, 1999 from Ch. DelVaux to the Managing Director of Artesia Banking's Corporate Banking Division, Rene Avonts, and others (a copy of which was recently obtained in discovery), Nadia Van Hove, the manager of Artesia Banking's corporate research department, attended the weekly analyst meetings at Artesia Securities for the purpose of "coordinating efforts" of Artesia Securities' analysts with those of Artesia Banking and to assure that Artesia Securities did not take any position contrary to the Bank's interests.    In this way, Artesia Banking entangled itself with the analysts at Artesia Securities to ensured that Artesia Securities would issue falsely positive reports regarding the financial performance of L&H that had the effect of fraudulently inflating the share value of L&H's securities.    As noted previously, because at this time Artesia Banking directly held nearly one million shares of L&H stock, while

also holding hundreds of thousands of additional shares of L&H stock as collateral on L&H related loans, Artesia Banking had a powerful motive to ensure that Artesia Securities issued falsely positive reports on the value of L&H stock.

271.    The fact that Artesia Securities and Verelst acted as agents of Artesia Banking in issuing positive reports concerning L&H is also demonstrated by the fact that, in order to secure additional banking business of L&H and various L&H related customers, Artesia Banking promised those customers that it would cause Artesia Securities to "cover" those customers' stock as an analyst.  Artesia Banking hoped to secure and maintain L&H's lucrative banking and investment banking business by providing L&H and L&H's senior officers with a means for communicating positive information concerning L&H's operations and prospects to investors through a supposedly neutral outlet.

272.    Artesia Banking's efforts to falsely inflate and manipulate the price of L&H's securities went well beyond its control of Artesia Securities' misleading analyst reports regarding L&H.  Indeed, the degree to which Artesia Banking was willing to go to further these illicit purposes of the fraudulent scheme is exemplified by the Bank's willing and intentional manipulation of the price of L&H stock, as alleged above at ¶¶ 139-46.

## VI.    ADDITIONAL FACTS AND CIRCUMSTANCES THAT DEMONSTRATE THE ARTESIA ENTITIES ACTED WITH SCIENTER

273.    Each of the Artesia Entities participated in the fraudulent scheme and other fraudulent conduct alleged by Plaintiffs with scienter in that they knew or recklessly disregarded that their scheme and course of conduct would deceive Plaintiffs and that the misrepresentations and omissions that the Artesia Entities made or caused to be made concerning L&H were materially false and misleading when made.

274.    The facts alleged in the following paragraphs, among others, strongly support the conclusion that Artesia Entities acted with scienter.

275.    The Artesia Entities were motivated to participate in the fraudulent scheme alleged by Plaintiffs because of the substantial business and profits they received from L&H and its principals.   Artesia Banking received lucrative interest payments and banking fees in connection with the loans described above that Artesia Banking made to the LDCs and the L&H Principal Officers.  Artesia Banking also received assurances that L&H would find unsuspecting investors who would provide funds to repay Artesia Banking's loans, in effect, guaranteeing Artesia Banking a profit on these transactions.

276.    Artesia Banking also had additional, powerful financial incentives to participate in the fraudulent scheme alleged by Plaintiffs because the false inflation of the market price of L&H stock increased the worth of Artesia Banking's considerable holdings in L&H securities. As noted previously, Artesia Banking held nearly one million shares of L&H stock at various times between 1996-2000 and received pledges of several hundred thousand additional shares of L&H stock as collateral for loans that Artesia Banking extended to L&H or entities controlled by L&H.   Artesia Banking directly benefited from the fraudulent scheme by selling hundreds of thousands of shares of L&H stock at inflated prices for substantial profits.

277.    In addition to the sales noted in paragraph 12 above for the years 1996 through 1999,  Artesia made the following sales of L&H stock in 2000 on which Artesia Bank made a total profit of more than $10 million:

| DATE OF SALE | # OF SHARES | SETTLEMENT AMOUNT ($) | PRICE ($) |
|---|---|---|---|
| 1/10/2000 | 50,000 | 1,419,655 | 28.39 |
| 1/10/2000 | 14,000 | 385,000 | 27.50 |
| 1/10/2000 | 10,000 | 283,750 | 28.38 |
| 1/10/2000 | 20,000 | 558,750 | 27.94 |

| DATE OF SALE | # OF SHARES | SETTLEMENT AMOUNT ($) | PRICE ($) |
|---|---|---|---|
| 1/10/2000 | 4,000 | 116,000 | 29.00 |
| 1/11/2000 | 18,236 | 506,049 | 27.75 |
| 1/11/2000 | 18,236 | 506,149 | 27.76 |
| 2/10/2000 | 30,000 | 1,166,685 | 38.89 |
| 2/10/2000 | 20,000 | 778,440 | 38.92 |
| 3/30/2000 | 10,000 | 573,850 | 57.39 |
| 4/7/2000 | 8,800 | 510,682 | 58.03 |
| 4/7/2000 | 20,000 | 1,161,771 | 58.09 |
| 5/8/2000 | 2,000 | 109,281 | 54.64 |
| 5/9/2000 | 200 | 10,928 | 54.64 |
| 5/12/2000 | 10,000 | 454,074 | 45.41 |
| 6/8/2000 | 70,000 | 3,115,000 | 44.50 |
| 6/9/2000 | 70,000 | 3,182,316 | 45.46 |
| 8/9/2000 | 115,000 | 3,744,400 | 32.56 |
| 9/25/2000 | 15,000 | 215,784 | 14.39 |
| 9/26/2000 | 20,000 | 279,720 | 13.99 |
| 9/26/2000 | 40,000 | 568,841 | 14.22 |
| 9/26/2000 | 5,000 | 69,930 | 13.99 |

278.    Artesia Banking was further motivated to participate in the fraud by the prospect of receiving substantial banking business from L&H as the Company proceeded to acquire numerous companies through mergers and acquisitions.    For example, Artesia Banking participated in the financing of L&H's acquisition of Dictaphone, which provided Artesia Banking with substantial origination fees and interest payments.

279.    Artesia Banking intentionally structured its loans to the LDCs and the L&H Principal Officers (Lernout, Hauspie and Willaert) to conceal the fact that those loans were guaranteed by the L&H Principal Officers so that L&H could recognize revenue on the sham transactions with the LDCs.    The various Artesia Banking documents cited above demonstrate that Artesia Banking knew that the purpose of the loans to the LDCs and the L&H Principal Officers (which were coupled with the undisclosed guarantees made by the L&H Principal

Officers) was to allow L&H to deceive investors by recognizing revenue in violation of GAAP and SEC regulations.

280.    Moreover, as is specifically alleged above, Artesia Banking deliberately misled investigators hired by L&H's Audit Committee in order to conceal Artesia Banking's critical role in the fraudulent scheme Plaintiffs allege.

281.    Artesia Banking was motivated to participate in the defrauding of Stonington through the Dictaphone Transaction by its desire to convert its loans to Radial and LIC into a loan to L&H, and by its need to maintain its lucrative relationship with L&H in the face of increasing competition from other banks.

282.    Artesia Banking's knowing participation in the fraudulent scheme Plaintiffs allege is also demonstrated by its efforts to conceal the whereabouts of substantial assets belonging to the L&H Principal Officers.  On June 18, 2003, *De Financieel-Economische Tijd* reported that the Belgian Prosecutors had recently succeeded in seizing from a safe located at Dexia Belgium's offices in Amsterdam $25 million in Parvest Short Term Dollar fund stock owned by the L&H Principal Officers.  Although Artesia Banking knew those funds were in its possession prior to the time it merged with Dexia Belgium and Dexia Belgium's knowledge of that fact following the merger, neither entity disclosed the existence of these hidden funds owned by their co-conspirators.  Artesia Banking and Dexia Belgium hid those funds with the intention of splitting the proceeds of their fraudulent conduct with their fellow wrongdoers, the L&H Principal Officers.

283.    In issuing materially false and misleading analyst reports concerning L&H, Artesia Securities also acted with knowledge or reckless disregard for the falsity of its uniformly positive representations concerning L&H.

284.    Artesia Securities' scienter is demonstrated, in part, by the substantial motives that it possessed to misrepresent L&H's financial condition.  As a subsidiary of Artesia Banking, Artesia Securities shared its parent company's desire to advance Artesia Banking's financial interests.    In fact, Artesia Securities continually issued positive reports concerning L&H's operations at the direction of Artesia Banking and in the scope of its role as an agent of Artesia Banking.

285.    At the time Artesia Securities issued the materially false and misleading analyst reports described above and other reports that have not yet been produced to Plaintiffs, Artesia Banking had loaned hundreds of millions of dollars to L&H and  the L&H Principal Officers. The bankruptcy of L&H has resulted in Artesia Banking losing hundreds of millions of dollars. Indeed, Artesia Banking was one of the largest creditors in the L&H bankruptcy proceedings.

286.    The fraudulent scheme Artesia Banking engineered with the L&H Principal Officers was designed to enable Artesia Banking to recover its substantial investment in L&H. Specifically, Artesia Banking agreed to provide L&H with funds to be utilized to fraudulently inflate L&H's revenue and to act as a cheerleader  for L&H shares in order to create the false impression that L&H was a thriving company: (a) to induce investors to continue to purchase L&H stock; and (b) to induce investors to replace the funds provided to the LDCs by Artesia Banking.

287.    The Artesia Entities recognized at all relevant times that, if L&H were unable to continue to report substantial revenue and earnings growth, a loss of investor confidence in L&H or the disclosure of the fraudulent nature of the LDC transactions engineered by Artesia Banking would result in a precipitous decline in the price of L&H's stock and threaten the recovery of the funds loaned by Artesia Banking to L&H.    In fact, when  that information was eventually

discovered by investors, Artesia Banking suffered the loss of much of the money it loaned to L&H and the L&H Principal Officers.

288.    The Artesia Entities were also motivated to engage in the fraudulent conduct alleged herein by their desire to retain L&H and Lernout, Hauspie and Willaert as substantial customers.  L&H was one of the largest companies in Belgium and Lernout and Hauspie were two of Belgium's richest men.  L&H also generated substantial banking and investment banking fees during the relevant time period because the Company conducted numerous acquisitions, including acquisitions of Dictaphone and Dragon.  Artesia Banking and its agent, Artesia Securities, were willing to engage in the fraudulent scheme Plaintiffs allege because of their desire to obtain lucrative banking and investment banking fees from L&H and the L&H Principal Officers.

289.    Artesia Securities' scienter  is also demonstrated by its issuance of materially false and misleading reports concerning L&H despite its access to the adverse information concerning L&H alleged herein, including the fact that much of L&H's reported revenue was generated by means of the fraudulent scheme in which Artesia Banking was an integral participant.  Artesia Securities had access to that information by virtue of its status as an Artesia Banking subsidiary.  Indeed, Artesia Securities issued its uniformly positive reports concerning L&H precisely because Artesia Banking was attempting to support the price of L&H stock and to create the false impression that L&H was a growing company.

290.    Moreover, all Artesia Securities had to do to determine that much of L&H's revenue was fraudulent in nature was to call the executives of Artesia Banking, Artesia Securities' reference shareholder, to determine the information those executives knew regarding L&H's operations.  Thus, at an absolute minimum, Artesia Securities acted in a grossly reckless

manner in touting L&H stock without making appropriate inquiries of Artesia Banking regarding the nature of its business transactions with L&H.

## VII.   THE FRAUD-ON-THE-MARKET PRESUMPTION

291.   Stonington relied on the existence of an efficient market for L&H stock, and will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, L&H stock traded on the NASDAQ, an open and efficient market.  Several entities and individuals, including but not limited to L&H and Artesia Securities, made material public misrepresentations or failed to disclose material facts regarding L&H's financial results during 1999 and 2000.   These misrepresentations and omission would tend to induce a reasonable investor to misjudge the value of L&H's stock.

292.   In addition, L&H stock was followed by analysts including, *inter alia*, Auerbach Grayson, Branch Cabell & Co., Ladenburg, Thalman & Co., S.G. Cowen Sec. Corp. and Deutsche Bank.  The price of L&H stock reflected the effect of news from these and other analysts, among other sources, disseminated in the market.

293.   Based on the foregoing, Stonington is entitled to the presumption of reliance upon the integrity of the market, and the market price of L&H stock.

## CLAIMS FOR RELIEF

### COUNT ONE

#### VIOLATION OF § 10(b) OF THE 1934 ACT AND RULE 10b-5 PROMULGATED THEREUNDER

294.   Stonington repeats and re-alleges each and every preceding allegation as if fully set forth herein.

295.   This Count is asserted against Dexia for violations of § l0(b) of the 1934 Act, 15 U.S.C.  § 78j(b), and Rule 10b-5 as promulgated thereunder.

296.    Dexia, by acquiring the Artesia Entities, is liable to Stonington for the Artesia Entities' wrongful conduct as set forth herein.

297.    Dexia and the Artesia Entities, singly and in concert with L&H and its senior officers and directors, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Stonington.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to enable L&H to falsely inflate its financial results, to falsely inflate the price of L&H stock, and to induce Stonington to exchange its shares of Dictaphone for the common stock of L&H at an artificially inflated price.

298.    The Artesia Entities engaged in acts, practices, and a course of business and employed devices, schemes, and artifices to defraud which operated as a fraud on Stonington.  In particular, pursuant to the scheme alleged herein, Artesia Banking provided millions of dollars to shell companies that it intended to be utilized to artificially inflate L&H's reported  financial results.  Without the Artesia Entities' knowing participation in the fraudulent scheme that Plaintiffs allege herein, L&H and the L&H Principal Officers could not have perpetrated that fraud.  The Artesia Entities knowingly, or with reckless disregard for the truth, engaged in these acts, practices, and course of business and employed devices, schemes, and artifices to defraud.

299.    As a result of the dissemination of the false and misleading statements set forth above and the Artesia Entities' knowing participation in the fraudulent scheme Plaintiffs allege, the market price of L&H securities was artificially inflated and Stonington was induced to purchase the common stock of L&H at an artificially inflated price.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices

and contrivances employed by defendant, Stonington relied, to its detriment, on the integrity of the market price of the stock, and the false and misleading statements made directly by L&H to Stonington. Had Stonington known the truth, it would not have entered into the Dictaphone Transaction and purchased L&H common stock at inflated prices.

300. Artesia Banking's scienter is demonstrated by internal documents quoted in the Prosecutors' Report and produced in discovery, set forth at ¶¶ 106-38 above, and demonstrating, *inter alia*, that:

a. Artesia Banking knew that its $6 million loan to Radial would be, and was, used to create and fund three LDCs that would pay the $6 million to L&H, which would in turn book that $6 million as revenue, and that the LDCs were shell corporations with no assets, operations or employees and no purpose other than to create fictitious revenue for L&H,

b. Artesia Banking knew that its approximately $6 million loan to LIC would be, and was, used to create and fund four LDCs that would pay the $6 million to L&H, which would in turn book that $6 million as revenue, and that the LDCs were shell corporations with no assets, operations or employees and no purpose other than to create fictitious revenue for L&H,

c. Artesia Banking knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d. Artesia Banking knew that L&H would, and did, recognize the fictitious revenues received from the LDCs in violation of U.S. GAAP and in such a way that L&H's financial statements were materially misleading,

e. Artesia Banking knew that the sham credit default swaps it used to obtain guarantees from the L&H Principal Officers for the Radial and LIC loans were intended to conceal from L&H's auditors, the SEC and L&H investors that the LDCs were related to L&H.

f. Artesia Banking knew that if the L&H Principal Officers were mentioned in the Radial and LIC loan documents as guarantors of the loans, and if the purpose of the $20 million personal loan to the L&H Principal Officers was accurately reflected in the loan documents for that loan, L&H would have to disclose that the

LDCs were related parties and that its financial statements for 1998 and 1999 were materially misstated.

301.    Stonington suffered substantial damages as a direct and proximate result of the wrongs committed by the Artesia Entities in an amount to be proven at trial.

302.    By reason of the foregoing, the Artesia Entities directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made material misrepresentations of fact and failed to disclose material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Stonington in connection with its purchase of shares of the common stock of L&H in exchange for shares of Dictaphone.

## COUNT TWO
### VIOLATION OF § 20(a) OF THE 1934 ACT

303.    Plaintiffs repeat and reallege the foregoing paragraphs as if set forth in full herein.

304.    This Count is brought against Dexia in its role as the successor to Artesia Banking.

305.    Dexia, as the acquirer of Artesia Banking and Artesia Securities, is liable to Plaintiffs for the Artesia Entities' wrongful conduct, as set forth herein.

306.    As is particularized above, Artesia Banking was a "controlling person" of Artesia Securities within the meaning of § 20(a) of the Exchange Act.

307.    Artesia Banking qualified as a "controlling person" because it had the power to cause Artesia Securities to engage in the unlawful conduct complained of herein and because Artesia Banking did, in fact, cause Artesia Securities to issue the materially false and misleading analyst reports Plaintiffs describe above.

308.    Because Artesia Banking was a "controlling person" of Artesia Securities, which has committed violations of Section 10(b) of the Exchange Act by issuing materially false and misleading analyst reports concerning L&H, Artesia Banking is secondarily liable for those primary violations pursuant to Section 20(a) of the Exchange Act.

309.    By virtue of its acquisition of Artesia Banking and its liabilities, Dexia is liable to Plaintiffs for Artesia Banking's violations of § 20(a) of the Exchange Act.

## COUNT THREE
### CONSPIRACY TO COMMIT COMMON LAW FRAUD

310.    Stonington repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein and asserts this count against Dexia.

311.    Dexia, by acquiring Artesia Banking is liable to Stonington for Artesia Banking's wrongful conduct.

312.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were perpetrating a fraud against Stonington, as set forth above.  These parties made the materially false and misleading statements identified above, knowing that Stonington and the investing public would rely on those statements in connection with their purchases of L&H stock.  In addition, L&H falsely represented to Stonington, among other things, that its 1998 and 1999 financial statements, upon which Stonington relied in entering into the Dictaphone Transaction, were prepared in conformity with U.S. GAAP.  Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

313.    Artesia Banking conspired with L&H and the L&H Principal Officers to defraud L&H's auditors, the SEC and L&H investors, including Stonington.  Among other things, as detailed above, Artesia Banking created at least ten sham LDCs by lending millions of dollars to

L&H-controlled entities and concealing from L&H's auditors, the SEC and L&H investors the fact that the L&H Principal Officers were guarantors of the loans. Artesia Banking knew that the loaned funds would be paid to L&H as licensing fees, and that L&H intended to, and did, recognize these licensing fees as revenue in violation of U.S. GAAP. Artesia Banking knowingly enabled L&H to recognize the entire amount of the loans as revenue, in blatant violation of U.S. GAAP, and to misrepresent such amounts in its public statements detailed above.

314. In furtherance of the conspiracy, Artesia Banking committed the following overt acts:

a.   On or about September 29, 1998, Artesia Banking established and funded these sham LDCs by entering into a loan agreement with Radial, for a $6 million loan that was to be used to finance LDCs that would pay license fees to L&H.

b.   On or about December 22, 1998, Artesia Banking established and funded another three sham LDCs by entering into a loan agreement with LIC for a loan of approximately $6 million that was to be used to finance LDCs that would pay license fees to L&H.

c.   On or about June 19, 1999, Artesia Banking entered into an amendment to the December 22, 1998 LIC loan agreement. This amendment falsely stated that "henceforth" the LIC loan would be guaranteed by a credit default swap. In fact, the LIC loan had been guaranteed by a credit default swap since inception.

d.   On or about June 25, 1999, Artesia Banking granted a $20 million personal line of credit to the L&H Principal Officers to be used to make payments to L&H through LDF and the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements. Artesia Banking's loan agreement for this loan deliberately misrepresented the purpose of the loan as being for the L&H Principal Officers' "professional activities."

e.   On or about September 9, 1998, December 22, 1998, June 17, 1999, October 7, 1999, and October 26, 1999, Artesia Banking issued credit agreements that failed to disclose, or that concealed

the nature of, the credit default swaps used to guarantee the loans to LIC and Radial.

f.   On or about March 17, 2000, Artesia Banking falsely stated to L&H's auditors that on December 31, 1999, the Bank had no personal loans outstanding to L&H officers.

g.   In or about March or April 2000, Artesia Banking agreed to nullify the credit default swaps that had been used to guarantee the Radial and LIC loans, in order to evade Belgian tax regulations which would have required the L&H Principal Officers to disclose the credit default swaps in their tax filings.

h.   On or about May 5, 2000, Artesia Banking provided $50 million in financing to facilitate the Dictaphone Transaction, after conditioning its participation in the Transaction on the repayment of the outstanding loans to LIC, Radial and Lernout, Hauspie and Willaert.

315.   Artesia Banking committed this misconduct intentionally, with full knowledge of the fraud being perpetrated at L&H, and in furtherance of the common objective of misrepresenting L&H's financial results.  Specifically, Artesia Banking's internal documents, set forth above, demonstrate that, *inter alia*:

a.   Artesia Banking knew that its $6 million loan to Radial would be, and was, used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees and no purpose other than to create fictitious revenue for L&H.

b.   Artesia Banking knew that its approximately $6 million loan to LIC would be, and was, used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees, and no purpose other than to create fictitious revenue for L&H.

c.   Artesia Banking knew that the LDCs were not independent of L&H but were rather controlled by L&H.

d.   Artesia Banking knew that L&H would, and did, recognize the fictitious revenues received from the LDCs in violation of U.S. GAAP and in such a way that L&H's financial statements were materially misleading.

e.      Artesia Banking knew that the sham credit default swaps it used to obtain guarantees from the L&H Principal Officers for the Radial and LIC loans were intended to conceal from L&H's auditors, the SEC and L&H investors that the LDCs were related to L&H.

f.      Artesia Banking knew that if the L&H Principal Officers were mentioned in the Radial and LIC loan documents as guarantors of the loans, and if the purpose of the $20 million personal loan to the L&H Principal Officers were accurately reflected in the loan documents for that loan, L&H would have to disclose that the LDCs were related parties and that its financial statements for 1998 and 1999 were materially misstated.

g.      Artesia Banking knew that there was no basis to not disclose the credit default swaps in the documentation of its loans to LIC and Radial.

h.      Artesia Banking knew that Stonington would receive hundreds of millions of dollars in L&H stock through the Dictaphone Transaction.

316.    Artesia Banking remained a participant in the fraud alleged herein at least through July 2000, when it granted a loan to Bastiaens for the purpose of propping up L&H's stock price.

317.    At all material times, Artesia Banking knew of L&H's extensive history of using its own shares to purchase competing companies and technologies.  Therefore, Artesia Banking knew or should have known that a natural and probable consequence of the material falsity of L&H's financial statements was that investors acquiring new L&H shares in transactions with the Company, including Stonington, would be deceived concerning the value of those shares. Artesia Banking knew or should have known that such investors would be injured as a result of their reliance on L&H's false financial statements.

318.    By no later than December 8, 1999 – when Artesia Banking was still a participant in the conspiracy alleged herein – Artesia Banking knew of L&H's intention to finance a major acquisition of a competitor in the speech recognition industry through a loan provided by the Bank.  Artesia Banking knew, no later than January 5, 2000, that L&H would complete that

114

acquisition through the use of L&H stock as consideration.  Prior to the close of the Dictaphone

Transaction, Artesia Banking knew the details of the Transaction and the specific amount of

L&H stock that Stonington would receive in exchange for its interest in Dictaphone.  Therefore,

Artesia Banking knew or should have known that a natural and probable consequence of the

material falsity of L&H's financial statements was that Stonington would be deceived

concerning the value of that stock.  Artesia Banking knew or should have known that Stonington

would be injured as a result of its reliance on L&H's false financial statements.  Despite this

knowledge, Artesia Banking provided $50 million in financing to facilitate the Dictaphone

Transaction.

319.    As a consequence of the foregoing, Stonington suffered damages in an amount to

be proven at trial.

**COUNT FOUR**

**AIDING AND ABETTING COMMON LAW FRAUD**

320.    Stonington repeats and re-alleges each of the allegations set forth in the foregoing

paragraphs as if fully set forth herein and asserts this count against Dexia.

321.    Dexia, by acquiring Artesia Banking is liable to Stonington for Artesia Banking's

wrongful conduct.

322.    At all times relevant to this complaint, L&H, Lernout, Hauspie and Willaert were

perpetrating a fraud against Stonington, as set forth above.  These parties made the materially

false and misleading statements identified above, knowing that Stonington and other investors

would rely on those statements in connection with their purchases of L&H stock.  In addition,

L&H falsely represented to Stonington, among other things, that its 1998 and 1999 financial

statements, upon which Stonington relied in entering into the Dictaphone Transaction, were

prepared in conformity with U.S. GAAP.  Ultimately, L&H was forced to admit that these

115

statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

323.    Artesia Banking substantially assisted L&H and the L&H Principal Officers in perpetrating the fraudulent scheme. Among other things, as detailed above, Artesia Banking created at least ten sham LDCs by lending millions of dollars to L&H-controlled entities and concealing from L&H's auditors, the SEC and L&H investors the fact that the L&H Principal Officers were guarantors of the loans. Artesia Banking knew that the loaned funds would be paid to L&H as licensing fees, and that L&H intended to, and did, recognize these licensing fees as revenue in violation of U.S. GAAP. Artesia Banking knowingly enabled L&H to recognize the entire amount of the loans as revenue, in blatant violation of U.S. GAAP, and to misrepresent such amounts in its public statements detailed above.

324.    Among other acts of substantial assistance by Artesia Banking were the following:

a.    On or about September 29, 1998, Artesia Banking entered into a loan agreement with Radial, for a $6 million loan that was to be used to finance LDCs that would pay license fees to L&H. In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the L&H Principal Officers.

b.    On or about December 22, 1998, Artesia Banking entered into a loan agreement with LIC for a loan of approximately $6 million that was to be used to finance LDCs that would pay license fees to L&H. In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the L&H Principal Officers.

c.    On or about June 19, 1999, Artesia Banking entered into an amendment to the December 22, 1998 LIC loan agreement. This amendment falsely stated that "henceforth" the LIC loan would be guaranteed by a credit default swap. In fact, the LIC loan had been guaranteed by a credit default swap since inception.

d.    On or about June 25, 1999, Artesia Banking granted a $20 million personal line of credit to the L&H Principal Officers to be used to make payments to L&H through LDF and the LDCs in the form of licensing fees, which were improperly included as revenue on L&H's financial statements.  Artesia Banking's loan agreement for this loan deliberately misrepresented the purpose of the loan as being for the L&H Principal Officers' "professional activities."

e.    On or about September 9, 1998, December 22, 1998, June 17, 1999, October 7, 1999, and October 26, 1999, Artesia Banking issued credit agreements that failed to disclose, or that concealed the nature of, the credit default swaps used to guarantee the loans to LIC and Radial.

f.    On or about March 17, 2000, Artesia Banking falsely stated to L&H's auditors that on December 31, 1999, the Bank had no personal loans outstanding to L&H officers.

g.    In or about March or April 2000, Artesia Banking agreed to nullify the credit default swaps that had been used to guarantee the Radial and LIC loans, in order to evade Belgian tax regulations which would have required the L&H Principal Officers to disclose the credit default swaps in their tax filings.

h.    On or about May 5, 2000, Artesia Banking provided $50 million in financing to facilitate the Dictaphone Transaction, after conditioning its participation in the Transaction on the repayment of the outstanding loans to LIC, Radial and Lernout, Hauspie and Willaert.

325.    At all times relevant to this complaint, Artesia Banking knew of the fraud being perpetrated by L&H on its auditors, the SEC and investors.  Specifically, as set forth in internal Artesia Banking documents described above:

a.    Artesia Banking knew that its $6 million loan to Radial would be, and was, used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees and no purpose other than to create fictitious revenue for L&H,

b.    Artesia Banking knew that its approximately $6 million loan to LIC would be, and was, used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees, and no purpose other than to create fictitious revenue for L&H,

c.  Artesia Banking knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d.  Artesia Banking knew that L&H would, and did, recognize the fictitious revenues received from the LDCs in violation of U.S. GAAP and in such a way that L&H's financial statements were materially misleading,

e.  Artesia Banking knew that the sham credit default swaps it used to obtain guarantees from the L&H Principal Officers for the Radial and LIC loans were intended to conceal from L&H's auditors, the SEC and L&H investors that the LDCs were related to L&H,

f.  Artesia Banking knew that if the L&H Principal Officers were mentioned in the Radial and LIC loan documents as guarantors of the loans, and if the purpose of the $20 million personal loan to the L&H Principal Officers were accurately reflected in the loan documents for that loan, L&H would have to disclose that the LDCs were related parties and that its financial statements for 1998 and 1999 were materially misstated.

g.  Artesia Banking knew that there was no basis to not disclose the credit default swaps in the documentation of its loans to LIC and Radial.

h.  Artesia Banking knew that Stonington would receive millions of dollars in L&H stock through the Dictaphone Transaction. As a consequence of the foregoing, Stonington suffered damages in an amount to be proven at trial.

326.  Artesia Banking remained a participant in the fraud alleged herein at least through July 2000, when it granted a loan to Bastiaens for the purpose of propping up L&H's stock price.

327.  At all material times, Artesia Banking knew of L&H's extensive history of using its own shares to purchase competing companies and technologies. Therefore, Artesia Banking knew or should have known that a natural and probable consequence of the material falsity of L&H's financial statements was that investors acquiring new L&H shares in transactions with the Company, including Stonington, would be deceived concerning the value of those shares. Artesia Banking knew or should have known that such investors would be injured as a result of their reliance on L&H's false financial statements.

118

328.    By no later than December 8, 1999 – when Artesia Banking was still a participant in the conspiracy alleged herein – Artesia Banking knew of L&H's intention to finance a major acquisition through a loan provided by the Bank.  Artesia Banking knew, no later than January 5, 2000, that L&H would complete that acquisition through the use of L&H stock as consideration. Prior to the close of the Dictaphone Transaction, Artesia Banking knew the details of the Transaction and the specific amount of L&H stock that Stonington would receive in exchange for its interest in Dictaphone.  Therefore, Artesia Banking knew or should have known that a natural and probable consequence of the material falsity of L&H's financial statements was that Stonington would be deceived concerning the value of that stock.  Artesia Banking knew or should have known that Stonington would be injured as a result of its reliance on L&H's false financial statements.  Despite this knowledge, Artesia Banking provided $50 million in financing to facilitate the Dictaphone Transaction.

329.    As a consequence of the foregoing, Stonington suffered damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Stonington prays for judgment as follows:

A.    Awarding Stonington all compensatory damages suffered as a result of the wrongful conduct of the defendants in an amount to be determined at trial, including lost profits and consequential and incidental damages;

B.    Awarding Stonington punitive damages in an amount to be determined at trial;

C.    Awarding Stonington pre-judgment and post-judgment interest;

D.    Awarding Stonington their costs and expenses incurred in this action, including fees for plaintiffs' attorneys and experts;

E.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of defendant's trading activities or their other assets so as to assure that plaintiffs have an effective remedy; and

F.    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Stonington hereby demands a trial by jury.

Dated: September 15, 2006                Respectfully submitted,

Max W. Berger
Steven B. Singer
Avi Josefson
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

*Counsel to Plaintiffs Stonington Partners,
Inc., Stonington Capital Appreciation 1994
Fund L.P. and Stonington Holdings, L.L.C.*

Richard J. Grahn (BBO # 206620)
Charles P. Kindregan (BBO # 554947)
**LOONEY & GROSSMAN LLP**
101 Arch Street
Boston, Massachusetts 02110
(617) 951-2800

*Local Counsel to Plaintiffs Stonington
Partners, Inc., Stonington Capital
Appreciation 1994 Fund L.P. and
Stonington Holdings, L.L.C.*