# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HANS A. QUAAK, ATTILIO PO and KARL LEIBINGER, on behalf of themselves and those similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br><br>     Defendants. | Civil Action No.: 03-11566 (PBS) |
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company,<br><br>     Plaintiffs,<br><br>     v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br><br>     Defendants. | Civil Action No.: 04-10411 (PBS) |
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust,<br><br>     Plaintiffs,<br><br>     v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br><br>     Defendants. | Civil Action No.: 04-10477 (PBS) |

JANET BAKER and JAMES BAKER,
JKBAKER LLC and JMBAKER LLC,

      Plaintiffs,

      v.

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),

      Defendants.

Civil Action No.:  04-10501 (PBS)

## DECLARATION OF MARYANA A. KODNER

I, Maryana A. Kodner, declare and state as follows:

1. I am an attorney associated with Clifford Chance US LLP and admitted *pro hac vice* to practice before this Court. I am fully familiar with the facts set forth herein. I submit this declaration in support of Dexia Bank Belgium's Response to Plaintiffs' Statement Concerning Proposed Rule 30(b)(6) Depositions.

2. Attached hereto as Exhibit A is a true and correct copy of Dexia Bank Belgium's Second Amended Responses and Objections to Plaintiffs' Sixth Set of Interrogatories.

3. Attached hereto as Exhibit B is a true and correct copy of excerpts from the transcript of the deposition of Dirk Bruneel dated June 16, 2006.

4. Attached hereto as Exhibit C is a true and correct copy of excerpts from the transcript of the deposition of Hans Deweirdt dated June 14, 2006.

NYA 812039.1

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Dated: New York, New York
       November 20, 2006

_____
              Maryana A. Kodner

NYA 812039.1

Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

HANS A. QUAAK, ATTILIO PO )
and KARL LEIBINGER, on behalf of )
themselves and those similarly situated, )
                                      )
               Plaintiffs, )
                                        )
    v. )
                                        )
DEXIA BANK BELGIUM (formerly known )
as ARTESIA BANKING CORP., S.A.), )
                                        )
            Defendants. )
                                        )
                                        )

Civil Action No. 03-Civ-11566 (PBS)

---

## DEXIA BANK BELGIUM'S SECOND AMENDED RESPONSES AND OBJECTIONS TO CLASS PLAINTIFFS' SIXTH SET OF INTERROGATORIES

       Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules

of the District of Massachusetts, defendant Dexia Bank Belgium ("Dexia") responds as follows

to Class Plaintiffs' Sixth Set of Interrogatories dated May 15, 2006.

## GENERAL OBJECTIONS

       1.   Dexia objects to this set of interrogatories as exceeding the limit of 25 interrogatories

and subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c).

Depending on how subparts are counted, Plaintiffs have already served between 29 and 174

interrogatories, and Dexia has provided more than 75 pages of substantive responses to those

interrogatories.  This Sixth Set of Interrogatories contains between 18 and 80 additional

interrogatories, depending on how subparts are counted.  By any reasonable measure, Plaintiffs

have exceeded the limit of 25 interrogatories and subparts.  For this reason, Dexia is not under

any obligation to respond to these interrogatories.

2.  Dexia objects to this set of interrogatories as unduly burdensome and harassing. Plaintiffs have waited until the last moment to serve this broad set of interrogatories, even though much of the information requested has been sought through other discovery in this litigation and, in any event, could have been sought through interrogatories served much earlier in the discovery process. These interrogatories are plainly designed to harass and impose undue burden on Dexia and its counsel during the final month of the discovery period.

3.  Dexia objects to each Interrogatory, Instruction or Definition to the extent it otherwise seeks to impose obligations beyond those required by the Federal Rules of Civil Procedure and the Local Rules of this Court.

4.  Dexia objects to each Interrogatory, Instruction or Definition as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information concerning unidentified predecessors, successors, parents, subsidiaries, branches, divisions, affiliates, officers, directors, trustees, partners, members, employees, servants and agents of any entity.

5.  Dexia objects to each Interrogatory, Instruction or Definition to the extent that it is overly broad, unduly burdensome, duplicative or seeks information that is not relevant and not reasonably calculated to lead to the discovery of admissible evidence.

6.  Dexia objects to each Interrogatory, Instruction or Definition to the extent that it is vague, ambiguous or does not identify with particularity the information sought.

7.  Dexia objects to each Interrogatory, Instruction or Definition to the extent that it would impose undue burden or expense on Dexia.

8.  Dexia objects to each Interrogatory, Instruction or Definition to the extent that it seeks information in the possession, custody or control of Plaintiffs.

NYA 810834.1

9.  Dexia objects to each Interrogatory, Instruction or Definition to the extent that it seeks documents or information protected from disclosure by the attorney-client privilege, work product doctrine or other applicable privileges.

10. Dexia objects to each Interrogatory, Instruction or Definition to the extent that it calls for information that is obtainable by Plaintiffs from public sources or other sources that are also available to Plaintiffs.

11. Dexia objects to each Interrogatory, Instruction or Definition to the extent that it calls for a legal opinion or for an opinion on a mixed question of law and fact.

12. Dexia objects to the "Relevant Time Period" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

13. Dexia's investigation of the facts relevant to this action and review of relevant documents is continuing.  Dexia reserves the right to amend, modify, or supplement the Responses set forth herein to the extent required or permitted under Rule 26 of the Federal Rules of Civil Procedure.  Dexia further reserves the right to rely on any facts, documents or other evidence that may develop or come to its attention at a later date.

## SPECIFIC OBJECTIONS AND RESPONSES

Interrogatory No. 12:  Identify any consideration given by Dexia to Jo Lernout, Pol Hauspie, or Nico Willaert in connection with any credit default swap, including the date and amount of each payment by Dexia, and indicate:  (i) whether this consideration was paid by depositing the monies into accounts opened for or in the name of Messrs. Lernout, Hauspie or Willaert and, if so, the date(s) any such account was opened and who at Dexia directed these accounts to be opened; (ii) whether Dexia prepared or submitted any 281.50 forms reflecting such consideration; (iii) whether Messrs. Lernout, Hauspie or Willaert waived, repaid or otherwise forgave any consideration owned to them by Dexia in connection with any credit default swap and identify the form and manner of any such waiver/forbearance, including but not limited to any agreement(s) of waiver or "settlement" agreements entered between Dexia on the one hand and any one or more of Messrs. Lernout, Hauspie or Willaert on the other; and (iv) the reasons for such waiver, repayment or forbearance.

3

Response to Interrogatory No. 12

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c). Dexia objects to this interrogatory as vague and ambiguous because the term "identify" is undefined as applied to consideration. Dexia objects to this interrogatory as vague and ambiguous because the meaning of the term "directed" in the phrase "who at Dexia directed these accounts to be opening" is not clear. Dexia objects to this interrogatory as vague and ambiguous because the term "identify" is undefined as applied to "the form and manner of any such waiver/forbearance." Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information about tax forms that were "prepared" but not submitted to the tax authorities. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information concerning the "reasons" of Jo Lernout, Pol Hauspie or Nico Willaert. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information that is not, upon reasonable investigation, within the possession, custody or control of the bank.

Subject to and without waiving the foregoing objections and the General Objections, Dexia responds to interrogatory as follows:

In connection with the credit default swap with Jo Lernout, Pol Hauspie and Nico Willaert associated with the Radial loan with a trade date of June 30, 1999, Dexia paid to Lernout, Hauspie and Willaert a commission of 229,909 BEF on September 15, 1999 and a commission of 271,711 BEF on December 15, 1999. Dexia paid these commission by depositing the monies into an account in the names of Lernout, Hauspie and Willaert, opened on or about April 9, 1999. Dexia did not prepare or submit a 281.50 form reflecting this consideration.

4

In connection with the credit default swap with Jo Lernout and Pol Hauspie associated with the LIC loan with a trade date of December 29, 1998, Dexia paid to Lernout and Hauspie a commission of 281,111 BEF on April 27, 1999 and a commission of 189,444 BEF on June 7, 1999.  Dexia paid these commission by depositing the monies into an account in the names of Lernout and Hauspie, opened on or about April 9, 1999.  Dexia did not prepare or submit a 281.50 form reflecting this consideration.

In connection with the credit default swap with Jo Lernout and Pol Hauspie associated with the LIC loan with a trade date of June 30, 1999, Dexia paid to Lernout and Hauspie a commission of 235,278 BEF on September 15, 1999 and a commission of 278,056 BEF on December 15, 1999.  Dexia paid these commission by depositing the monies into an account in the names of Lernout and Hauspie, opened on or about April 9, 1999.  Dexia did not prepare or submit a 281.50 form reflecting this consideration.

Lernout, Hauspie and Willaert did not waive, repay or otherwise forgive any consideration owed to them by Dexia in connection with any credit default swap.

<u>Interrogatory No. 13</u>:  Identify the total amount of consideration or financial incentive (including securities, which includes but is not limited to, stock, options or warrants to purchase stock, or any type of "equity kicker") received by Dexia from L&H or any officer or director of L&H for any services (including, but not limited to, the extension of credit or credit lines) performed by Dexia for or on behalf of each of the individuals or entities listed below:

Dictation Consortium, N.V.
Brussels Translation Group, N.V.
Radial Belgium, N.V.
Language Investment Company, N.V.
Language Development Fund
Document Management Partners
L&H
Lernout & Hauspie Investment Company
Lernout & Hauspie Holding Company, Inc.
FLV Fund
SAIL
Peer Van Driesten
Jo Lernout

Pol Hauspie
Nico Willaert
Gaston Bastiaens
Dictaphone Corp.

Response to Interrogatory No. 13

       Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and

subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c).

Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably

calculated to lead to the discovery of admissible evidence to the extent it seeks information

concerning transactions that are not at issue in this litigation.  Dexia objects to this interrogatory

as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of

admissible evidence to the extent it seeks information concerning routine banking transactions.

Dexia's response to this interrogatory is limited to significant, non-routine services, including

loans, investment banking services and investment management services.  Dexia objects to this

interrogatory as vague and ambiguous because the term "identify" is undefined as applied to "the

total amount of consideration or financial incentive."  Dexia objects to this interrogatory as

unduly burdensome to the extent it seeks information that is not, upon reasonable investigation,

within the possession, custody or control of the bank.

       Subject to and notwithstanding the foregoing objections and the General Objections,

Dexia responds to this interrogatory as follows:

       (a)      Dictation Consortium, N.V.

       In June 1998, Bacob and Paribas each received warrants to purchase 200,000 shares of

the Common Stock of L&H at an exercise price of $8.69 per share and warrants to purchase

66,000 of the Common Stock of L&H at an exercise price of $12.50 per share.  A portion of

these may have been granted as consideration for the Dictation Consortium loan.  After a

NYA 810834.1

reasonable investigation, Dexia has been unable to determine which portion of the warrants were granted in connection with this loan. Dexia's investigation of relevant facts in this litigation is ongoing and Dexia reserves the right to amend its answer to this interrogatory.

> (b)    Brussels Translation Group, N.V.

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services provided to Brussels Translation Group.

> (c)    Radial Belgium, N.V.

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services to Radial Belgium.

> (d)    Language Investment Company, N.V.

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services to Language Investment Company.

> (e)    Language Development Fund

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services to Language Development Fund.

> (f)    Document Management Partners

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services to Document Management Partners.

> (g)    L&H

In connection with a 150,000,000 BEF revolving credit facility established by Bacob for L&H in May 1996, Bacob received 100,000 type A2 warrants. After a reasonable investigation, Dexia has been unable to determine whether it received any other consideration from L&H or any officer or director of L&H in connection with relevant services to L&H. Dexia's

7

investigation of relevant facts in this litigation is ongoing and Dexia reserves the right to amend its answer to this interrogatory.

In June 1998, Bacob and Paribas received warrants to purchase 100,000 shares of the Common Stock of L&H at an exercise price of $17.35 per share and warrants to purchase 33,000 of the Common Stock of L&H at an exercise price of $25.00 per share. A portion of these may have been granted as consideration for $8.5 million credit facilities established by Bacob and Paribas for L&H in June 1997. After a reasonable investigation, Dexia has been unable to determine which portion of the warrants were granted in connection with this loan and whether it received any other consideration from L&H or any officer or director of L&H in connection with relevant services to L&H. Dexia's investigation of relevant facts in this litigation is ongoing and Dexia reserves the right to amend its answer to this interrogatory.

In connection with the $430 million consortium credit facility in April 2000, Artesia received a total $2,896,031.42 in interest and fees from L&H.

(h)    Lernout & Hauspie Investment Company

In connection with a $25 million Revolving Advance granted to LHIC as part of a December 1998 $55 million multicurrency credit facility, Artesia received an equity kicker equaling 10% of the positive difference between:

(1) the average closing stock price of one share of common stock of LHSP over the following five trading days on the NASDAQ: two trading days preceding the repayment date of the Revolving Advance, the trading date coinciding with the repayment date of the Revolving Advance and two trading days following the repayment date of the Revolving Advance; and

NYA 810834.1

(2) the average closing stock price of one share of common stock of LHSP over the

following five trading days on the NASDAQ: two trading days preceding the Advance

Date of the Revolving Advance, the trading date coinciding with the Advance Date of the

Revolving Advance and two trading days following the Advance Date of the Revolving

Advance,

multiplied by 1,250,000 with a maximum of $750,000.

    (i)    <u>Lernout & Hauspie Holding Company, Inc.</u>

Dexia did not receive any consideration from L&H or any officer or director of L&H in

connection with services to Lernout & Hauspie Holding Company, Inc.

    (j)    <u>FLV Fund</u>

After a reasonable investigation, Dexia has been unable to determine whether it received

any consideration from L&H or any officer or director of L&H in connection with relevant

services to FLV Fund.  Dexia's investigation of relevant facts in this litigation is ongoing and

Dexia reserves the right to amend its answer to this interrogatory.

    (k)    <u>SAIL</u>

Dexia did not receive any consideration from L&H or any officer or director of L&H in

connection with services to SAIL.

    (l)    <u>Peer Van Driesten</u>

Dexia did not receive any consideration from L&H or any officer or director of L&H in

connection with services to Peer Van Driesten.

    (m)    <u>Jo Lernout</u>

Dexia did not receive any consideration from L&H or any officer or director of L&H in

connection with services to Jo Lernout.

NYA 810834.1

     (n)    <u>Pol Hauspie</u>

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services to Pol Hauspie.

     (o)    <u>Nico Willaert</u>

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services to Nico Willaert.

     (p)    <u>Gaston Bastiaens</u>

After a reasonable investigation Dexia has been unable to determine whether it received any consideration from L&H or any officer or director of L&H in connection with relevant services to Gaston Bastiaens. Dexia's investigation of the facts in this litigation is ongoing and Dexia reserves the right to amend its answer to this interrogatory.

     (q)    <u>Dictaphone Corp.</u>

Dexia did not receive any consideration from L&H or any officer or director of L&H in connection with services to Dictaphone Corp.

<u>Interrogatory No. 14</u>: For all loans provided to the following individuals or entities, please provide (a) the amount of the loan, (b) the term of the loan (including any extensions), (c) the interest rate and any other consideration, financial incentive or compensation provided for the loan from any source, (d) any security or guarantee of repayment provided for the loan, (e) the date of repayment of the loan or the amount currently owed to Dexia under the loan or which was written off and (f) whether any such loans were either initially granted or the due date extended pursuant to Dexia's emergency procedures and, if so, the nature of the emergency warranting use of those procedures:

Dictation Consortium, N.V.
Brussels Translation Group, N.V.
Radial Belgium, N.V.
Language Investment Company, N.V.
Language Development Fund
Document Management Partners
L&H
Lernout & Hauspie Investment Company
Lernout & Hauspie Holding Company, Inc.
FLV Fund

NYA 810834.1

SAIL
Peer Van Driesten
Jo Lernout
Pol Hauspie
Nico Willaert
Gaston Bastiaens
Dictaphone Corp.

Response to Interrogatory No. 14

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and

subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c).

Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably

calculated to lead to the discovery of admissible evidence to the extent it seeks information

concerning transactions that are not at issue in this litigation.  Dexia objects to this interrogatory

as vague and ambiguous because the meaning of the phrase "which was written off" is not clear.

Dexia objects to this interrogatory as vague and ambiguous because the meaning of the phrase

"pursuant to Dexia's emergency procedures" is not clear.  Dexia objects to this interrogatory as

unduly burdensome to the extent it seeks information that is not, upon reasonable investigation,

within the possession, custody or control of the bank.

Subject to and without waiving the foregoing objections and the General Objections,

Dexia responds to this interrogatory as follows:

(a)      Dictation Consortium, N.V.

On or about June 24, 1997, Paribas granted a $4.5 million bridge loan to Dictation

Consortium.  The initial term of this loan ended on September 30, 1997.  After a reasonable

investigation, Dexia has been unable to determine the interest rate for this loan.  Dexia's

investigation of relevant facts in this litigation is ongoing and Dexia reserves the right to amend

its answer to this interrogatory.  The bridge loan was guaranteed by the personal guarantees of

11

Lernout, Hauspie, Willaert and Cloet in the amount of $4.5 million. The loan was repaid on or about August 12, 1997. This loan was not granted pursuant to the bank's emergency procedures.

On August 12, 1997, Bacob and Paribas jointly granted a rollover credit facility of 450,000,000 BEF to Dictation Consortium. The initial term of this loan ended on June 30, 2000. Money could be withdrawn at the achievement of certain Milestones. The interest rate for the loan was BIBOR plus 1.5% on realization of Milestones E-3 and P-3, BIBOR plus 1.25% on realization of Milestones E-4 and P-4, BIBOR plus 1% on realization of Milestones E-5 and P-5, and .75% on realization of Milestones E-6 and P-6. The banks charged 0.5% of the total loan as a file cost. In June 1998, Bacob and Paribas each received warrants to purchase 200,000 shares of the Common Stock of L&H at an exercise price of $8.69 per share and warrants to purchase 66,000 of the Common Stock of L&H at an exercise price of $12.50 per share. A portion of these may have been granted as consideration for the Dictation Consortium loan. After a reasonable investigation, Dexia has been unable to determine which portion of the warrants were granted in connection with this loan. Dexia's investigation of relevant facts in this litigation is ongoing and Dexia reserves the right to amend its answer to this interrogatory. The loan was guaranteed by a supplementary surety from the Flemish Region amounting to 75% of the loan's principal amount plus interest. The loan was also secured by a pledge of the business for 50,000,000 BEF plus interest, commission and other ancillary items; power of attorney to pledge the business for 175,000,000 BEF plus interest, commission and other ancillary items; a pledge of all current and future intellectual property rights, rights and claims including those resulting from the license agreement and SDCA concluded with LHSP; a surety promise relating to all current and future property rights, rights and claims including those resulting from the license agreement and SDCA concluded with LHSP; pledge of an escrow deposit relating to the source

12

code for the Development Software and the Dictation Software; and a pledge on the claims on the Belgian state relating to the recovery of VAT and the account where recovered VAT is deposited. In May 1998, LHSP acquired Dictation Consortium and took over the loan. The loan was reimbursed sometime in May 1999. This loan was not granted pursuant to the bank's emergency procedures.

On or about December 31, 1997, Bacob and Paribas each granted an additional loan of 75,000,000 BEF to Dictation Consortium. The initial term of the loan ended on April 30, 1998. This loan was granted on the same terms as the 450,000,000 BEF loan. 74,000,000 BEF was disbursed to Dictation Consortium on December 31, 1997. This loan was not granted pursuant to the bank's emergency procedures.

    (b)    <u>Brussels Translation Group, N.V.</u>

On or about October 10, 1997, Paribas granted a rollover credit of $14 million to Brussels Translation Group. Money could be withdrawn at the achievement of certain milestones. The initial term of the loan ended on January 31, 2000. The interest rate for the loan was LIBOR plus 1% and the compensation for the non-utilization of the credit facility was calculated at 0.3% per trimester. A fee of 0.5% calculated over the total credit amount was assessed and the bank charged 5,000 BEF per year for managing the file. A guaranteed from the Brussels Capital Region was expected for 75% of the loan, but this guarantee did not materialize. The first two disbursements of the loan were personally guaranteed by Lernout, Hauspie and Willaert in the amounts of $3.15 million and $6.6 million, respectively. The loan was otherwise secured by a pledge of the business for 30 million BEF plus interest , commission and other ancillary items; an authorization to the N.V. SAGIP to establish a pledge in the bank's favor of the business concern in a principal sum of 300 million BEF plus interest, commissions and other ancillary

NYA 810834.1

items; a pledge of all debt claims that BTG has or shall have in the future at the expense of LHSP on the account of deliveries of goods and services and on account of all other commercial activities; a pledge of all claims that BTG has or shall have in the future at the expense of the Belgian State, Ministry of Finance, Administration of the tax over the added value, registration and domains, from the principal recoverable VAT claims; a pledge of the license agreement with LHSP; a pledge of a deposit "escrow" concerning the source code of the Machine Translation Software; and a pledge of property rights aspects of the copyrights connected to the source code of the Machine Translation Software of which BTG is the owner and of which BTG will be the owner. This loan was not granted pursuant to the bank's emergency procedures.

On or about December 30, 1998, the credit line to BTG was increased by $3 million. This increase in credit was personally guaranteed by Lernout, Hauspie, Willaert and Cloet. In March 1999, L&H acquired BTG and took over the loan. The loan was repaid on July 30, 1999. This loan was not granted pursuant to the bank's emergency procedures.

      (c)    <u>Radial Belgium, N.V.</u>

On or about September 29, 1998, Artesia granted a credit line of 214,980,300 BEF to Radial Belgium NV. The initial term of the loan ended on December 31, 1998. On June 17, 1999, the term of the loan was extended until June 30, 1999. On October 7, 1999, the term of the loan was extended until December 15, 1999 and the credit line was decreased to 146,350,000 BEF. The bank charged a one-time fee of 10,000 BEF for the opening of the credit and 5,000 BEF per year for managing the file. After a reasonable investigation, Dexia has been unable to determine the interest rate for this loan. Dexia's investigation of relevant facts in this litigation is ongoing and Dexia reserves the right to amend its answer to this interrogatory. The bank received 865,699 BEF in 1998 and 3,217,408 BEF in 1999 as interest on this loan. A personal

NYA 810834.1

guarantee from Lernout, Hauspie and Willaert was expected for this loan, but this guarantee did not materialize. The loan was repaid on or about January 5, 2000. This loan was granted pursuant to the bank's emergency procedures. After a reasonable investigation Dexia has been unable to determine the nature of the emergency warranting the use of those procedures. Dexia's investigation is ongoing and Dexia reserves the right to amend its answer to this interrogatory.

      (d)    <u>Language Investment Company, N.V.</u>

On December 22, 1998, Artesia granted a credit line of 220,000,000 BEF to Language Investment Company. The initial term of the loan ended on June 30, 1999. On September 30, 1999, the term of the loan was extended until December 15, 1999. The bank charged interest of 8.5% per year and a commission of 0.25% per calendar quarter. The bank also charged a onetime fee of 3,000 BEF for opening the credit line and 3,000 BEF per year in administrative costs. The loan was secured by: the irrevocable commitment not to alienate or use the business as a security without the bank's prior consent; the deposit as collateral of the registered shares of the Greek, Polish, Hungarian and Czech development companies; the deposit as collateral of 206 shares of Cardian and 51% of registered shares in the limited companies NDC Voice Eastern Europe, NDC Voice South America, and NDC Voice Middle East; the irrevocable obligation which Hacom N.V. and Joost Degroote undertook vis à vis the bank, to subordinate zero bonds in the amount of 192,000,000 BEF to the bank's claim during the total term of the present credit opening; and the jointly and severally indivisible security of Willem Hardeman in the amount of 220,000,000 BEF as a principal sum, to be increased with the interest charge, commissions, and all other complementary charges. The loan was repaid on or about January 5, 2000. This loan was not granted pursuant to the bank's emergency procedures.

NYA 810834.1

(e)    <u>Language Development Fund</u>

Dexia did not provide any loan to Language Development Fund.

(f)    <u>Document Management Partners</u>

In April 2000, N.V. Gemeentekrediet, granted a bridge loan of 15,000,000 BEF to Document Management Partners. The initial term of the loan ended on June 15, 2000. The bank charged interest of EURIBOR plus 2.50% on this loan. The bank also charged a file administration fee of 20,000 BEF. The loan was secured by a pledge of 15,000,000 BEF of L&H securities and the personal guarantee of Luc Broos in the amount of 5,000,000 BEF. In July 2000, the credit was increased to 60,000,000 BEF. At the same time, the term of the loan was extended until March 1, 2001. The loan increase was guaranteed by L&H for the amount of 1,115,520.86 EUR. On February 28, 2001, the term of the loan was extended until October 1, 2001. The bank terminated the credit facility on March 30, 2001. This loan was reimbursed on or about March 30, 2001. This loan was not granted pursuant to the bank's emergency procedures.

(g)    <u>L&H</u>

On May 2, 1996 Bacob established a 150,000,000 BEF revolving credit facility for L&H. The initial term of the loan ended on December 29, 2000. The interest rate was LIBOR plus 1%. The bank also charged a reservation commission of 1% per year and a commission of 5,000,000 BEF per year. The loan was guaranteed by a floating charge of 250,000,000 BEF, 3 years of interest, and an ancillary amount of 25,000,000 BEF. This loan was reimbursed. After a reasonable investigation Dexia has been unable to determine when this loan was reimbursed. This loan was not granted pursuant to the bank's emergency procedures.

16

In June 1997 Bacob established $8,500,000 revolving credit facility also for L&H. The initial term of the loan ended on June 25, 2000. The interest rate was LIBOR plus 2.0%. The bank also charged a 1.0% commission per year. The credit facility was guaranteed by a Euro 460 million floating charge and a mandate to take a mortgage of 30,000,000 BEF. This loan was reimbursed. After a reasonable investigation Dexia has been unable to determine when this loan was reimbursed. This loan was not granted pursuant to the bank's emergency procedures.

In July 1997 Paribas also established $8,500,000 revolving credit facility also for L&H. The initial term of the loan ended on February 28, 2001. The interest rate was LIBOR plus 2.0%. The bank charged an interest 1.0% per year for non-use of the facility and 1.0% fee on any amount repaid early. The credit facility was guaranteed by a pledge on L&H's business in the total amount of 544,250,000 BEF plus interest, commissions and other ancillary items, an additional pledge on L7H's business of 210,000,000 BEF plus interest, commissions and other ancillary items, a power of attorney to SAGIP NV to establish a mortgage to the bank benefit for 30,000,000 BEF plus interest, commissions and other ancillary items on a certain property. This loan was reimbursed. After a reasonable investigation Dexia has been unable to determine when this loan was reimbursed. This loan was not granted pursuant to the bank's emergency procedures.

In May 2000, Artesia participated in a consortium credit facility for L&H. Artesia's participation was $50,000,000. $44,000,000 was drawn down from Artesia's portion of the facility. The credit facility had two tranches. The term of loan for Tranche A ended on March 31, 2001. The term of the loan for Tranche B ended 5 years from the effective date of the loan. The bank charged interest of 1.0% per year on Tranche A. The bank charged starting interest of 1.75% on Tranche B, which was to vary based on the ratio of the Total Financial Debt to the

NYA 810834.1

Consolidated Annualized EBITDA. The bank charged a 0.25% participation fee on Tranche B. The bank also charged a commitment fee of 0.375% per year for Tranche A and a commitment fee of 0.75% per year for Tranche B. The loan was secured by Dictaphone Corporation's guarantee of the full and prompt payment and performance of L&H's obligations. The credit facility was terminated on November 27, 2000. This loan was not reimbursed. This loan was not granted pursuant to the bank's emergency procedures.

      (h)    <u>Lernout & Hauspie Investment Company</u>

On December 18, 1998, Artesia granted a multi-currency credit facility of $55,000,000 to LHIC. The initial term of the loan ended on December 31, 2003. On January 19, 2000, the loan was increased by $3,000,000 and 5,000,000 NOK until February 28, 2000. On April 10, 2000, this increase was extended until April 30, 2000. Also on April 10, 2000, the loan was increased by another $25,000,000 until July 31, 2000. The bank charged interest of LIBOR (for advances in USD), BIBOR (for advances in BEF) or EURIBOR (for advances after January 1, 1999 or in EUR) plus 1.0% from the date of signing until December 31, 1999, plus 1.5% from January 1, 2000 until December 31, 2000, and plus 2.0% from January 1, 2001 until the final maturity date. The bank charged a commitment fee of 0.5% per year from the date of signing until December 31, 1999, 0.625% from January 1, 2000 until December 31, 2000, and 0.75% from January 1, 2001 until the final maturity date. The bank also charged the following fees: $99,687.50 from the date of singing until December 31, 1999, $105,187.50 from January 1, 2000 until December 31, 2000, $111,375.00 from January 1, 2001 until December 21, 2001, $118,250.00 from January 1, 2002 until December 31, 2002, and $126,156.25 from January 1, 2003 until the final maturity date. The loan was guaranteed by a pledge on 60,924 L&H Holding shares and a pledge on the investment portfolio of LHIC. The pledge on the investment portfolio consisted of

NYA 810834.1

555,182 shares and 254,114 warrants of ViA; 183,881 Dasar Brothers shares; 3,500,000

Rapidtext shares; 635,000 Mindmaker shares; 29,326 CellPort Labs warrants; 1,800,000 shares

and 200,000 warrants of Speech Machines; 53,092, 270 Mediaring shares; 29,447 SwiftTouch-

Pumatech shares; 11,050,062 shares and 3,000,000 warrants of LanguageWare.Net; 551,979

GRIC shares; and 1,428,572 VASCO shares. The loan has not been reimbursed. This loan was

not granted pursuant to the bank's emergency procedures.

     (i)    <u>Lernout & Hauspie Holding Company, Inc.</u>

Dexia did not provide any loan to Lernout & Hauspie Holding Company, Inc.

     (j)    <u>FLV Fund</u>

Dexia did not provide any loan to the FLV Fund.

     (k)    <u>SAIL</u>

Dexia did not provide any loan to the SAIL.

     (l)    <u>Peer Van Driesten</u>

On or about March 30, 1999, Artesia granted a credit facility of $5,000,000 to Peer Van

Driesten. The initial term of the loan ended on September 30, 1999. The bank charged interest

of LIBOR plus 1.0%. The bank also charged a commission of 5,000 BEF and a file

administration fee of 5,000 BEF. On July 30, 1999, this credit facility was increased to

$7,000,000 and the term of the loan was extended until December 30, 1999. The loan was

extended again on or about August 11, 2000 until September 15, 2000. This loan has not been

reimbursed. This loan was not granted pursuant to the bank's emergency procedures.

     (m)    <u>Jo Lernout</u>

On or about June 28, 1999, Artesia loaned $20,000,000 to Lernout, Hauspie and Willaert.

The initial term of loan ended on October 10, 1999. The loan had an interest rate of LIBOR plus

3.0%. The fee for non-utilization was 1.50% per quarter. A fee of 0.125% applied to any accelerated pay-off amount. The bank charged a one-time fee of 4,500 BEF for establishing the credit and 4,500 BEF per year for managing the file. The loan was guaranteed by a share pledge of 650,000 registered LHSP shares, being a value of minimum 120% of the credit amount. The loan was repaid on or about January 5, 2000. This loan was not granted pursuant to the bank's emergency procedures.

      (n)    <u>Pol Hauspie</u>

On or about June 28, 1999, Artesia loaned $20,000,000 to Lernout, Hauspie and Willaert. The initial term of loan ended on October 10, 1999. The loan had an interest rate of LIBOR plus 3.0%. The fee for non-utilization was 1.50% per quarter. A fee of 0.125% applied to any accelerated pay-off amount. The bank charged a one-time fee of 4,500 BEF for establishing the credit and 4,500 BEF per year for managing the file. The loan was guaranteed by a share pledge of 650,000 registered LHSP shares, being a value of minimum 120% of the credit amount. The loan was repaid on or about January 5, 2000. This loan was not granted pursuant to the bank's emergency procedures.

      (o)    <u>Nico Willaert</u>

On or about June 28, 1999, Artesia loaned $20,000,000 to Lernout, Hauspie and Willaert. The initial term of loan ended on October 10, 1999. The loan had an interest rate of LIBOR plus 3.0%. The fee for non-utilization was 1.50% per quarter. A fee of 0.125% applied to any accelerated pay-off amount. The bank charged a one-time fee of 4,500 BEF for establishing the credit and 4,500 BEF per year for managing the file. The loan was guaranteed by a share pledge of 650,000 registered LHSP shares, being a value of minimum 120% of the credit amount. The

loan was repaid on or about January 5, 2000. This loan was not granted pursuant to the bank's emergency procedures.

(p)     Gaston Bastiaens

On or about August 5, 1997, Paribas loaned $5,000,000 to Gaston Bastiaens. The initial term of the loan ended on September 30, 19997. A commitment fee of 750,000 BEF was paid to the bank in connection with this loan. The loan had an interest rate of LIBOR plus 1.0% and was secured by the personal guarantees of Lernout and Hauspie and a stock pledge of 300,000 shares of Common Stock beneficially owned by Oldco, N.V. The loan was reimbursed on November 7, 1997. This loan was not granted pursuant to the bank's emergency procedures.

In July 2000, Banque Artesia Nederland granted a $25,000,000 rollover credit to Bastiaens. The initial term of the loan ended on June 30, 2002. The interest rate of the loan was LIBOR plus 3.0% (until 9/30/00), LIBOR pus 3.5% (1/10/00 until 12/31/00), LIBOR plus 4.0% (1/1/01 until 6/30/01), LIBOR plus 4.5% (7/1/01 until 12/31/01), and LIBOR plus 5.0% (1/1/02 until 6/30/02). The loan was guaranteed by a share pledge on 625,000 LHSP shares, a pledge on LHSP shares obtained from the exercise of 1,080,000 warrants, and a pledge on Bastiaens' bank account. Lernout, Hauspie and Willaert also provided supplemental guarantees. This loan has not been reimbursed. This loan was not granted pursuant to the bank's emergency procedures.

(q)     Dictaphone Corp.

Dexia did not make any loan to Dictaphone Corp.

Interrogatory No. 15: Any actual or proposed public offering of stock, public offering or sale of bonds or similar type of public financing for L&H or concerning or relating to the sale of stock of L&H which Dexia participated in as an underwriter, co-underwriter or investment broker or dealer, including the date(s) and amount(s) of any such offering, the identity of any offering circular(s) for such offering(s), and the type and amount of any compensation received by Dexia due to its participation in such offering.

NYA 810834.1

<u>Response to Interrogatory No. 15</u>

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c). Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information concerning "proposed" transactions. Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information concerning offerings in which Dexia "participated in as . . . investment broker or dealer." Dexia objects to this interrogatory as vague and ambiguous because it does not contain a verb seeking information from Dexia. To the extent Plaintiffs meant to include the verb "identify" at the beginning of this interrogatory, Dexia objects to this term because it is undefined as applied to "any actual or proposed public offering of stock, public offering or sale of bonds or similar type of public financing of L&H or concerning or relating to the sale of stock of L&H." Dexia objects to this interrogatory as vague and ambiguous because the meaning of the term "offering circular" is not clear. Dexia objects to this interrogatory as cumulative because Plaintiffs have served a Rule 30(b)(6) notice seeking the same information. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information that is not, upon reasonable investigation, within the possession, custody or control of the bank.

Subject to and notwithstanding the foregoing objections and the General Objections, Dexia states that Paribas participated as an underwriter in an offer of 2,100,000 shares of L&H common stock in September 1997. The offering was made pursuant to a prospectus filed with the SEC on September 26, 1997. Paribas received 5.5% of the price equivalent of the total number of shares underwritten by Paribas and the syndicate of underwriters offered to investors. Please see offering prospectus at DBB 064912-065090.

NYA 810834.1

Interrogatory No. 16:  Identify all consideration, including but in no way limited to any monetary compensation, stock, or ownership interest, distributions, or assets of any type received or obtained by Dexia in connection with, or as a result of, L&H's and/or Dictaphone Corp.'s bankruptcy proceedings in the United States or L&H's concordat in Belgium.

Response to Interrogatory No. 16

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c). Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence because the information requested is not relevant to any claim or defense in this litigation.  Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information that is available from public sources.

Subject to and notwithstanding the foregoing objections and the General Objections, Dexia received the following consideration, including but in no way limited to any monetary compensation, stock, or ownership interest, distributions, or assets of any type received or obtained in connection with, or as a result of, L&H's and/or Dictaphone Corp.'s bankruptcy proceedings in the United States or L&H concordat in Belgium: (1) Payment-in-Kind-Notes of Dictaphone in the following amounts: $183,485.17 (October 2004); $183,485.17 (April 2005); $2,481,348.87 (June 2005); and $672,486.04 (September 2005) for a total of $3,520,805.25, (b) 743,478 shares of Dictaphone Stock, and (3) 7.67% interest in the Dictaphone Corporation Litigation Trust.

Interrogatory No. 17:  For each of the following documents (copies of which are attached hereto), please identify the author(s), recipient(s), the date it was prepared, and the reason the document was prepared as well as how it was or is being used by Dexia:

Van Riet Deposition Exhibit 6
Van Riet Deposition Exhibit 7
Van Riet Deposition Exhibit 12
Van Riet Deposition Exhibit 16 (also marked as Piret Ex 16)
Van Riet Deposition Exhibit 17
Van Riet Deposition Exhibit 45

NYA 810834.1

Van Riet Deposition Exhibit 54

Response to Interrogatory No. 17

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c). Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks all authors and recipients of the documents. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks the exact date on which the documents were created. Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information concerning how a document "was or is being used by Dexia." Dexia objects to this interrogatory as vague and ambiguous because the meaning of the phrase "was or is being used by Dexia" is not clear. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information that is not, upon reasonable investigation, within the possession, custody or control of the bank.

Subject to and without waiving the foregoing objections and the General Objections, Dexia responds to this Interrogatory as follows:

(a)     Van Riet Deposition Exhibit 6

This documents was drafted by Jean-Paul Cloes during the preparation of an audit report in January 2001.

(b)     Van Riet Deposition Exhibit 7

This documents was drafted by Jean-Paul Cloes during the preparation of an audit in January 2001 after a meeting with Françoise Dankelman and Geert Dauwe.

NYA 810834.1

    (c)    <u>Van Riet Deposition Exhibit 12</u>

Dexia has been unable to identify the author of this document, or to obtain any further

information about it.

    (d)    <u>Van Riet Deposition Exhibit 16</u>

This document was drafted by Bernard Mommens in preparation for responding to an

inquiry by the Belgian Banking and Finance Commission in the spring of 2001.

    (e)    <u>Van Riet Deposition Exhibit 17</u>

This document was drafted by Catherine Decoutere while performing an audit of the

L&H group and was drafted sometime during the fall of 2000 or the spring of 2001.

    (f)    <u>Van Riet Deposition Exhibit 45</u>

This document was drafted by Catherine Decoutere while performing an audit of the

L&H group and was drafted sometime during the fall of 2000 or the spring of 2001.

    (g)    <u>Van Riet Deposition Exhibit 54</u>

Dexia further states that Van Riet Deposition Exhibit 54 was drafted by Bernard Lamiroy

sometime during 2003 in the course of the Bank's response to the Velstra proceeding in

Singapore.

<u>Interrogatory No. 18</u>:  Identify every credit default swap contemplated or entered into by and
between Dexia and any one or more of the following: L&H, Joe Lernout, Pol Hauspie, Nico
Willaert, Gaston Bastiens, and/or any other L&H officer or director.  For any such credit default
swap(s) state (i) whether and when it was entered into and, if not, the reason it was not entered
into; (ii) the underlying loan(s) to which the credit default swap(s) corresponds; (iii) the effective
date of the credit default swap(s) entered into; (iv) the amount of consideration to be paid
pursuant to each credit default swap entered into, when and to whom and (iv) whether any
consideration was paid, and, if so, how much and when.

<u>Response to Interrogatory No. 18</u>

    Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and

subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c).

NYA 810834.1

Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information concerning credit default swaps that were "contemplated" but not concluded. Dexia objects to this interrogatory as vague and ambiguous because the term "identify" is not defined as applied to credit default swaps. Dexia objects to this interrogatory as vague and ambiguous to the extent it asks Dexia to "state . . . the underlying loan(s) to which the credit default swap(s) corresponds." Dexia objects to this interrogatory as cumulative of information sought in Interrogatory No. 12. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information that is not, upon reasonable investigation, within the possession, custody or control of the bank.

Subject to and notwithstanding the foregoing objections and the General Objections, Dexia responds to this interrogatory as follows:

1.    Radial Credit Default Swaps

Artesia entered a credit default swap with Lernout, Hauspie and Willaert with an effective date of October 2, 1998. Dexia has been unable to determine the date this credit default swap was finalized, but believes that it was no earlier than April 1999. The reference loan for this credit default swap was the 214,980,300 BEF loan to Radial Belgium, N.V. The consideration to be paid by Artesia was 809,162 BEF. This consideration was not paid.

Artesia entered a credit default swap with Lernout, Hauspie and Willaert with an effective date of June 30, 1999. Dexia has been unable to determine the date this credit default swap was finalized, but believes that it was entered no earlier than September 1999. The reference loan for this credit default swap was the 214,980,300 BEF loan to Radial Belgium, N.V. The consideration to be paid by Artesia was 501,620 BEF. 229,909 BEF was paid to the

NYA 810834.1

account of Lernout, Hauspie and Willaert on September 15, 1999 and 271,711 BEF was paid to the same account on December 15, 1999.

2.    LIC Credit Default Swaps

Artesia entered a credit default swap with Lernout and Hauspie with an effective date of January 4, 1999. Dexia has been unable to determine the date this credit default swap was finalized, but believes that it was entered no earlier than March 1999. The reference loan for this credit default swap was the 220,000,000 BEF loan to Language Investment Company. The consideration to be paid by Artesia was 546,944 BEF. 470,555 BEF was paid to the account of Lernout and Hauspie.

Artesia entered a credit default swap with Lernout and Hauspie with an effective date of June 30, 1999. Dexia has been unable to determine the date this credit default swap was finalized, but believes that it was entered no earlier than September 1999. This reference loan for this credit default swap was the 220,000,000 BEF loan to Language Investment Company. The consideration to be paid on this swap was 513,334 BEF. 235,278 BEF was paid to the account of Lernout and Hauspie on Sept 15, 1999 and 278,056 BEF was paid to the same account on December 15, 1999.

Interrogatory No. 19: Describe the scope and nature of any due diligence performed by Dexia leading up to and in contemplation of Dexia's acquisition of Artesia, including but not limited to whether Dexia knew about Artesia's acts which Plaintiffs in this case claim constitute federal securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder, prior to the time Dexia performed any such due diligence and, if so, how, when and what Dexia learned and/or whether Dexia learned about Artesia's acts which Plaintiffs in this case claim constitute federal securities fraud under sections 10(b) and 20(a) in the course of Dexia performing any such due diligence and, if so, how, when and what Dexia learned and, if not, why Dexia did not learn about Artesia's acts which Plaintiffs in this case claim constitute federal securities fraud under sections 10(b) and 20(a) in the course of performing due diligence for the acquisition of Artesia.

NYA 810834.1

Response to Interrogatory No. 19

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c). Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information concerning due diligence that is not related to the transactions at issue in this litigation. Dexia objects to this interrogatory as vague and ambiguous because the meaning of the phrase "scope and nature" is not clear. Dexia objects to this interrogatory as vague and ambiguous because the meaning of the phrase "Dexia knew" is not clear. Dexia objects to this interrogatory as vague and ambiguous because the meaning of the phrase "Artesia's acts which Plaintiffs in this case claim constituted federal securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder" is not clear. Dexia objects to this interrogatory as vague and ambiguous to the extent it seeks information concerning "why Dexia did not learn about" something. Dexia objects to this interrogatory as vague and ambiguous to the extent it seeks information known to Dexia before Dexia performed due diligence and then asks whether Dexia learned of that information during due diligence. Dexia objects to this interrogatory as cumulative because Plaintiffs have served a Rule 30(b)(6) notice seeking the same information. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information that is not, upon reasonable investigation, within the possession, custody or control of the bank.

Subject to and notwithstanding the foregoing objections and the General Objections, Dexia responds as follows: Dexia or Artesia did not conduct any due diligence of Artesia's relationship with L&H or Artesia's loans in the speech technology sector.

NYA 810834.1

Interrogatory No. 20:  Identify all employees, agents, officers or directors of Artesia Banking Corporation, S.A. who provided any services to Artesia Securities S.A. or who otherwise functioned, as employees, agents, officers or directors of Artesia Securities, S.A.  If any such person simultaneously held positions at Artesia Banking Corporation and Artesia Securities S.A., indicate all titles or positions held at, and functions performed for, both Artesia Banking Corporation, S.A. and Artesia Securities, S.A.

Response to Interrogatory No. 20

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and

subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c).

Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably

calculated to lead to the discovery of admissible evidence to the extent it seeks information on

"all" employees and agents who provided "any services" to Artesia Securities or who functioned

as employees or agents of Artesia Securities.  Dexia objects to this interrogatory as vague and

ambiguous because the meaning of the phrase "any services" is not clear.  Dexia objects to this

interrogatory as vague and ambiguous because the meaning of the phrase "functions performed"

is not clear.  Dexia objects to this interrogatory as unduly burdensome to the extent it seeks

information that is not, upon reasonable investigation, within the possession, custody or control

of the bank.  Dexia objects to the Relevant Time Period as applied to this interrogatory as overly

broad, unduly burdensome and not reasonably calculated to lead to the disclosure of admissible

evidence.

Subject to and notwithstanding the foregoing objections and the General Objections,

Dexia responds that the following employees, officers or directors of Artesia Banking

Corporation were at some time employees, officers or directors of Artesia Securities, or members

of the management committee or any credit committee of Artesia Banking and senior managers

(one or two levels below the management committee) in the Investment Banking and Corporate

Finance Departments of Artesia Banking who provided services to, made decisions for, acted on

behalf of, other otherwise interacted with Artesia Securities in 1999 or 2000: Rene Avonts, Dirk

Bruneel, Filip De Campenaere, Stefaan Decraene, Geert Dauwe, Jacques Janssens, Claude Piret,

and Philippe Steverlynck.

Dexia also states that the following individuals simultaneously held positions at Artesia

Banking Corporation and Artesia Securities:

| Name | Artesia Banking Corporation Position | Artesia Securities Position |
|---|---|---|
| Rene Avonts | Director | Director |
| Dirk Bruneel | Director | Director |
| Stefaan Decraene | In possession of special signatory powers | Director |
| Geert Dauwe | Director | Director |
| Claude Piret | Director | Director |

Interrogatory No. 21:  Identify all communications between Dexia on the one hand and L&H on the other hand concerning any loan or extension of credit of the following:

Lernout & Hauspie Investment Company
FLV Fund
SAIL
Dictation Consortium, N.V.
Brussels Translation Group, N.V.
Radial Belgium, N.V.
Language Investment Company N.V.
Language Development Fund
Jo Lernout
Pol Hauspie
Nico Willáert
Gaston Bastiaens

Response to Interrogatory No. 21

Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and

subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c).

Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably

NYA 810834.1

calculated to lead to the discovery of admissible evidence to the extent it seeks information

concerning transactions not at issue in this litigation.  Dexia objects to this interrogatory as

unduly burdensome to the extent it seeks information concerning oral communications.  Dexia

objects to this interrogatory as unduly burdensome and cumulative to the extent it seeks

information concerning written communications because Dexia has already produced relevant

written communications to Plaintiffs.  Dexia objects to this interrogatory as unduly burdensome

to the extent it seeks information that is not, upon reasonable investigation, within the

possession, custody or control of the bank.

Interrogatory No. 22:  Identify each and every Communication between Dexia, on the one hand, and KPMG or any employee, partner, agent, attorney, or representative of KPMG, on the other hand, Concerning any of the following individuals or entities, and Identify each and every document reflecting any such Communication with the following individuals or entities:

Dictation Consortium, N.V.
Brussels Translation Group, N.V.
Radial Belgium, N.V.
Language Investment Company, N.V.
Language Development Fund
Document Management Partners
L&H
Lernout & Hauspie Investment Company
Lernout & Hauspie Holding Company, Inc.
FLV Fund
SAIL
Peer Van Driesten
Jo Lernout
Pol Hauspie
Nico Willaert
Gaston Bastiaens
Dictaphone Corp.


Response to Interrogatory No. 22

        Dexia objects to this interrogatory as exceeding the limit of 25 interrogatories and

subparts per side provided by Federal Rule of Civil Procedure 33(a) and Local Rule 26.1(c).

Dexia objects to this interrogatory as overly broad, unduly burdensome and not reasonably

NYA 810834.1

calculated to lead to the discovery of admissible evidence to the extent it seeks information concerning transactions not at issue in this litigation. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information concerning oral communications. Dexia objects to this interrogatory as unduly burdensome and cumulative to the extent it seeks information concerning written communications and documents reflecting communications because Dexia has already produced relevant written communications and documents reflecting communications to Plaintiffs. Dexia objects to this interrogatory as unduly burdensome to the extent it seeks information that is not, upon reasonable investigation, within the possession, custody or control of the bank.

Dated: November 17, 2006

CLIFFORD CHANCE US LLP

By: _____

James B. Weidner
Jeff E. Butler
31 West 52nd Street
New York, NY 10019-6131
Tel:    (212) 878-8000
Fax:    (212) 878-8375

MINTZ LEVIN COHN FERRIS GLOVSKY &
POPEO
         Peter M. Saparoff (BBO#567379)
         Breton Leone-Quick (BBO#391000)
One Financial Center
Boston, MA 02111
Tel:    (617) 542-6000
Fax:    (617) 542-2241

Counsel for Dexia Bank Belgium

NYA 810834.1

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of Dexia Bank Belgium's Second Amended Responses and Objections to Class Plaintiffs' Sixth Set of Interrogatories were served upon the following parties by e-mail and first class mail on November 17, 2006:

BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
Glen DeValerio
Jeffrey C. Block
Patrick T. Egan
One Liberty Square
Boston, MA 02109
(617) 542-8300
Fax (617) 542-1194

SHALOV, STONE & BONNER LLP
Lee S. Shalov
James Bonner
Patrick L. Rocco
485 Seventh Avenue, Suite 100
New York, NY 10018
(212) 239-4340
Fax (212) 239-4310

CAULEY BOWMAN CARNEY & WILLIAMS, PLLC
J. Allen Carney
11311 Arcade Drive, Suite 200
Little Rock, AK 72212
(501) 312-8500
Fax (501) 312-8505
*Counsel for Class Plaintiffs*

NYA 810834.1

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Max W. Berger
Steven B. Singer
Javier Bleichmar
Avi Josefson
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400
Fax (212) 554-1444
*Counsel for Plaintiffs Stonington Partners, Inc.,*
*Stonington Capital Appreciation 1994 Fund L.P.*
*and Stonington Holdings, L.L.C.*

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph
Susan M. Davies
805 Third Avenue, 31st Floor
New York, NY 10022
(212) 407-1200
Fax (212) 407-1299
*Counsel for Plaintiffs Gary B. Filler and Lawrence Perlman,*
*Trustees for the TRA Rights Trust*

BOIES, SCHILLER & FLEXNER LLP
Karen C. Dyer
George R. Coe
255 South Orange Avenue, Suite 905
Orlando, FL 32801
(407) 425-7118
Fax (407) 425-7047
*Counsel for Plaintiffs Janet Baker, James Baker, JKBaker LLC, and JMBaker LLC*

Dated:  November 17, 2006

Maryana A. Kodner

34

NYA 810834.1

# Exhibit B

# Mini Transcript and Word Index To the Deposition of

## Dirk Bruneel

## June 16, 2006

### In the case:

## Quaak et al
## Vs.
## Dexia et al

### Taken in
### Brussels, Belgium

Reporting supplied by
Anglo-American Court Reporters Ltd
London England
Tel: + 44 (0) 207 264 2088
Email: info@a-acr.com



Dirk Bruneel 16th June, 2006

**209**

1 purchase of the stock to its clients?
2     A.  You normally would have -- there is no --
3 well, there was a clear role that running the portfolio
4 of the bank was not influenced and should not influence
5 the situation of the broker. The way we monitored the
6 stock of Lernout & Hauspie in the bank had much more to
7 do with what I already mentioned a couple of times of
8 what is the overall exposure to Lernout & Hauspie
9 because if you have loans, if you have exposure to
10 companies which are depending on Lernout & Hauspie, and
11 if you have stock of Lernout & Hauspie, that all
12 determines your exposure.
13        So at some point in time, monitoring the
14 exposure can be done by selling stock.
15     Q.  I am not sure I understood you clearly, but
16 was it true that during the time period in 1999 that
17 the bank, Artesia Bank, maintained a Chinese Wall
18 between itself and Artesia Securities?
19     A.  As Artesia Securities was in Antwerp with a
20 team which was basically the whole Smeets-Verbaet team,
21 there was not a lot of contact between the two of them.
22     Q.  Right, but irrespective whether there were
23 in fact contacts, was there an effort to maintain a
24 Chinese Wall between the bank and Artesia Securities?
25     A.  Yes.

**210**

1     Q.  And was that a policy of the bank to maintain
2 that Chinese Wall?
3     A.  Even if it was not explicit, it was certainly
4 implicit.
5     Q.  Do you know, whether explicit or implicit,
6 that policy was, in fact, adhered to by the bank during
7 that time period?
8     A.  As far as I know, yes.
9     Q.  Do you know how much stock the clients of
10 Artesia Bank or any of its subsidiaries held at the
11 time of the collapse of the Lernout & Hauspie
12 share price?
13     A.  To be honest, no, I don't know.
14     Q.  Would it surprise you to learn that there
15 were over six million shares held of Lernout & Hauspie
16 stock by clients of the bank at the time of the end of
17 December 2000?
18     A.  The question is would I be astonished to hear
19 that?
20     Q.  Would you be surprised?
21     A.  Would I be surprised? It is possible.
22     Q.  Do you know whether the bank has made any
23 attempt to recoup money for its customers who lost
24 their funds on Lernout & Hauspie stock?
25     A.  Recoup money in what sense?

**211**

1     Q.  In any sense. Was there any attempt by the
2 bank to try to make those people whole?
3     A.  To make those people?
4     Q.  The people who lost money in investing in
5 Lernout & Hauspie who were clients of the bank -----
6     A.  That we would like to compensate them, is
7 that your question?
8     Q.  Yes.
9     A.  It never occurred to us.
10     Q.  The CBF, the banking Regulators in Belgium,
11 you have had some correspondence with them; am I right?
12     A.  Yes.
13     Q.  Can you remember when the first time you were
14 contacted by the CBF regarding Lernout & Hauspie?
15     A.  No, I don't remember when the first time was.
16     Q.  Do you recall generally what the first
17 inquiry from the CBF was about?
18        MR WEIDNER: Are you going in to a new area?
19        MR ROCCO: Yes, sure. You want to take a
20 break?
21        MR WEIDNER: Yes.
22        MR ROCCO: Sure, absolutely.
23        (Off the record at 3.51 p.m.)
24        (Back on the record at 4.04 p.m.)
25 BY MR ROCCO:

**212**

1     Q.  We were talking about the CBF and the
2 enquiries they made regarding Lernout & Hauspie.
3 Without looking at the various correspondence to that
4 regulatory body, do you have any recollection of what
5 they were interested in from the bank?
6     A.  I think that basically they were concerned
7 about the risk position of the bank, I suppose.
8     Q.  When you say that, you mean because the bank
9 had so many loans that were related to
10 Lernout & Hauspie, that after bankruptcy they were
11 concerned about the financial position of the bank?
12     A.  Yes.
13     Q.  Do you recall receiving a letter from the CBF
14 where they were concerned about the fact that the bank
15 had not given over certain Internal Audit Reports to
16 the CBF?
17     A.  There is no policy that requires us to
18 provide them with the Audit Reports. They just have
19 access to all the Audit Reports.
20     Q.  My question was a little different, though.
21 Do you remember that the CBF took issue with the fact
22 that the bank did not provide certain Internal
23 Audit Reports to the CBF when they made a request?
24     A.  When they made a request? I have no knowledge
25 of that.

Dirk Bruneel  16th June, 2006

**273**

1 this help you recall as to whether that was a routine
2 event?
3    A.  It looks like.
4    Q.  The document that I am directing your
5 attention to now, the Artesia Securities Minutes, if
6 you could turn to the third page of that document, it
7 is marked DBB-109700; do you see that?
8    A.  Yes.
9    Q.  Under the title "Miscellaneous", there is a
10 note about equity research; do you see that?
11    A.  "Miscellaneous", yes.
12    Q.  It reads, "This note summarizes a meeting
13 organized by G Van de Walle with Artesia Securities'
14 analysts. The Board of Directors stresses the
15 importance of avoiding any duplicate publication by our
16 two different sources and the need to coordinate the
17 efforts of Artesia Securities' analysts with those of
18 investment banking. The Board of Directors decides to
19 invite N Van Hove from Investment Banking in the weekly
20 meetings of the Artesia Securities analysts"; do you
21 see that?
22    A.  Yes.
23    Q.  Do you know whether that means that
24 Miss Van Hove attended the weekly meetings of Artesia
25 Securities' analysts?

**274**

1    A.  Does that mean that? I have the impression
2 that, in terms whenever you have an IPO coming up, and
3 we did some, that at least you need to have someone
4 from the Corporate Banking to coordinate the
5 operations. So if it would have been in that capacity,
6 there would be nothing wrong, would there.
7    Q.  It says nothing here, though, about an IPO,
8 does it?
9    A.  No, but they did it all the time.
10    Q.  What IPO was in this time frame that you
11 remember?
12    A.  I don't remember any IPO, specific names but
13 we did a series of, I believe, seven or eight IPOs in
14 that period.
15    Q.  For what companies?
16    A.  Smaller companies most of them.
17    Q.  What -- when you -- withdrawn.
18       Do you have any specific recollection as to
19 why Miss Van Hove would be attending Artesia
20 Securities' Analyst Meetings during this time frame?
21    A.  I have no knowledge of what the precise
22 reason was.
23    Q.  Before viewing this note, were you aware that
24 she was attending meetings of the analysts?
25    A.  I definitely did not recollect that.

**275**

1    Q.  You can set that aside. As a member of
2 Artesia Bank's Management Board, were you familiar with
3 the practices and procedures of Artesia Securities?
4    A.  Not in detail.
5    Q.  So you did not have any day-to-day
6 involvement with that firm?
7    A.  No, not at all.
8    Q.  Did you have any involvement with the
9 management of Artesia Securities other than Mr Avonts
10 who was present on the Management Board of the bank?
11    A.  No. I was, of course, as I just mentioned,
12 Chairman of the Board of Directors, but which looks at
13 accounts and results and the strategy of that entity.
14    Q.  Were you directly involved in setting up
15 Artesia Securities?
16    A.  No.
17    Q.  Were you familiar with the way in which
18 Artesia Securities was funded?
19    A.  Funded? It definitely took the money from the
20 bank; they didn't have any other resources.
21    Q.  Meaning that the Artesia Banking Corporation
22 funded the operations of Artesia Securities; correct?
23    A.  Yes, apart from the capital they had.
24    Q.  And do you know whether Artesia Securities
25 and Artesia Banking Corporation shared similar

**276**

1 customers?
2    A.  They had different sales teams. I don't
3 remember whether they had the same customers, which
4 is not excluded, which is not a given fact either.
5    Q.  You don't remember one way or the other
6 whether they had common customers with the bank; is
7 that correct?
8    A.  I don't know.
9    Q.  Were they located in the same building,
10 Artesia Securities and the bank?
11    A.  They were located in the WTC Tower.
12    Q.  That is the World Trade Center in Brussels?
13    A.  Brussels, yes.
14    Q.  And that is the same location the bank had an
15 office?
16    A.  The bank had an office there as well.
17    Q.  And they used the same Artesia logo as the
18 bank, correct, Artesia Securities?
19    A.  All the companies of the group used that
20 logo.
21    Q.  Did the market research arms of
22 Artesia Securities and the bank share any employees?
23    A.  The market -- they were different companies
24 so they didn't share any personnel as you can't do that
25 in Belgium.

Dirk Bruneel  16th June, 2006

PAGE 277                                      277

1    Q.  Well, Mr Avonts was an officer of both
2  companies, the bank and -----
3    A.  Yes, but he was on the Management Board.
4    Q.  Is the rule in Belgium you can have common
5  management but not common employees?
6    A.  Actually it depends on the statute. If you
7  are a manager on a Management Board of a bank, then you
8  are, at the same time, a member of the Board of
9  Directors. That gives you a different situation, so you
10 could be, at the same time, Executive and Board of
11 Directors member. That is the exception to the rule,
12 but you can't have an employee working for the two
13 companies.
14   Q.  Did the -- withdrawn.
15       The term "reference shareholder" are you
16 familiar with that term in Belgium?
17   A.  Yes.
18   Q.  What does that mean?
19   A.  That is the dominant shareholder of the
20 company.
21   Q.  And Artesia Banking Corporation was the
22 reference shareholder for Artesia Securities; correct?
23   A.  Yes.
24   Q.  Do you know whether the Artesia Securities
25 entity and Artesia Banking Corporation shared email

PAGE 278                                      278

1  servers?
2    A.  That is a detail I don't know.
3    Q.  Do you know whether Artesia Banking
4  Corporation had Credit Committees that made investment
5  decisions for Artesia Securities?
6    A.  Had Credit Committees that held
7  investment -----
8    Q.  That made investment decisions for -----
9    A.  Made investment decisions.
10   Q.  ----- Artesia Securities?
11   A.  I have no recollection of that. But typically
12 Artesia Securities, I don't see when they would need
13 capital because brokerage customers, they don't need
14 any capital to do that. You don't need any loans or any
15 credit decisions to do that.
16   Q.  Do you know whether Artesia Securities took
17 positions for their own account in securities or other
18 investments?
19   A.  Yes.
20   Q.  And do you know with respect to the
21 investments that Artesia Securities made for those type
22 of investments, whether Artesia Banking Corporation had
23 a committee that made the final decision on such
24 investments?
25   A.  No.

PAGE 279                                      279

1    Q.  You don't -----
2    A.  They did not make any final decisions on
3  that. There was a committee which was a committee which
4  was fully monitored and controlled by
5  Artesia Securities, so there is no involvement of the
6  bank.
7    Q.  Were there any decisions, to your knowledge,
8  that were controlled -- investment decisions that were
9  controlled by the bank that were made by
10 Artesia Securities?
11   A.  They would have related to the investments
12 linked to the company, except they would have needed a
13 new IT system, then they probably would have come to us.
14   Q.  Were you aware as to whether there were any
15 accounts of bank and Artesia Securities that were
16 co-mingled together, that were shared?
17   A.  That would -- well, I have no knowledge of
18 this and that is something that I don't expect to have
19 been the case.
20   Q.  It will make your lawyer very happy, if not
21 you, to say that I have no further questions at this
22 time and I thank you, Mr Bruneel, for taking the time
23 to speak with us.
24   A.  Okay.
25       (The deposition concluded at 5.54 p.m.)

PAGE 280                                      280

1              CERTIFICATE OF WITNESS
2
3   I, DIRK BRUNEEL, have read the transcript of my
4   evidence contained in pages 1 to 279 inclusive and
5   certify that it is a correct and complete transcript of
6   my testimony given on Friday, 16th June 2006 (subject
7   to any corrections as per the attached errata sheets).
8
9
10
11             Signed.................
12
13             Dirk Bruneel
14
15
16
17  Dated this...........day of.............2006
18
19
20
21
22
23
24
25

Exhibit C

# Mini Transcript and Word Index To the Deposition of

## Hans DeWeirdt

## June 14, 2006

### In the case:

## Quaak et al
## Vs.
## Dexia et al

### Taken in
### Brussels, Belgium

Reporting supplied by
Anglo-American Court Reporters Ltd
London England
Tel: + 44 (0) 207 264 2088
Email: info@a-acr.com

Hans Deweirdt 14th June, 2006



**SHEET 1    PAGE 1**

```
 1              THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4

 5     - - - - - - - - - - - - - - - - - - - )
                                            )
 6                                          )
       HANS A QUAAK, ATTILIO PO and         )
 7     KARL LEIBINGER, on behalf of themselves )
       and those similarly situated         )
 8                                          )
                    Plaintiffs    )No:      )
 9                                )03-CV-11566(PBS)
                                            )
10                                          )
                 v                          )
11     DEXIA, S.A. and DEXIA BANK BELGIUM   )
       (formerly known as ARTESIA BANKING   )
12     CORP, S.A.                           )
                                            )
13                  Defendants              )
       - - - - - - - - - - - - - - - - - - -)
14     STONINGTON PARTNERS, INC., a Delaware )
       Corporation, STONINGTON CAPITAL      )
15     APPRECIATION 1994 FUND L.P., a Delaware )
       Partnership, and STONINGTON HOLDINGS )
16     LLC., a Delaware Limited Liability    )
       Company                              )
17                                          )
                    Plaintiffs    )04-CV-10411(PBS)
18                                          )
                 v                          )
19                                          )
       DEXIA, S.A. And DEXIA BANK BELGIUM   )
20     (formerly known as ARTESIA BANKING   )
       CORP, S.A.                           )
21                  Defendants              )
22                                          )
23
24
25
```

**PAGE 3**

```
 1              A P P E A R A N C E S

 2     FOR THE STONINGTON PLAINTIFFS

 3       BERNSTEIN LITOWITZ BERGER & GROSSMANN, L.L.P.

 4       BY:  MR STEPHEN C. FOYTLIN
                (Attorney at Law)
 5
         1285 Avenue of the Americas
 6       New York, New York 10019
         U.S.A.
 7
         Telephone: (212) 554 1283
 8       Facsimile: (212) 554 1444
         Email: stephenf@blbglaw.com
 9
10     FOR DR QUAAK and MR PO and MR LEIBINGER, CLASS
       PLAINTIFFS
11
         SHALOV STONE & BONNER, L.L.P.
12
         BY:  MR PATRICK ROCCO
13
         485 Seventh Avenue
14       Suite 1000
         New York, New York 10018
15       U.S.A.

16       Telephone: (212) 239 4340
         Facsimile: (212) 239 4310
17       Email: procco@lawssb.com

18
19     FOR MR FILLER and MR PERLMAN, PLAINTIFFS

20       GREGORY P. JOSEPH LAW OFFICES, L.L.C.

21       BY:  MS SUSAN M. DAVIES

22       805 Third Avenue, 31st Floor
         New York, New York 10022
23       U.S.A.

24       Telephone: (212) 407 1208
         Facsimile: (212) 407 1274
25       Email: sdavies@josephnyc.com
```



**PAGE 2**

```
 1     - - - - - - - - - - - - - - - - - - - )
 2     GARY B FILLER and LAWRENCE PERLMAN,  )
       trustees of the TRA Rights Trust     )
 3                    Plaintiffs             )
 4                                           )
 5                 v                         )
       DEXIA, S.A. and DEXIA BANK BELGIUM    )
 6     (formerly known as ARTESIA BANKING    )
       CORP, S.A.                            )
 7                                           )
                    Defendants               )
 8     - - - - - - - - - - - - - - - - - - - )
       JANET BAKER and JAMES BAKER JK BAKER  )
 9     LLC., and JM BAKER LLC.               )
10                                           )
11                  Plaintiffs               )
12                 v                         )
       DEXIA S.A. and DEXIA BANK BELGIUM     )
13     (formerly known as ARTESIA BANKING    )
       CORP., S.A.                           )
14                  Defendants.              )
15     - - - - - - - - - - - - - - - - - - - )
16
17
       Deposition of MR HANS DEWEIRDT
18     held at the office of Dal & Veldekens,
       Rue de l'Aurore/Dageraadstraat 18
19     Brussels, Belgium at 10.35 a.m.
       on Wednesday, 14th June 2006
20     before Leah Willersdorf, ABIVR
21
22
23
24
25
```

**PAGE 4**

```
 1              A P P E A R A N C E S (continued)

 2     FOR THE DEFENDANTS

 3       CLIFFORD CHANCE

 4       BY:  MR JAMES B. WEIDNER
                MR JEFF E. BUTLER
 5
         31 West 52nd Street
 6       New York, NY 10019-6131
         U.S.A.
 7
         Telephone: (212) 878 8235
 8       Facsimile: (212) 878 8375
         Emails: james.weidner@cliffordchance.com
 9               jeff.butler@cliffordchance.com

10       CLIFFORD CHANCE (BELGIUM)

11       BENOIT ALLEMEERSCH
         KLAAS THIBAUT
12
         Avenue Louise 65, Box 2
13       1050 Brussels
         Belgium
14
         Telephone: +32 (0)2 533 59 11
15       Facsimile: +32 (0)2 533 59 59
         Emails: benoit.allemeersch@cliffordchance.com
16               klaas.thibaut@cliffordchance.com

17     THE INTERPRETER
18
         JACQUES SABBE
19
         Kluisstraat 7
20       9050 Gentbrugge
         Belgium
21
         Telephone: +32 (0)9 232 35 13
22       Email: info@as-you-like-it.be
23
24
25
```

Hans Deweirdt 14th June, 2006

---

PAGE 77

77

1 formal. Lernout & Hauspie, there was only one problem;
2 it was a financial crash for the bank. We had a huge
3 amount of loans outstanding and the risk was that only
4 a little part of it should be recovered.
5        I have discussed with Mrs Decamps that the
6 amount of provisions -- in reality, it is -- (through
7 the interpreter) There is a distinction to be made
8 between what are called provisions and what are called
9 "waardevermindering".
10       THE INTERPRETER: Which is, literally
11 translated as "value reductions", so losses really.
12       THE WITNESS: Impairments. Impairments?
13       THE INTERPRETER: Impairments, yes. That is a
14 good term.
15       THE WITNESS: And if there are not provisions
16 for loans so you have to discuss about impairments and
17 we have discussed to see that the amount that could not
18 be recovered was correctly estimated and was translated
19 in the fair price for Artesia. But there was no
20 indication of other incident, other problems. Nobody
21 was aware and I believe that people have spoken very
22 honestly towards me.
23 BY MS DAVIES:
24    Q.  Mr Piret participated in the due diligence
25 process?

---

PAGE 78

78

1    A.  He was a member of the Management Committee
2 of Artesia.
3    Q.  Artesia.
4    A.  I have not visited all the people of the
5 Management Committee. I have spoken to the people who
6 were, at that moment, in function in the bank.
7    Q.  I am sorry. The other person whose name you
8 mentioned, could you spell that name for us, please?
9    A.  Onclin.
10       THE INTERPRETER: Onclin which we had.
11       THE WITNESS: I have already.
12       MS DAVIES: Okay. O-N-C-L-I-N.
13       THE INTERPRETER that is right.
14       THE WITNESS: Former President of the bank.
15 BY MS DAVIES:
16    Q.  Okay. Did you speak with Mr Bruneel?
17    A.  No, because Mr Bruneel was not in Dexia Bank
18 I think at that moment but in Dexia Group and that
19 is not my authority to speak with him.
20    Q.  Was Dexia Group involved in the acquisition
21 process for Artesia?
22    A.  Of course.
23    Q.  Was Mr Bruneel involved in the acquisition
24 process?
25    A.  Of course. He was President of Artesia.

---

PAGE 79

79

1       (Deweirdt Exhibit 4 marked)
2    Q.  Have you seen this document before?
3    A.  I suppose, because it is addressed and copied
4 to me.
5    Q.  Okay. This is a one-page document and it is
6 Bates-numbered DBB-144268. Do you recognize the
7 handwriting on this document?
8    A.  No. No. It is possibly the handwriting of one
9 of the people, one of my auditors but I don't know
10 their handwriting.
11    Q.  This email is from Mr Dierckx?
12    A.  Dierckx, yes.
13    Q.  It sets forth a division of responsibilities
14 for the L&H file. Is this a division of
15 responsibilities among the people within
16 Audit & Control?
17    A.  Frank Dierckx gives here his instruction to
18 his different subordinates, what each of them has to do
19 in the coming weeks.
20    Q.  It says that this is the division of
21 responsibilities until the "middle of August." What was
22 the significance of the middle of August?
23    A.  Because we are here in July and it is towards
24 such an inquiry. It is normal that we get instructions
25 for two weeks and that we cannot say what people shall

---

PAGE 80

80

1 do in September.
2    Q.  Okay. Do you have an understanding, in the
3 assignment given to Marie-France, the second paragraph
4 says, "Strategy FO market room with regard to
5 transactions in the LHSP share portfolio. Potential
6 links in applied strategy between ABC (Artesia Banking
7 Corporation) and Securities." Does that mean
8 Artesia Securities?
9    A.  I suppose so. I am not sure. I think so, yes.
10 ABC Securities, I think so, yes.
11    Q.  Can you explain to me what you understand,
12 from these two sentences, what was Marie-France
13 investigating here?
14    A.  She had to look if there existed specific
15 instructions towards transactions for the stock
16 Lernout, to see if front office received instructions
17 to deal in portfolio of Lernout & Hauspie and on which
18 moment to see if there was a strategy established
19 towards those transactions.
20    Q.  Was Marie-France able to determine whether
21 there was a strategy?
22    A.  Certainly, yes. Of course.
23    Q.  Can you tell me what the result of your
24 investigation was?
25    A.  There was no strategy. By "strategy", I mean

---

Hans Deweirdt 14th June, 2006

81

1 a formal set of instructions to do this or to do this
2 with Lernout & Hauspie actions, when this or that
3 occurs, (through the interpreter) "actions" meaning
4 shares. (In person) Actions meaning shares.
5     Q.   In the written notes, do you know how
6 Marie-France was able to determine there was no such
7 strategy?
8     A.   She was able to determine because existence
9 of such a strategy was not a technical issue, but a
10 question of to integrate responsible people from -----
11    Q.   The market room.
12         THE INTERPRETER: The market room, yes. That's
13 right. Yes.
14         THE WITNESS: The market room, to see if they
15 had documentation about it and if they -- because it is
16 an instruction of the responsibility of market room, to
17 his dealers to say you have to do this and this when
18 this occurs.
19         So it was an easy interrogation for an
20 auditor to see if there were instructions on it.
21 BY MS DAVIES:
22    Q.   Did she investigate whether there were any
23 unwritten instructions?
24    A.   Of course because it is part of the normal
25 work of an internal auditor to interrogate all the

PAGE 82

82

1 people and the dealers to hear if they had
2 instructions, written or not written. Of course.
3     Q.   Who did she interview?
4     A.   I don't know. I don't know. You should ask to
5 her.
6     Q.   Did she keep any notes or records of her
7 interviews?
8     A.   I don't know.
9     Q.   Is it part of normal audit procedure to keep
10 notes or memos of interviews?
11    A.   Yes.
12         MS DAVIES: Counsel, have those documents been
13 turned over to us?
14         MR WEIDNER: I don't know whether there are
15 any at all, so I really can't answer the question.
16         MS DAVIES: I don't believe that we have seen
17 any documents like that.
18         MR WEIDNER: There may not be but I just can't
19 answer your question.
20 BY MS DAVIES:
21    Q.   When the Audit & Control group turned over
22 all their files about Lernout & Hauspie to the
23 Legal Department, would Marie-France have turned over
24 her notes of interviews to the Legal Department?
25    A.   If there were any notes, I suppose so because

PAGE 83

83

1 all the documents that were relevant for the activities
2 of Audit were in the hands of Frank Dierckx,
3 responsible for the organization of that, and he has
4 given the entirety of his archive to Legal, yes. So if
5 there were notes, they were in the files in the
6 possession of my associate, Frank Dierckx.
7     Q.   In the handwritten section of this document,
8 the point number one appears to say, "Obtain
9 certainty/guarantee for the graphical diagram".
10    A.   Mmm-hmm.
11    Q.   And then "Did no TFT occur to and from A/S."
12 Do you have any understanding of what TFT stands for?
13    A.   Transfer. "TFT" I think is transfer.
14    Q.   Transfer?
15    A.   Transfer. I think. I think transfer, that is
16 true. Transfers to and from A/S, yes.
17    Q.   A/S, Artesia Securities?
18    A.   It is not my writing, I don't know but
19 I suppose that it is Artesia Securities, yes.
20    Q.   At point number three, it says, "Why trading
21 activities, August 9 of 2000."
22    A.   Mmm-hmm.
23    Q.   Do you have any understanding that there was
24 an issue about trading activities on that date?
25    A.   It is a question, I suppose, from one of the

PAGE 84

84

1 auditors to further examine the trading activities in
2 that period, that they had to do it again or do it, to
3 start doing it, I don't know. These are instructions
4 pending the inquiry.
5     Q.   But do you understand why there would be
6 instructions about trading on August 9, 2000?
7     A.   No.
8         (Deweirdt Exhibit 5 marked)
9     Q.   For the record, Deweirdt Exhibit 5 is a
10 three-page document, Bates-stamped DBB-130479 through
11 DBB-130481. Have you seen this document before?
12    A.   Mmm-hmm. It is a note from
13 Marie-France Van Caillie to me.
14    Q.   Did you receive this note on or around
15 August 18, 2003?
16    A.   Probably, yes.
17    Q.   Does this note describe the status of the
18 work of the Audit & Control group on the
19 Lernout & Hauspie investigation?
20    A.   Yes. It is intermediary stages of -- (through
21 the interpreter) progress report. (In person) Progress
22 report, yes.
23         THE INTERPRETER: Yes.
24 BY MS DAVIES:
25    Q.   On the first page under the heading No. 1,